# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| WHITMAN-WALKER CLINIC, Inc. d/b/a WHITMAN-WALKER HEALTH 1377 R Street NW Washington, DC 20009; | ) ) ) ) ) | Case No. |

WHITMAN-WALKER CLINIC, Inc. d/b/a
WHITMAN-WALKER HEALTH
1377 R Street NW
Washington, DC 20009;          ) Case No.

THE TRANSLATIN@ COALITION          ) **COMPLAINT FOR DECLARATORY**
3055 Wilshire Boulevard, Suite 350          ) **AND INJUNCTIVE RELIEF**
Los Angeles, CA 90010;

LOS ANGELES LGBT CENTER
1625 Schrader Boulevard
Los Angeles, CA 90028;

BRADBURY-SULLIVAN LGBT
COMMUNITY CENTER
522 West Maple Street
at Bayard Rustin Way
Allentown, PA 18101;

AMERICAN ASSOCIATION OF PHYSICIANS
FOR HUMAN RIGHTS, INC. d/b/a GLMA:
HEALTH PROFESSIONALS ADVANCING
LGBTQ EQUALITY
1133 19th Street NW, Suite 302
Washington, DC 20036;

AGLP: THE ASSOCIATION OF LGBTQ
PSYCHIATRISTS
4514 Chester Avenue
Philadelphia, PA 19143;

SARAH HENN, MD, MPH
c/o Steptoe & Johnson LLP
1330 Connecticut Avenue NW
Washington, DC  20036;

RANDY PUMPHREY, D.MIN, LCC, BCC
c/o Steptoe & Johnson LLP
1330 Connecticut Avenue NW
Washington, DC  20036;

ROBERT BOLAN, MD )
c/o Steptoe & Johnson LLP )
1330 Connecticut Avenue NW )
Washington, DC  20036; and )
)
WARD CARPENTER, MD )
c/o Steptoe & Johnson LLP )
1330 Connecticut Avenue NW )
Washington, DC  20036, )
)
                *Plaintiffs*, )
)
      v. )
)
U.S. DEPARTMENT OF HEALTH AND )
HUMAN SERVICES )
200 Independence Avenue SW )
Washington, D.C. 20201; )
)
ALEX M. AZAR II, in his official capacity as )
Secretary of U.S. Department of Health and )
Human Services, )
200 Independence Avenue SW )
Washington, D.C. 20201; )
)
ROGER SEVERINO, in his official capacity as )
Director, Office for Civil Rights, U.S. )
Department of Health and Human Services, )
200 Independence Avenue, SW )
Room 509F, HHH Building )
Washington, D.C. 20201; and )
)
SEEMA VERMA, in her official capacity as )
Administrator for the Centers for Medicare and )
Medicaid Services, U.S. Department of Health )
and Human Services, )
7500 Security Boulevard, )
Baltimore, MD 21244, )
)
                *Defendants*. )
)

## INTRODUCTION

1.      A person's access to health care should not be contingent on their sex, gender identity, transgender status, sexual orientation, race, national origin, age, disability, or religion. When people go to a doctor's office, hospital, or an emergency room seeking treatment, they expect and are entitled to receive care appropriate to meet their health needs without regard to who they are or the type of health care they seek.

2.      Yet, in the midst of a global pandemic, the Trump Administration's Department of Health and Human Services ("HHS") has sought to diminish protections from discrimination in health care because of a person's sex, gender identity, transgender status, sexual orientation, race, national origin, age, or disability.

3.      HHS has taken these actions notwithstanding and despite the decision of the Supreme Court of the United States on June 15, 2020 holding that discrimination on the basis of a person's transgender status or sexual orientation is discrimination on the basis of sex.  *See Bostock v. Clayton Cty., Ga.*, 590 U.S. ___, 2020 WL 3146686 (June 15, 2020).

4.      As of the filing of this Complaint, and in less than six months, approximately 2.25 million people in the United States have tested positive for COVID-19, resulting in approximately 120,000 deaths to date.[1]  The United States is facing a public health crisis. During these difficult times, Americans need the security and peace of mind that they will be able to access the health care they need and require.  The government should be doing everything within its capacity to protect and preserve the safe and effective delivery of health care to all patients regardless of their sex, gender identity, transgender status, sexual orientation, race,

---

[1] Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): Cases in the U.S.*, https://perma.cc/38HG-JUBB (last visited June 21, 2020).

national origin, age, or disability.  Yet, HHS is doing exactly the opposite, adopting positions

that fly in the face of its stated mission to "enhance and protect the health and well-being of all

Americans by providing for effective health and human services." [2]

5.      Recognizing the paramount importance of providing people with prompt,

effective, and nondiscriminatory access to health care, Congress has taken repeated and

concerted efforts to improve access to health care and bar discrimination within the health care

industry.

6.      Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42

U.S.C. § 18116, specifically and explicitly protects against discrimination in the provision of

health care services.  Section 1557 prohibits discrimination based on sex, race, color, national

origin, age, and disability.

7.      In 2016, HHS promulgated a final rule, developed over the course of six years and

two notice-and-comment periods, to implement the nondiscrimination requirements of Section

1557.  *See* Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376 (May 18,

2016) (formerly codified at 45 C.F.R. pt. 92) (the "2016 Final Rule").  Consistent with Section

1557's nondiscrimination mandate, the 2016 Final Rule made clear that health care providers and

insurers may not discriminate against lesbian, gay, bisexual, transgender, and queer ("LGBTQ")

people in making medical and coverage decisions.  Doing so constitutes discrimination on the

basis of sex, which the 2016 Final Rule specifically defined to include discrimination on the

basis of gender identity and sex stereotyping, among other criteria.

---

[2] U.S. Dep't of Health & Human Servs., *About HHS*, HHS.GOV, https://perma.cc/CY5N-RBPH.

8.      The 2016 Final Rule also included specific guidance about how Section 1557's sex discrimination prohibition applies to transgender people, including access to and coverage of gender-affirming health services.

9.      In addition, the 2016 Final Rule confirmed, based on the plain statutory language of Section 1557, that all enforcement mechanisms available under the statutes listed in Section 1557 are available to any person regardless of the person's protected characteristic, establishing a unitary legal standard for all violations of the statute.  It also confirmed that Section 1557 prohibits not only intentional discrimination, but conduct and practices that have the effect of subjecting individuals to discrimination on the basis of their sex.

10.      Since the 2016 Final Rule went into effect, it has led to a dramatic decrease in discriminatory policies and practices.[3]

11.      Now, however, with next-to-no legal, medical, or reasoned policy foundation, and contrary to the opinions of professional medical and public health organizations,[4] HHS has issued a revised regulation under Section 1557 (the "Revised Rule") that rolls back the 2016 Final Rule and limits the protections for LGBTQ people, among others.  *See* Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg.

---

[3] *See, e.g.*, Sharita Gruberg and Frank J. Bewkes, *The ACA's LGBTQ Nondiscrimination Regulations Prove Crucial*, Center for American Progress (Mar. 7, 2018), https://perma.cc/CTP2-UMEJ.

[4] *See, e.g.*, Letter from James L. Madara, MD, Exec. Vice President/CEO, American Medical Association, to The Hon. Alex M. Azar II, Sec'y, U.S. Dep't Health & Hum. Servs. (Aug. 13, 2019), https://perma.cc/9N7N-JJ3G; Letter from Saul Levin, MD, MPA, FRCP-E, CEO & Med. Dir., American Psychiatric Association, to Sec'y Alex Azar II, U.S. Dep't Health & Hum. Servs. (Aug. 9, 2019), https://perma.cc/YUG9-E6SW; Letter from Katherine B. McGuire, Chief Advocacy Officer, American Psychological Association, to U.S. Dep't Health & Hum. Servs. (Aug. 13, 2019), https://perma.cc/LE65-6Q63.

37,160 (June 19, 2020) (to be codified at 42 C.F.R. pts. 438, 440, & 460 and 45 C.F.R. pts. 86, 92, 147, 155, & 156).

12.     Although the Revised Rule cannot change the law, it is part of the Trump Administration's concerted and aggressive effort to undermine protections for LGBTQ people, including Section 1557's nondiscrimination protections and the regulatory structure and administrative processes the 2016 Final Rule established.  Multiple provisions in the Revised Rule threaten to confuse and mislead patients, health care providers, and insurers and will result in increased discrimination and substantial harm to precisely those vulnerable communities that Section 1557 is intended to protect, like LGBTQ people and their families.

13.     Relying on essentially one federal district court opinion, the Revised Rule arbitrarily and capriciously repeals entirely the 2016 Final Rule's definition of discrimination on the basis of sex, which specifically included discrimination based on gender identity and sex stereotyping, as well as related provisions prohibiting discrimination against transgender individuals.  The elimination of this definition not only invites health care insurers and providers to discriminate against LGBTQ people seeking health care, but it also introduces substantial confusion among health care providers and insurers regarding their legal obligations and the right of the populations they serve to be free from sex discrimination, particularly in light of the Supreme Court's decision in *Bostock* v. *Clayton County, Georgia*, 590 U.S. __, 2020 WL 3146686, which held that discrimination based on transgender status or sexual orientation "necessarily entails discrimination based on sex."  *Id.* at *11.

14.     The Revised Rule, which HHS publicly released three days prior to the Supreme Court's ruling in *Bostock*, recognizes that "a holding by the U.S. Supreme Court on the meaning of 'on the basis of sex' under Title VII will likely have ramifications for the definition of 'on the

basis of sex' under Title IX," because "Title VII case law has often informed Title IX case law with respect to the meaning of discrimination 'on the basis of sex.'"  85 Fed. Reg. 37,168. However, undeterred from their goal to foster discrimination against LGBTQ people, HHS published the Revised Rule, without any changes, four days after the Supreme Court's decision in *Bostock*.

15.     To be clear, *Bostock*'s holding that discrimination on the basis of sexual orientation or transgender status constitutes discrimination on the basis of sex forecloses HHS's attempts to deny the full protection of Section 1557 to LGBTQ individuals and patients in health care settings.

16.      The Revised Rule also eliminates the unitary legal standard for enforcement of violations of Section 1557, replacing it with a fractured approach that will complicate and make it more difficult to bring discrimination claims under Section 1557, particularly claims of intersectional discrimination.  The Revised Rule's elimination of the explicit recognition of private rights of action and the availability of compensatory damages under Section 1557 also will confuse the public and mislead individuals into not asserting their legal rights.

17.     In addition, the Revised Rule imports broad and sweeping exemptions for discrimination based on personal religious or moral beliefs from the identified statutes in Section 1557 *and* other statutes, including the Religious Freedom Restoration Act (42 U.S.C. § 2000bb *et seq*.), which Section 1557 does not reference.  These exemptions invite individual health care providers, health care entities, and insurers across the country to opt out of treating patients, including many transgender patients, if they believe doing so would compromise their faith.

18.     These exemptions will adversely affect health care providers that serve and treat the LGBTQ community and their LGBTQ patients because (1) their individual health care

employees may decline to serve patients based on religious objections, and (2) their ability to refer patients to other providers will be impaired, as the Revised Rule would invite discrimination against their LGBTQ patients.

19.     HHS's attempt to create new religious exemptions in Section 1557 is contrary to law and endangers patients' health in the name of advancing the religious beliefs of those who are entrusted with caring for them—a result sharply at odds with HHS's stated mission to "enhance and protect the health and well-being of all Americans" and to "provid[e] for effective health and human services."[5]

20.     The Revised Rule also arbitrarily and capriciously eliminates the requirement that covered entities post notices informing individuals about nondiscrimination requirements and their rights and also cuts back the safeguards that the 2016 Final Rule implemented for patients with Limited English Proficiency ("LEP"), weakening protections for LEP patients and depriving families and individuals of adequate care.

21.     In addition, the Revised Rule limits the scope of Section 1557, cutting back on the entities subject to Section 1557.  Despite the plain language of Section 1557, the Revised Rule excludes health programs and activities that HHS funds but are not established or administered under Title I of the ACA and health insurance plans outside of Title I of the ACA that do not receive Federal financial assistance.  Not only is this action inconsistent with Section 1557, it will cause drastic reductions in protections for LGBTQ people.

22.     The Revised Rule also amends a series of unrelated regulations issued under statutes other than Section 1557 by deleting references to sexual orientation and gender identity discrimination.  HHS does not have the authority to make these changes within the rulemaking

---

[5] U.S. Dep't of Health & Human Servs., *About HHS*, HHS.GOV, https://perma.cc/CY5N-RBPH.

challenged, and these changes are not supported by any analysis or evidence.  The Revised Rule is intended only to send a message that a person's LGBTQ identity is not recognized and LGBTQ people can be subjected to discrimination.

23.     The Revised Rule's cost-benefit analysis is fatally flawed, incomplete, and unreasonable.  Specifically, HHS fails to account for the increased costs to patients, insurers, and the health care system at large stemming from discrimination against LGBTQ and other patients.

24.     The Revised Rule, if allowed to go into effect, will undermine the progress achieved so far in eradicating health care discrimination against LGBTQ people in a broad array of health care programs and entities by inviting health care insurers and providers once again to discriminate against them, while also discouraging LGBTQ people from seeking health care in the first instance.

25.     In adopting the Revised Rule, HHS acted arbitrarily and capriciously, in excess of its statutory authority, and not in accordance with the law in violation of the Administrative Procedure Act ("APA") (5 U.S.C. § 551 *et seq.*).  The Revised Rule also violates the Equal Protection Guarantee and Due Process Clause of the Fifth Amendment, and the Free Speech and Establishment Clauses of the First Amendment to the United States Constitution.

26.     The Revised Rule is causing and will continue to cause irreparable harm to LGBTQ people and health care providers.  The Revised Rule should be declared unlawful, enjoined, and vacated.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States and United States Constitution; 28 U.S.C. § 1346, as a civil action against the United States founded upon the Constitution, an Act of Congress, or an

executive regulation; and 28 U.S.C. § 1361, as an action to compel an officer or agency to perform a duty owed to plaintiffs.

28.     Jurisdiction also is proper under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.  Defendants' issuance of the Revised Rule on June 19, 2020, constitutes a final agency action that is subject to judicial review under 5 U.S.C. §§ 702, 704, and 706.

29.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

30.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), & (e)(1) because at least one plaintiff resides in this judicial district, a substantial part of the events or omissions giving rise to this action occurred in this district, and each defendant is an agency of the United States or an officer of the United States sued in their official capacity.

<b>PARTIES</b>

**A.     Plaintiffs**

31.     Plaintiffs are two private health care facilities that provide health care services to LGBTQ people and many individuals and families with LEP (Whitman-Walker Clinic, Inc. d/b/a Whitman-Walker Health and the Los Angeles LGBT Center) ("private health care provider plaintiffs"); two organizations that provide a wide range of services to the LGBTQ community, including people and families with LEP (the TransLatin@ Coalition and Bradbury-Sullivan LGBT Community Center) ("LGBTQ-services plaintiffs"); two national associations of health professionals (American Association of Physicians for Human Rights d/b/a GLMA: Health Professionals Advancing LGBTQ Equality and AGLP: The Association of LGBTQ Psychiatrists) ("health professional association plaintiffs"); and three individual physicians and

one behavioral health provider who work for the private health care provider plaintiffs

("individual provider plaintiffs").

33. The private health care provider plaintiffs (Whitman-Walker Health and the Los Angeles LGBT Center) and the individual provider plaintiffs assert claims on their own behalf and also on behalf of their patients and recipients of services, who face barriers to asserting their own claims and protecting their own interests.

33. The LGBTQ-services plaintiffs (the TransLatin@ Coalition and the Bradbury-Sullivan LGBT Community Center) assert claims on their own behalf and also on behalf of the recipients of their services who face barriers to asserting their own claims and protecting their own interests.

34. The TransLatin@ Coalition also asserts claims on behalf of its transgender and gender nonconforming members, including members who are leaders of affiliated community organizations serving Latinx transgender and gender nonconforming people.

35. The health professional association plaintiffs (GLMA and AGLP) assert claims on their own behalf and on behalf of their members and also on behalf of the LGBTQ patients whose interests they represent and the patients whom their members treat who face barriers to asserting their own claims and protecting their own interests.

36. Plaintiffs assert different but complementary interests and share the common objective of maintaining an effective, functioning health care system that protects patients' dignity and their rights to access health services.  Plaintiffs also support providing informed access to comprehensive, medically appropriate care to LGBTQ patients, including gender-affirming care for transgender persons, without discrimination based on a patient's sex, gender

identity, transgender status, or sexual orientation and in accordance with medical and ethical standards of care.

37.    Plaintiff **Whitman-Walker Clinic, Inc. d/b/a Whitman-Walker Health**, a Federally Qualified Health Center located in Washington, D.C., has a special mission to serve the LGBTQ community and persons living with HIV of every sexual orientation and gender. More than 280 medical, behavioral health and dental professionals, lawyers and paralegals, support staff and administrators provide a range of services, including medical and community health care, transgender care and services, behavioral-health services, dental-health services, legal services, insurance-navigation services, and youth and family support.  In 2019, Whitman-Walker provided health care services to 20,760 individuals.  More than 10% of those individuals identified as transgender or gender nonconforming.  Almost 45% of health care patients – and 60% of those who provided information on their sexual orientation – identified as lesbian, gay, bisexual, or otherwise non-heterosexual.  More than 9% of patients had limited English proficiency.  Whitman-Walker receives various forms of federal funding from HHS and from institutions affiliated with or funded by HHS, including but not limited to funds under the Public Health Services Act ("PHSA"), direct grants, funding under the Ryan White Comprehensive AIDS Resources Emergency Act of 1990, 42 U.S.C. § 300ff *et seq.* ("Ryan White funding"), funds under the 340B Drug Discount Program, and research grants from the Centers for Disease Control and Prevention and the National Institutes of Health, and Medicaid and Medicare reimbursements.  Whitman-Walker also receives funds from the Health Resources and Service Administration ("HRSA") and is a Federally Qualified Heath Center.  In 2019, Whitman-Walker's federally funded research contracts and grants totaled more than $7 million.  Whitman-Walker is subject to Section 1557 of the ACA and the Revised Rule.

38.     Plaintiff **Dr. Sarah Henn** is the Chief Health Officer of Whitman-Walker.  Dr. Henn oversees all health care-related services at Whitman-Walker and maintains a panel of patients for whom she provides direct care.  Whitman-Walker's patient population, including patients to whom Dr. Henn provides direct care and whose care she oversees, includes many patients who have experienced refusals of health care or who have been subjected to disapproval, disrespect, or hostility from medical providers outside of Whitman-Walker because of their actual or perceived sexual orientation, gender identity, or transgender status.  Many of Dr. Henn's patients and those whose care she oversees are, therefore, apprehensive or fearful of encountering stigma and discrimination in health care settings because of their past experiences. Such experiences will increase as a result of the Revised Rule.  In addition to overseeing medical care of patients and working with her own patients, Dr. Henn oversees Whitman-Walker's Research Department and is personally involved in a number of clinical research projects, including as the Leader of Whitman-Walker's Clinical Research Site for the AIDS Clinical Trials Group funded by the National Institutes of Health.

39.     Plaintiff **Dr. Randy Pumphrey** is Senior Director of Behavioral Health at Whitman-Walker.  As Senior Director of Behavioral Health, Dr. Pumphrey oversees Whitman-Walker's portfolio of mental-health services and substance-use-disorder-treatment services and maintains a panel of patients for whom he provides direct behavioral health care.  In 2019, Whitman-Walker provided mental-health or substance-use-disorder-treatment services to more than 1,800 patients, many of whom identify as LGBT or are living with HIV.   Many, if not most, of the patients to whom Dr. Pumphrey provides direct care and whose behavioral health care he oversees face considerable stigma and discrimination as people living with HIV, sexual or gender minorities, or people of color.  They have experienced difficulty finding therapists or

11

other mental-health or substance-use-disorder professionals who are understanding and welcoming of their sexual orientation, gender identity, or transgender status. These experiences of discrimination will increase as a result of the Revised Rule.

40. Plaintiff **The TransLatin@ Coalition** is a nationwide 501(c)(3) nonprofit membership organization that advocates for the interests of transgender and gender nonconforming individuals, particularly Latinx people, and provides direct services to the transgender community, including leadership development, educational services, and employment services. The TransLatin@ Coalition currently has a presence in Los Angeles, California; Washington, D.C.; Chicago, Illinois; New York, New York; Atlanta, Georgia; Houston, Texas; and Tucson, Arizona. The TransLatin@ Coalition has thousands of individual members across the United States, including transgender and gender nonconforming Latinx individuals who have experienced or fear discrimination based on their sex, transgender status, national origin, or LEP status in health care. This includes individual transgender and gender nonconforming Latinx members like Bamby Salcedo, who resides in California, and Arianna Lint, who resides in Florida. Ms. Salcedo and Ms. Lint have experienced discrimination in health care because of their transgender status and fear the Revised Rule will make it more likely they will encounter discrimination in health care again. The TransLatin@ Coalition's membership also includes leaders of affiliated community organizations that serve Latinx transgender and gender nonconforming people across the country, such as Arianna's Center headquartered in Florida and with offices in Puerto Rico, Community Estrella in Georgia, and the Fundación Latinoamericana de Accion Social (FLAS) in Texas. The Coalition and its members advocate for policy changes at the local, state, and federal levels, and conducts research regarding homelessness, health and health care, and employment in the transgender Latinx

community.  Through its Center for Violence Prevention & Transgender Wellness, the Coalition

also provides direct services to transgender, gender nonconforming, and intersex people in the

City of Los Angeles.  Many of the members of the Coalition and the individuals they and the

Coalition serve are immigrants, some living with HIV/AIDS.  The Coalition and its members

serve many communities in which English is not the primary language spoken and a number of

individuals in these communities are not fluent in English.

      41.     Plaintiff **Los Angeles LGBT Center** is located in Los Angeles, California.  Its

mission is to build a world in which LGBT people thrive as healthy, equal, and complete

members of society.  The LA LGBT Center offers programs, services, and advocacy spanning

four broad categories: health, social services and housing, culture and education, and leadership

and advocacy.  The LA LGBT Center has more than 750 employees and provides services to

more LGBT people than any other organization in the world, with about 500,000 client visits per

year, including LEP patients.  LA LGBT Center receives funds under the PHSA.  Approximately

80% of the LA LGBT Center's funding originates from the federal government, including but

not limited to Ryan White funding; direct funding from the Centers for Disease Control and

Prevention; discounts under the 340B Drug Discount Program; grants under section 330 of the

PHSA; grants from HRSA's Bureau of Primary Health Care under which the LA LGBT Center

is a Federally Qualified Health Center; and Medicaid and Medicare reimbursements.  The LA

LGBT Center is an entity subject to Section 1557 of the ACA and the Revised Rule.

      42.     Plaintiff **Dr. Robert Bolan** is the Chief Medical Officer of the LA LGBT Center.

He oversees the delivery of health care for over 20,000 patients who come to the LA LGBT

Center and personally treats approximately 300 patients.  More than 90% of these patients

identify as LGBT, many of them coming from different areas of California and other States to

obtain services in a safe and affirming environment.  Dr. Bolan also oversees the LA LGBT

Center's Research Department.  Dr. Bolan and the providers he supervises treat patients who

identify as transgender and who require gender-affirming treatment, including medically

necessary health care for gender dysphoria.  Many of Dr. Bolan's patients and many of the

patients of the providers he supervises at the LA LGBT Center already have experienced

traumatic and discriminatory denials of health care based on their sexual orientation, gender

identity, transgender status, or HIV status at the hands of providers outside the LA LGBT Center,

including by health care providers who have expressed religious or moral objections to treating

them.  These experiences will increase as a result of the Revised Rule.

43.     Plaintiff **Dr. Ward Carpenter** is the Co-Director of Health Services at the LA

LGBT Center.  Dr. Carpenter is a nationally recognized expert in the field of transgender

medicine.  In his role as Co-Director of Health Services, Dr. Carpenter oversees the healthcare of

more than 25,000 patients who come to the LA LGBT Center and personally treats 150 patients.

All of Dr. Carpenter's patients identify within the LGBT community and approximately 30% are

people living with HIV.  These patients come from different areas of California and other States

to obtain services in a safe and affirming environment.  Dr. Carpenter's patient population is

disproportionately low-income and experiences high rates of chronic medical conditions,

homelessness, unstable housing, and extensive trauma history.  In addition, many of Dr.

Carpenter's patients, as well as the patients of the other medical providers he supervises at the

Center, already have experienced traumatic and discriminatory denials of healthcare based on

their sexual orientation, gender identity, transgender status, or HIV status at the hands of

providers outside the LA LGBT Center, including by healthcare providers who have expressed

religious or moral objections to treating them.  These experiences will increase as a result of the Revised Rule.

44.     Plaintiff **Bradbury-Sullivan LGBT Community Center** is a 501(c)(3) nonprofit organization based in Allentown, Pennsylvania, and incorporated in Pennsylvania.  It is dedicated to securing the health and well-being of LGBTQ people of the Greater Lehigh Valley. It provides a variety of programs and services for the LGBTQ community, including HIV/STI testing, health care-enrollment events, health promotion programs for LGBTQ adults and youth, support groups, and a free legal clinic.  Bradbury-Sullivan Center also provides referrals to LGBT-welcoming health care providers.  Patrons of Bradbury-Sullivan Center often seek health care services from other health care organizations, including religiously affiliated organizations. Bradbury-Sullivan Center works with patrons who have experienced discriminatory treatment when seeking health care services from such organizations, and it advocates on behalf of those patrons by providing referrals to LGBT-welcoming agencies and providers, training agencies to provide LGBT-welcoming services, and, when necessary, communicating with agencies to inform them of their legal obligations to serve LGBT people.  Bradbury-Sullivan Center also conducts research documenting health disparities in the LGBT community and performs related community-education efforts to improve public health within the LGBT community.  Bradbury-Sullivan Center receives pass-through funding from HHS through the Assistance Programs for Chronic Disease Prevention and Control, State Public Health Approaches to Ensuring Quitline Capacity funded in part by Prevention and Public Health Fund, State Physical Activity and Nutrition, Injury Prevention and Control Research and State and Community Based Programs, National State-Based Tobacco Control Programs, Maternal and Child Health Services Block Grant, and in the past also has received Ryan White funding.

45.     Plaintiff **American Association of Physicians For Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality** (formerly known as the Gay & Lesbian Medical Association) is a 501(c)(3) nonprofit membership organization based in Washington, D.C. and incorporated in California.  GLMA is a national organization committed to ensuring health equity for lesbian, gay, bisexual, transgender, queer, and all sexual and gender minority individuals, and equality for health professionals in such communities in their work and learning environments.  To achieve this mission, GLMA utilizes the scientific expertise of its diverse multidisciplinary membership to inform and drive advocacy, education, and research. GLMA works with professional accreditation bodies and health professional associations on standards, guidelines, and policies that address LGBTQ health and protect individual patient health and public health in general.  GLMA also represents the interests of hundreds of thousands of LGBTQ health professionals and millions of LGBTQ patients and families across the United States.  GLMA's membership includes approximately 1,000 member physicians, nurses, advanced practice nurses, physician assistants, researchers and academics, behavioral health specialists, health-profession students, and other health professionals throughout the country.  Their practices represent the major health care disciplines and a wide range of health specialties, including primary care, internal medicine, family practice, psychiatry, pediatrics, obstetrics/gynecology, emergency medicine, neurology, and infectious diseases.

46.     Plaintiff **AGLP: The Association of LGBTQ Psychiatrists** is a 501(c)(3) nonprofit membership organization based in Philadelphia, Pennsylvania.  AGLP is a national organization of 450 LGBTQ+ psychiatrists that educates and advocates on LGBTQ mental-health issues.  It is the oldest association of LGBTQ+ professionals in the country.  AGLP represents the interests of its members, LGBTQ+ patients, and the patients whom AGLP

members treat in working to influence policies relevant to the LGBTQ+ community and advocating for its members' patients. AGLP's goals are to foster a fuller understanding of LGBTQ+ mental-health issues; research and advocate for the best mental healthcare for the LGBTQ community; develop resources to promote LGBTQ mental health; create a welcoming, safe, nurturing, and accepting environment for members; and provide valuable and accessible services to our members. AGLP also assists medical students and residents in their professional development; encourages and facilitates the presentation of programs and publications relevant to LGBTQ concerns at professional meetings; and serves as liaison with other minority and advocacy groups within the psychiatric community. Some of the institutions in which AGLP's members work receive various forms of federal funding directly or indirectly via federal programs. AGLP's members therefore are subject to Section 1557 of the ACA and the Revised Rule.

**B.      Defendants**

47.      Defendant **United States Department of Health and Human Services** is a cabinet department of the federal government, headquartered in the District of Columbia. HHS promulgated the Revised Rule and is responsible for its enforcement. HHS is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

48.      Defendant **Alex M. Azar, II** is the Secretary of HHS. He is sued in his official capacity. Secretary Azar is responsible for all aspects of the operation and management of HHS, including the adoption, administration, and enforcement of the Revised Rule, and with implementing and fulfilling HHS's duties under the United States Constitution and the APA.

49.      Defendant **Roger Severino** is the Director of the Office of Civil Rights ("OCR") at HHS. He is sued in his official capacity. Director Severino is responsible for all aspects of the operation and management of OCR, including the adoption, administration, and enforcement

of the Revised Rule.  As an HHS law enforcement agency, OCR is supposed to ensure equal access to health and human services by enforcing civil rights laws such as Section 1557.

50.     Defendant **Seema Verma** is the Administrator for the Centers for Medicare and Medicaid Services ("CMS"), a component of HHS.  She is sued in her official capacity. Administrator Verma is responsible for all aspects of the operation and management of CMS, including the adoption, administration, and enforcement of the Revised Rule as it pertains to regulations relating to the establishment and operation of ACA exchanges; in the marketing and design practices of health insurance issuers under the ACA; in the administration, marketing, and enrollment practices of Qualified Health Plans ("QHPs") under the ACA; in beneficiary enrollment and the promotion and delivery of services under Medicaid; and in the delivery of services under the Programs for All-Inclusive Care for the Elderly ("PACE").

## FACTUAL ALLEGATIONS

**I.      Discrimination Against Transgender People Prior to the Affordable Care Act**

51.      Before the Affordable Care Act was enacted in 2010 during the Obama Administration, HHS documented many forms of discrimination against transgender people in accessing health care services, insurance coverage, and facilities.

52.     The administrative record documents and demonstrates that, prior to the enactment of the ACA, transgender people experienced significant discrimination from entities providing health care, even for routine medical care.  HHS reported that "[f]or transgender individuals, a major barrier to receiving care is a concern over being refused medical treatment based on bias against them."  81 Fed. Reg. 31,376, 31,460.  For example, "[i]n a 2010 report, 26.7% of transgender respondents reported that they were refused needed health care.  A 2011 survey revealed that 25% of transgender individuals reported being subject to harassment in medical settings."  *Id.*

18

53.     Some entities providing insurance or health care discriminated against transgender patients by refusing to cover medically necessary treatments for gender dysphoria in accordance with accepted standards of care.  Gender dysphoria is a serious medical condition codified in the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) and International Classification of Diseases (ICD-11).  The criteria for diagnosing gender dysphoria are set forth in the DSM-V (302.85).  The World Professional Association for Transgender Health ("WPATH") publishes widely accepted standards of care for treating gender dysphoria.  Leading medical organizations and federal courts have recognized the WPATH Standards of Care as the authoritative standards of care.  The overwhelming consensus among medical experts and every major medical organization is that treatments for gender dysphoria, including surgical procedures, are effective, safe, and medically necessary when clinically indicated to alleviate gender dysphoria.

54.     Prior to the enactment of the ACA, however, insurance companies routinely excluded coverage for transition-related care based on the misguided assumption that such treatments were cosmetic and experimental.  Today, medical consensus recognizes that such exclusions have no basis in medical science.[6]

55.     Those discriminatory exclusions prevented transgender people from obtaining medically necessary treatment for gender dysphoria.  *See* 81 Fed. Reg. at 31,460.  As a result, transgender people were more likely to lack health insurance and suffer significant health disparities, including high rates of untreated mental health needs, suicide attempts, and HIV.  *Id.*

---

[6] *See* Decision No. 2576, National Coverage Determination 140.3: Transsexual Surgery at 18 (Docket No. A-13-87) (U.S. Dep't of Health & Human Servs. Appeals Bd. App. Div. 2014), https://perma.cc/3BGA-F9DH.

## II.     Section 1557 of the Affordable Care Act

56.     On March 23, 2010, Congress enacted the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), recognizing the importance of providing patients with prompt and nondiscriminatory access to medical care and to information about all treatment options.

57.     Section 1554 of the ACA provides:

> Notwithstanding any other provision of this Act, the Secretary of Health and Human Services shall not promulgate any regulation that—
>
>> (1)   creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care;
>>
>> (2)  impedes timely access to healthcare services;
>>
>> (3)  interferes with communications regarding a full range of treatment options between the patient and the provider;
>>
>> (4)  restricts the ability of healthcare providers to provide full disclosure of all relevant information to patients making healthcare decisions;
>>
>> (5)   violates the principles of informed consent and the ethical standards of healthcare professionals; or
>>
>> (6)  limits the availability of healthcare treatment for the full duration of a patient's medical needs.

42 U.S.C. § 18114.

58.     Section 1557 of the ACA protects against discrimination in the provision of health care services.  It provides, in relevant part:

> Except as otherwise provided for in this title [I] (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of Title 29 [Section 504 of the Rehabilitation Act of 1973], be excluded from participation in, be denied the

benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title [I] (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116(a).

59.     Section 1557 prohibits discrimination based on sex, including discrimination based on a patient's gender identity, transgender status, sexual orientation, and failure to conform to sex stereotypes, all of which are forms of sex discrimination.  It also prohibits discrimination on the basis of race, color, national origin, age, and disability.

60.     Section 1557 provides that "[t]he enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection."  *Id.* § 18116(a).

61.     Section 1557 further provides that the Secretary of HHS "may promulgate regulations to implement this section."  *Id.* § 18116(c).

62.     The ACA covers nearly every health care provider in the country.

### III.    The 2016 Final Rule

63.     On May 18, 2016, HHS published a final rule implementing Section 1557.  *See* Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376 (May 18, 2016) (formerly codified at 45 C.F.R. pt. 92) (the "2016 Final Rule").  A copy of the 2016 Final Rule is attached as **Exhibit 1**.

64.     In implementing Section 1557's prohibition of discrimination "on the basis of . . . sex," the 2016 Final Rule defined "on the basis of sex" to include "discrimination on the basis of

21

. . . sex stereotyping, and gender identity." 81 Fed. Reg. at 31,467 (formerly codified at 45 C.F.R. § 92.4).[7]

65.   The 2016 Final Rule defined "gender identity" as "an individual's internal sense of gender, which may be male, female, neither, or a combination of male and female, and which may be different from an individual's sex assigned at birth." *Id.* In the 2016 Final Rule, HHS emphasized that "even where it is permissible to make sex-based distinctions, individuals may not be excluded from health programs and activities for which they are otherwise eligible based on their gender identity." 81 Fed. Reg. at 31,409.

66.   The 2016 Final Rule defined "sex stereotypes" as

> stereotypical notions of masculinity or femininity, including expectations of how individuals represent or communicate their gender to others, such as behavior, clothing, hairstyles, activities, voice, mannerisms, or body characteristics. These stereotypes can include the expectation that individuals will consistently identify with only one gender and that they will act in conformity with the gender-related expressions stereotypically associated with that gender. Sex stereotypes also include gendered expectations related to the appropriate roles of a certain sex.

81 Fed. Reg. at 31,468 (formerly codified at 45 C.F.R. § 92.4).

67.   In defining "on the basis of sex" to include "discrimination on the basis of . . . sex stereotyping, and gender identity," HHS explained that "courts, including in the context of Section 1557, have recognized that sex discrimination includes discrimination based on gender

---

[7] Although OCR stated in 2016 "that current law is mixed on whether existing Federal nondiscrimination laws prohibit discrimination on the basis of sexual orientation as a part of their prohibitions on sex discrimination," 81 Fed. Reg. at 31388, the Supreme Court now has definitively answered this question by holding in *Bostock* that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." 2020 WL 3146686, at *7.

identity.  Thus, we proposed to adopt formally this well-accepted interpretation of discrimination

'on the basis of sex.'"  81 Fed. Reg. at 31,387-88.

68.     The 2016 Final Rule also prohibited discrimination based on association – that is,

it prohibited discrimination against a person on the basis of the sex, race, color, national origin,

age, or disability of "an individual with whom the individual or entity is known or believed to

have a relationship or association."  81 Fed. Reg. at 31,472 (formerly codified at 92 C.F.R.

§ 209).  HHS explained that a "prohibition on associational discrimination is consistent with

longstanding interpretations of existing antidiscrimination laws, whether the basis of

discrimination is a characteristic of the harmed individual or an individual who is associated with

the harmed individual."  81 Fed. Reg. at 31,439.  It also is consistent with the Age

Discrimination Act, which includes a specific prohibition of discrimination based on association

with an individual with a disability.  *Id.*; *see also* 42 U.S.C. § 12182(b)(1)(E); 28 C.F.R.

§ 35.130(g).

69.     The 2016 Final Rule also recognized that Section 1557 not only prohibits

intentional discrimination on the basis of sex, it also prohibits conduct and practices "that *have

the effect of subjecting individuals to discrimination* on the basis of sex," which can give rise to

disparate impact claims.  81 Fed. Reg. at 31,470 (formerly codified at 45 C.F.R.

§ 92.101(b)(3)(ii)) (emphasis added).

70.     The 2016 Final Rule applied to "every health program or activity, any part of

which receives Federal financial assistance provided or made available by the Department; every

health program or activity administered by the Department; and every health program or activity

administered by a Title I entity."  81 Fed. Reg. at 31,466 (formerly codified at 45 C.F.R.

§ 92.2(a)).  HHS estimated that the rule would "likely cover almost all licensed physicians because they accept Federal financial assistance."  81 Fed. Reg. at 31,445.

71.     With respect to health care insurance providers or employee benefits plans, the 2016 Final Rule specifically required covered entities to treat individuals consistent with their gender identity.  *See* 81 Fed. Reg. at 31,471 (formerly codified at 45 C.F.R. § 92.206).  And it prohibited covered entities from having or implementing "a categorical coverage exclusion or limitation for all health care services related to gender transition," 81 Fed. Reg. at 31,472 (formerly codified at 45 C.F.R. § 92.207(b)(4)), because such an exclusion is "discriminatory on its face," 81 Fed. Reg. at 31,456.  In adopting these provisions, HHS explained that blanket "exclusions of coverage for all care related to gender dysphoria or associated with gender transition" were "outdated and not based on current standards of care."  81 Fed. Reg. at 31,429.

72.     The "range of transition-related services" the 2016 Final Rule contemplated were "not limited to surgical treatments and may include, but [were] not limited to, services such as hormone therapy and psychotherapy, which may occur over the lifetime of the individual."  81 Fed. Reg. at 31,435-36.

73.     Consistent with the plain language of Section 1557, which provides that the "enforcement mechanisms provided for and available under such title VI, title IX, section 794, *or* such Age Discrimination Act shall apply for purposes of violations" of Section 1557, 42 U.S.C. § 18116(a) (emphasis added), the 2016 Final Rule adopted a unitary legal standard for addressing discrimination in health care and enforcing Section 1157.  The 2016 Final Rule provided:  "The enforcement mechanisms available for and provided under Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, *or* the Age Discrimination Act of 1975 shall apply for purposes of

Section 1557 as implemented by this part."  81 Fed. Reg. at 31,472 (formerly codified at 45 C.F.R. § 92.301) (emphasis added).

74.    In the preamble to the 2016 Final Rule, HHS clarified that *all* enforcement mechanisms available under the statutes listed in Section 1557 are available for purposes of Section 1557 enforcement, regardless of an individual's protected characteristic or characteristics.  Otherwise, different enforcement mechanisms and standards would apply depending on whether an individual's claim is based on her sex, race, age, or disability.  81 Fed. Reg. at 31,439-40.  HHS thus interpreted Section 1557 as "authorizing a private right of action for claims of disparate impact discrimination on the basis of any of the criteria enumerated in the legislation."  *Id.* at 31,440.

75.    The 2016 Final Rule also specifically recognized that a private right of action is available under Section 1557 and compensatory damages are available.  *See* 81 Fed. Reg. at 31,472 (formerly codified at 45 C.F.R. §§ 92.301(b), 92.302(d)).  HHS explained that its "interpretation of Section 1557 as authorizing compensatory damages is consistent with our interpretations of Title VI, Section 504, and Title IX."  81 Fed. Reg. at 31,440.

76.    The 2016 Final Rule did not incorporate Title IX's blanket religious exemption because Section 1557 "contains no religious exemption."  81 Fed. Reg. at 31,380.  In declining to import Title IX's religious exemption, HHS further explained that "Title IX and its exemption are limited in scope to educational institutions, and there are significant differences between the educational and health care contexts that warrant different approaches."  *Id.*  HHS noted that "a blanket religious exemption could result in a denial or delay in the provision of health care to individuals and in discouraging individuals from seeking necessary care, with serious and, in some cases, life threatening results."  *Id.*

77.     After a careful and deliberate analysis, HHS determined that a "more nuanced approach in the health care context" was warranted.  *Id*.  The 2016 Final Rule provided:  "Insofar as the application of any requirement under this part would violate applicable Federal statutory protections for religious freedom and conscience, such application shall not be required."  81 Fed. Reg. at 31,466 (formerly codified at 45 C.F.R. § 92.2(b)(2)).

78.     The 2016 Final Rule also included provisions to ensure that the approximately 25 million Americans who are Limited English Proficient (LEP)[8] have access to the health care they need.  The 2016 Final Rule required health care providers and other covered entities to post nondiscrimination notices and include taglines in the top 15 languages spoken throughout the state with all significant publications and communications.  *See* 81 Fed. Reg. at 31,469 (formerly codified at 45 C.F.R. § 92.8).

79.     The 2016 Final Rule also included standards that governed access to language assistance services for LEP individuals by requiring that language interpreters be "qualified" and that when covered entities video interpretation services to LEP individuals, it be real-time and high quality.  *See* 81 Fed. Reg. at 31,470-71 (formerly codified at 45 C.F.R. § 92.201).

80.     The promulgation of the 2016 Final Rule led to a decrease in discriminatory policies and practices.[9]  For example, a recent study of 37 states in the federal marketplace

---

[8] U.S. Census Bureau, *Language Spoken at Home*, American Community Survey 2018 1-Year Estimates Subject Tables, tbl. S1601 (2018), https://perma.cc/Z452-RSWR; U.S. Census Bureau, Characteristics of People by Language Spoken at Home, American Community Survey 2018 1-Year Estimates Subject Tables, tbl. S1603, https://perma.cc/R59J-HG4K.

[9] *See* Gruberg & Bewkes, *The ACA's LGBTQ Nondiscrimination Regulations Prove Crucial*, https://perma.cc/CTP2-UMEJ.

showed that, in 2019, 97% of plans did not contain blanket exclusions of transition-related care.[10]

## IV.    The Trump Administration's Proposed Revision to the 2016 Final Rule

81.    On June 14, 2019, the Trump Administration issued a Notice of Proposed Rulemaking, proposing to "make substantial revisions" to the 2016 Final Rule, including repealing certain provisions.  *See* Notice of Proposed Rulemaking, *Nondiscrimination in Health and Health Education Programs or Activities*, 84 Fed. Reg. 27,846, 27,848 (June 14, 2019) ("Proposed Rule").

82.    In an attempt to explain why it was reversing course merely three years after the 2016 Final Rule went into effect, HHS stated it was revising the implementing regulations "to better comply with the mandates of Congress, address legal concerns, relieve billions of dollars in undue regulatory burdens, further substantive compliance, reduce confusion, and clarify the scope of Section 1557 in keeping with existing civil rights statutes and regulations prohibiting discrimination on the basis of race, color, national origin, sex, age, and disability."  84 Fed. Reg. at 27,846.

83.    HHS further claimed that the 2016 Final Rule "exceeded its authority under Section 1557, adopted erroneous and inconsistent interpretations of civil rights law, caused confusion, and imposed unjustified and unnecessary costs."  *Id.* at 27,849.

84.    These purported justifications do not withstand scrutiny.

85.    HHS received nearly 200,000 comments during the public comment period.  The comments that HHS received identified and expressed concerns about many of HHS's proposed

---

[10] Out2Enroll, *Summary of Findings: 2020 Marketplace Plan Compliance with Section 1557*, https://perma.cc/WU25-C9BN.  This finding is consistent with summaries from 2017, 2018, and 2019.

revisions, including many of the same issues that form the basis of this complaint.  Commenters emphasized that the following actions, taken individually or combined, will cause immediate and irreparable harm to LGBTQ people and their families:

a. Eliminating the definition of "on the basis of sex" and the specific prohibition on discrimination on the basis of gender identity and sex stereotyping is arbitrary and capricious, not the result of reasoned decision-making, contrary to law, and invites covered health care providers and insurers to discriminate against transgender people;

b. Eliminating a unitary legal standard for enforcing violations of Section 1557 and replacing it with a fractured and complex set of procedures is contrary to the plain language of Section 1557 and Congress's intent, and will complicate and make it more difficult to bring discrimination claims, particularly claims of intersectional discrimination;

c. Incorporating sweeping religious exemptions is contrary to the statutory language of Section 1557 and will create significant burdens on patients and providers;

d. Eliminating notice requirements and critical language access provisions that ensure LEP individuals can access necessary health care is arbitrary and capricious, contrary to statutory intent, and will make it more difficult for LEP patients to understand their health care rights, communicate with doctors and other health care workers, and navigate complex insurance and medical documents with specialized terminology, and cause an increase in patients who will delay or not seek care at all;

e.      Excluding from Section 1557 health programs and activities that HHS

administers but are not established under Title I of the ACA and health

insurance plans outside of Title I of the ACA that do not receive Federal

financial assistance is inconsistent with Section 1557 and will cause

drastic reductions in protections for LGBTQ people;

f.      Eliminating gender identity and sexual orientation protections in unrelated

regulations is procedurally improper, arbitrary and capricious, and

contrary to law; and

g.      Eliminating protections relating to discrimination on the basis of

association is arbitrary and capricious and contrary to law.

## V.      The Revised Rule

86.      Despite the significant concerns raised during the comment period, HHS

published the Revised Rule in the Federal Register on June 19, 2020, making only "minor and

primarily technical corrections."  *See* Nondiscrimination in Health and Health Education

Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160, 37,161 (June 19, 2020).  A

copy of the Revised Rule is attached as **Exhibit 2** and incorporated by reference.

87.      In adopting the Revised Rule, HHS failed to address adequately many of the

serious issues commenters raised, including concerns that the proposed elimination of the

definition of "on the basis of sex," which the 2016 Final Rule defined to include gender identity

and sex stereotyping, would invite discrimination against LGBTQ people.  *See* 85 Fed. Reg. at

37,165, 37,180.

88.      Relying essentially on one federal district court opinion—*Franciscan Alliance,

Inc.* v. *Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016)—which the preamble cites more than 40

times, HHS takes the position that "the ordinary public meaning of the term 'sex' in Title IX is

29

unambiguous" and refers to a "biological binary meaning of sex," 85 Fed. Reg. at 37,178-80, and discrimination on the basis of sex under Title IX does not encompass discrimination on the basis of gender identity or sex stereotyping, 85 Fed. Reg. at 37,183-86.

89.     HHS explicitly rejected comments urging it to wait until the Supreme Court decided *Bostock* and related cases because of the potential implications for the Revised Rule. *See* 85 Fed. Reg. at 37,168.  Despite acknowledging that "a holding by the U.S. Supreme Court on the meaning of 'on the basis of sex' under Title VII will likely have ramifications for the definition of 'on the basis of sex' under Title IX," because "Title VII case law has often informed Title IX case law with respect to the meaning of discrimination 'on the basis of sex,'" *id.*, HHS stated it was sticking with the position the federal government had taken in *Bostock* and related cases that "discrimination 'on the basis of sex' in Title VII and Title IX does not encompass discrimination on the basis of sexual orientation or gender identity," *id.*

90.     HHS further asserted that even if the Supreme Court determined that the prohibition on sex discrimination in Title VII encompassed gender identity and sexual orientation, such a ruling may not fully address the implications for the health care context.  85 Fed. Reg. at 37,168.

91.     Among other revisions, the Revised Rule:

a.      Repeals the definition of "on the basis of sex" and the specific prohibition of discrimination on the basis of gender identity and sex stereotyping, *see* 85 Fed. Reg. at 37,161-62;

b.      Repeals the unitary legal standard for enforcing violations of Section 1557 and eliminates provisions recognizing a private right of action and compensatory damages, *see* 85 Fed. Reg. at 37,162;

c.  Incorporates sweeping religious exemptions, *see id.*;

d.  Repeals notice requirements and access to language provisions, *see id.*;

e.  Excludes from the scope of Section 1557 certain health programs and activities and health insurance plans, *see id.*;

f.  Repeals gender identity and sexual orientation protections in unrelated regulations, *see id.*; and

g.  Repeals provisions relating to discrimination on the basis of association, *see id*.

92.  These changes are arbitrary and capricious, not the process of reasoned decision-making, contrary to the statutory language and Congress's intent, not in accordance with law, in excess of HHS's statutory authority, and unconstitutional.

**VI.  HHS's Repeal of the Definition of "On the Basis of Sex" and Protections Against Discrimination on the Basis of Gender Identity and Sex Stereotyping Is Arbitrary and Capricious and Contrary to Law**

93.  Section 1557 prohibits sex discrimination.  In line with that prohibition, the 2016 Final Rule included a definition of "on the basis of sex" that explicitly prohibited discrimination on the basis of gender identity and sex stereotyping, among other grounds.  *See* 81 Fed. Reg. at 31,467 (formerly codified at 45 C.F.R. § 92.4).

94.  The Revised Rule repeals entirely the 2016 Final Rule's definition of discrimination "on the basis of sex," without providing a different definition.  Although HHS's Notice of Proposed Rulemaking stated HHS was declining to define the term because "of the likelihood that the Supreme Court will be addressing the issue in the near future," 84 Fed. Reg. at 27,857, HHS did not wait for the Supreme Court to decide whether discrimination on the basis of "sex" encompasses discrimination against LGBTQ people.

95.     Instead, it staked its elimination of the definition of "on the basis of sex" on the *Franciscan Alliance* decision and the government's position in the *Bostock* litigation "that discrimination 'on the basis of sex' in Title VII and Title IX does not encompass discrimination on the basis of sexual orientation or gender identity."  85 Fed. Reg. at 37,168.

96.     The Supreme Court now has conclusively rejected that position, holding "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual on the basis of sex."  *Bostock*, 2020 WL 3146686, at *7. *Bostock*'s conclusion that discrimination "on the basis of sex" encompasses claims of discrimination based on transgender status and sexual orientation affirms the validity of the substantial body of case law that formed the basis of the 2016 Final Rule.  *See* 81 Fed. Reg. at 31,387-90, 31,392.

97.     The Revised Rule's repeal of the definition of "on the basis of sex" and elimination of the protections for LGTBQ people against discrimination is contrary to law and will invite health care insurers and providers to discriminate against LGBTQ people seeking health care.  It also introduces substantial confusion among health care providers and insurers regarding their legal obligations and the right of the populations they serve to be free from discrimination, particularly in light of the Supreme Court's ruling in *Bostock*.

98.     The Revised Rule also eliminates the provisions in the 2016 Final Rule specifically requiring covered entities to treat individuals consistent with their gender identity and prohibiting covered entities from having or implementing "a categorical coverage exclusion or limitation for all health care services related to gender transition."  *Compare* 81 Fed. Reg. at 31,471-72 (formerly codified at 45 C.F.R. §§ 92.101(b)(3)-(4)), *with* 85 Fed. Reg. at 37,187-88.

99.     HHS claims this provision inappropriately interfered with the ethical and medical judgment of health professionals.  *See* 85 Fed. Reg. at 37,187-88.  However, as the 2016 Final Rule demonstrates, prohibiting the exclusion or denial of health programs or activities on the basis of an individual's LGBTQ status does not prevent medical providers from providing appropriate medical advice.

100.     The Revised Rule also eliminates the provision in the 2016 Final Rule that prohibited a covered entity from discriminating against an individual based on those with whom they are known or believed to have a relationship or to be associated.  *Compare* 81 Fed. Reg. at 31,472 (formerly codified at 45 C.F.R. § 92.209), *with* 85 Fed. Reg. at 37,199-200.  The 2016 Final Rule grounded this provision on a thorough examination of existing case law.  *See* 81 Fed. Reg. at 31,438-39.

101.     Former Section 92.209 accurately reflected current law.  HHS has provided no good reason to eliminate it.  Its decision to do so is arbitrary and capricious and contrary to the law, in violation of the APA.

**VII.    The Revised Rule's Repeal of the Unitary Standard Is Arbitrary and Capricious and Contrary to Law**

102.     Section 1557 provides:  "The enforcement mechanisms provided for and available under such title VI, title IX, section 794, *or* such Age Discrimination Act shall apply for purposes of violations of [Section 1557]."  42 U.S.C. § 18116(a) (emphasis added).  Congress's use of the disjunctive "or" indicates that the enforcement mechanisms applicable under any of the incorporated statutes are available to every claim of discrimination under Section 1557, regardless of the particular type of discrimination.

103.     During the notice-and-comment period on the 2016 Final Rule, commenters pointed to the plain language of Section 1557 and asked HHS to "clarify that all enforcement

mechanisms available under the statutes listed in Section 1557 are available to each Section 1557 plaintiff, regardless of the plaintiff's protected class.  Thus, for example, an individual could bring a race claim under the Age Act procedure and an age claim under the Title VI procedure." 81 Fed. Reg. at 31,439.

104.    As commenters emphasized, by enacting Section 1557, Congress intended to create a new health-specific, anti-discrimination cause of action subject to a singular standard regardless of a person's protected characteristic.  Otherwise, different enforcement mechanisms and standards would apply depending on whether an individual's claim is based on their sex, race, national origin, age, or disability, in which case a person who faces intersectional discrimination – that is, discrimination based on more than one ground – would have different remedies and enforcement mechanisms for the same conduct under the same law.  *Id.* at 31,439-40.

105.    In response, HHS stated:  "OCR interprets Section 1557 as authorizing a private right of action for claims of disparate impact on the basis of any of the criteria enumerated in the legislation." *Id.* at 31,440.

106.    The 2016 Final Rule specified, consistent with this interpretation, that Section 1557 not only prohibits intentional discrimination on the basis of sex, but also conduct and practices "that *have the effect of subjecting individuals to discrimination* on the basis of sex" – conduct that can give rise to disparate impact claims based on sex.  81 Fed. Reg. at 31,470 (formerly codified at 45 C.F.R. § 92.101(b)(3)(ii)) (emphasis added).

107.    The 2016 Final Rule implemented Section 1557's directives regarding enforcement by promulgating 45 C.F.R. § 92.301, which provided:  "The enforcement mechanisms available for and provided under Title VI of the Civil Rights Act of 1964, Title IX

of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, *or* the

Age Discrimination Act of 1975 shall apply for purposes of Section 1557 as interpreted by this

part."  81 Fed. Reg. at 31,472 (formerly codified at 45 C.F.R. § 92.301(a)) (emphasis added).

108.   In addition, the 2016 Final Rule specified that a private right of action is available

under Section 1557 and compensatory damages are available.  *See* 81 Fed. Reg. at 31,472

(formerly codified at 45 C.F.R. §§ 92.301(b), 92.302(d)).  HHS explained that its "interpretation

of Section 1557 as authorizing compensatory damages is consistent with our interpretations of

Title VI, Section 504, and Title IX."  81 Fed. Reg. at 31,440.

109.   Under these regulations, individuals bringing claims of intersectional

discrimination, i.e., discrimination based on multiple characteristics, would not need to litigate

their claims under different standards and different enforcement mechanisms.

110.   The Revised Rule, however, without reasoned explanation, rejects the 2016 Final

Rule's establishment of a unitary legal standard and enforcement mechanism under Section

1557, limiting the remedies available from claims of discrimination based on a characteristic

listed in Section 1557 to only those remedies available under the statute from which the

characteristic was incorporated.  HHS acknowledged commenters raised concerns about

intersectional discrimination but brushed them aside by noting that OCR accepts complaints that

allege discrimination based on more than one protected status.  85 Fed. Reg. at 37,199-200.

111.   HHS claims the 2016 Final Rule applied the enforcement mechanisms in existing

statutes "in a confusing and inconsistent manner," 85 Fed. Reg. at 37,202, and resulted in "a new

patchwork regulatory framework unique to Section 1557 covered entities," 85 Fed. Reg. at

37,162.

112.    The 2016 Final Rule accomplished precisely the opposite.  It established a consistent, unitary legal standard and enforcement mechanism as Section 1557 contemplates.  It is HHS's arbitrary and capricious elimination of a unitary standard that creates a confusing and patchwork approach, applying different remedies and enforcement mechanisms to discriminatory conduct that arises under a single statute – Section 1557.

113.    The Revised Rule also eliminates, without providing a reasoned explanation, the provisions in the 2016 Final Rule expressly recognizing a private right of action to "challenge a violation of Section 1557 or this part."  *Compare* 81 Fed. Reg. at 31,472 (formerly codified 45 C.F.R. § 92.302(d)), *with* 85 Fed. Reg. at 37,203.

114.    HHS eliminated the private right of action provision even though the existence of such a right is clear from the statutory language of Section 1557, which explicitly references and incorporates the "enforcement mechanisms" of four civil rights laws, all of which have a private right action, and even though every court that has ruled on the question has held that the statutory language of Section 1557 confers a private right of action.

115.    The Revised Rule also eliminates, without providing a reasoned explanation, § 92.301(b) of the 2016 Final Rule that recognized "[c]ompensatory damages for violations of Section 1557 are available in appropriate administrative and judicial actions brought under this rule."  81 Fed. Reg. at 31,472 (formerly codified 45 C.F.R. § 301(b)).  The only justification HHS offers is that "the Department has concluded that its enforcement of Section 1557 should conform to the Department of Justice's Title VI Manual," which states that "under applicable Federal case law, compensatory damages are generally unavailable for claims based solely on a Federal agency's disparate impact regulations."  85 Fed. Reg. at 37,202.

116.    HHS ignores entirely its own statement in the preamble to the 2016 Final Rule

that its interpretation of Section 1557 as authorizing compensatory damages was consistent with

HHS's "interpretations of Title VI, Section 504, and Title IX," as providing for compensatory

damages.  *See* 81 Fed. Reg. at 31,440.  HHS's elimination of the provision recognizing the

availability of compensatory damages also is inconsistent with controlling U.S. Supreme Court

decisions holding that damages are available under these civil rights statutes.

117.    HHS's unreasonable interpretation of Section 1557 is arbitrary, capricious, and

contrary to law in that it fails to follow the statutory language of Section 1557 and apply each of

the "enforcement mechanisms" available under each of the civil rights statutes incorporated into

Section 1557 to every claim of discrimination arising under Section 1557 regardless of the basis.

HHS's arbitrary and capricious elimination of provisions recognizing a private right of action

under Section 1557 and the availability of compensatory damages likewise is contrary to the

plain language of the statute and the law.

118.    Although HHS cannot change the law, its fracturing of the consolidated

procedures established in the 2016 Final Rule undermines Congress's intent to create a new,

health-specific anti-discrimination cause of action and will make it more difficult to bring

discrimination claims under Section 1557.  HHS's elimination of the private right of action and

compensatory damages provisions also will confuse the public and mislead some persons into

not asserting their legal rights.

## VIII.   The Revised Rule's Incorporation of Sweeping Religious Exemptions Conflicts with the Statutory Language of Section 1557 and Is Inappropriate in the Health Care Context

119.    The 2016 Final Rule included a provision stating that covered entities do not have

to comply with Section 1557 if doing so would violate applicable federal statutory protections

for religious conscience and freedom.  *See* 81 Fed. Reg. at 31,466 (formerly codified at 45

C.F.R. § 92.2(b)(2)).

120.    HHS considered incorporating Title IX's blanket religious exemptions into

Section 1557, but after careful consideration and deliberation, HHS declined to do so in the 2016

Final Rule.  81 Fed. Reg. at 31,379-80.  Title IX's religious exemption by its terms applies only

to educational institutions and programs, not health care providers or health plans.  It protects

religiously-controlled educational institutions and programs from requirements that violate their

religious tenets.  *See* 20 U.S.C. § 1681(a)(3); 34 C.F.R. § 106.12.  For example, religious schools

that believe only men can be priests, rabbis, or ministers are not required to admit women to

training programs for the priesthood, rabbinate, or ministry.

121.    In declining to import Title IX's blanket religious exemption into Section 1557,

HHS explained that Section 1557, unlike Title IX, does not include a religious exemption.  It

further explained that Title IX's blanket exemption would be inappropriate in the health care

setting because it is framed for educational institutions, which are very different from health care

settings, and those differences "warrant different approaches."  81 Fed. Reg. at 31,380.

122.    HHS noted that, unlike the educational context where individuals may select a

religious educational institution by choice, in the health care context, individuals may have

limited or no choice of providers.  *Id.*  In addition, "a blanket religious exemption could result in

a denial or delay in the provision of health care to individuals and in discouraging individuals

from seeking necessary care, with serious and, in some cases, life threatening results."  *Id.*

123.    HHS determined that a "more nuanced approach in the health care context" was

warranted.  *Id.*  As a result, the 2016 Final Rule provided:  "Insofar as the application of any

requirement under this part would violate applicable Federal statutory protections for religious

freedom and conscience, such application shall not be required."  81 Fed. Reg. at 31,466

(formerly codified at 45 C.F.R. § 92.2(b)(2)).

124.    The Revised Rule upends this nuanced and carefully considered approach by

explicitly identifying and incorporating sweeping religious exemptions from a number of

different statutes.   Not only does the Revised Rule incorporate the Title IX religious exemptions,

it also incorporates "definitions, exemptions, affirmative rights, or protections" from unrelated

statutes.  85 Fed. Reg. at 37,245 (to be codified at 45 C.F.R. § 92.6(b)).

125.    The inclusion of sweeping religious exemptions in Section 1557 is contrary to the

statutory language of Section 1557, which by its terms does not incorporate any exemptions from

Title IX or any other statute.  Section 1557 expressly incorporates the enforcement mechanisms

from four civil rights statutes, but pointedly does not incorporate the religious exemptions from

Title IX or any other statute.

126.    Religiously affiliated hospitals and health care systems occupy a large and

growing percentage of health care markets.  The Revised Rule's sweeping religious exemptions

to Section 1557's prohibitions on discrimination will invite these institutions to allow their

religious beliefs to determine patient care, contrary to medical standards and the health of an

increasing number of individuals.

127.    The Revised Rule also invites individual health care providers to deny care to

LGBTQ patients on the basis of their individual religious beliefs.  It prioritizes the protection of

individual conscience and religious freedom rights over ensuring that LGBTQ people receive the

health care to which they are entitled.  *See* 85 Fed. Reg. at 37,206.

128.    The Revised Rule's religious exemptions disproportionately harm LGBTQ

people, who often are refused health care because of their sexual orientation or gender identity.

According to a 2018 study, 8% of LGBTQ people were refused health care because of their sexual orientation, and 29% of transgender people were denied care because of their gender identity.[11]

129.   When LGBTQ people are denied care, it becomes difficult and sometimes impossible to find another provider, especially for those who live in rural areas and for transgender people.  In one recent study, 18% of LGBTQ people said it would be very difficult if not impossible to find the same type of service in another hospital.  Outside of a metropolitan area, 41% of respondents stated that, if they were denied treatment, it would be very difficult if not impossible to find the same service at a different location.[12]

130.   These religious exemptions also will frustrate the ability of organizations who provide health care to LGBTQ patients to accomplish their missions.  Individual health care providers employed by these organizations may choose to deny care to LGBTQ patients, claiming that doing so would violate their religious beliefs.  This denial of care would harm the ability of these organizations to treat their patients effectively.  These exemptions also would impair the ability of these organizations to refer their LGBTQ patients to other health care providers because they would be unsure whether these providers would invoke these exemptions to deny care to LGBTQ patients.

---

[11] Shabab Ahmed Mirza & Caitlin Rooney, *Discrimination Prevents LGBTQ People From Accessing Health Care*, Center for American Progress (Jan. 18, 2018), https://perma.cc/ZG7E-7WK8.

[12] *Id*.

IX.   **The Revised Rule's Elimination of Notices of Nondiscrimination Rights and Language Access Provisions Is Arbitrary and Capricious and Contrary to Statutory Intent**

131.   More than 25 million Americans are of LEP, meaning they speak, read, or write English less than "very well."[13]   An estimated 6.5 million LEP adults are uninsured.[14]

132.   The 2016 Final Rule contained a number of provisions to ensure that LEP patients understand their rights and are able to communicate fully and effectively with their providers and other health care staff.   The 2016 Final Rule required covered entities to provide notice of nondiscrimination policies, including notice of availability of and how to access language assistance services.   81 Fed. Reg. at 31,469 (formerly codified at 45 C.F.R. § 92.8(a)).

133.   In addition, covered entities were required to include taglines on all significant documents in the top fifteen languages spoken by individuals with LEP in their state.   81 Fed. Reg. at 31,469 (formerly codified at 45 C.F.R. § 92.8(d)(1)).   Taglines are short statements that inform individuals of their right to language assistance and how to seek such assistance.

134.   The 2016 Final Rule also required that a covered entity with at least 15 employees designate a specific individual or individuals with responsibility to oversee compliance with Section 1557, including LEP efforts, and investigate complaints and concerns and establish and adhere to a specific grievance procedure.   81 Fed. Reg. at 31,469 (formerly codified at 45 C.F.R. § 92.7).

---

[13] *See* U.S. Census Bureau, *Language Spoken at Home*, American Community Survey 2018 1-Year Estimates Subject Tables, tbl. S1601 (2018), https://perma.cc/Z452-RSWR; U.S. Census Bureau, *Characteristics of People by Language Spoken at Home*, American Community Survey 2018 1-Year Estimates Subject Tables, tbl. S1603, https://perma.cc/R59J-HG4K.

[14] *See* Letter from Kathy Ko Chin, President & CEO, Asian & Pacific Islander American Health Forum, to Roger Severino, Dir., Office of Civil Rights, U.S. Dep't Health & Hum. Servs., at 21 (Aug. 13, 2019), https://perma.cc/6HWW-6833.

135.    The Revised Rule repeals §§ 92.7 and 92.8 of the 2016 Final Rule, eliminating the notice and tagline requirements and the requirement to designate a specific individual to oversee Section 1557 compliance, including LEP efforts, and grievance procedure requirements.  *See* 85 Fed. Reg. at 37,204.

136.    The elimination of the notice, tagline, and LEP requirements is arbitrary and capricious and will result in some LEP patients failing to understand or assert their rights.  It also will result in some LEP patients failing to receive adequate care because of the difficulties patients may have in understanding their providers or other staff, undermining the purpose and intent of the nondiscrimination provisions of Section 1557.

137.    HHS has not explained how individuals will know about their rights and how elimination of notices will not deny LEP individuals meaningful access to health care.

**X.    The Revised Rule's Attempt to Narrow paduthe Scope of Health Programs and Activities Subject to Section 1557 is Arbitrary and Capricious and Contrary to Law**

138.    The plain language of Section 1557 prohibits discrimination based on sex, race, color, national origin, age, and disability under:

> any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under [Title I of the ACA] (or amendments).

42 U.S.C. § 18116(a).

139.    The 2016 Final Rule correctly interpreted Section 1557 to cover all health-related operations and programs of any health care or health insurance provider, if any part of its operations receives Federal financial assistance; any other health program or activity that HHS administers; or any health insurance exchange or other entity established under ACA Title I or health insurance-exchange-related insurance plan.

140.     The Revised Rule attempts to limit the scope of Section 1557 in two principal ways.  First, it applies Section 1557's nondiscrimination protections only to health programs or activities of HHS that are administered under Title I of the ACA, not to other health programs and activities that HHS administers.  85 Fed. Reg. at 37,244 (to be codified at 45 C.F.R. § 92.3(a)(2)).  Such a limitation excludes from Section 1557 numerous HHS health programs and activities, including health programs and activities of the Centers for Medicare and Medicaid Services, the Centers for Disease Control and Prevention, the National Institutes of Health, and the Substance Abuse and Mental Health Services Administration.

141.     The Revised Rule's interpretation of the scope of Section 1557 is inconsistent with and contradicts the plain language of Section 1557, which states that it applies to "any program or activity that is administered by an Executive Agency."  42 U.S.C. § 18116(a).  It does not limit Section 1557 to health programs and activities established or administered under ACA Title I.

142.     Second, the Revised Rule erroneously declares that health insurers are not a "health program or activity" under Section 1557 and not subject to Section 1557's nondiscrimination prohibitions because, now according to HHS, they are not "principally engaged in the business of providing healthcare."  85 Fed. Reg. at 37,244-45 (to be codified at 45 C.F.R. § 92.3(c)).

143.     By declaring that health insurance providers are not principally engaged in the business of providing health care, HHS purports to exclude health insurance providers from the requirements of Section 1557, except for plans offered on the Health Insurance Marketplace or Federally-facilitated Marketplace created under Title I and insurance plans outside of Title I that receive Federal financial assistance.  For those health insurers that operate plans outside of Title I

43

but receive Federal financial assistance, the Revised Rule further limits the application of Section 1557 to only those operations that receive Federal financial assistance—all other operations of the insurer are excluded.  85 Fed. Reg. at 37,244 (to be codified at 45 C.F.R. § 92.3(b)).

144.    This Revised Rule exempts many plans, products, and operations of many health insurance issuers, such as self-funded group health plans, the Federal Employees Health Benefits (FEHB) Program, and short-term limited duration insurance plans.  85 Fed. Reg. at 37,173-74.

145.    To support its new interpretation, HHS contends that providing "health insurance" is different than providing "healthcare" and points to the definitions of "healthcare" and "health insurance" in unrelated statutes to support its distinction.  85 Fed. Reg. at 37,172-73.

146.    But Section 1557 covers "health programs and activities," not just direct health care.  Health insurance clearly is a health-related program or activity.  It is what enables the vast majority of Americans to access health care.  Indeed, health insurance companies design the health care individuals receive by determining benefits offered and establishing formularies, payment structures, and networks.  They also conduct prior authorization and establish and evaluate other clinical coverage criteria, as well as exercise considerable control over the health care of enrollees—deciding which providers a patient may see, what hospitals they may visit, and what treatments or medications they may receive.

147.    Neither the plain language of Section 1557 nor HHS's effort to rely on unrelated statutes supports HHS's unreasonable assertion that "healthcare" is different than "health insurance."  Section 1557 explicitly provides that it covers "health programs and activities."  Its scope is not limited to direct health care.

**XI.    The Revised Rule Arbitrarily and Capriciously Eliminates Gender Identity and Sexual Orientation Protections in Unrelated Regulations**

148.    The Revised Rule amends a series of unrelated regulations that had identified gender identity and sexual orientation as prohibited bases of discrimination, including regulations related to Medicaid State Plans, Programs for All-Inclusive Care for the Elderly (PACE), and ACA state health insurance exchanges and plans.  The Revised Rule eliminates protections against gender identity and sexual orientation discrimination in those regulations.  85 Fed. Reg. at 37,218-22, 37,243.

149.    These regulations were not issued pursuant to Section 1557 and do not interpret Section 1557.  They were promulgated by CMS pursuant to the authority granted by several unrelated statutes.  These unrelated regulations were not promulgated pursuant to HHS's authority to implement regulations under Section 1557.

150.    For example, the Revised Rule amends regulations regarding Medicaid State Plans and Medicaid contractors, 42 C.F.R. §§ 438.3(d)(4), 438.206 (c)(2), and 440.262, which were issued pursuant to HHS's authority under Section 1902 of the Social Security Act to implement Section 1902(a)(19).  That section directs HHS to "provide such safeguards as may be necessary to assure that eligibility for care and services under the [Medicaid] plan will be determined, and such care and services will be provided, in a manner consistent with simplicity of administration and the best interest of the recipients."  42 U.S.C. § 1396a(a)(19); *see also* Medicaid and Children's Health Insurance Program (CHIP) Programs, 81 Fed. Reg. 27,498, 27,538-39, 27,666 (May 6, 2016).

151.    Prior to the Revised Rule, 42 C.F.R. § 438.3(d)(4) provided:  "The MCO, PIHP, PAHP, PCCM or PCCM entity will not discriminate against individuals eligible to enroll on the basis of race, color, national origin, sex, sexual orientation, gender identity, or disability and will

not use any policy or practice that has the effect of discriminating on the basis of race, color, or

national origin, sex, sexual orientation, gender identity, or disability."  The Revised Rule amends

§ 438.3(d)(4) to state:  "The MCO, PIHP, PAHP, PCCM or PCCM entity will not discriminate

against individuals eligible to enroll on the basis of race, color, national origin, sex, or disability

and will not use any policy or practice that has the effect of discriminating on the basis of race,

color, or national origin, sex, or disability."  85 Fed. Reg. at 37,243 (to be codified at 42 C.F.R.

§ 438.3(d)(4)).

152.    PACE is a program for services for frail community-dwelling elderly persons,

most of whom are Medicaid and Medicare dual eligible, to keep them in the community rather

than moving to nursing homes.  *See* 42 C.F.R. §§ 460.98, 460.112.  HHS added sexual

orientation to the list of protected categories of persons eligible for PACE services in 2006,

explaining that "we do not believe anyone should be denied enrollment in PACE because of

discrimination of any kind."  Medicare and Medicaid Programs; Programs of All-Inclusive Care

for the Elderly (PACE); Program Revisions, 71 Fed. Reg. 71,244, 71,295 (Dec. 8, 2006).

153.    Prior to the Revised Rule, 42 C.F.R. § 460.98(b)(3) provided:  "The PACE

organization may not discriminate against any participant in the delivery of required PACE

services based on race, ethnicity, national origin, religion, sex, age, sexual orientation, mental or

physical disability, or source of payment."  The Revised Rule amends 42 C.F.R. § 460.98(b)(3)

to state:  "The PACE organization may not discriminate against any participant in the delivery of

required PACE services based on race, ethnicity, national origin, religion, sex, age, mental or

physical disability, or source of payment."  85 Fed. Reg. at 37,243 (to be codified at 42 C.F.R.

§ 460.98(b)(3)).  The Revised Rule also eliminates protections against sexual orientation

discrimination in 42 C.F.R. § 460.112(a). 85 Fed. Reg. at 37,220, 37,243 (to be codified at 42 C.F.R. § 460.112(a)).

154. Prohibitions of discrimination on the basis of sexual orientation and gender identity were added to regulations regarding group and individual market health insurance plans subject to the ACA and to ACA-created health insurance exchanges and qualified health plans. These prohibitions were added to further the ACA's aim of expanding insurance coverage, which discriminatory marketing practices and benefit designs can thwart. *See* 45 C.F.R. §§ 147.104(e), 155.120(c)(1)(ii), 155.220(j)(2)(i), 156.200(e), & 156.1230(b)(2); *see also* PPACA; Establishment of Exchanges and Qualified Health Plans, 77 Fed. Reg. 18,310, 18,319, 18,415 (March 27, 2012); PPACA; Health Insurance Market Rules, 78 Fed. Reg. 13,406, 13,417 (Feb. 27, 2013); PPACA; Exchange and Insurance Market Standards for 2015 and Beyond, 79 Fed. Reg. 30,240, 30,261 (May 27, 2014); PPACA; HHS Notice of Benefit and Payment Parameters for 2018, 81 Fed. Reg. 94,058, 94,064, 94,152 (Dec. 22, 2016).

155. The Revised Rule eliminates the prohibitions on gender identity and sexual orientation discrimination in these regulations. *See* 85 Fed. Reg. at 37, 219-21, 37,247-48 (to be codified at 45 C.F.R. §§ 147.104(e), 155.120(c)(1)(ii), 155.220(j)(2)(i), 156.200(e), & 156.1230(b)(2)).

156. HHS offers no legal, policy, or cost-benefit analysis for amending these regulations, including the effects they have had during the years they have been in place or the costs and benefits of amending them.

157. HHS's erroneous analysis of discrimination on the basis of sex under longstanding civil rights laws provides no justification for amending these regulations, which were promulgated to advance the goals of other statutory provisions.

158.    HHS's amendment of these unrelated regulations to eliminate protections for LGBTQ people is arbitrary and capricious and without legal support.

## XII.    The Revised Rule's Cost-Benefit Analysis Is Arbitrary and Capricious

159.    The Revised Rule fails to address adequately the direct and indirect costs that repeal of protections for LGBTQ people will have on patients, providers, insurers, and the overall health care system.

160.    These costs take many forms, none of which the Revised Rule considers.  First, out-of-pocket costs for necessary medical procedures will shift from insurers to patients and providers.  Under the 2016 Final Rule, most insurers covered these services, but under the Revised Rule, insurers can deny coverage on the basis that these are cosmetic procedures, rather than medically necessary to alleviate gender dysphoria.  Thus, many patients may forgo this necessary medical care due to the high cost of these procedures or cover the cost themselves.  Providers also would lose out on the revenue from these procedures when patients cannot afford them.

161.    Second, insurers' increased transgender exclusions and transgender patients' increased fear of discrimination by health care providers empowered by the Revised Rule will lead to transgender patients delaying or declining to seek care.[15]  As such, transgender patients may develop comorbid conditions such as depression, anxiety, drug abuse, and other stress-related conditions.  Treating these increased comorbid conditions will increase costs to patients, insurers, providers, and the health system overall.

---

[15] *See* Lambda Legal, *When Health Care Isn't Caring:  Lambda Legal's Survey on Discrimination Against LGBT People and People Living with HIV* at 12 (2010), https://perma.cc/9SEG-JD2K; *see also* S.E. James *et al.*, Nat'l Ctr. for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey* at 98 (2016), https://perma.cc/9S9L-VJ9C.

162.    Third, patients' delays or failures to obtain treatment will increase the direct cost of treating physical medical conditions and is a patient safety issue that can lead to poor patient outcomes.  LGBTQ patients who fear discrimination may delay, or never receive, preventative care such as cancer screenings.  Without regular screenings, LGBTQ patients will develop more advanced cancers and other health conditions.  Because the cost of treating more advanced diseases far outweighs the cost of preventative care, the Revised Rule will increase costs to patients, insurers, providers, and the overall health care system.

163.    The Revised Rule does not consider these costs associated with inviting discrimination against LGBTQ patients, and in particular those who are transgender.  Ignoring such substantial costs makes the Revised Rule's cost-benefit analysis seriously flawed and arbitrary and capricious.

164.    Indeed, the Revised Rule specifically admits HHS did not take the costs or harms to transgender patients into account, stating: "the Department also lacks the data necessary to estimate the number of individuals who currently benefit from covered entities' policies governing discrimination on the basis of gender identity who would no longer receive those benefits after publication of this rule."  85 Fed. Reg. at 37,225.

165.    The costs of prohibiting sex-based discrimination against transgender people in health insurance coverage is minimal compared to the costs associated with inviting such discrimination.  The 2016 Final Rule acknowledged this fact, stating that prohibiting discrimination against transgender consumers in health insurance "will have de minimis impact on the overall cost of care and on health insurance premiums."  81 Fed. Reg. at 31,456-57. Moreover, studies have found that providing coverage of transition-related care is extremely cost-effective and reduces costs in the long term.  For example, a 2013 survey of employers

found that providing transition-related health care benefits has "zero or very low costs" and

utilization rates of approximately 1 per 10,000 to 20,000 employees.[16]   Another study found that

the cost of providing coverage for treatment of gender dysphoria was about $0.016 per member

per month.  It also concluded that this small cost could reduce other costly health risks like

depression and drug abuse.[17]   Numerous other studies confirm these conclusions.[18]

166.     The Revised Rule also fails to include in its cost-benefit analysis the costs

associated with (1) eliminating gender identity nondiscrimination protections in the CMS

regulations promulgated under different statutes, and (2) adopting the broad religious exemptions

from Title IX and unrelated statutes.  The costs of these changes include those associated with

the increased discrimination that will result from the Revised Rule.  Failing to consider these

costs also makes the Revised Rule arbitrary and capricious.

---

[16] Jody L. Herman, *Cost and Benefits of Providing Transition-Related Health Care Coverage in Employee Health Benefits Plans,* The Williams Institute of the UCLA School of Law (Sept. 2013), https://perma.cc/D8J5-FACP.

[17] William V. Padula *et al.*, *Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis*, 31 J. GEN. INTERN. MED. 394, 398 (Oct. 2015), https://perma.cc/74EW-LZPY.

[18] *See* Declaration of Raymond Edwin Mabus, Jr., former Secretary of the Navy, in Support of Plaintiff's Motion for Preliminary Injunction ¶ 41, *Doe* v. *Trump*, No. 1:17-cv-1597-CKK (Aug. 31, 2017), ECF No. 13-9, https://perma.cc/8ZU8-8NGE (concluding costs associated with providing health care to transgender service members was considered by a former Secretary of the Navy to be "budget dust, hardly even a rounding error"); Padula, *et al.*, *Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis* at 398, https://perma.cc/74EW-LZPY (calculating the costs would be fewer than two pennies per month for every person with health insurance coverage in the United States); Cal. Dep't of Ins., Economic Impact Assessment: Gender Nondiscrimination in Health Insurance (Reg. File No. REG-2011-00023) (Apr. 13, 2012), https://perma.cc/QJ34-RVNQ (finding that costs of providing health care did not increase materially when employers adopted policies that prohibited discrimination against transgender individuals).

## XIII.   The Revised Rule Betrays Discriminatory Animus Against LGBTQ People

167.    HHS's discriminatory animus in promulgating the Revised Rule is evident, as the promulgation of the Revised Rule is just the latest step in its multi-step erasure of LGBTQ people from health care-related nondiscrimination protections.

168.    Defendant Severino has a history of anti-LGBTQ sentiments, advocacy, and comments.  For example, in 2016, before he became Director of OCR, defendant Severino decried the 2016 Final Rule because it ran counter to some people's "moral, and religious beliefs about biology" and because, in his opinion, the 2016 Final Rule "create[d] special privileges, new protected classes, or new rights to particular procedures."[19]

169.    In 2016, defendant Severino also denounced the Department of Justice's enforcement of Title IX's sex discrimination protections as they applied to transgender people as "using government power to coerce everyone, including children, into pledging allegiance to a radical new gender ideology."[20]

170.    That same year, defendant Severino also stated that he believes transgender military personnel serving openly "dishonors" the service of other service members.[21]  In addition, he referred to a transgender male student involved in a Title IX lawsuit as a "teen biological girl."[22]

---

[19] Ryan Anderson & Roger Severino, *Proposed Obamacare Gender Identity Mandate Threatens Freedom of Conscience and the Independence of Physicians*, The Heritage Foundation (Jan. 8, 2016), https://perma.cc/5XKG-S79Z.

[20] Roger Severino, *DOJ's Lawsuit Against North Carolina Is Abuse of Power*, The Daily Signal (May 9, 2016), https://perma.cc/3FFM-KFMB.

[21] Roger Severino, *Pentagon's Radical New Transgender Policy Defies Common Sense*, CNSNews (July 1, 2016), https://perma.cc/VK37-5FP7.

[22] Roger Severino & Jim DeMint, *Court Should Reject Obama's Radical Social Experiment, The Heritage Foundation* (Dec. 14, 2016), https://perma.cc/N6K8-HQY5.

171.    In 2018, it was reported that HHS's OCR was considering defining sex as "a person's status as male or female based on immutable biological traits identifiable by and before birth," a definition that is contrary to the legal, medical, and scientific understanding of sex.[23]

172.    And in 2019, HHS issued a Notification of Nonenforcement of Health and Human Services Grants Regulation, in which it stated that it would no longer enforce regulations that prohibit discrimination based on sex, sexual orientation, or gender identity in grant programs that HHS funds.  84 Fed. Reg. 63,809 (Nov. 19, 2019).

173.    With defendant Severino now Director of OCR, defendants seek to eviscerate the nondiscrimination protections Severino denounced.

174.    For example, HHS asserts that it considered adding gender identity and sexual orientation discrimination to a definition of "sex" or discrimination "on the basis of sex" under Title IX, but concluded doing so was "inappropriate to do so in light of the ordinary public meaning of discrimination on the basis of sex under Title IX" and because "[a]s a policy matter," state and local entities "are better equipped to address with sensitivity issues of gender dysphoria, sexual orientation, and any competing privacy interests, especially when young children or intimate settings are involved."  85 Fed. Reg. at 37,222.  Not only has the Supreme Court rejected HHS's position on the definition of "sex" under Title VII, but the notion that health care protections for LGBTQ people are at odds with "young children" is as offensive as it is telling.

175.    As another example, although HHS declares that its position on the meaning of sex discrimination "will not bar covered entities from choosing to grant protections on the basis

---

[23] Erica L. Green, Katie Benner & Robert Pear, '*Transgender' Could Be Defined Out of Existence Under Trump Administration*, N.Y. Times (Oct. 21, 2018), https://perma.cc/YQR6-YN2F.

of sexual orientation and gender identity that do not conflict with any other Federal law," 85 Fed. Reg. at 37,222, HHS also states that a covered entity's refusal to make distinctions on the basis of sex "could in some cases violate personal privacy interests and so create a hostile environment under Title IX." 85 Fed. Reg. at 37,184. This assertion and the cases cited have nothing to do with Section 1557 and what facilities should be available to a patient in a health care setting.

176.    HHS also fails to acknowledge that no cognizable legal claim exists based on having to share a restroom or other single-sex facility with a transgender person. HHS's suggestion to the contrary, *see* 85 Fed. Reg. at 37,190-91, is inconsistent with the rule of law and not a "reasonable" analysis. It serves only to heighten alarm among LGBTQ people and embolden those who attack them with frivolous assertions.

177.    The Revised Rule reflects HHS's animosity toward LGBTQ people.

## XIV.   The Revised Rule Creates Immediate and Irreparable Harms

178.    The Revised Rule cannot change the law and the courts will determine the meaning of Section 1557. However, HHS's rules have a substantial effect on health care providers and institutions, as well as on the public. The Revised Rule will result in increased discrimination against LGBTQ people, including those with LEP, by health care providers and health insurers. This increased discrimination will directly and irreparably injure plaintiffs, their members, their patients, and the individuals whom they serve.

### A.    The Revised Rule Will Increase LGBTQ Discrimination by Health Care Providers and Staff and Cause Irreparable Harm to Plaintiffs and the Patients and Individuals They Serve

179.    Discrimination delays or denies necessary health care. It also discourages LGBTQ people from seeking care and from fully disclosing personal information that health care providers need for proper diagnosis and treatment.

180.    The Revised Rule sends a message to the health care industry and the LGBTQ community that federal law permits discrimination against LGBTQ patients.

181.    Indeed, in its Notice of Proposed Rulemaking, HHS acknowledged the 2016 Final Rule "likely induced many covered entities to conform their policies and operations to reflect gender identity as protected classes [sic] under Title IX."  84 Fed. Reg. at 27,876.  And in the Revised Rule, HHS acknowledges that some covered entities may revert to the policies and practices they had in place before the 2016 Final Rule.  85 Fed. Reg. at 37,225.  OCR also estimates that 60% of the increase in its anticipated long-term caseload of claims of discrimination are attributable to discrimination claims based on the 2016 Rule's definition of sex discrimination with respect to gender identity and sex stereotyping, though OCR has not enforced such claims.  85 Fed. Reg. at 37,235.

182.    HHS tries to minimize the harm the Revised Rule will create, repeatedly claiming that because a federal district court enjoined enforcement of claims based on the definition of sex discrimination in the 2016 Final Rule in December 2016 and later vacated those provisions, any harm would not be the result of the Revised Rule, which merely is maintaining the status quo. *See, e.g.*, 85 Fed. Reg. at 37,181-82, 37,192, 37,199, & 37,238.

183.    HHS's position is disingenuous at best.  HHS has issued a Revised Rule attempting to legislate that claims of discrimination based on LGBTQ status are not "cognizable" under Section 1557.  85 Fed. Reg. at 37,225.

184.    Without complete protection from discrimination based on their sex, including discrimination based on their sexual orientation, gender identity, transgender status, or failure to conform to sex stereotypes, LGBTQ people will be discouraged from seeking the health care they need.

185.    The Revised Rule also will discourage LGBTQ people from fully disclosing personal information related to their sexuality and gender that health care providers need for proper diagnosis.

186.    The Revised Rule will harm plaintiffs, their patients, and the LGBTQ people whom they serve in multiple ways.

### 1.    Harm to Patients and Individuals Whom Plaintiffs Serve

187.    LGBTQ individuals and especially transgender and gender-nonconforming people already face particularly acute barriers to care and health disparities that will be compounded by the Revised Rule.  A majority of LGBTQ patients fear going to health care providers because of past experiences of anti-LGBTQ bias in health care settings.  Many LGBTQ patients report negative experiences, including hostility, discrimination, and denials of care, when they disclose to health care providers their sexual orientation, history of sexual conduct, gender identity, transgender status, or history of gender-affirming medical treatment, and related medical histories.

188.    For example, multiple LGBTQ patients at Whitman-Walker have previously been refused medical care, including routine care unrelated to gender dysphoria, by providers outside of Whitman-Walker simply because they are LGBTQ.  In one instance, a radiological technician refused to perform an ultrasound for testicular cancer on a transgender patient.  In another, a health care worker at a dialysis clinic confronted a Whitman-Walker patient with end-stage renal disease and objected to being involved in the patient's care because of hostility to his sexual orientation.  In another, after a Whitman-Walker patient—a transgender teenager—was hospitalized in a local hospital following a suicide attempt, the staff would only address or refer to the young person with pronouns inconsistent with their gender identity, exacerbating the teenager's acutely fragile state of mind.  Local hospitals and surgeons have refused to perform

transition-related surgeries on Whitman-Walker transgender patients, even when they routinely perform the very same procedures on non-transgender patients, including in situations when the patient's insurance would have covered the procedure or when the patient was able to pay for the procedure.  Many local primary-care physicians unaffiliated with Whitman-Walker have refused to prescribe hormone therapy for transgender patients.  And multiple Whitman-Walker patients have been denied prescriptions by pharmacists.  Behavioral-health providers at Whitman-Walker report that the vast majority of transgender patients—as many as four out of five—report instances of mistreatment or discrimination by health care providers, hospitals, clinics, doctors' offices, or other facilities outside of Whitman-Walker.

189.    Patients of the LA LGBT Center report similar experiences of discrimination by other providers.  One transgender patient, who developed profuse bleeding after surgery, was denied treatment at an emergency room and arrived at the LA LGBT Center in distress three days later, having lost a significant amount of blood.  Another patient required extensive surgery to repair damage caused by a prior silicone breast-augmentation procedure.  But she was turned down by an academic plastic-surgery center in Los Angeles because the surgeon said her health problems were caused by her own poor decision-making and she therefore would not be considered for treatment.  By the time she was able to identify a surgeon who was willing to treat her, with the assistance of a physician at the LA LGBT Center, years had passed and her condition had become life-threatening.  For patients at the LA LGBT Center, the ability to receive gender-affirming medical care can mean the difference between life and death.

190.    In many geographic regions, a majority of LGBTQ people lack a provider whom they consider to be their personal doctor.  As a result, when they seek health care services, they will encounter a health care provider with whom they do not have a relationship.  This makes

them especially vulnerable to discriminatory treatment from providers who are not LGBTQ-affirming.  For some medical specialties, there are only a handful of health care providers in the region who have the expertise necessary to treat a patient for a particular condition, so a denial of care from even one provider could make it practically impossible for an LGBTQ patient to receive any care at all.

191.    In a recent study, nearly one in five LGBTQ people, including 31% of transgender people, said that if they were turned away from a hospital, it would be very difficult or impossible to get the health care they need elsewhere.[24]  The rate was substantially higher for LGBTQ people living in non-metropolitan areas, with 41% reporting that it would be very difficult or impossible to find an alternative provider.  Even when they are able to get access to care, many LGBTQ individuals report that health care professionals have used harsh language toward them, refused to touch them, used excessive precaution, or blamed the individuals for their health status.[25]

192.    Consequently, LGBTQ patients are disproportionately likely to delay preventative screenings and necessary medical treatment and therefore to end up with more acute health problems and outcomes, raising concerns about patient safety.  Research has identified pervasive health disparities for LGBTQ people with respect to cancer, HIV, obesity, mental health, tobacco use, and more.  In other words, LGBTQ people, who are disproportionately likely to need a wide range of routine medical care, already have reason to fear, and often do fear, negative consequences of "coming out" to health care providers about their sexual orientation, history of

---

[24] *See* Mirza & Rooney, *Discrimination Prevents LGBT People From Accessing Health Care*, https://perma.cc/ZG7E-7WK8.

[25] *Id.*

sexual conduct, gender identity, transgender status, history of gender-affirming medical treatment, and related medical histories.

193.    The Revised Rule will exacerbate the acute health disparities LGBTQ people already face.  The Revised Rule sends the message that discrimination on the basis of gender identity and sex stereotyping is permissible under federal law, which will increase the number of LGBTQ people who will be denied care.

194.    The Revised Rule also encourages LGBTQ people to remain closeted to the extent possible when seeking medical care.  But remaining closeted to a health care provider may result in significant adverse health consequences.  For instance, a patient who conceals or fails to disclose a same-sex sexual history may not be screened for HIV or other relevant infections or cancers, or may not be prescribed preventative medications such as Pre-Exposure Prophylaxis or PrEP, which is extremely effective at preventing HIV transmission.  Patients who fail fully to disclose their gender identity and sex assigned at birth may not undergo medically indicated tests or screenings (such as tests for cervical or breast cancer for some transgender men, or testicular or prostate cancer for some transgender women).  The barriers to care are particularly high for transgender people.  Nearly one-quarter of transgender people report delaying or avoiding medical care when sick or injured, at least partially because of fear of discrimination by and disrespect from health care providers.[26]

195.    Patients remaining closeted to health care providers also results in increased costs to the health care system.  For example, when a patient is closeted, medical providers may not order medically necessary tests or screenings, which has downstream effects such as

---

[26] See Mirza & Rooney, *Discrimination Prevents LGBT People From Accessing Health Care*, https://perma.cc/ZG7E-7WK8.

exacerbating a patient's distress and increasing costs to providers and the health care system as a whole for delayed treatment.

196.    The Revised Rule will result in increased discrimination against LGBTQ people in the provision of health care and cause harm to the health of LGBTQ people and to public health generally.

### 2.    Harm to Private Health Care Provider Plaintiffs, LGBTQ-Services Plaintiffs, and Health Professional Association Plaintiffs

197.    The Revised Rule, which fosters discrimination against LGBTQ people in the provision of health care, frustrates plaintiffs' core missions of providing and advocating for affirming, high-quality care to all LGBTQ people and protecting against discrimination on the basis of LGBTQ status in the delivery of health care and services to patients.

198.    In addition, because more LGBTQ patients will delay seeking health care, they will come to Whitman-Walker and the LA LGBT Center, the private health care provider plaintiffs who serve many LGBTQ patients, and members of the health professional association plaintiffs – GLMA and AGLP – with more acute conditions, diseases that are more advanced at diagnosis, less responsive to treatment, or no longer treatable.  This delay will strain the resources of providers and increase costs for providers and patients and the health care system in general.

199.    The discriminatory experiences LGBTQ patients have with other health care providers erode patients' trust in health care providers overall and thus also challenges the ability of plaintiffs to treat their patients effectively and provide appropriate services and referrals.  To provide proper medical care and services to the LGBTQ community, plaintiffs rely on frank and complete communication with their patients and the individuals who seek their services. Plaintiffs need patients and individuals seeking services to fully disclose all aspects of their

health history, sexual history, and gender identity to provide appropriate care for the patients'
health.  Without full disclosure, plaintiffs are not able to treat adequately their patients.  For
instance, plaintiffs need to know patients' sexual history to know whether to test them for HIV or
other infections or cancers.  And plaintiffs need to be aware of patients' gender identity and sex
assigned at birth to order proper screenings and tests – like cervical or breast cancer for some
transgender men, or testicular or prostate cancer for some transgender women.  The Revised
Rule endangers the provider-patient relationship and will harm plaintiffs and their patients by
discouraging full disclosure.  This also means that medical and health care providers bear
increased risk of malpractice when patients do not feel comfortable to fully disclose all aspects
of their health history, sexual history, and gender identity.

200.    The Revised Rule's effect of increasing discrimination by other providers will
lead to increased demand for providers, entities, and individuals who serve the LGBTQ
community, like Whitman-Walker, LA LGBT Center, the TransLatin@ Coalition (and its
affiliated organizations like FLAS and Arianna's Center), Bradbury-Sullivan Center, and the
members of GLMA and AGLP.  This increased demand will place a strain on these plaintiffs'
resources, leaving them unable to fulfill their organizational missions, spend sufficient time on
each patient or individual seeking services, and provide care and services to all individuals.  It
also will harm LGBTQ people through increased wait times and delays of care that may worsen
conditions.

201.    In addition, Whitman-Walker, LA LGBT Center, the TransLatin@ Coalition (and
some of its affiliated organizations like FLAS and Arianna's Center), and Bradbury-Sullivan
Center, as well as the members of GLMA and AGLP and the individual provider plaintiffs, all
refer patients to other health care providers.  The Revised Rule will harm the ability of these

plaintiffs to refer LGBTQ patients to other providers because they will not know whether these providers will discriminate against their patients and/or refuse to treat their patients under the Revised Rule's personal religious or moral belief exemptions.  Thus, these plaintiffs will be required to redirect their staff and resources from providing their own services to assisting patrons in determining who among the health care providers in the region will serve LGBTQ patients in a nondiscriminatory manner.

202.    The Revised Rule also will burden the private health care provider and LGBTQ-services plaintiffs by precluding them from carrying out their organizational missions of providing affirming, non-discriminatory care to all LGBTQ patients based on the religious views of a single employee.  The sweeping religious exemptions in the Revised Rule encourage individual employees to believe their discriminatory beliefs can prevail over their duties to patients – and to their fellow employees – posing barriers to patient care and creating burdens for the organizations.  The private health care provider and LGBTQ-services plaintiffs may be forced to institute costly workarounds and duplicative staff to accommodate the religious views of a single employee, which also may result in unfairly burdening non-objecting employees. These increased costs also may result in a reduction of services and closure of programs, thus frustrating plaintiffs' institutional missions and core functions of providing comprehensive health care and other services to LGBTQ people.

### 3.    Additional Harm to GLMA, AGLP, and Their Members

203.    The Revised Rule also will create additional harms to the health professional association plaintiffs GLMA and AGLP, their members, the LGBTQ patients whose interests they represent, and the patients whom their members treat.

204.    GLMA works with professional accreditation bodies, such as the Joint Commission, and health-professional associations, on standards, guidelines, and policies that

address LGBTQ health and protect individual patient health and public health in general.  The Revised Rule prevents GLMA from achieving its goals with professional accreditation bodies by preventing such bodies from holding health care providers accountable for discrimination against LGBTQ people.

205.     For a health care organization to participate in and receive federal payment from Medicare or Medicaid programs, the organization must obtain a certification of compliance with health and safety requirements.  That certification is achieved based on a survey conducted either by a state agency on behalf of the federal government, or by a federally recognized national accrediting organization, like the Joint Commission.  Accreditation surveys include requirements that health care organizations not discriminate on the basis of sex, sexual orientation, or gender identity in providing services or in employment.  The Revised Rule presents a direct conflict with nondiscrimination standards the Joint Commission has adopted and all the major health-professional associations stating that health care providers should not discriminate in providing care for patients and clients because of sexual orientation or gender identity.

206.     The Revised Rule invites health care organizations who discriminate against LGBTQ people to become accredited.  The Revised Rule conflicts with GLMA's mission of achieving and enforcing accreditation standards relating to nondiscrimination.

207.     Members of GLMA and AGLP also will be harmed by the Revised Rule because some members are employed by health care organizations that may rely on the religious and moral exemptions in the Revised Rule to deny care or discriminate against LGBTQ patients.  The Revised Rule encourages religiously-affiliated health care employers to discriminate against employees who are GLMA or AGLP members for adhering to and enforcing their medical and

ethical obligations to treat all patients in a nondiscriminatory manner, including providing all medically-necessary care that is in LGBTQ patients' best interests.

208.     In addition, the Revised Rule invites harassment and discriminatory treatment of GLMA and AGLP members in the workforce by fellow employees.  The Revised Rule sends a message that discrimination against LGBTQ health care providers and their LGBTQ patients is permissible.  GLMA and AGLP members and their LGBTQ patients are stigmatized and demeaned by this message that LGBTQ people are not deserving of legal protections in the health care context.  The Revised Rule thus frustrates GLMA's and AGLP's missions of achieving and enforcing safe workspaces for LGBTQ health professionals and non-discriminatory health care services for their LGBTQ patients.

### 4.     Additional Harm to the TransLatin@ Coalition, Its Members, and the Individuals it Serves

209.     The Revised Rule also will harm the TransLatin@ Coalition, its members, its affiliated organizations, and the individuals whom the Coalition serves in that the harms the Revised Rule will exact on LGBTQ people, particularly those who are transgender, will be exacerbated for those with LEP.  The Revised Rule's elimination of notice and tagline requirements will make it more difficult for LGBTQ people with LEP to be aware of their rights, which language services and aids are available, how to access such services, and how to handle discrimination and complaints.  The health care system was already difficult to navigate for LEP individuals, and the Revised Rule serves to exacerbate those difficulties and undermines access to health care, health insurance, and legal redress.  The Revised Rule will harm the TransLatin@ Coalition's mission and members by making it more difficult to access health care and by decreasing protections from discrimination.

210.    The Revised Rule's elimination of the unitary standard also harms the
TransLatin@ Coalition, its members, and individuals whom it serves by making it more difficult
to bring claims of intersectional discrimination.  Rather than being able to assert claims under a
unitary standard, intersectional discrimination claims will be subject to different standards,
enforcement mechanisms, and remedies based on which identities are at issue.

**B.      The Revised Rule Will Result in Increased Discrimination by Health Plans,
Particularly Against Persons Seeking Gender-Affirming Care**

211.    Many private and public plans resist coverage of medically necessary procedures,
whether through blanket exclusions of "sex change" or "sex transition" procedures, or through
denials of coverage of specific procedures.  Many plans that do not contain blanket exclusions
still exclude many essential types of surgeries related to gender transition, such as facial or chest
surgery.

212.    Many insurers also deny coverage of other specific treatments needed to complete
an individual's transition on the grounds that the procedure is "cosmetic" – either by relying on
general plan language excluding cosmetic procedures or concluding that a procedure is not
medically necessary.  Examples of procedures that are categorically excluded as "cosmetic" in
many plans and by many utilization reviewers include:

a.      Surgeries of the head and face, such as hair transplant, scalp advancement,
brow reduction, lip reduction or augmentation, rhinoplasty, cheek and chin
contouring, jawline modification, blepheroplasty, and other facial
feminization techniques for transgender women;

b.      Laser hair removal and electrolysis, on the face and elsewhere on the
body;

    c.      Surgeries involving the neck, such as cartilage reduction (modification of the Adam's Apple) and vocal feminization surgery;

    d.      Breast augmentation and reduction;

    e.      Other body contouring procedures, such as waist reduction, hip/buttocks implants, fat transfer, pectoral implants; and

    f.      Lessons/training to modify the vocal range.

213.    Relying on its definition of "on the basis of sex" to include gender identity and to forbid discrimination against transgender individuals, the 2016 Final Rule helped persuade Medicaid administrators, insurance company personnel, and employee health plan sponsors to eliminate outdated exclusions and to agree to cover procedures when supported by evidence of medical necessity. Following its promulgation, the 2016 Final Rule led to a decrease in discriminatory policies and practices.[27] A recent study of 37 states in the federal marketplace showed that 97% of plans analyzed did not contain blanket exclusions of transition-related care in 2019.[28]

214.    By eliminating the 2016 Final Rule's definition of "on the basis of sex" and the explicit prohibitions on "categorical coverage exclusion[s] or limitation[s] for all health services related to gender transition" and denials, limitations, or restrictions "for specific health services related to gender transition if such denial, limitation, or restriction results in discrimination against a transgender individual," 81 Fed. Reg. at 31,472 (formerly codified at 45 C.F.R. § 92.207(b)(4)-(5)), the Revised Rule invites reversal of much of this progress, leading to a

---

[27] Gruberg & Bewkes, *The ACA's LGBTQ Nondiscrimination Regulations Prove Crucial*, https://perma.cc/CTP2-UMEJ.

[28] Out2Enroll, *Summary of Findings: 2020 Marketplace Plan Compliance with Section 1557*, https://perma.cc/WU25-C9BN. This is consistent with summaries from 2017, 2018, and 2019.

reduction in coverage and access to medically necessary health care for transgender and gender nonconforming patients.

215.    In addition, the Revised Rule's narrow interpretation of what constitutes a covered entity similarly will result in a reduction in coverage and access to medically necessary health care for transgender and gender nonconforming patients.

216.    Increased discrimination by health insurance plans will harm plaintiffs and the patients and individuals whom they serve.  Plaintiffs that provide health care services will face increased costs because many private and public plans will refuse to cover medically necessary procedures based on the Revised Rule's elimination of protections against gender identity discrimination.  Plaintiffs, in turn, will be forced to either cover the costs of these medically necessary procedures, or turn away LGBTQ patients who need these services but cannot afford to pay for them out of pocket.  Likewise, patients may forgo necessary medical care due to the high cost of these procedures or cover the cost themselves.

### C.    The Revised Rule Will Result in Increased Discrimination towards Patients with Limited English Proficiency

217.    Language access protections are required to prevent discrimination based on national origin.  These services are important because ineffective communication between health care providers and LEP patients for the purposes of diagnosis, treatment options, proper use of medication, obtaining informed consent, and insurance coverage can result in adverse health consequences or death.

218.    The Revised Rule eliminates the requirement that covered entities take reasonable steps to provide meaningful access to "*each individual* with LEP eligible to be served or likely to be encountered" and replaces it with a general reference to "LEP individuals."  *See, e.g.*, 85 Fed.

Reg. at 37,245.  However, focusing on LEP individuals in general as opposed to each individual will result in some individuals not receiving the services they need for meaningful access.

219.    In addition, the Revised Rule eliminates the existing requirement that non-discrimination notices include the availability of language assistance services and taglines in the top 15 languages spoken by LEP individuals in a state.  HHS "acknowledges the potential of reduced awareness of the availability of language services by LEP individuals by the changes made in this rule, or downstream effects on malpractice claims due to less awareness," 85 Fed. Reg. at 37,235, yet HHS dismissed these negative effects claiming enforcement of Section 1557 will diminish them.

220.    The Revised Rule will harm LEP patients, including members of the TransLatin@ Coalition and those the Coalition and its affiliated organizations (like FLAS and Arianna's Center) serve, as well as the LEP patients private health care provider plaintiffs serve, by diminishing or eliminating meaningful access to health care because they will not be aware of their rights or the programs or services available to them.

221.    The weakening of protections for LEP individuals will result not only in poorer health outcomes for LEP individuals, but also in increased costs and burdens for plaintiffs.  As a result of the Revised Rule, private health care and individual provider plaintiffs will face increased burdens due to fewer clients being aware of their language access rights and the likelihood that more people will turn to them for help in their language, rather than other covered health care providers.

222.    For example, the weakening of protections for LEP individuals will harm LEP patients of private health care providers who get care elsewhere and who private health care providers need to refer outside their organizations for specialty care, as they will no longer

benefit from the notices, taglines, and additional language access provisions that are critical to ensure meaningful access to care.

223.    The weakening of protections also will burden private health care and individual provider plaintiffs, as well as members of health professional association plaintiffs, because patients will come to them sicker due to inadequate care elsewhere, and more people may come to them because their LEP services will remain robust.

224.    In addition, the weakening of protections for LEP individuals will harm private health care providers and individual provider plaintiffs, as well as members of health professional association plaintiffs, as it will place them at an increased risk for malpractice claims linked to inadequate language access.

## FIRST CLAIM FOR RELIEF
### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious

225.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

226.    Defendants are subject to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*

227.    The APA provides that courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

228.    The Revised Rule is arbitrary and capricious because defendants' justifications for repealing critical anti-discrimination protections run counter to the evidence before the agency and disregard material facts and evidence, defendants fail to supply a reasoned explanation for their policy change from the 2016 Final Rule to the Revised Rule, defendants have failed to consider important aspects of the problem, including the Revised Rule's interference with

current law, and defendants failed to account properly for the costs and benefits of the Revised Rule.

229.    The Revised Rule relies primarily on a single ruling and the federal government's litigation position in the *Bostock* case and related litigation to justify HHS's rejection of long-standing authority that has defined discrimination on the basis of sex in a variety of federal civil rights laws to include discrimination against individuals who are LGBTQ.  The Supreme Court now has rejected HHS's position.

230.    The Revised Rule also eliminates, contrary to statutory authority, the unitary legal standard for enforcement of violations of Section 1557, replacing it with a fractured approach that will complicate and make it more difficult to bring discrimination claims under Section 1557, particularly claims of intersectional discrimination.

231.    The Revised Rule's elimination of the explicit recognition of private rights of action and the availability of compensatory damages under Section 1557 also will confuse the public and mislead many individuals into not asserting their legal rights.

232.    In addition, contrary to the statutory language of Section 1557, the Revised Rule imports broad and sweeping exemptions for discrimination based on personal religious or moral belief from both the named statutes in Section 1557 and other statutes, like the Religious Freedom Restoration Act (42 U.S.C. § 2000bb *et seq.*), which Section 1557 does not reference. These exemptions invite individual health care providers, health care entities (hospitals, clinics etc.), and insurers across the country to opt out of treating patients, including many transgender patients, if they believe doing so would compromise their faith.  Defendants' attempt to create new religious exemptions in Section 1557 is contrary to law and endangers patients' health in the name of advancing the religious beliefs of those who are entrusted with caring for them – a result

sharply at odds with HHS's stated mission, which is to "enhance and protect the health and well-being of all Americans" and to "provid[e] for effective health and human services."  It also adversely affects health care providers that serve and treat the LGBTQ community because (1) individual health care employees may decline to serve patients based on religious objections, and (2) their ability to refer patients to other providers will be impaired, as the Revised Rule invites those other providers to discriminate against their LGBTQ patients.

233.    The Revised Rule also arbitrarily limits the scope of Section 1557, cutting back on the entities subject to the statute, contrary to the plain language of Section 1557.

234.    Defendants also have failed to provide a sufficient explanation for the decision to eliminate the references to sexual orientation and gender identity discrimination in unrelated regulations promulgated under different statutes.  Neither the evidence before the agency nor the weight of the legal authority supports the elimination of these protections.

235.    Defendants also have failed to provide a sufficient explanation for the decision to eliminate protections against discrimination on the basis of association.  Neither the evidence before the agency nor the weight of the legal authority supports the elimination of these protections.

236.    The Revised Rule also is arbitrary and capricious in that it eliminates the requirement of notice of nondiscrimination requirements and access to language protections without adequate justification, undermining the ACA's charge to ensure individuals have access to health care and health insurance.

237.    The Revised Rule fails to consider important regulatory costs, including significant direct or indirect health costs to plaintiffs, their patients, and public health and safety.

238.    The Revised Rule therefore is arbitrary, capricious, [or] an abuse of discretion" in violation of the APA.  5 U.S.C. § 706(2)(A).

239.    Defendants' violations cause ongoing harm to plaintiffs, their patients, the individuals they serve, and their members.

**SECOND CLAIM FOR RELIEF**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Not in Accordance with Law**

240.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

241.    Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law."  5 U.S.C. § 706(2)(A).

242.    The Revised Rule is not in accordance with law because it conflicts with the Supreme Court's ruling in *Bostock* that discrimination on the basis of a person's sexual orientation or transgender status is discrimination on the basis of sex under Title VII, and rejects the well-established understanding of "sex" under longstanding civil rights laws as including such discrimination.

243.    The Revised Rule's elimination of protections based on sexual orientation and gender identity in unrelated regulations promulgated under different statutes likewise conflicts with controlling legal authority regarding the meaning of "sex."

244.    The Revised Rule's elimination of protections against discrimination on the basis of association contravenes existing case law and the underlying statutes and therefore is , not in accordance with law.

245.    The Revised Rule conflicts with the statutory language and purpose of Section 1557 by failing to make the enforcement mechanisms provided by Title VI, Title IX, the Age

71

Discrimination Act, and the Rehabilitation Act available in the case of discrimination against a person based on any characteristic protected by these statutes.

246.  The Revised Rule also conflicts with the statutory language of Section 1557 by importing broad and sweeping exemptions based on personal religious or moral belief from the identified statutes in Section 1557 and other statutes, including the Religious Freedom Restoration Act (42 U.S.C. § 2000bb *et seq.*), which Section 1557 does not reference.

247.  In addition, the Revised Rule conflicts with the statutory language of Section 1557 by limiting the entities covered under Section 1557.

248.  The Revised Rule violates Section 1554 of the ACA, which explicitly prohibits the Secretary of HHS from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care" or "impedes timely access to health care services."  42 U.S.C. § 18114.  The Revised Rule creates unreasonable barriers and impedes timely access to health care by reversing protections against discrimination of historically marginalized communities and eliminating access to language provisions.

249.  The Revised Rule therefore is "not in accordance with law" as required by the APA.  5 U.S.C. § 706(2)(A).

250.  Defendants' violations cause ongoing harm to plaintiffs, their patients, the individuals they serve, and their members.

### THIRD CLAIM FOR RELIEF
### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(C)
### Exceeds Statutory Authority

251.  Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

252.    Under the APA, a court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

253.    Federal agencies do not have the power to act unless Congress confers the power upon them.  Defendants were not given the power to alter Section 1557's statutory terms, but that is precisely what the Revised Rule attempts to do.  The Revised Rule unduly limits the explicit nondiscrimination protections against sex discrimination set forth in Section 1557 by purporting to preclude claims of discrimination based on an individual's LGBTQ status.  It also places health care services for LGBTQ people, gender nonconforming people, and other consumers at risk without congressional authorization to make these changes.

254.    The Revised Rule's elimination of a unitary legal standard to address violations of Section 1557 and limitation on the entities covered under Section 1557 likewise is contrary to the language and intent of Section 1557 and exceeds HHS's authority.

255.    The Revised Rule also amends a series of unrelated regulations to conform with the Revised Rule.  The Revised Rule erases not only existing protections for LGBTQ people in the 2016 Final Rule, but eliminates such protections in other regulations, which were promulgated pursuant to the authority granted by several different statutes, including Section 1321(a) and the provisions of the ACA, Social Security Act, and other statutory authority, not Section 1557.

256.    The Revised Rule also eliminates notice requirements and access to language protections, undermining the ACA's central purpose to ensure individuals have access to health care and health insurance.

257.    The Revised Rule therefore is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" in violation of the APA.  5 U.S.C. § 706(2)(C).

258.     Defendants' violations cause ongoing harm to plaintiffs, their patients, the individuals they serve, and their members.

### FOURTH CLAIM FOR RELIEF
### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(B)
### and U.S. Constitution, Fifth Amendment, Equal Protection Component

259.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

260.    Under the APA, a court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

261.    The Fifth Amendment's Due Process Clause provides that no person shall be deprived of life, liberty, or property without due process of law.

262.    The Due Process Clause includes within it a prohibition against the denial of equal protection of the laws by the federal government, its agencies, or its officials or employees.

263.    The purpose and effect of the Revised Rule are to discriminate against plaintiffs, their patients, the individuals they serve, and their members based on their sex, gender identity, transgender status, gender nonconformity, and exercise of their fundamental rights, including the rights to bodily integrity and autonomous medical decision-making, and the rights to live and express oneself consistent with one's gender identity.

264.    The Revised Rule also is intended to have and will have a disproportionate impact on LGBTQ people.  The Revised Rule places an impermissible special burden on these individuals.

265.     LGBTQ people have suffered a long history of discrimination and continue to suffer that discrimination.  They are part of discrete and insular groups and lack the power to protect their rights through the political process.

266.     Transgender people have a gender identity that differs from the sex assigned to them at birth.  A person's gender identity is a core, defining trait fundamental to a person's sense of self and personhood.

267.     Requiring a person to abandon their gender identity as a condition to equal treatment violates the Equal Protection Clause.

268.     Discrimination on the basis of sex, including on the basis of gender identity, transgender status, sexual orientation, and failure to conform to sex stereotypes, is presumptively unconstitutional and subject to heightened scrutiny.

269.     Similarly, discrimination based on the exercise of a fundamental right is presumptively unconstitutional and is subject to strict scrutiny.

270.     The Revised Rule lacks a rational or legitimate justification, let alone the important or compelling one that is constitutionally required.  The Revised Rule also lacks adequate tailoring under any standard of review.

271.     Defendants' encouragement of discrimination against LGBTQ people deprives LGBTQ people of their right to equal dignity and stigmatizes them as second-class citizens.

272.     The Revised Rule therefore violates the Equal Protection Clause of the Fifth Amendment of the U.S. Constitution and must be set aside under the APA and the Fifth Amendment.

273.     Defendants' violations cause ongoing harm to plaintiffs, their patients, the individuals they serve, and their members.

**FIFTH CLAIM FOR RELIEF**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(B)**
**and U.S. Constitution, Fifth Amendment, Substantive Due Process**

274.    Plaintiffs repeat and incorporate by reference each allegation of the prior
paragraphs as if fully set forth herein.

275.    Under the APA, a court must "hold unlawful and set aside agency action" that is
"contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

276.    The Fifth Amendment's Due Process Clause protects individuals' substantive
rights to be free to make certain decisions central to privacy, bodily autonomy, integrity, self-
definition, intimacy, and personhood without unjustified governmental intrusion.  Those
decisions include the right to transition-related medical treatment, as well as the right to live
openly and express oneself consistent with one's gender identity.

277.    By encouraging health care providers and insurers to interfere with and unduly
burden patients' access to medically necessary health care, the Revised Rule violates the rights
of plaintiffs to privacy, liberty, dignity, and autonomy as guaranteed by the Fifth Amendment.

278.    A person's gender identity and ability to live and express oneself consistent with
one's gender identity without unwarranted governmental interference is a core aspect of each
person's autonomy, dignity, self-definition, and personhood.  By encouraging health care
providers and insurers to deny or otherwise interfere with individuals' access to gender-affirming
medical care, including surgical procedures, hormone therapy, and other medically necessary
care, and by interfering with the ability of transgender and gender-nonconforming individuals to
live and express themselves in accordance with their gender identities, the Revised Rule
infringes on patients' interests in privacy, liberty, dignity, and autonomy protected by the Fifth
Amendment.

279.   There is no legitimate interest supporting the Revised Rule's infringement on patients' fundamental rights, let alone an interest that can survive the elevated scrutiny required to justify infringement of these fundamental rights.

280.   The Revised Rule therefore violates the Due Process Clause of the Fifth Amendment of the U.S. Constitution and must be set aside under the APA and the Fifth Amendment.

281.   Defendants' violations cause ongoing harm to plaintiffs, their patients, the individuals they serve, and their members.

**SIXTH CLAIM FOR RELIEF**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(B)**
**and U.S. Constitution, First Amendment, Free Speech**

282.   Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

283.   Under the APA, a court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

284.   The Free Speech Clause of the First Amendment to the United States Constitution declares:  "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  The Free Speech Clause prohibits the government from "chilling" a person's right to free expression.

285.   A person's disclosure of their transgender or gender nonconforming status, speech or expression that discloses gender identity, and a person's gendered speech and expressive conduct all receive constitutional protection under the First Amendment.

286.   The Revised Rule has the purpose and effect of chilling constitutionally protected First Amendment activity.  As a result of the Revised Rule, an increased number of LGBTQ

people will remain closeted in health care settings and to doctors, nurses, and other healthcare providers and will decline to disclose their sexual orientation, transgender status, or gender identity.

287.    Further, an increased number of LGBTQ people will decline to engage in gendered speech and expression, including by declining to disclose related medical histories— even when that self-censorship impedes the ability of their health care providers to provide appropriate treatment and results in negative health consequences to the patients and to public health.

288.    The Revised Rule will chill a patient of ordinary firmness from making such disclosures.

289.    The Revised Rule violates the Free Speech Clause of the First Amendment because it impermissibly burdens the exercise of patients' constitutionally protected speech, expression and expressive conduct based on the content and viewpoint of patients' speech.

290.    In addition, the Revised Rule is overbroad because it will chill protected First Amendment activity.

**SEVENTH CLAIM FOR RELIEF**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(B)**
**and U.S. Constitution, First Amendment, Establishment Clause**

291.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

292.    Under the APA, a court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

293.     The Establishment Clause of the First Amendment to the United States Constitution declares:  "Congress shall make no law respecting an establishment of religion."

U.S. Const. amend. I.  The Establishment Clause prohibits the government from favoring one religion over another, or religion over nonreligion.

294.    The Establishment Clause permits the government to provide religious accommodations or exemptions from generally applicable laws only if, among other requirements, the accommodation (1) lifts a substantial, government-imposed burden on the exercise of religion, and (2) does not shift substantial costs or burdens onto a discrete class of third parties, without regard for the third parties' interests.  In other words, the government may "accommodate" religion in accordance with the Free Exercise Clause, but it may not "promote" religion.

295.    The Revised Rule violates the Establishment Clause by creating expansive religious exemptions for health care providers, plans, and employees at the expense of third parties – namely, plaintiffs, other providers, and most importantly the patients and the individuals whom plaintiffs serve.  It invites health care providers, including insurance companies, hospitals, doctors, and nurses, to deny LGBTQ patients necessary medical treatment based on their religious beliefs.

296.    The effect of the Revised Rule will be that patients who seek care at odds with the religious beliefs of a health care provider or employee of a health care provider may be delayed in receiving care (including emergency care) or denied care altogether.

297.    The Revised Rule also will burden plaintiffs by precluding them from carrying out their organizational missions based solely on the religious views of a single employee.

298.    In addition, plaintiffs will be harmed because their ability to refer LGBTQ patients to other providers will be affected in that they will not know whether these providers will discriminate against their patients and/or refuse to treat their patients under the Revised

Rule's personal religious or moral belief exemptions.  Plaintiffs thus will be required to redirect

their staff and resources from providing their own services to assisting patrons in determining

who among the health care providers in the region will serve LGBTQ patients in a

nondiscriminatory manner.

299.    The Revised Rule violates the Establishment Clause because it:

(a)    has the primary purpose and effect of favoring, preferring, and endorsing

certain religious beliefs and certain religious denominations over others

and over nonreligion;

(b)    has the primary purpose and effect of preferring the religious beliefs of

some people and institutions over the lives, health, and other rights and

interests of third parties;

(c)    impermissibly entangles government with religion;

(d)    makes plaintiffs, their patients, and other third parties bear the costs and

harms of objecting employees' religious beliefs or religious exercise; and

(e)    imposes on plaintiffs a requirement to accommodate employees' religious

objections without taking constitutionally required account of the actual

burdens (if any) on the objectors or the effects on or harms to plaintiffs,

their patients, or the greater public health.

300.    Those who are denied coverage will suffer the stigma of government-sanctioned

discrimination.  They also will be forced to either endure significant psychological burdens or, if

they can afford it, pay for treatment out-of-pocket.  The Revised Rule favors religion at the

expense of LGBTQ patients without regard for LGBTQ patients' interests.  The Revised Rule

contains no provision for balancing or accounting for a patient's right to care.  Instead, it applies

categorically to deny patients the right to medical treatment based on a provider's religious or moral beliefs.

301.    The Revised Rule therefore violates the Establishment Clause of the First Amendment of the U.S. Constitution and must be set aside under the APA and the Establishment Clause.

302.    Defendants' violations cause ongoing harm to plaintiffs, their patients, the individuals they serve, and their members.

**EIGHTH CLAIM FOR RELIEF**
**Equitable Relief to Preserve Remedy**

303.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

304.    The Revised Rule will become effective on August 18, 2020 unless it is enjoined. Plaintiffs are entitled to a full, fair, and meaningful process to adjudicate the lawfulness of the Revised Rule before being required to implement its far-reaching and harmful requirements.

305.    Plaintiffs will suffer irreparable injury by implementation of the Revised Rule, which would erode hard-won trust between LGBTQ people and their health care providers, stigmatize and traumatize patients, interfere with medical procedures and operations, and result in delays and denials of care leading to physical harm and even death.  Preliminary and permanent injunctive relief is needed to ensure that plaintiffs' injuries are fully remedied.

306.    Injunctive relief also is needed to prevent the immediate harm resulting from the Revised Rule.  Patients need assurance that they will receive complete, accurate information and timely and responsive medical care in an environment that protects their constitutional rights and does not expose them to stigma and harm.  This Court should step in to protect plaintiffs' institutions, their patients, the individuals they serve, and their members, in addition to the

foremost principle guiding medical providers in responding to those in need of assistance and care – first, do no harm.

307.     Accordingly, to ensure that plaintiffs receive meaningful relief should they prevail in this action, the Court should preliminarily and permanently enjoin defendants from implementing the Revised Rule.

## REQUEST FOR RELIEF

Wherefore, plaintiffs pray that the Court grant the following relief:

A.  Declare that the Revised Rule is unlawful and unconstitutional through a declaratory judgment under 28 U.S.C. § 2201(a) and 5 U.S.C. § 706(a);

B.  Set aside and vacate the Revised Rule;

C.  Preliminarily and permanently enjoin the implementation and enforcement of the Revised Rule;

D.  Award reasonable attorneys' fees, costs, and expenses; and

E.  Award any other further and additional relief the Court deems just and proper.

Dated:  June 22, 2020

Respectfully submitted,

LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.

STEPTOE & JOHNSON LLP

By:  /s/ Omar Gonzalez-Pagan

By:  /s/ Johanna Dennehy

OMAR GONZALEZ-PAGAN*
*ogonzalez-pagan@lambdalegal.org*
KAREN LOEWY*
*kloewy@lambdalegal.org*
CARL S. CHARLES*
*ccharles@lambdalegal.org*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY  10005
Phone: (212) 809-8585
Fax:    (212) 809-0055

LAURA (LAURIE) J. EDELSTEIN*
*ledelstein@steptoe.com*
STEPTOE & JOHNSON LLP
One Market Plaza
Spear Tower, Suite 3900
San Francisco, CA  94105
Phone: (415) 365-6700
Fax:    (415) 365 6699

JAMIE A. GLIKSBERG*
*jgliksberg@lambdalegal.org*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
105 West Adams, 26th Floor
Chicago, IL  60603
Phone: (312) 663-4413
Fax:    (312) 663-4307

MICHAEL VATIS
(D.C. Bar No. 422141)
*mvatis@steptoe.com*
KHRISTOPH A. BECKER*
*kbecker@steptoe.com*
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY  10036
Phone: (212) 506-3900
Fax:    (212) 506-3950

JOHANNA DENNEHY
(D.C. Bar No. 1008090)
*jdennehy@steptoe.com*
LAURA LANE-STEELE**
*llanesteele@steptoe.com*
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC  20036
Phone: (202) 429-3000
Fax:    (202) 429-3902

*\* Motion for admission pro hac vice pending.*

*\*\* Application for admission to U.S. District
Court for the District of Columbia forthcoming.*

*Counsel for Plaintiffs*

83