**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WHITMAN-WALKER CLINIC, INC., *et al.*, | |
| *Plaintiffs,* | |
| v. | Case No. 1:20-cv-1630 |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | |
| *Defendants.* | |

**DECLARATION OF DR. SARAH HENN, MD, MPH**
**CHIEF HEALTH OFFICER, WHITMAN-WALKER HEALTH**

I, Sarah Henn, declare as follows:

1. I am the Chief Health Officer of Whitman-Walker Clinic, Inc., d/b/a Whitman-Walker Health ("Whitman-Walker").

2. I received my medical degree from the University of Virginia; interned at Emory University; was a resident in Internal Medicine at the University of Virginia; and completed an Infectious Disease Fellowship at the University of Maryland. I earned a Masters of Public Health degree at The Johns Hopkins Bloomberg School of Public Health. I maintain active board certifications in Infectious Disease and Internal Medicine. A copy of my curriculum vitae is attached as **Exhibit A**.

3. I have been a physician at Whitman-Walker since 2007, and became Chief Health Officer in May 2018. I oversee all health care related services at Whitman-Walker, as well as maintain a panel of patients for whom I provide direct care. In addition, I am the primary investigator for multiple HIV and Hepatitis C treatment and prevention trials, and am the Leader

1

of our Clinical Research Site for the AIDS Clinical Trials Group funded by the National Institutes of Health.

4.   I am submitting this Declaration in support of Plaintiffs' motion for a preliminary injunction to prevent the revised regulation under Section 1557, published by the U.S. Department of Health and Human Services ("HHS") on June 19, 2020 (the "Revised Rule"), from taking effect.

5.   Whitman-Walker provides a range of services, including medical and community health care, transgender care and services, behavioral-health services, dental-health services, legal services, insurance-navigation services, and youth and family support. Whitman-Walker provides primary medical care, HIV and Hepatitis C specialty care, and gender-affirming care to transgender and gender non-binary persons within the diverse community of the greater Washington, DC metropolitan area.  In calendar year 2019, our medical, dental, behavioral-health and community-health professionals provided health services to 20,760 patients—including medical care to 11,817 individuals, dental care to 2,014 patients, and walk-in sexually-transmitted-infection testing and treatment to 1,762 persons.  In 2019, 3,587 of our patients were individuals living with HIV; 2,148 identified as transgender; and 9,295 identified as gay, lesbian, bisexual or otherwise non-heterosexual.

6.   Whitman-Walker's patient population, including patients to whom I provide direct care and whose care I oversee, includes many persons who have experienced refusals of health care or who have been subjected to disapproval, disrespect, or hostility from medical providers and staff in hospitals, medical clinics, doctor's offices, or Emergency Medical Services personnel because of their actual or perceived sexual orientation, gender identity, transgender status, gender presentation, ethnicity or race, religious affiliation, poverty, substance use history, or for other reasons.

7. My patients and those whose care I oversee tell us that they are apprehensive or fearful of encountering stigma and discrimination in health care settings because of their past experiences. Many of our patients have delayed medical visits or postponed recommended screenings or treatment because of such fears. Frequently, persons living with HIV, diagnosed with sexually transmitted infections, struggling with substance use disorders, or whose gender identity is different from the sex that they were assigned at birth, face heightened stigma and discrimination and are particularly apprehensive in medical encounters. Our patients' concerns have been magnified by their belief that the federal government is permitting, if not encouraging, discrimination by health care personnel and health care institutions under the Revised Rule.

8. There is every reason to believe that the Revised Rule's elimination of protections from discrimination based on gender identity, sexual orientation, transgender status, failure to conform with sex stereotypes, along with its expansion of religious exemptions and weakening of safeguards for services to patients with Limited English Proficiency (LEP), will result in more discrimination against lesbian, gay, bisexual, transgender, queer and questioning (LGBTQ) patients, and inadequate services to LEP patients, at other clinics, doctors' offices, hospitals, pharmacies, and other health care facilities outside Whitman-Walker.

9. I and other Whitman-Walker health care providers, including referral coordinators, behavioral-health providers, and other staff, have learned of many instances of discrimination, from our patients and from communications with outside providers and staff. Examples include the following:

    a. Whitman-Walker was recently contacted by a transgender woman suffering from tonsillitis. She wanted treatment but knew of no hospital or facility other than Whitman-Walker where she could go. The caller reported that

in her suburban area, she and other transgender individuals she knows are routinely disrespected and poorly treated when they seek medical care, and asked for advice on where transgender patients can receive good care.

b. A gay man reported that he consulted a cardiologist for a heart issue. The cardiologist reviewed his medications and saw that one was Truvada—an antiretroviral medication that is used for "Pre-Exposure Prophylaxis" or "PrEP"—taken by persons who are not HIV-infected to avoid contracting HIV during sex. The cardiologist was startled and disapproving, and began lecturing the patient about what the cardiologist considered his inappropriate sex life.

c. A transgender man, together with his girlfriend, consulted a fertility clinic about their pregnancy options. Clinic staff told them that they would not help people like them.

d. A transgender patient of Whitman-Walker attempted to fill a prescription at a non-Whitman-Walker pharmacy for a hormone prescribed to assist in their gender transition, and was refused by the pharmacist.

e. Our patients seeking to fill prescriptions for Truvada for PrEP have also been refused by some pharmacies.

f. A gay man who is a long-term HIV survivor went to a local hospital emergency room after an accident that occurred during sex. He was treated with contempt by ER staff and was lectured about his sex life.

g. A transgender individual went to a local hospital emergency room suffering from acute abdominal pain. The individual was subjected to intrusive,

hostile questioning by ER personnel, loudly and in public, about their anatomy and gender identity.

h.  One of our physicians, while in residency at a hospital in a major Midwestern city, heard other residents refuse to refer to transgender patients by pronouns conforming to their gender identity, citing their religious beliefs. They continued to refuse even when informed that they were violating hospital policy.

i.  A transgender woman was scheduled to receive an ultrasound for cancer. The first radiological technician she encountered refused to perform the ultrasound. When she protested, a second technician performed the procedure, but mocked her openly.

j.  Transgender patients have reported to us that they have been in medical or mental-health crisis and called for an ambulance, and that the Emergency Medical Service personnel who have arrived on the scene have intentionally used pronouns inconsistent with their gender identity, even when the patients have asked them to stop and told them that their language was increasing their distress.

k.  A gay man who was engaged in sex, while under the influence of drugs, experienced a physical episode and was fearful he was having a heart attack. He called an ambulance, but the Emergency Medical Service personnel who arrived belittled him and his situation and refused to take him to an emergency room.

l. Local hospitals and surgeons have refused to perform gender-transition-related surgeries on Whitman-Walker transgender patients, even when they routinely perform the procedures in question on non-transgender patients, including in situations where the patient's insurance would cover the procedure or when the patient was able to pay for the procedure. This has happened with orchiectomies, breast augmentations, and breast reductions - procedures which are all routinely performed for treatment of cancer or for other reasons not related to gender identity.

m. A number of primary care physicians in our area have refused to prescribe hormone therapy for transgender patients seeking to transition from the sex they were assigned at birth to their actual gender identity. Many of these doctors have stated that they are not "comfortable" with such hormone therapy.

n. Our providers have seen situations in which a teenager who is transgender or gender-expansive has presented at a local hospital with symptoms for which hospitalization was indicated, but their hospitalization was delayed and even denied because hospital personnel took them less seriously than they took other young people with similar presentations who were not transgender.

o. Our transgender patients frequently report instances of being treated with disrespect and hostility by staff in doctors' offices, hospitals, and clinics. Frequently, staff at these facilities will refuse to address patients by their chosen names and gender pronouns, if these are not the same as the patients'

legal names and sex assigned at birth, or if patients appear to be transgender. The persistent use of names and pronouns other than what the patients have requested appears intentional and intended to communicate strong disapproval of the patients. I and my staff who frequently consult with transgender patients hear of such experiences from as many as four out of every five transgender patients. To state the obvious, there is no medically indicated reason to refuse to call patients by their names and pronouns, consistent with their gender identities.

10. These and many other experiences reveal that many medical providers and other staff continue to harbor explicit or implicit biases against LGBTQ people. Many providers and staff who harbor such feelings or beliefs nonetheless have provided care to LGBTQ patients, and kept their personal beliefs in check, because of anti-discrimination laws and regulations, such as the 2016 Final Rule; non-discrimination policies at many hospitals, clinics, and other health care facilities; and professional norms. The Revised Rule counteracts such non-discrimination policies and norms by signaling that discrimination based on sexual orientation, gender identity, and transgender status is permissible under federal law, and by extending religious exemptions to health care settings where they are inappropriate and dangerous. The result will likely be a significant increase in discriminatory incidents, denials of care, and the attendant harms to patients' health and well-being.

11. Discriminatory incidents are not only insulting and demoralizing for patients, but can jeopardize the patient's health, when a screening or treatment is denied or postponed, or the patient is discouraged from seeking medical care out of fear of repeated discrimination. Many if not most of my and Whitman-Walker's transgender patients express strong distrust of the health care system

generally, and a demonstrative reluctance to seek care outside Whitman-Walker unless they are in a crisis or in physical or mental stress.  This is because they want to avoid discrimination or belittlement.  Such incentives to avoid regular check-ups and other medical care can result in disease processes that are more advanced at diagnosis, less responsive to treatment, or even no longer curable in the case of some cancers.

12. In addition, LGBTQ people are more vulnerable to COVID-19.  For example, LGBTQ people are less likely compared to the general population to have health insurance to begin with and are more likely to be smokers with the resultant comorbidities such as asthma, COPD, and CVD which increase the risk for complications from COVID-19.  LGBTQ people are also more likely to work in jobs in that have been highly affected by the COVID-19 pandemic, often with more exposure and/or higher economic sensitivity to the COVID-19 crisis.[1]

13. As health care has had to go virtual due to the COVID-19 pandemic, hard coding within electronic health records and other limitations in functionality have made it very challenging for people with LEP to access care. In many cases for walk-in COVID-19 testing, registration and screening is being accomplished via the telephone. Many LGBTQ people and people with LEP have a challenging time with this need for electronic resources.

14. The Revised Rule frustrates my ability and the ability of my colleagues to successfully refer patients for specialty care from outside providers because we cannot assure our patients that those providers will provide care free from discrimination.

---

[1] Human Rights Campaign Found., *The Lives and Livelihoods of Many in the LGBTQ Community are at Risk Amidst COVID-19 Crisis* (Mar. 2020), https://assets2.hrc.org/files/assets/resources/COVID19-IssueBrief-032020-FINAL.pdf?_ga=2.249711620.386339034.1593392090-1365884386.1591027992.

15. The Revised Rule also erodes trust between patients and their health care providers, endangers the provider-patient relationship, and is likely to harm many patients' health.

16. Good medical care is based on trust as well as frank, and full communication between the patient and their provider. In many, if not most encounters, providers need patients to fully disclose all aspects of their health history, sexual history, substance-use history, lifestyle, and gender identity in order to provide appropriate care for the patients' mental and physical health. Incomplete communication, or miscommunication, can have dangerous consequences. For instance, a patient who conceals or fails to disclose a same-sex sexual history may not be screened for HIV or other relevant infections or cancers; and a patient who fails to fully disclose their gender identity and sex assigned at birth may not undergo medically-indicated tests or screenings (such as tests for cervical or breast cancer for some transgender men, or testicular or prostate cancer for some transgender women). The Revised Rule completely overlooks the importance of this information to medical providers, and instead focuses myopically on the limited instances in which sex assigned at birth may be relevant to care. Patients need to be encouraged to fully disclose all information relevant to their health care and potential treatment, which can only be achieved when patients are assured that the information they provide will be treated confidentially and with respect, and will not be used against them to deny treatment.

17. In order for Whitman-Walker's heath care providers to provide proper medical care and services to the LGBTQ community, our health care providers rely on frank and complete communication with their patients and the individuals who seek their services, and want the same happen when our patients need care elsewhere. Without full disclosure, we are not able to treat adequately our patients.

18. Patients remaining closeted to health care providers also results in increased costs to the health care system. When a patient is closeted and medical providers do not order medically necessary tests or screenings as a result, Whitman-Walker and its patients, as well as the health care system as a whole, suffer downstream effects, such as the exacerbation of a patient's distress and more acute conditions, and increased costs. In addition, I and other Whitman-Walker health care providers will bear an increased risk of malpractice when patients do not feel comfortable revealing important information about their sexual orientation, gender identity, and health history.

19. The Revised Rule also discourages LGBTQ patients from seeking preventative screenings and necessary medical treatment for fear of being subjected to discrimination.

20. The delay of preventative screenings and necessary health care can result in more acute health problems and outcomes for patients and raises concerns about patient safety. For example, research has identified pervasive health disparities for LGBTQ people with respect to cancer, HIV, obesity, mental health, tobacco use, and more. The delay of preventative screenings and necessary health care thus endangers the health and wellbeing of Whitman-Walker's LGBTQ patients and exposes them to lasting harms.

21. The delay of preventative screenings and necessary health care at other health care facilities fostered by the Revised Rule will cause LGBTQ patients to come to Whitman-Walker with more acute conditions and/or diseases that are more advanced at diagnosis, less responsive to treatment, or no longer treatable. This will in turn strain Whitman-Walker's resources, increase costs for providers, make it harder for our health care providers to treat the patients, and increase costs to the health care system in general.

22. Discrimination by health insurance providers against transgender individuals is yet another barrier to care that my patients and the patients whose care I oversee frequently experience.

Our providers, care navigators, and Legal Services attorneys continuously advocate for patients whose insurance – including Medicaid plans, Medicare, and private insurance plans – denies coverage of surgical procedures hormone therapies that are medically indicated and vital to patient health and well-being. The 2016 Final Rule has been an important tool in advocating for our patients. By declaring that discrimination in insurance based on gender identity or transgender status is not prohibited in federal law, and by limiting the types of insurance plans that are subject to federal nondiscrimination requirements, the Revised Rule will increase barriers to life-saving, medically-necessary care for transgender patients by allowing health insurers to revert back to policies excluding coverage for gender-affirming care. If patients with such coverage exclusions are to access the care they require, they will incur debilitating out of pocket costs to pay for their medical treatment. For many if not most of our transgender patients, lack of insurance coverage of gender-affirming surgeries and other treatments will mean that they are simply unavailable.

23. Ensuring that our health services are fully accessible to persons with limited English proficiency, and that our health care providers and other staff are able to communicate fully with all of our patients, is critical to Whitman-Walker's mission. Whitman-Walker has a number of patients whose primary language is Spanish or some other language, and who lack English proficiency. In 2019, approximately 9% of our patients had limited proficiency in English and needed interpreter services. Over the past several years, we have devoted considerable time and attention to developing and implementing a language access plan and training all staff in the details of that plan.

24. I and the providers I supervise have patients who, in hospital and medical-clinic settings, were refused Spanish-language interpreters, even when such interpreters were available

in the facility, because the provider or other staff thought that the patient ought to know English, or because of bias against immigrants.

25. Patients in these situations have had difficulty understanding their diagnosis and/or treatment plan, greatly increasing risk of a negative result and harm. Notices to LEP patients explaining their rights and what programs and services are available to them are crucial to promoting positive patient health outcomes. The Revised Rule's elimination of the requirement of such notices will result in harm to Whitman-Walker LEP patients by diminishing their meaningful access to health care, outside of what Whitman-Walker can provide. In addition, the Revised Rule will cause more patients to seek out care at Whitman-Walker due to a lack of appropriate language services available elsewhere.

26. Whitman-Walker's mission and fundamental principles of medical ethics that I adhere to in overseeing and providing care to patients dictate that all patients are deserving of the best and most respectful care available to them. All health care professionals are taught that their personal beliefs about a patient's actions, identity or beliefs cannot compromise the care that they provide to that patient in any way. Whitman-Walker and I, in my role as Chief Health Officer for Whitman-Walker, communicate that message to all health care staff from the beginning of the recruitment process to the first day of employment, and reinforce the message regularly.

27. The possibility that providers outside Whitman-Walker could invoke the overly broad religious exemptions in the Revised Rule to opt out of any aspect of care would fundamentally disrupt our care model and operations, as it would make it harder to refer patients to specialists and strain Whitman-Walker's already limited resources. Such discrimination would also violate basic tenets of medical ethics. Broad-based denials of care cannot be accommodated without lasting damage to the patient morale, health center, and our reputation in the community.

28. The Revised Rule removes or substantially weakens safeguards against health care discrimination against LGBTQ individuals, and the weakening of safeguards for LEP patients will make health care for significant numbers of Latinx people less accessible and less effective. In other words, the Revised Rule will make it harder for us to care for our patients who will face discrimination or have diminished access to care elsewhere as a result of the Revised Rule.

29. Although Whitman-Walker prides itself on being a refuge for LGBTQ individuals, LEP persons, and others who have experienced discrimination or culturally inadequate care elsewhere, it would be quite difficult for us to accommodate the substantial increase in demand for our services caused by the Revised Rule. Many if not most of our services are under-compensated due to private and public insurance reimbursement rates, and grant funds that do not fully account for the actual cost of service. Moreover, the COVID-19 pandemic has posed extraordinary financial and operational challenges. Many of our health services have been temporarily suspended since March of this year, or shifted entirely to telemedicine, with substantially lower reimbursement rates. The logistical challenges remain daunting, even without a significant increase in new patients.

[*Signature on next page.*]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 30 day of June, 2020.

Sarah Henn, MD, MPH

# EXHIBIT A

*Curriculum Vitae of Sarah Henn, MD, MPH*

# Sarah L. Henn, MD, MPH





1525 14th Street NW ● Washington, DC 20005 ● Phone: 202.745.6174 ● E-Mail: shenn@whitman-walker.org

## Education and Post-Doctoral Training

Bachelor of Arts                                                                 1988 - 1992
Hamilton College, Clinton, New York, Major International and Comparative Political Studies, Minor German

Doctor of Medicine                                                           1993 - 1997
University of Virginia School of Medicine, Charlottesville, Virginia

Internship                                                                           1997 - 1998
Internal Medicine, Emory University Medical Center, Atlanta, Georgia

Residency                                                                           1998 - 2000
Internal Medicine, University of Virginia Medical Center, Charlottesville, Virginia

Master of Public Health                                                   2001 - 2003
The Johns Hopkins Bloomberg School of Public Health, Baltimore, Maryland, Concentration in International Health

Fellowship                                                                         2004 - 2006
Infectious Diseases, University of Maryland Medical Center and the Institute for Human Virology, Baltimore, Maryland

## Certifications, Licensures, & Appointments:

Board Certifications:
- American Board of Internal Medicine, Internal Medicine, 2000, recertified 2010
- American Board of Internal Medicine, Infectious Diseases, 2006, recertified 2016

Medical Licensure:
- District of Columbia, 2007 – present

Academic Appointments:
- George Washington University, Clinical Assistant Professor, 2008 - present

## Professional Experience

### Chief Health Officer                                                    May 2018 – present

### Whitman-Walker Health, Washington DC

**Responsibilities:** Medical lead of a Federally Qualified Health Center serving over 12,000 clients with over 300 employees and an annual budget of over 100 million dollars.  Key member of the executive team responsible for strategic planning and the overall management of the organization.  Reports directly to the CEO/Executive Director.

**Key Achievements:**

- Established in conjunction with seven regional FQHC leaders the Coordinated Care Network, an incorporated independent entity, in the District of Columbia to centralize coordinated primary care, increase quality, reduce cost, and increase influence with payers and stakeholders positioning WWH effectively for value based payment transformation which negotiates directly with Medicaid MCO payers around service delivery for the care of over 100,000 individuals in the District of Columbia
- Expanded clinical services to include adolescents with a specialty focus on HIV Prevention, Sexual Health, and Gender Affirming Care
- Clinical Research Site (CRS) Leader of AIDS Clinical Trials Group (ACTG) site as part of Johns Hopkins' Clinical Trails Unit (CTU)



- Serves of the Executive Committee of the DC Center for AIDS Research (CFAR) and is a member of the DC CFAR housed at the George Washington University Milken School of Public Health

## Senior Director of Health Care Operations and Medical Services        January 2015 – April 2018

## Whitman-Walker Health, Washington DC

**Responsibilities:** Leads medical operations of a Federally Qualified Health Center serving over 18,000 clients with near 300 employees and an annual budget of over 100 million dollars. Serves on the senior leadership team providing strategic direction for the health center. Oversees the integrated delivery of primary medical, specialty HIV, HIV prevention, gender affirming, dental, occupational therapy, aesthetics, laboratory, and pharmacy services. Negotiates and oversees contracts with outside vendors.

**Key Achievements:**

- Achieved Patient Center Medical Home highest level 3 accreditation for demonstrating strong performance and significant improvement in performance measures across the triple aim of better patient experience, better health, and lower per capita cost.
- Led the design and implementation of an improved patient scheduling system increasing same day and next day scheduled appointments to 30% of all patient visits and decreasing new patient wait times to under one week
- Improved laboratory patient experience while simultaneously negotiating improved rates with LabCorp achieving cost savings of up to 50% on frequently order tests and $10,000 per month in credit to WWH's account for labs performed for clients who are <200% federal poverty level
- Oversee pharmacy contract and performance in a pharmacy that dispenses up to 1000 prescriptions daily with a net profit of close to a million dollars monthly in close conjunction with the Deputy Executive Director
- Awarded over 1 million dollars in new research grants in 2017 from the National Institute of Drug Abuse and the Patient Centered Outcomes Research Institute
- Significantly improved health center policies, trainings, and practices related to LGBT health helping to result in WWH being recognized as a "Leader in LGBT Healthcare Equity" with a score of 100/100
- Achieved increased service integration and productivity by leading weekly interdepartmental medical operations meetings and working closely with providers to create buy-in and improve morale
- Transitioned medical operations of the Elizabeth Taylor Medical Center serving more than 10,000 patients to a new facility at 1525 14th St NW in May 2015
- Expanded medical services at the Max Robinson Center, in Southeast DC, more than tripling the number of care providers ensuring that the full suite of patient services are consistently available

## Interim Sr. Director of Evidence Based Medicine        2015

## Whitman-Walker Health, Washington DC

**Responsibilities:** Oversaw the clinical research department and the execution of large-scale research studies and collaborations. Acted as leader of clinical research site (CRS) for AIDS Clinical Trials Group (ACTG) and primary investigator for the Study to Help the AIDS Research Effort (SHARE), which is one of the four clinical sites for the Multicenter AIDS Cohort Study (MACS).

**Key Accomplishments:**



- Reorganized the structure of the department to allow for increased staff development opportunities and quality monitoring of research programs
- Maintained industry research funding of over 2 million annually while more than doubling ACTG study participation

## Medical Director                                                        2009 – 2014

### The Elizabeth Taylor Center, Whitman-Walker Health, Washington DC

**Responsibilities:**  Performed overall planning, organizing, scheduling, directing, and evaluation of clinical medical providers ensuring excellent patient care experience. Worked closely with the Chief Medical Officer and the Senior Director of Quality Improvement in the delivery of the highest quality of care and the development of quality improvement projects.

**Key Accomplishments:**

- Implemented ongoing provider education to improve quality indicators.
- Supervised 15 providers, including other physicians, physician volunteers, physician-assistants, and nurse practitioners

## Staff Physician                                                        2007 - 2009

### Whitman-Walker Health, Washington DC

- Provided primary care at clinical sites in Northwest and Southeast Washington, DC and Northern Virginia
- Specialized in complex HIV care and Hepatitis C treatment
- Initiated Hepatitis C treatment program

## Clinical Instructor, Division of Infectious Diseases                   2006 - 2007

### University of Maryland Medical Center, Baltimore, Maryland

- Maintained active outpatient infectious disease clinics at both the University of Maryland and the Veterans Administration Hospital in Baltimore, MD
- Attended on the inpatient HIV hospital services overseeing Infectious Disease fellows, Medical residents, and students
- Developed a research protocol to reduce maternal to child transmission of Hepatitis B in HIV co-infected mothers

## Technical Advisor for PEPFAR                                           2004 - 2007

### Institute for Human Virology, Baltimore, Maryland

- Launched and evaluated points of service for HIV/AIDS care in Nigeria
- Provided technical assistance and expertise to Nigerian physicians and medical staff in order to initiate HIV treatment for patients

## Clinical Associate Staff Physician                                     2002 - 2003

### The Cleveland Clinic Foundation, Cleveland, Ohio

- Trained internal medicine residents, interns, and medical students
- Attended on the inpatient medicine wards, primary care clinic, and pre-operative clinic performing medical consultations on national and international referrals.



- Supervised patient care team

**Associate Physician**                                                                                    2000 - 2002

**Shenandoah Internal Medicine, Augusta Medical Center, Virginia**

- Practiced private practice Internal Medicine in rural Virginia
- Attended to patients in both the outpatient and inpatient setting
- Cared for patients in the Intensive Care Unit, Cardiac Step Down Unit, and performed cardiac stress testing

## Publications

**Peer-reviewed journal articles**

1. Lathouwers E, Wong EY, Brown K, Baugh B, Ghys A, Jezorwski J, Mohsine EG, Van Landuyt E, Opsomer M, De Meyer S. Week 48 Resistance Analyses of the Once-Daily, Single-Tablet Regimen Darunavir/Cobicistat/Emtricitabine/Tenofovir Alafenamide (D/C/F/TAF) in Adults Living with HIV-1 from the Phase III Randomized AMBER and EMERALD Trials. AIDS Res Hum Retroviruses. 2019 Oct 21;. doi: 10.1089/AID.2019.0111. [Epub ahead of print]

2. Eron JJ, Orkin C, Cunningham D, Pulido F, Post FA, De Wit S, Lathouwers E, Hufkens V, Jezorwski J, Petrovic R, Brown K, Van Landuyt E, Opsomer M. Week 96 efficacy and safety results of the phase 3, randomized EMERALD trial to evaluate switching from boosted-protease inhibitors plus emtricitabine/tenofovir disoproxil fumarate regimens to the once daily, single-tablet regimen of darunavir/cobicistat/emtricitabine/tenofovir alafenamide (D/C/F/TAF) in treatment-experienced, virologically-suppressed adults living with HIV-1. Antiviral Res. 2019 Oct;170:104543.

3. Naggie S, Fierer DS, Hughes MD, Kim AY, Luetkemeyer A, Vu V, Roa J, Rwema S, Brainard DM, McHutchison JG, Peters MG, Kiser JJ, Marks KM, Chung RT. Ledipasvir/Sofosbuvir for 8 Weeks to Treat Acute Hepatitis C Virus Infections in Men With Human Immunodeficiency Virus Infections: Sofosbuvir-Containing Regimens Without Interferon for Treatment of Acute HCV in HIV-1 Infected Individuals. Clin Infect Dis. 2019 Mar 28;. doi: 10.1093/cid/ciy913. [Epub ahead of print]

4. Orkin C, Molina JM, Negredo E, Arribas JR, Gathe J, Eron JJ, Van Landuyt E, Lathouwers E, Hufkens V, Petrovic R, Vanveggel S, Opsomer M; EMERALD study group. Efficacy and safety of switching from boosted protease inhibitors plus emtricitabine and tenofovir disoproxil fumarate regimens to single-tablet darunavir, cobicistat, emtricitabine, and tenofovir alafenamide at 48 weeks in adults with virologically suppressed HIV-1 (EMERALD): a phase 3, randomised, non-inferiority trial. Lancet HIV. 2018 Jan;5(1):e23-e34.

5. Cahn P, Kaplan R, Sax PE, Squires K, Molina JM, Avihingsanon A, Ratanasuwan W, Rojas E, Rassool M, Bloch M, Vandekerckhove L, Ruane P, Yazdanpanah Y, Katlama C, Xu X, Rodgers A, East L, Wenning L, Rawlins S, Homony B, Sklar P, Nguyen BY, Leavitt R, Teppler H; ONCEMRK Study Group. Raltegravir 1200 mg once daily versus raltegravir 400 mg twice daily, with tenofovir disoproxil fumarate and emtricitabine, for previously untreated HIV-1 infection: a randomised, double-blind, parallel-group, phase 3, non-inferiority trial. Lancet HIV. 2017 Nov;4(11):e486-e494.

6. Wyles D, Ruane PJ, Sulkowski MS, Dieterich D, Luetkemeyer A, Morgan TR, Sherman KE, Dretler R, Fishbein D, Gathe JC, Henn S, Hinestrosa F, Huynh C, McDonald C, Mills A, Overton ET, Ramgopal M, Rashbaum B, Ray G, Scarsella A, Yozviak J,



McPhee F, Liu Z, Hughes E, Yin PD, Noviello S, Ackerman P for the ALLY-2 Investigators, Daclatasvir plus Sofosbuvir for HCV in Patients Coinfected with HIV-1. N Engl J Med. 2015 Aug 20;373(8):714-25.

7. Alcaide ML, Feaster DJ, Duan R, Cohen S, Diaz C, Castro JG, Golden MR, Henn S, Colfax GN, Metsch LR, The incidence of Trichomonas vaginalis infection in women attending nine sexually transmitted diseases clinics in the USA. Sex Transm Infect. 2015 Jun 12 pii: sextrans-2015-052010.

8. Metsch LR, Feaster DJ, Gooden L, Schackman BR, Matheson T, Das M, Golden MR, Huffaker S, Haynes LF, Tross S, Malotte CK, Douaihy A, Korthuis PT, Duffus WA, Henn S, Bolan R, Philip SS, Castro JG, Castellon PC, McLaughlin G, Mandler RN, Branson B, Colfax GN., Effect of risk-reduction counseling with rapid HIV testing on risk of acquiring sexually transmitted infections: the AWARE randomized clinical trial. JAMA. 2013 Oct 23;310(16):1701-10.

9. Silver D, Karnik G, Osinusi A, Silk R, Stabinski L, Doonquah L, Henn S, Teferi G, Masur H, Kottilil S, Fishbein D., Effect of HIV on liver fibrosis among HCV-infected African Americans. Clinical Infectious Disease. 2013 May;56(9):1280-3.

10. Henn SL, Forrest GN, Febrile Neutropenia Associated with Painful Lesions of the Palms and Digits. Clinical Infectious Disease. 2006;43(6):747, 791-2.

11. Henn S, Bass N, Shields G, Crow TJ, DeLisi LE, Affective illness and schizophrenia in families with multiple schizophrenic members: independent illnesses or variant gene(s)? Eur Neuropsychopharmacol. 1995;5 Suppl:31-6.

## Abstracts

1. Alt Olsen H, Sarkodie E, Coleman M, Davies M, Henn, S, Fast Forward to Viral Suppression: A Nurse-driven Model for Facilitating Same Day Start of ARVs Following Reactive HIV+ Result or First-time Engagement in HIV Care. 2019, Association of Nurses in AIDS Care, Portland. Abstract #B-11.

2. Coleman M, Sarkodie E. Eggleston A, Kelley E, Henn S, Measuring Retention in Real World PrEP Programs; What is the best way to evaluate engagement with PrEP? 14th International Conference on HIV Treatment, Prevention, and Adherence, Miami. Abstract # 3381.

3. Alt Olson H, Sarkodie E, Coleman M, Davies M, Henn S, Fast Forward to Viral Suppression: Immediate Initiation of ARVs Following Reactive HIV+ Test Results or Engagement in HIV Care for the First Time at a Community Health Center in Washington, DC. 2019. 14th International Conference on HIV Treatment, Prevention, and Adherence, Miami. Abstract #5035.

4. Alt Olson H, Sarkodie E, Colemen M, Davies M, Henn S, Immediate Initiation of ARVs Following Reactive HIV+ Test Result or Engagement in HIV Care for the First Time at a FQHC in Washington. 2019. 6th Annual SYNChronicity Conference.

5. Walsh B, Coleman M, Dietrich M, Du Mond J, Jue J, Sadler M, Saperstein S, Wickham C, Henn S, Improvements in Engagement, Retention, and Viral Load Suppression in a Mobile Outreach Retention and Engagement (MORE) Project at a Community Health Center in Washington DC. 2017. 9th IAS Conference on HIV Science. Abstact #A-854-0225-05081.

6. Dieterich M, Coleman M, Du Mond J, Jue J, Sadler M, Saperstein S, Wickham C, Walsh B, Henn S, HIV+ Participants in the Mobile Outreach and Retention (MORE) Program in Washington, DC with Co-Morbid Mental Health and/or Substance


Abuse Diagnoses are Significantly Less Likely to Achieve Viral Suppression Despite Comprehensive Support. 2017 12th International Conference on HIV Treatment and Prevention Adherence, Miami. Oral Abstract #277.

7. Osinusi A, Wang C, Zhang X, Shivabesan G, Shivakumar B, Silk R, Doonquah L, Henn S, Teferi G, Masur H, Kottillil S, Fishbein D, Augmentation of Interferon signaling pathway by Nitazoxanide: A therapeutic strategy for HIV/HCV Coinfected Relapsers to Peg-interferon and Ribavirin therapy. 2012 19th Conference on Retroviruses and Opportunistic Infections, Seattle.

8. Silver D, Karnik G, Osinus A, Silk R, Stabinski L, Doonquah L,Henn S, Tefari G, Masur H, Kotillil S, Fishbein D, Liver Fibrosis in African Americans, Comparing HCV Mono-Infection with HIV-HCV Co-Infection. 2011 American Association for the Study of Liver Disease Conference, San Francisco.

9. Henn SL, Weekes E, Forrest GN, Methicillin Resistant Staphylococcus Aureus Bacteremia Treated with Linezolid: A Retrospective Review of Outcomes. 2006 46th Interscience Conference on Antimicrobial Agents and Chemotherapy (ICAAC), San Francisco. Abstract #876.

## Awards:

Outstanding Employee of the Year 2016, Whitman-Walker Health, selected by employees and the Employee Advisory Group

George McCracken Infectious Disease Fellow 2006, Interscience Conference on Antimicrobial Agents and Chemotherapy, San Francisco