DocuSign Envelope ID: 05019E4A-1C4D-49B9-8FAC-7776F2CAC693

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WHITMAN-WALKER CLINIC, INC., *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> *Defendants*. | Case No. 1:20-cv-1630 |

## DECLARATION OF DR. WARD CARPENTER, MD
## CO-DIRECTOR OF HEALTH SERVICES, LOS ANGELES LGBT CENTER

I, Ward Carpenter, declare as follows:

1. I am the Co-Director of Health Services for the Los Angeles LGBT Center (LA LGBT Center), where I was formerly the Associate Chief Medical Officer as well as the Director of Primary and Transgender Care.

2. I received my medical degree from the Robert Wood Johnson Medical School and had my residency at St. Vincent's Hospital Manhattan. I am board-certified in Internal Medicine and I hold certification in HIV Medicine. I am licensed to practice in the state of California. At the LA LGBT Center, I oversee all operations of the Federally Qualified Health Center ("FQHC"), including personnel, finances, clinical programs (mental health, psychiatry, primary care, HIV care, transgender health, substance abuse, and sexual health), nursing, case management, quality, risk management, and clinical research. I also maintain a panel of patients for whom I provide direct care. A copy of my curriculum vitae is enclosed as **Exhibit A**.

3. I am submitting this Declaration in support of Plaintiffs' Motion for Preliminary Injunction to prevent the revised regulation under Section 1557 of the Affordable Care Act

1

DocuSign Envelope ID: 05019E4A-1C4D-49B9-8FAC-7776F2CAC693

("ACA"), published by the U.S. Department of Health and Human Services ("HHS") on June 19, 2020 (the "Revised Rule"), from taking effect.

4. As the Co-Director of Health Services, I oversee the health care of over 32,000 patients who come to the LA LGBT Center for their care; I personally provide care to a panel of 200 patients. All of my patients identify as LGBTQ, and approximately 30% of my patients are people living with HIV. My patient population is also disproportionately low-income and experiences high rates of chronic medical conditions, homelessness, unstable housing, extensive trauma history, and discrimination and stigmatization in health care services. Many of these patients come to me from different areas of California, other states, and even other nations to seek services in a safe and affirming environment.

5. I provide a wide spectrum of health care services, including, but not limited to, HIV treatment, testing and prevention; STD testing, treatment and prevention; general primary care with an LGBT focus; and comprehensive transgender care. I have worked in this field of medicine continuously since 2004 and have personally cared for over 4,000 people in that time. I have worked in two Federally Qualified Health Centers, in New York and Los Angeles, as well as a private practice in New York. I am a nationally-recognized expert in the field of transgender medicine.

6. Many if not most of the individuals in our very diverse patient population face considerable stigma and discrimination – as people living with HIV, as sexual or gender minority people, and/or as people of color. Transgender people have a 41% lifetime risk of attempting suicide. This shocking observation can be explained by the intense dysphoria inherent in living in a body and a society that does not reflect and validate who you know yourself to be at a core level. In order to avoid this tragic consequence, transgender people require compassionate, sensitive, and

competent care that often includes medical and/or surgical procedures. These patients have significantly improved mental health outcomes when able to proceed with the treatments they need. Treatments for gender dysphoria have been deemed medically necessary by the World Professional Association of Transgender Health (WPATH) and the Endocrine Society, as well as other major medical organizations, in the same way that the American College of Cardiology has deemed treatment for hypertension medically necessary. In fact, in the course of treating gender dysphoria, endocrinologists and other health care providers use the same medications to treat transgender people as they use to treat non-transgender people with hormone deficiencies.

7. Under the Revised Rule, not only are health care providers invited to discriminate against LGBTQ patients, but insurance providers are encouraged to stop providing coverage for medically necessary, life-saving procedures and medications to treat gender dysphoria. Medical personnel who are duty-bound to treat life-threatening conditions (*e.g.*, hypertension) are now being invited to refuse to treat or cover care for a condition that could become life-threatening if left untreated – gender dysphoria –despite having the necessary tools and expertise to do so. Health care discrimination like this will have immediate negative consequences for a distinct and oppressed minority group. It should not invited and encouraged, as it is in the Revised Rule.

8. There is every reason to believe that the Revised Rule encourages health care providers to claim a right to refuse care or opt out of serving patients with particular needs, based on religious or moral beliefs, and will result in more discrimination, mistreatment, and denials of health care services against LGBTQ patients and patients living with HIV at other clinics, doctors' offices, hospitals, pharmacies, and other health care facilities outside of the LA LGBT Center. Even before the Revised Rule was proposed or issued, I and the other providers that I supervise at the LA LGBT Center treated many patients who have experienced traumatic stigma and

3

DocuSign Envelope ID: 05019E4A-1C4D-49B9-8FAC-7776F2CAC693

discrimination – based on their sexual orientation, gender identity, HIV status, and/or other factors – when seeking care from other providers. For example:

    a. A transgender patient went to a urologist due to uncomfortable urination lasting for several years after her vaginal surgery. She was repeatedly referred to as "sir" and "he" despite repeated requests to use the correct pronouns. When the patient confronted the clerk, the clerk said "this is what your ID says, so this is how we will refer to you." When she saw the doctor, he also called her "sir," completely humiliating her in the most unprofessional manner. He did not close the door to the exam room during their visit, so that the entire waiting room could hear his conversations with her, and he asked her to remove her pants in full view of the waiting room. She was so traumatized by this experience that four years later, she continues to live with daily pain rather than risk being subjected to discrimination by another transphobic urologist.

    b. A transgender patient started bleeding profusely from her vagina one week after surgery. Because there are so few trans-competent surgeons in the United States, this patient's surgeon was thousands of miles away. When she finally spoke to an ER doctor, the physician looked disgusted and said "what do you want me to do about it?" then walked away. She had to pack her own vagina with gauze pads and leave the ER, not knowing if she would live or die, and only coming to see us three days later after having lost a significant amount of blood. These horrific incidents will increase as a result of the Revised Rule. The likely result: patients will die.

DocuSign Envelope ID: 05019E4A-1C4D-49B9-8FAC-7776F2CAC693

c. A gay male patient with a serious and concerning neurological condition went to a neurologist. At this visit, the doctor had religious brochures throughout the waiting room. On arrival in the exam room, he was given a brochure about a particular Christian faith and asked if he had any questions. The patient felt extremely uncomfortable with this insertion of religion into what he felt should be a neutral space. As a result, he did not return for care and experienced a delay of several more months trying to find a new doctor he could trust.

d. A person living with HIV was referred to a surgeon for a routine procedure. The surgeon sent a note back to the patient's primary care physician asking him to refer the patient to someone "who was more familiar with treating patients like him." Again, this patient waited another two months to have this surgery, which could have caused severe or life-threatening complications.

e. A lesbian woman went to her doctor and was told that lesbians are not at risk for HPV and, therefore, she did not need cervical cancer screening. This patient knew enough to find a new doctor, but many patients would accept this information as fact and never receive a Pap smear, significantly increasing their chances of dying from cervical cancer. This type of medical error based on discriminatory stereotypes demonstrates what will happen when medical personnel are invited to discriminate instead of focusing on the health needs of patients in their care.

      f. A gay man went to his primary care physician with urinary burning and discharge. Because his health care provider did not ask, the provider did not know that this patient was sexually active with men. Therefore, the provider did only one test, which was negative, and sent him to a urologist. The urologist did another test, which was negative, then performed a procedure to look inside this man's bladder with a camera. It was not until he came to the LGBT Center that we performed a proper medical history and exam and were able to treat him immediately for his sexually transmitted infection. We also determined that he had sex with five other people from the time of his first symptoms to the time he was finally treated, weeks later. Had any of these providers stopped to ask the man about his sexual practices, they would have immediately tested him and treated him for a sexually transmitted disease. Instead, he saw three providers, received hundreds of dollars in unnecessary testing and passed his infection along to five other people who themselves had to go down similar testing and treatment paths.

9. In sum, the message of these examples is clear: when patients are discriminated against, stereotyped, and mistreated in medical establishments, patients stop seeking care or their care is detrimentally delayed out of fear of repeated discrimination and denials of care. As a result, their conditions remain untreated for a much longer period of time, if they ever get treatment, resulting in much more acute conditions, ultimately costing the health care system millions of dollars in unnecessary expenses while harming patients and public health, including by increasing costs on the Center. When medical staff fail to care for every patient in the best way that they can,

DocuSign Envelope ID: 05019E4A-1C4D-49B9-8FAC-7776F2CAC693

putting patients' best interests at the center of medical care, medical mistrust is worsened, care is delayed, and health care becomes more expensive.

10. These incidents reveal that many health care providers and other staff harbor explicit or implicit biases against LGBTQ people and people living with HIV. Because of legal requirements, health care facility nondiscrimination policies, and professional norms, many of them have kept their personal beliefs and feelings in check. By empowering health care staff to think that they have the right to act on their personal beliefs, even at the expense of patient needs, the Revised Rule is very likely to result in many more incidents of discrimination and greater harm to LGBTQ individuals and patients living with HIV who are struggling with mental health or substance use issues, including the patients whom I treat and whose treatment I supervise.

11. Such experiences are not only insulting and demoralizing for the patient, but can jeopardize the patient's health, when a screening or treatment is denied or postponed, or the patient is discouraged from seeking medical care out of fear of repeated discrimination. Many if not most of my and the LA LGBT Center's transgender patients express strong distrust of the health care system generally, and a demonstrative reluctance to seek care outside the LA LGBT Center unless they are in a crisis or in physical or mental stress. This is because they want to avoid discrimination or belittlement. Such incentives to avoid regular check-ups and other medical care can result in disease processes that are more advanced at diagnosis, less responsive to treatment, or even no longer curable in the case of some cancers. Already, my patients are arriving at the LA LGBT Center with more acute medical conditions than they would otherwise because anti-LGBTQ policies fomenting discrimination, like the Revised Rule, has caused patients to fear receiving necessary medical care.

DocuSign Envelope ID: 05019E4A-1C4D-49B9-8FAC-7776F2CAC693

12. It is extremely difficult to provide effective care after patients have been rejected or discriminated against by other providers. The patients' level of trust at that point is so low that they expect to mistreated, stereotyped, and discriminated against. This requires providers at the LA LGBT Center to spend a significant amount of time trying to undo the damage (often cumulative, particular with intersectional marginalized identities) of such care. Patients who have been discriminated against have lost complete trust in the system and in health care providers. The Revised Rule has caused and will continue to cause additional discrimination against our patients at other facilities. As a result, we physicians and the LA LGBT Center will need to hire extra mental health staff to assist in unpacking our patients' health care trauma so that our patients are able to engage in our services and trust our health care providers in a meaningful way. When patients are discriminated against elsewhere, every patient contact at our facility will need to spend more time and resources assisting those patients, from front desk to triage staff. Discrimination creates added health stressors that damage the patient-physician relationship, resulting in inferior health outcomes for patients. It takes a long time to re-earn the trust patients hope for, but are afraid to give us. The Revised Rule has and will continue to increase patient trauma, and in turn, increase the Center's workload, consume its resources and make it more difficult to provide patients with the care that they need.

13. With existing health and health care disparities that harm the LGBTQ community – particularly the shortage of LGBTQ/HIV culturally competent providers – the Revised Rule has and will continue to create chaos and confusion, which will further exacerbate existing barriers to health care and result in negative community health outcomes. I have already received countless calls and visits from LGBTQ patients, particularly transgender patients, concerned that their surgeries are canceled and that they will no longer have access to hormone therapy to treat gender

dysphoria as a result of the discriminatory Revised Rule. Patients are concerned that under the Revised Rule, they will no longer be able to access necessary medical services.

14. Good medical care is based on trust as well as frank and full communication between the patient and their provider. In many, if not most encounters, providers need patients to fully disclose all aspects of their health history, sexual history, substance-use history, lifestyle, and gender identity in order to provide appropriate care for the patients' health, both physical and mental. Incomplete communication, or miscommunication, can have dangerous consequences. For instance, a patient who conceals or fails to disclose a same-sex sexual history may not be screened for HIV or other relevant infections or cancers. A patient who fails to fully disclose their gender identity and sex assigned at birth may not undergo medically-indicated tests or screenings (such as tests for cervical or breast cancer for some transgender men, or testicular or prostate cancer for some transgender women). Patients need to be encouraged to fully disclose all information relevant to their health care and potential treatment, which can be achieved only when patients are assured that the information they provide will be treated confidentially and with respect.

15. The Revised Rule will cause LGBTQ patients to attempt to hide their LGBT identities when seeking health care services, especially from religiously-affiliated health care organizations, to avoid discrimination. The Revised Rule endangers the provider-patient relationship and is likely to harm many patients' health by discouraging patients from full disclosure about their gender identity, sexual orientation, or medical histories and encouraging providers to avoid topics that may offend their personal moral or religious beliefs in their encounters with patients. Patients will avoid raising any topics, questions, or facts that they fear could possibly offend their health care providers' personal beliefs, resulting in harm to patients. When patients are unwilling to disclose their sexual orientation and/or gender identity to health

9

DocuSign Envelope ID: 05019E4A-1C4D-49B9-8FAC-7776F2CAC693

care providers out of fear of discrimination and denial of treatment, their mental and physical health is critically compromised.

16. The Revised Rule will also cause an increase in demand for my health care services and the services of the providers whom I supervise. I have seen a spike in behavioral and mental-health issues resulting from discrimination and denials of health care services because discriminatory rules like the Revised Rule cause LGBTQ patients and patients living with HIV to lose trust in their health care providers (either out of fear of discrimination or on account of being denied care). As a result, there will be an increase in demand for my and my department's services that will limit my ability to provide adequate care and time to my patients. This will increase wait times for my patients, and the delays in care may worsen conditions for which my patients are seeking treatment and outcomes of care.

17. The Revised Rule is in direct conflict with the oath that I swore as a doctor and many of the federal, state, and insurance rules, regulations, and statutes that I am required to follow. Like all physicians, I swore an oath to do no harm and to care for the people who need me to the best of my ability. Physicians are not ethically allowed to refuse care even to someone because of who they are. The fact that the Revised Rule suggests that such discriminatory behavior is allowed, has personally caused me great confusion and stress. In light of the oath I took, it is unclear to me how I can work collaboratively with colleagues who may discriminate against my patients without violating current medical ethical and legal standards of care.

18. The Revised Rule makes it impossible for me and my patients to trust the specialists on whom we rely to serve as critical partners in the care team. Care for a patient cannot be effectively provided if there is no trust. A patient may not go to a specialist appointment outside the Center if they fear discrimination. And in such a situation, for example, a person who initially

DocuSign Envelope ID: 05019E4A-1C4D-49B9-8FAC-7776F2CAC693

had mild chest pain but who never received the proper care suddenly is in the ER with a massive heart attack, costing the workforce and the health care system hundreds of thousands of dollars.

19. The Revised Rule's removal of language access protections for Limited English Proficiency (LEP) patients will put our patients at an increased risk of receiving inferior care and improper testing and delayed diagnoses when they seek health care services from outside providers. This sea change is contrary to medical ethics and standards of care. Without necessary translations services, LEP patients tend to remain silent during consultations. For example, if translators are not required, LEP patients tend not to speak up and tell me that they are failing to take their medications or are feeling ill. Instead, the more typical patient response is "I'm fine, thank you," because of the difficulty of articulating in English their medical needs, concerns and pains. We sometimes do not even know that they are LEP patients until a translator is provided because patients are often embarrassed to mention their LEP. If health care providers are not mandated to provide translators, patients tend not to speak up about needing translation services. The result is that providers cannot provide proper services to such patients because they cannot understand the patients' full medical needs, histories, and the extent of their problems. This leads to misdiagnoses, delays in care, and improper treatment plans. And the end result is that our patients end up in the emergency room dying unnecessarily. By removing mandatory accommodations for LEP patients, the Revised Rule causes harm to patients and increases health care costs overall.

20. The Revised Rule is especially egregious and harmful during a pandemic like COVID-19 when patients most desperately need to know that they will have somewhere to go for nondiscriminatory health care should they contract the virus. During a pandemic, access to health care services is paramount. The Revised Rule's invitation for health care providers to discriminate

DocuSign Envelope ID: 05019E4A-1C4D-49B9-8FAC-7776F2CAC693

against LGBTQ people and LEP patients does the exact opposite. The Revised Rule sends a message to LGBTQ and LEP patients that they are not deserving of equal access to health care, deterring such populations from seeking care, even in cases of emergency. When you empower discrimination, people understand and believe "the health care system is not for me." This discrimination harms our patients and those around them during a global pandemic. People will not show up to the health care system, and they will then spread coronavirus to countless more people around them. We already have problem with transgender people avoiding the emergency room when they need care out of fear of discrimination. After a person has been told enough times by an ER: "we don't serve your kind here," they are not likely to go back even if it means they might die. I imagine LGBTQ people have died at home, avoiding an ER, out of fear of being subjected to such discrimination in their most vulnerable moments. The Revised Rule multiplies this very serious problem.

21. The Revised Rule will also adversely impact the LA LGBT Center and its individual health care providers, including me, by necessitating the diversion and reallocation of resources to address the increase in the numbers of referral requests resulting from the Revised Rule. The Revised Rule has increased requests for referrals to LGBTQ-affirming outside providers for services that the LA LGBT Center does not have sufficient resources to provide. The Center will also have more difficulty finding health care providers to refer patients to, especially those with niche specialties, given that the Revised Rule emboldens health care providers to discriminate against and refuse services to LGBTQ patients in complete contradiction to medical and ethical standards of care. There are cities or insurance networks with only 2 or 3 specialists of a certain type (e.g. electrophysiologists). If those few people discriminate, my patients could be in the very real position of having literally no access to that type of care.

DocuSign Envelope ID: 05019E4A-1C4D-49B9-8FAC-7776F2CAC693

22. This is also especially concerning for the Center's LGBTQ youth who may not even be out to many people. If our youth encounter providers who are homophobic or transphobic, this will result in serious suicide risks. In turn, we physicians will have to proactively call providers before referring patients to make sure that the outside providers will not discriminate against our patient and cause more harm than good. This effort will soak up more of the Center's time and money. Not having the 2016 Final Rule to reinforce health care providers' obligation to provide nondiscriminatory care will make these efforts much more difficult.

23. One of the guiding ethics of medicine is to treat all patients equally. We do not treat blue-eyed people better than brown-eyed people. We do not treat women better than men. We do not provide better care to blonde-haired people than red-haired people. Medical personnel see people in their most vulnerable states; the trust placed in us is sacred. Allowing the Revised Rule to go into effect will create division within the medical field, which must be united around values of inclusion and acceptance, especially at a time of a global pandemic. The Revised Rule frustrates the mission and activities of the LA LGBT Center, my mission and activities, medical ethics, and established standards of care.

[*Signature on next page.*]

DocuSign Envelope ID: 05019E4A-1C4D-49B9-8FAC-7776F2CAC693

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this <u>6th</u> day of July, 2020.

DocuSigned by:

*Ward Carpenter*

EF22DAEAC18E44C...

Ward Carpenter, MD

# EXHIBIT A

*Curriculum Vitae of Ward S. Carpenter, MD*

# Ward S. Carpenter, MD

4352 Forman Ave Toluca Lake, CA 91602
carpenwa@gmail.com
646-734-9697

## Relevant Experience

**Co-Director of Health Services, Associate Chief Medical Officer:** *Los Angeles LGBT Center* March 2018- present
- 80% administration: responsible for oversight of entire operations of FQHC including personnel, finances, clinical programs (mental health, psychiatry, primary care, HIV care, transgender health, substance abuse), nursing, case management, quality, risk management
- 20% clinical: general primary care, HIV care, comprehensive transgender care, office-based opiate treatment

**Associate Chief Medical Office, Dir of Primary and Transgender Care:** *Los Angeles LGBT Center* March, 2016 – present
- 60% clinical: general primary care, HIV care, comprehensive transgender care, office-based opiate treatment
- 40% administration
  - Practice management lead clinician
  - Quality management lead clinician
  - Health Information Systems lead clinician
  - Clinical supervision of advanced practice providers
  - Creation and management of PREP program
  - Creation and management of MAT program
  - Creation and management of Transgender Pre-Surgery Program
  - Operations of primary care and transgender health programs

**Director of Primary Care and Transgender Care Services:** *Los Angeles LGBT Center* Oct 2013-March 2016
- General adult primary care
- Comprehensive HIV care
- Transgender care including hormone management and general primary care
- Administration of primary care program including strategic planning and execution of quality measures, program improvement measures, direct supervision of advanced practice providers
- Administration of transgender care program including strategic planning and execution of quality measures, program improvement measures, direct supervision of advanced practice providers

**Member, Participant Advisory Committee:** *PRIDE Study @ UCSF*     Jan, 2016 – present
- Represent the voices of the Los Angeles LGBT Center, healthcare providers, gay cisgender men and the greater Southern California region as we design and implement this transformative longitudinal study of LGBTQ health

**President and Primary Care Internist:** *Ward Carpenter Integrative Medicine, NY, NY*  March, 2009 – Sept 2013
- Full-time primary care to 2000 adult patients and additional 500 HIV patients
- Management of staff, accounts, billing, supplies and marketing for practice

**Primary Care Internist**: *Callen – Lorde Community Health Center, New York, NY*     July, 2004 – Oct, 2010
- General adult primary care
- Comprehensive HIV care

# Ward S. Carpenter, MD

4352 Forman Ave Toluca Lake, CA 91602
carpenwa@gmail.com
646-734-9697

- Transgender medicine
- Clinical supervision and instruction of rotating medical and physician assistant students

**Director of Operations**: *Fire Island Volunteer Medical Clinics, Brookhaven, NY* January – November, 2006
- Responsible for all aspects of clinic management including recruiting providers, credentialing providers, obtaining insurance, purchasing medicines and supplies, managing patient charts and billing, training and supervising providers, creating training manual. Additionally served as volunteer provider

**Acting Associate Medical Director**: *Callen – Lorde Community Health Center, New York, NY* January – April, 2006
- Responsible for running weekly provider meetings, creating provider schedules, addressing patient complaints, representing provider concerns to senior management, assisting the Medical Director with all aspects of clinic management

## Education & Training

| | | |
|---|---|---|
| **Residency in Internal Medicine-Pediatrics** | *SVCMC – St Vincent's Hospital Manhattan* | June, 2004 |
| **MD** | *UMDNJ – Robert Wood Johnson Medical School, Camden, NJ* | May, 2000 |
| **BS** | *University of Richmond, Richmond, Va.*, Psychology with Honors | May, 1996 |
| **BA** | *University of Richmond, Richmond, Va.*, History with Honors | May, 1996 |

## Lectures

**Plenary Session:** ***Update on Transgender Health.*** HIV/AIDS on the Front Line Annual Conference at University of California, Irvine. April 27, 2016

## Licensure & Certification

| | |
|---|---|
| **Certificate in HIV Medicine** | 2007 - present |
| **Board Certified in Internal Medicine** | 2004-2024 |
| **Licensed in California** | 2012 - present |
| **Licensed in New York State** | 2004 – 2014 |
| **X-waiver for Buprenophine** | 2016-present |