**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WHITMAN-WALKER CLINIC, Inc. d/b/a WHITMAN-WALKER HEALTH, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>*Defendants*. | Case No. 20-cv-01630-JEB |

**BRIEF OF U.S. HOUSE OF REPRESENTATIVES
AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS**

Elizabeth B. Wydra
Brianne J. Gorod
Ashwin P. Phatak
CONSTITUTIONAL ACCOUNTABILITY
    CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036-2513
Tel: (202) 296-6889
brianne@theusconstitution.org

Douglas N. Letter
    *General Counsel*
Todd B. Tatelman
Megan Barbero
Josephine Morse
OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
Tel: (202) 225-9700
douglas.letter@mail.house.gov

*Counsel for Amicus U.S. House of Representatives*

## TABLE OF CONTENTS

                                                                              **Page**

TABLE OF AUTHORITIES ................................................................................ ii

INTEREST OF *AMICUS CURIAE* ..................................................................... 1

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 5

THE TRUMP ADMINISTRATION'S DECISION TO WITHDRAW CERTAIN ANTI-DISCRIMINATION PROTECTIONS FOR LGBTQ INDIVIDUALS VIOLATES THE TEXT OF THE AFFORDABLE CARE ACT AND UNDERMINES CONGRESS'S PLAN IN PASSING IT ........................................................................................... 5

    A.  The Affordable Care Act Responded to Serious Problems in America's Health Care System That Had Left Millions Without Access to Quality, Affordable Care .......................................................................................... 5

    B.  Congress Passed the Affordable Care Act to Expand Access to Quality, Affordable Health Care, and the Act's Reforms Have Been Remarkably Successful ................................................................................................... 8

    C.  The Trump Administration's Withdrawal of Certain Protections Against Discrimination in Health Care for LGBTQ Individuals Undermines the Affordable Care Act .................................................................................. 12

CONCLUSION .................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bostock v. Clayton Cty.*,
   140 S. Ct. 1731 (2020) ........................................................................... 4, 13, 14

*Fla. ex rel. Att'y Gen. v. U.S. Dep't of Health & Human Servs.*,
   648 F.3d 1235 (11th Cir. 2011) ............................................................... 7

*King v. Burwell*,
   135 S. Ct. 2480 (2015) ........................................................................... 8, 9, 15

*King v. Burwell*,
   759 F.3d 358 (4th Cir. 2014) .................................................................. 9

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) ............................................................................... 2, 6, 7, 8

*Obergefell v. Hodges*,
   135 S. Ct. 2584 (2015) ........................................................................... 17

*S. Bay United Pentecostal Church v. Newsom*,
   140 S. Ct. 1613 (2020) ........................................................................... 3

**Statutes, Legislative Materials, and Administrative Materials**

20 U.S.C. § 1681(a) ...................................................................................... 3, 13

26 U.S.C. § 36B ............................................................................................ 9

26 U.S.C. § 4980H ........................................................................................ 10

26 U.S.C. § 4980H(a) .................................................................................... 10

29 U.S.C. § 218a ........................................................................................... 10

42 U.S.C. § 1396a(a)(10) .............................................................................. 6

42 U.S.C. § 1396a(a)(10)(A)(i)(VIII) ............................................................ 8

42 U.S.C. § 2000e-2(a)(1) ............................................................................ 13

42 U.S.C. § 18022(b)(1) ............................................................................... 10

42 U.S.C. § 18022(b)(4)(B) .......................................................................... 15

42 U.S.C. § 18022(b)(4)(C) .......................................................................... 15

42 U.S.C. § 18031(b)(1) ........................................................................ 9

42 U.S.C. § 18041(c)(1) ......................................................................... 9

42 U.S.C. § 18071 .................................................................................. 10

42 U.S.C. § 18081 .................................................................................. 9

42 U.S.C. § 18082 .................................................................................. 9

42 U.S.C. § 18091(2)(C) ........................................................................ 15

42 U.S.C. § 18091(2)(D) ........................................................................ 1, 8, 15

42 U.S.C. § 18116(a) .............................................................................. 3, 11, 12

42 U.S.C. § 300gg(a) .............................................................................. 11

42 U.S.C. § 300gg-1 ............................................................................... 11

42 U.S.C. § 300gg-3 ............................................................................... 11

42 U.S.C. § 300gg-4 ............................................................................... 11

42 U.S.C. § 300gg-4(b) .......................................................................... 11

42 U.S.C. § 300gg-6(a) .......................................................................... 10

42 U.S.C. § 300gg-11 ............................................................................. 10

42 U.S.C. § 300gg-12 ............................................................................. 10

42 U.S.C. § 300gg-13 ............................................................................. 10

42 U.S.C. § 300gg-14 ............................................................................. 10

Rule II.8(b), Rules of the U.S. House of Representatives, 116th Cong. (2019)
   https://perma.cc/J2SG-ZNDP .......................................................... 1

H. Rep. No. 111-299, pt. 1 (2009) ......................................................... 5, 6

H. Rep. No. 111-299, pt. 3 (2009) ......................................................... 5, 6, 7

Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376
   (May 18, 2016) ................................................................................. 3, 7

Nondiscrimination in Health and Health Education Programs or Activities, Delegation of
   Authority, 85 Fed. Reg. 37,160 (June 19, 2020) ........................... 13, 14

## Other Authorities

Kellan Baker & Laura E. Durso, *Why Repealing the Affordable Care Act Is Bad Medicine for LGBT Communities*, Ctr. for Am. Progress (Mar. 22, 2017), https://perma.cc/5U2W-KDZB ................................................................. 7, 12

David Blumenthal & Sara Collins, *Where Both the ACA and AHCA Fall Short, and What the Health Insurance Market Really Needs*, Harv. Bus. Rev. (Mar. 21, 2017), https://perma.cc/QB6H-K3J6 ................................................................. 6

Cong. Budget Office, *CBO's Analysis of the Major Health Care Legislation Enacted in Mar. 2010* (Mar. 30, 2011), https://perma.cc/7RZP-5H48 ..................................... 9

Gary J. Gates, *How Many People Are Lesbian, Gay, Bisexual, and Transgender?*, Williams Inst. (Apr. 2011), https://perma.cc/XFR7-9GTJ....................................... 15

Jaime M. Grant, et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*, Nat'l Ctr. for Transgender Equality & Nat'l Gay & Lesbian Task Force (2011), https://perma.cc/9VJD-L3V7..................................................... 16

Inst. of Med. of the Nat'l Academies, *The Health of Lesbian, Gay, Bisexual, and Transgender People* (2011), https://perma.cc/V8U4-HRMG .................................. 8

Jen Kates et al., *Health and Access to Care and Coverage for Lesbian, Gay, Bisexual, and Transgender Individuals in the U.S.*, Kaiser Fam. Found. (May 2018), https://perma.cc/6SFN-2YYB .................................................................... 16

Lambda Legal, *When Health Care Isn't Caring: Lambda Legal's Survey on Discrimination Against LGBT People and People Living with HIV* (2010), https://perma.cc/44C8-BPAF ................................................................... 17

Shabab Ahmed Mirza & Caitlin Rooney, *Discrimination Prevents LGBTQ People from Accessing Health Care*, Ctr. for Am. Progress (Jan. 18, 2018), https://perma.cc/GJ6C-KQKH .................................................................... 8

Nat'l LGBT Educ. Ctr., *Understanding the Health Needs of LGBT People*, (Mar. 2016), https://perma.cc/AX83-9RWD.................................................................. 16

Frank Newport, *In U.S., Estimate of LGBT Population Rises to 4.5%*, Gallup (May 22, 2018), https://perma.cc/8TC8-BNSW ....................................................... 16

*State Health Insurance Marketplace Types, 2020*, Kaiser Fam. Found., https://perma.cc/B2T2-EZ5Y (last visited July 8, 2020) ......................................... 9

Namrata Uberio et al., U.S. Dep't of Health & Human Servs., *Health Insurance Coverage and the Affordable Care Act, 2010-2016* (2016), https://perma.cc/9N44-6ERZ ...... 11, 12

iv

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* the United States House of Representatives[2] has a strong institutional interest in the effective and non-discriminatory implementation of the Patient Protection and Affordable Care Act.  In 2010, the House passed the Affordable Care Act after significant study into the problems with then-existing health insurance markets, and the House is thus particularly well suited to explain to the Court why Congress enacted this landmark legislation, how it has helped ensure that all Americans have access to quality, affordable health care and health insurance, and why the Trump Administration's withdrawal of certain protections from discrimination in health care for LGBTQ (lesbian, gay, bisexual, transgender, and queer) individuals is inconsistent with the plan that Congress put in place when it passed the Affordable Care Act.

## INTRODUCTION

The Affordable Care Act is a landmark law that sought to achieve "near-universal coverage," 42 U.S.C. § 18091(2)(D), by making quality, affordable health care available to all Americans.  When Congress passed the Affordable Care Act in 2010, it was responding to serious problems affecting America's insurance and health care systems.  Many employers failed to offer coverage to their employees, and only a limited number of individuals were eligible for

---

[1] No person or entity other than *amicus* and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

[2] The Bipartisan Legal Advisory Group (BLAG) of the United States House of Representatives has authorized the filing of an *amicus* brief in this matter.  The BLAG comprises the Honorable Nancy Pelosi, Speaker of the House, the Honorable Steny H. Hoyer, Majority Leader, the Honorable James E. Clyburn, Majority Whip, the Honorable Kevin McCarthy, Republican Leader, and the Honorable Steve Scalise, Republican Whip, and "speaks for, and articulates the institutional position of, the House in all litigation matters."  Rule II.8(b), Rules of the U.S. House of Representatives, 116th Cong. (2019) https://perma.cc/J2SG-ZNDP.  The Republican Leader and Republican Whip dissented.

government health insurance programs like Medicaid.  Moreover, those who could not obtain

coverage through their employer or Medicaid were forced to try their luck in the individual

marketplace.  That marketplace was plagued with sky-high prices, care that was not

comprehensive, and discriminatory practices that prevented millions of Americans from

obtaining coverage.  These problems particularly harmed the LGBTQ community, which lacks

insurance or is underinsured at disproportionate rates, and also faces discrimination on the basis

of sexual orientation or gender identity at the hands of health care providers who refuse to

provide care.

In response to these systemic flaws, Congress passed the Affordable Care Act "to

increase the number of Americans covered by health insurance and decrease the cost of health

care." *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 538 (2012) (opinion of

Roberts, C.J.).  The law thus includes a number of provisions designed to expand access to

quality health care to as many Americans as possible, and to remove discriminatory barriers to

care and coverage.  First, it expands Medicaid to all low-income individuals.  Second, it creates a

system of American Health Benefit Exchanges (Exchanges) that enable individuals who do not

receive health insurance through their employer or through Medicaid to easily compare and

purchase health insurance in the individual marketplace, and it provides tax credits to subsidize

the cost of insurance for many lower- and middle-income individuals.  Third, it prevents insurers

from discriminating on the basis of preexisting conditions and includes a number of other

protections designed to ensure that insurers and health care providers offer comprehensive care

to a wide swath of consumers.

Among other things, the Act includes a broad anti-discrimination provision, Section

1557, which states that individuals may not "be excluded from participation in, be denied the

benefits of, or be subjected to discrimination under, any health program or activity" receiving federal funding on the basis of an individual's race, color, national origin, sex, age, and disability.  42 U.S.C. § 18116(a) (incorporating existing civil rights laws).  As relevant to this case, the provision prohibits health care discrimination "on the ground prohibited under . . . title IX of the Education Amendments of 1972," *id.*, and Title IX in turn prohibits discrimination in education against any "person . . . on the basis of sex," 20 U.S.C. § 1681(a).

In 2016, the Department of Health and Human Services (the Department) published a final rule interpreting Section 1557's prohibition on health care discrimination on the basis of sex to include "discrimination on the basis of . . . gender identity."  Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376, 31,467 (May 18, 2016).  The rule also concluded that "Section 1557's prohibition of discrimination on the basis of sex includes, at a minimum, sex discrimination related to an individual's sexual orientation where the evidence establishes that the discrimination is based on gender stereotypes."  *Id.* at 31,390.  Moreover, the rule prohibited discrimination against a person on the basis of the sex of "an individual with whom the individual or entity is known or believed to have a relationship or association."  *Id.* at 31,472.  The Department's 2016 interpretation of Section 1557 was consistent with the plain text of the statute and effectuated Congress's goal of expanding access to quality, affordable health insurance and care and ensuring that Americans did not face discrimination in health care.

The Trump Administration, however, has now reversed course, issuing a new rule to implement Section 1557 that no longer protects against discrimination in health care because of an individual's sexual orientation or gender identity.  And it has done so in the midst of a global pandemic when access to health care is more critical than ever.  *See S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Mem.) (Roberts, C.J., concurring in denial of

application for injunctive relief) ("COVID–19 [is] a novel severe acute respiratory illness that has killed . . . more than 100,000 nationwide.  At this time, there is no known cure, no effective treatment, and no vaccine.").  The Administration's new rule violates the text of Section 1557, as well as Congress's plan in passing the Affordable Care Act.

Significantly, the Supreme Court recently held in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), that when Congress outlawed discrimination on the basis of sex in Title VII of the Civil Rights Act of 1964, it included a prohibition on discrimination on the basis of an individual's sexual orientation or gender identity.  *Id.* at 1737.  As the Court explained, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."  *Id.* at 1741.  This result, the Court added, is "no more than the straightforward application of legal terms with plain and settled meanings."  *Id.* at 1743.  The relevant language of Section 1557 involves nearly the same "legal terms with plain and settled meanings"—discrimination on the basis of sex—that the Supreme Court conclusively interpreted in *Bostock*.  The Administration's new rule, which narrowly interprets the prohibition on sex discrimination in the 2010 Affordable Care Act, cannot be reconciled with *Bostock*.

Moreover, the new rule conflicts with Congress's plan in passing the Affordable Care Act, which was to *expand* access to quality, affordable health insurance and care and to prevent discrimination against all Americans.  Indeed, Congress included several anti-discrimination provisions in the Affordable Care Act, including the prohibition on discrimination against individuals with preexisting conditions.  Section 1557 is part and parcel of Congress's intent to eliminate discrimination, and applying its protections to prevent discrimination against LGBTQ people is necessary to achieving that goal.  When Congress passed the Act, LGBTQ individuals

4

often faced insurers and providers who refused to cover or care for them, even though the

LGBTQ community often has significantly greater health care needs than other communities.  In

short, this Administration's withdrawal of existing anti-discrimination protections for LGBTQ

individuals seriously undermines Congress's intent in passing the Affordable Care Act to prevent

discrimination and ensure that all Americans have access to the health care they need.

**ARGUMENT**

**THE TRUMP ADMINISTRATION'S DECISION TO WITHDRAW CERTAIN ANTI-DISCRIMINATION PROTECTIONS FOR LGBTQ INDIVIDUALS VIOLATES THE TEXT OF THE AFFORDABLE CARE ACT AND UNDERMINES CONGRESS'S PLAN IN PASSING IT.**

**A.  The Affordable Care Act Responded to Serious Problems in America's Health Care System That Had Left Millions Without Access to Quality, Affordable Care.**

Congress passed the Affordable Care Act in response to serious problems plaguing

America's health care system.  *See* H. Rep. No. 111-299, pt. 3, at 55 (2009) ("The U.S. health

care system is on an unsustainable course.").  In 2007, "more than 45.7 million people were

uninsured . . . , representing more than one-seventh of the population."  H. Rep. No. 111-299, pt.

1, at 320 (2009).  Several factors contributed to this uninsured rate.  First, there was "no federal

requirement that employers offer health insurance coverage to employees or their families."  H.

Rep. No. 111-299, pt. 3, at 134.  Accordingly, while almost all large employers offered their

employees health insurance benefits, "[l]ess than half of all small employers (less than 50

employees) offer[ed] health insurance coverage to their employees."  *Id.* at 322.

Second, when the Affordable Care Act was passed, health care costs were skyrocketing,

making it difficult for most Americans to purchase insurance in the individual marketplace.

"Between 1999 and 2008, health insurance premiums more than doubled as wages largely

5

stagnated." *Id.* at 55-56 (citing testimony of Jacob Hacker).[3]  Further, the United States "spen[t] substantially more than other developed countries on health care, both per capita and as a share of GDP."  H. Rep. No. 111-299, pt. 1, at 320.  This dramatic increase in health care costs affected employers—who "face[d] a growing challenge paying for health benefits while managing labor costs to succeed in a competitive market," *id.*—and federal and state budgets— "both directly, through spending on Medicare, Medicaid, and other programs, and indirectly, through tax expenditures for health insurance and expenses," *id.* at 320-21.

Third, millions of Americans who were not provided insurance benefits by their employers and could not afford or were denied coverage in the individual market were also ineligible for insurance through government programs like Medicaid.  At the time, Medicaid offered federal funding to States only "to assist pregnant women, children, needy families, the blind, the elderly, and the disabled in obtaining medical care."  *NFIB*, 567 U.S. at 541 (citing 42 U.S.C. § 1396a(a)(10)).

Finally, the insurance and health care industries were riddled with discriminatory policies and practices.  For instance, insurance companies in many States were permitted to discriminate against individuals with preexisting conditions.  Because "'20 percent of the population account[ed] for 80 percent of health spending'" in 2009, "health insurers—particularly in the individual market— . . . adopted discriminatory, but not illegal, practices to cherry-pick healthy people and to weed out those who [we]re not as healthy."  H. Rep. No. 111-299, pt. 3, at 92 (quoting testimony of Karen Pollitz).

---

[3] *See* David Blumenthal & Sara Collins, *Where Both the ACA and AHCA Fall Short, and What the Health Insurance Market Really Needs*, Harv. Bus. Rev. (Mar. 21, 2017), https://perma.cc/QB6H-K3J6 ("premiums for . . . policies [in the individual market] were increasing more than 10% a year, on average, while the policies themselves had major deficiencies").

Such practices included: "denying health coverage based on pre-existing conditions or medical history, even minor ones; charging higher, and often unaffordable, rates based on one's health; excluding pre-existing medical conditions from coverage; charging different premiums based on gender; and rescinding policies after claims [we]re made based on an assertion that an insured's original application was incomplete." *Id.*  As a result of these practices, "many uninsured Americans—ranging from 9 million to 12.6 million—voluntarily sought health coverage in the individual market, but were denied coverage, charged a higher premium, or offered only limited coverage that excludes a preexisting condition." *Fla. ex rel. Att'y Gen. v. U.S. Dep't of Health & Human Servs.*, 648 F.3d 1235, 1245 (11th Cir. 2011), *aff'd in part, rev'd in part sub nom. NFIB*, 567 U.S. 519.  Congress found that "[d]iscrimination based on health, gender and other factors has severe economic consequences for those who have been unable to find affordable health coverage and for those who have coverage, but are under-insured."  H. Rep. No. 111-299, pt. 3, at 92.

LGBTQ individuals were particularly harmed by these problems with the health insurance markets and suffered discrimination in the provision of care.  According to one study, "before the ACA's coverage reforms came into effect, 1 in 3 LGBT people making less than $45,000 per year . . . were uninsured."[4]  And for transgender individuals, even if they had coverage, "insurance companies routinely excluded coverage for transition-related care based on the misguided assumption that such treatments were cosmetic and experimental," Compl. ¶ 54, resulting in transgender individuals being unable to obtain medically necessary treatment for gender dysphoria.  *See* 81 Fed. Reg. at 31,460.  Moreover, even today, "[d]espite existing

---

[4] Kellan Baker & Laura E. Durso, *Why Repealing the Affordable Care Act Is Bad Medicine for LGBT Communities*, Ctr. for Am. Progress (Mar. 22, 2017), https://perma.cc/5U2W-KDZB.

protections," LGBTQ individuals "face disturbing rates of health care discrimination," with one survey showing that eight percent of LGB individuals and 29 percent of transgender individuals had a doctor or other health care provider refuse to see them in the prior year because of their actual or perceived sexual orientation or gender identity.[5]  That discrimination can result in "outright denial of care or . . . the delivery of inadequate care," and "LGBT individuals have reported experiencing refusal of treatment by health care staff, verbal abuse, and disrespectful behavior, as well as many other forms of failure to provide adequate care."  Inst. of Med. of the Nat'l Academies, *The Health of Lesbian, Gay, Bisexual, and Transgender People* 62 (2011), https://perma.cc/V8U4-HRMG (internal citations omitted).

### B. Congress Passed the Affordable Care Act to Expand Access to Quality, Affordable Health Care, and the Act's Reforms Have Been Remarkably Successful.

To address these serious and systemic problems, Congress passed the Affordable Care Act "to expand coverage" while keeping health care costs in check.  *King v. Burwell*, 135 S. Ct. 2480, 2485 (2015); *see NFIB*, 567 U.S. at 538 ("The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care."); 42 U.S.C. § 18091(2)(D) (the Act aims to achieve "near-universal coverage").  The Affordable Care Act does so in various respects.

First, it provides funding to States to expand Medicaid coverage to all individuals earning up to 133 percent of the federal poverty level.  *See* 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII).  The

---

[5] Shabab Ahmed Mirza & Caitlin Rooney, *Discrimination Prevents LGBTQ People from Accessing Health Care*, Ctr. for Am. Progress (Jan. 18, 2018), https://perma.cc/GJ6C-KQKH.

Congressional Budget Office estimated that this expansion newly provided coverage to millions of Americans.[6]

Second, for individuals who are not eligible for Medicaid and do not receive insurance from their employer, the Act provides for the creation of Exchanges through which individuals can purchase health insurance for themselves and their families.  The Act "requires the creation of an 'Exchange' in each State where people can shop for insurance, usually online."  *King*, 135 S. Ct. at 2487 (citing 42 U.S.C. § 18031(b)(1)).  Generally, States were tasked with setting up these Exchanges, *see* 42 U.S.C. § 18031(b)(1), but if a State declined to do so, the Secretary of Health and Human Services was required to "establish and operate such Exchange within the State," *id.* § 18041(c)(1).[7]

The Act then "s[ought] to make insurance more affordable by giving refundable tax credits to individuals with household incomes between 100 percent and 400 percent of the federal poverty line."  *King*, 135 S. Ct. at 2487 (citing 26 U.S.C. § 36B).  "Individuals who meet the Act's requirements may purchase insurance with the tax credits, which are provided in advance directly to the individual's insurer."  *Id.* (citing 42 U.S.C. §§ 18081, 18082); *see King v. Burwell*, 759 F.3d 358, 364 (4th Cir. 2014) ("The Exchanges facilitate this process by advancing an individual's eligible tax credit dollars directly to health insurance providers as a means of reducing the upfront cost of plans to consumers."), *aff'd*, 135 S. Ct. 2480.  The Act also requires insurers to reduce certain cost-sharing expenses—like deductibles and co-payments—for lower-

---

[6] *See* Cong. Budget Office, *CBO's Analysis of the Major Health Care Legislation Enacted in Mar. 2010*, at 22-23 (Mar. 30, 2011), https://perma.cc/7RZP-5H48 (prepared statement of Douglas Elmendorf, Director, Cong. Budget Office).

[7] As of 2019, 13 States operate State Exchanges, 32 States rely principally on the Federal Government to run their Exchanges, and 6 States have a hybrid Exchange of some sort.  *State Health Insurance Marketplace Types, 2020*, Kaiser Fam. Found., https://perma.cc/B2T2-EZ5Y (last visited July 8, 2020).

income individuals, and requires the Department of Health and Human Services to reimburse insurers for these cost-sharing reductions.  *See* 42 U.S.C. § 18071.

Third, the Act includes various market reforms designed to expand access to insurance coverage.  For instance, the Act requires large employers to offer insurance to their employees or pay a penalty, 26 U.S.C. § 4980H; to automatically enroll new and current employees of large employers in an employer-sponsored plan unless an employee opts out, 29 U.S.C. § 218a; and to offer adequate health insurance plans, 26 U.S.C. § 4980H(a).  The Act also includes numerous other important provisions that, for example, prohibit insurers from imposing lifetime dollar limits on the value of coverage, 42 U.S.C. § 300gg-11; prohibit insurers from rescinding coverage except in the case of fraud, *id.* § 300gg-12; require individual and group health plans to cover preventive services without cost sharing, *id.* § 300gg-13; and allow children to stay on their parents' health insurance until age 26, *id.* § 300gg-14.

The Act further addresses the inadequacy of benefits in the individual and small group markets by expressly providing that insurance offered in those markets must include "essential health benefits."  *Id*. § 300gg-6(a) ("A health insurance issuer that offers health insurance coverage in the individual or small group market shall ensure that such coverage includes the essential health benefits package required under section 18022(a) of this title.").  While the law gave the Secretary of Health and Human Services authority to define what those "essential health benefits" would be, the law specified that "such benefits shall include at least the following general categories": ambulatory patient services, emergency services, hospitalization, maternity and newborn care, mental health and substance abuse disorder services, prescription drugs, rehabilitative and habilitative services, laboratory services, preventive and wellness services, chronic disease management, and pediatric services, including oral and vision care.  *Id.*

§ 18022(b)(1).  All of these reforms were designed to allow more Americans access to comprehensive insurance coverage.

Moreover, the Act includes reforms ensuring that no American is denied the ability to purchase health insurance.  The Act prevents discrimination on the basis of preexisting conditions by including a guaranteed-issue provision prohibiting insurers from denying coverage to any individual because of a medical condition or their medical history, *see id.* §§ 300gg-1, 300gg-3, 300gg-4, and a community-rating provision prohibiting insurers from charging higher premiums because of an individual's preexisting medical conditions, *id*. §§ 300gg(a), 300gg-4(b).

Finally, the Act includes an important anti-discrimination provision that prohibits discrimination in the provision of health insurance coverage and health care services.  Section 1557 of the Act provides that individuals may not "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity" receiving federal funding on the basis of an individual's race, color, national origin, sex, age, or disability. 42 U.S.C. § 18116(a).  That provision of the law was a critical part of Congress's effort to ensure that every American has access to the health care they need.

Through all of these reforms, and despite the Trump Administration's myriad efforts to subvert them, the Act has been highly successful in ameliorating the immense public health problem caused by having so many Americans without adequate health insurance.  As of 2016, approximately 12.7 million people had purchased plans on the state and federal Exchanges established by the Affordable Care Act.  Namrata Uberio et al., U.S. Dep't of Health & Human Servs., *Health Insurance Coverage and the Affordable Care Act, 2010-2016*, at 8 (2016), https://perma.cc/9N44-6ERZ.  And approximately 14.5 million more people began receiving

comprehensive benefits through Medicaid and the Children's Health Insurance Program.  *Id.*

Overall, there has been a net gain of more than 20 million Americans with health insurance

coverage.  *Id.*  This gain spans many generational, ethnic, and racial groups, and has particularly

benefited women, younger people, and Black and Hispanic individuals.  *Id.* at 2.  The Act has

also led to a dramatic decrease in LGBTQ individuals without insurance coverage: one study

estimated that the number of low-income LGBTQ individuals without insurance dropped from

34% to 22% from 2013 to 2017.[8]

**C.  The Trump Administration's Withdrawal of Certain Protections Against Discrimination in Health Care for LGBTQ Individuals Undermines the Affordable Care Act.**

Even though it is critically important that all people be able to obtain health insurance in

the midst of this global health crisis, and even though the Affordable Care Act included a broad

anti-discrimination clause that prohibits discrimination in health care on the basis of sex, the

Trump Administration promulgated a rule that takes away existing protection from

discrimination for LGBTQ individuals.  This decision violates the text of the Affordable Care

Act and undermines Congress's plan in passing it.

**1.**  The Administration's new rule that fails to prohibit discrimination in health care based

on individuals' sexual orientation or gender identity directly conflicts with the text of the

Affordable Care Act.  When Congress passed the Act, it included a broad anti-discrimination

provision that prohibits discrimination in health care based on several characteristics included in

long-standing civil rights laws.  In particular, Section 1557 prohibits discrimination in health

care "on the ground prohibited under . . . title IX of the Education Amendments of 1972," 42

---

[8] Baker & Durso, *supra* note 4.

U.S.C. § 18116(a), which in turn prohibits discrimination against any person "on the basis of sex," 20 U.S.C. § 1681(a).

In its revised rule, the Administration took the position that "the ordinary public meaning of the term 'sex' in Title IX is unambiguous" and refers to a "biological binary meaning of sex." Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160, 37,179-80 (June 19, 2020).  Based on that erroneous understanding, the Administration concluded that Title IX, and in turn Section 1557, does not protect against discrimination based on sexual orientation or gender identity, and repealed the prior regulation affording those protections.  *Id.* at 37,183-86.

That understanding has just now been explicitly rejected by the Supreme Court.  In *Bostock v. Clayton County*, the Court held that Title VII's prohibition on discrimination in employment "because of such individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1), prohibits discrimination on the basis of an individual's sexual orientation or gender identity.  140 S. Ct. at 1737.  As the Court explained, "[a]n employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex" because "[s]ex plays a necessary and undisguisable role in the decision, exactly what Title VII forbids."  *Id.*  It is thus "impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."  *Id.* at 1741.

This holding applies squarely to Section 1557 of the Affordable Care Act.  If a health care provider refuses to provide care to a male individual "for no reason other than the fact he is attracted to men, the [health care provider] discriminates against him for traits or actions it tolerates in . . . female[s].  Put differently, the [provider] intentionally singles out [a patient to

deny care] based in part on the [patient's] sex, and the affected [patient's] sex is a but-for cause of [the denial of care]." *Id*. at 1741. Likewise, a health care provider who refuses service to a "transgender person who was identified as a male at birth but who now identifies as a female," but willingly cares for "an otherwise identical [patient] who was identified as female at birth . . . intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in a[] [patient] identified as female at birth." *Id.* The patient's "sex plays an unmistakable and impermissible role in the . . . decision" to deny care. *Id.* at 1741-42. Said another way, "to discriminate on the[] grounds [of sexual orientation or gender identity] requires [a health care provider] to intentionally treat individual [patients] differently because of their sex." *Id.* at 1742.

Notably, before putting the new rule into effect, the Administration conceded that "a holding by the U.S. Supreme Court on the meaning of 'on the basis of sex' under Title VII will likely have ramifications for the definition of 'on the basis of sex' under Title IX" because "Title VII case law has often informed Title IX case law with respect to the meaning of discrimination 'on the basis of sex.'" 85 Fed. Reg. at 37,168. Nevertheless, the Administration refused to alter its analysis in the revised version of its rule released on June 19, 2020—four days *after* the *Bostock* decision was released.[9] The rule thus violates the text of Section 1557 and Title IX, as now explicated by the Supreme Court, and it must be invalidated.

**2.** In addition to violating the text of Section 1557, the Administration's new rule also undermines Congress's plan in passing the Affordable Care Act. As explained above, Congress

---

[9] The Administration suggests in its rule that the Court's reasoning in *Bostock* might not apply to Section 1557 because "the binary biological character of sex (which is ultimately grounded in genetics) takes on special importance in the health context." 85 Fed. Reg. at 37,168. But the *Bostock* decision *assumed* that "sex" means "biological sex," and nevertheless held that discrimination against LGBTQ people is discrimination on the basis of sex. *See Bostock*, 140 S. Ct. at 1739 ("we proceed on the assumption that 'sex' . . . referr[ed] only to biological distinctions between male and female").

passed the Act to "achieve[] near-universal coverage," 42 U.S.C. § 18091(2)(D), by expanding insurance coverage and health care access to all Americans.  Thus, the Act contains numerous provisions that prevent discrimination against more vulnerable populations, both in the issuance of insurance and the provision of health care.  For instance, as described above, the Act protects individuals with pre-existing conditions by "bar[ring] insurers from taking a person's health into account when deciding whether to sell health insurance or how much to charge."  *King*, 135 S. Ct. at 2485.  That requirement was intended to "add millions of new consumers to the health insurance market, increasing the supply of, and demand for, health care services, and [to] increase the number and share of Americans who are insured."  42 U.S.C. § 18091(2)(C). Similarly, Section 1302 of the Act prohibits individual and small-group health insurance plans from making "coverage decisions, determin[ing] reimbursement rates, establish[ing] incentive programs, or design[ing] benefits in ways that discriminate against individuals because of their age, disability, or expected length of life."  *Id.* § 18022(b)(4)(B).  It also requires such plans to "take into account the health care needs of diverse segments of the population, including women, children, persons with disabilities, and other groups."  *Id.* § 18022(b)(4)(C).

Section 1557 of the Act was likewise adopted to achieve Congress's goal of ensuring universal access to health care by preventing discrimination.  Just as Congress in Title VII adopted a broad prohibition on discrimination in employment, Congress concluded that the same broad prohibition on discrimination was necessary in the often life-or-death context of health-care.  And given that there are approximately 9 million LGBTQ people in the United States,[10]

---

[10] Gary J. Gates, *How Many People Are Lesbian, Gay, Bisexual, and Transgender?*, Williams Inst. (Apr. 2011), https://perma.cc/XFR7-9GTJ.

and potentially far more,[11] prohibiting discrimination against individuals on the basis of transgender status and sexual orientation is critical to achieving that goal.

LGBTQ people often have significant health care needs that make access to affordable care especially necessary. "Research studies on same-sex couples find that LGB individuals have higher rates of unmet medical need because of cost and are less likely to have a regular provider."[12] LGBTQ people also experience disproportionate rates of HIV infection: men who have sex with men account for more than two-thirds of HIV diagnoses nationwide, even though they only account for 2% of the general population, and around 28% of transgender women in the United States have HIV.[13]

Moreover, transgender individuals are "more likely to live in poverty and less likely to have health insurance than the general population," with a 2011 survey of transgender individuals tragically showing that "nearly half (48%) of respondents postponed or went without care when they were sick because they could not afford it."[14] Indeed, when the Affordable Care Act was passed, "many health plans include[d] transgender-specific exclusions that den[ied] transgender individuals coverage of services provided to non-transgender individuals, such as surgical treatment related to gender transition, mental health services, and hormone therapy." *Id.*

---

[11] Frank Newport, *In U.S., Estimate of LGBT Population Rises to 4.5%* , Gallup (May 22, 2018), https://perma.cc/8TC8-BNSW.

[12] Jen Kates et al., *Health and Access to Care and Coverage for Lesbian, Gay, Bisexual, and Transgender Individuals in the U.S.*, Kaiser Fam. Found. 12 (May 2018), https://perma.cc/6SFN-2YYB.

[13] Nat'l LGBT Educ. Ctr., *Understanding the Health Needs of LGBT People* 5 (Mar. 2016), https://perma.cc/AX83-9RWD.

[14] Kates et al., *supra* note 12, at 14 (citing Jaime M. Grant, et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*, Nat'l Ctr. for Transgender Equality & Nat'l Gay & Lesbian Task Force (2011), https://perma.cc/9VJD-L3V7).

Finally, as described above, LGBTQ people face enormous discrimination in the provision of health care.  In one large study in 2010, at the time the ACA passed, a staggering 56 percent of LGB people and 70 percent of transgender and gender non-conforming people had experienced some form of discrimination in health care, which includes "being refused needed care; health care professionals refusing to touch them or using excessive precautions; health care professionals using harsh or abusive language; being blamed for their health status; or health care professionals being physically rough or abusive."[15]  And this discrimination in health care is consistent with the discrimination that LGBTQ people face in nearly all aspects of their lives. *See, e.g.*, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2596 (2015) ("Gays and lesbians were prohibited from most government employment, barred from military service, excluded under immigration laws, targeted by police, and burdened in their rights to associate.").  In short, ensuring that LGBTQ people can access care when they need it is necessary to achieving Congress's goal to expand access to health care to all Americans.

* * *

The Administration's new rule withdrawing certain existing anti-discrimination protections for LGBTQ people does not comport with the plain text of Section 1557, nor with Congress's plan in passing the Affordable Care Act.  The rule should be invalidated.

---

[15] Lambda Legal, *When Health Care Isn't Caring: Lambda Legal's Survey on Discrimination Against LGBT People and People Living with HIV* 5 (2010), https://perma.cc/44C8-BPAF.

**CONCLUSION**

For the foregoing reasons, the House submits this brief in support of Plaintiffs.

Respectfully submitted,

<table>
<tr>
<td>

Elizabeth B. Wydra
Brianne J. Gorod
Ashwin P. Phatak
CONSTITUTIONAL ACCOUNTABILITY
   CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036-2513
Tel: (202) 296-6889
brianne@theusconstitution.org

</td>
<td>

/s/ Douglas N. Letter
Douglas N. Letter
   *General Counsel*
Todd B. Tatelman
Megan Barbero
Josephine Morse
OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
Tel: (202) 225-9700
douglas.letter@mail.house.gov

</td>
</tr>
</table>

*Counsel for Amicus U.S. House of Representatives*

July 15, 2020