# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WHITMAN-WALKER CLINIC, INC., *et al.*,

    *Plaintiffs*,

    v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, *et al.*,

    *Defendants*.

Case No. 1:20-cv-01630 (JEB)

**PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION OR,
IN THE ALTERNATIVE, A STAY PENDING JUDICIAL REVIEW
PURSUANT TO 5 U.S.C. § 705**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

I.  DEFENDANTS' RELIANCE ON *FRANCISCAN ALLIANCE* IS MISPLACED. ............... 2

II.  PLAINTIFFS HAVE STANDING TO CHALLENGE THE REVISED RULE. ................. 4

    A.  Enjoinment of the Revised Rule Will Redress Plaintiffs' Injuries. ...................... 4

    B.  Plaintiffs Have Standing to Challenge Each Provision at Issue. ........................... 5

    C.  Plaintiffs Have Alleged Sufficient Injuries-in-Fact. ........................................... 6

        1.  Health Care Provider Plaintiffs .................................................................. 6

        2.  The TransLatin@ Coalition .......................................................................... 8

        3.  Bradbury-Sullivan Center ............................................................................ 8

        4.  The Health Professional Association Plaintiffs ........................................... 9

III.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS. .... 9

    A.  The Revised Rule Is Arbitrary and Capricious. ................................................... 9

        1.  HHS Did Not Provide Reasoned Explanations for its Policy Reversals. ... 9

        2.  HHS Failed to Consider the Harm the Revised Rule Will Cause. ............ 18

    B.  The Revised Rule Is Not in Accordance with Law ............................................. 19

    C.  Plaintiffs Are Likely to Succeed on Their Constitutional Claims. ...................... 21

        1.  The Revised Rule Violates Plaintiffs' Right to Equal Protection. ............ 21

        2.  The Revised Rule Violates Plaintiffs' Right to Due Process. ................... 22

        3.  The Revised Rule Violates Plaintiffs' Right to Free Speech. ................... 22

        4.  The Revised Rule Violates the Establishment Clause. ............................. 22

IV.  THE REVISED RULE WILL CAUSE IRREPARABLE HARM. ..................................... 23

V.  THE BALANCE OF EQUITIES FAVORS PLAINTIFFS, AND AN INJUNCTION
    OR STAY IS IN THE PUBLIC INTEREST. ..................................................................... 24

VI.  A NATIONWIDE INJUNCTION IS THE ONLY ADEQUATE REMEDY. .................... 25

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Action All. of Senior Citizens of Greater Phila. v. Heckler,*
 789 F.2d 931 (D.C. Cir. 1986) .......................................................................4, 5

*Arroyo Gonzalez v. Rossello Nevares,*
 305 F. Supp. 3d 327 (D.P.R. 2018)...............................................................7, 22

*Block v. Meese,*
 793 F.2d 1303 (D.C. Cir. 1986) ..........................................................................4

*Bostock v. Clayton County, Georgia,*
 590 U.S. ___, 2020 WL 3146686 (June 15, 2020) ....................................... *passim*

*Califano v. Yamasaki,*
 442 U.S. 682 (1979).........................................................................................25

*California v. Bernhardt,*
 No. 18 Civ. 5712, 2020 WL 4001480 (N.D. Cal. July 15, 2020) ..........................11

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
 467 U.S. 837 (1984)...........................................................................................9

*Ciox Health, LLC v. Azar,*
 435 F. Supp. 3d 30 (D.D.C. 2020) ......................................................................5

*City & Cnty. of San Francisco v. Azar,*
 411 F. Supp. 3d 1001 (N.D. Cal. 2019) ............................................................7, 8

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos,*
 483 U.S. 327 (1987)......................................................................................22, 23

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
 140 S. Ct. 1891 (2020)...................................................................................10, 14

*Dillow v. Home Care Network, Inc.,*
 No. 16 Civ. 612, 2017 WL 749196 (S.D. Ohio Feb. 27, 2017).................................4

*District of Columbia v. U.S. Dep't of Agric.,*
 No. 20 Civ. 119 (BAH), 2020 WL 1236657 (D.D.C. Mar. 13, 2020)...................8, 9

*Edmo v. Corizon, Inc.,*
 935 F.3d 757 (9th Cir. 2019) .............................................................................13

*Encino Motorcars LLC v. Navarro,*
    136 S. Ct. 2117 (2016) ...................................................................................9, 11, 16

*Estate of Thornton v. Caldor, Inc.,*
    472 U.S. 703 (1985) ...................................................................................................23

*F.C.C. v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ...........................................................................................10, 13

*Foster v. Andersen,*
    No. 18 Civ. 2552, 2019 WL 329548 (D. Kan. Jan. 25, 2019) .................................7

*Franciscan Alliance, Inc. v. Burwell,*
    227 F. Supp. 3d 660 (N.D. Tex. 2016) ....................................................... *passim*

*Franciscan Alliance, Inc. v. Burwell,*
    414 F. Supp. 3d 928 (N.D. Tex. 2019) ....................................................... *passim*

*Int'l Ladies' Garment Workers' Union v. Donovan,*
    722 F.2d 795 (D.C. Cir. 1983) ................................................................................5

*Judulang v. Holder,*
    565 U.S. 42 (2011) ...................................................................................................14

*June Med. Servs. L. L. C. v. Russo,*
    140 S. Ct. 2103 (2020) ..............................................................................................7

*Kennecott Utah Copper Corp. v. U.S. Dep't of Interior,*
    88 F.3d 1191 (D.C. Cir. 1996) ..........................................................................12, 20

*Kinkead v. Humana, Inc.,*
    206 F. Supp. 3d 751 (D. Conn. 2016) ......................................................................4

*Lawrence v. Texas,*
    539 U.S. 558 (2003) ...................................................................................................22

*Lewis-Ramsey v. Evangelical Lutheran Good Samaritan Soc'y,*
    215 F. Supp. 3d 805 (S.D. Iowa 2016) ....................................................................4

*Michigan v. EPA,*
    135 S. Ct. 2699 (2015) .............................................................................................15

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ...........................................................................................16, 17

*Nat'l Mining Ass'n v. U.S. Army Corps,*
    145 F.3d 1399 (D.C. Cir. 1998) ..............................................................................25

*New York v. U.S. Dep't of Health & Human Servs.*,
  414 F. Supp. 3d 475 (S.D.N.Y. 2019) ............................................................16, 18

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015) ......................................................................................22

*People for Ethical Treatment of Animals, Inc. v. U. S. Dep't of Agric.*,
  60 F. Supp. 3d 14 (D.D.C. 2014) .......................................................................12

*Powers v. Ohio*,
  499 U.S. 400 (1991) ...........................................................................................7

*Roe v. U.S. Dep't of Defense*,
  947 F.3d 207 (4th Cir. 2020) ............................................................................13

*Rumble v. Fairview Health Servs.*,
  No. 14 Civ. 2037, 2015 WL 1197415 (D. Minn. Mar. 16, 2015) ........................20

*Simon v. Eastern Kentucky Welfare Rights Organization*,
  426 U.S. 26 (1976) ..........................................................................................4, 5

*Singleton v. Wulff*,
  428 U.S. 106 (1976) ...........................................................................................7

*State Nat. Bank of Big Spring v. Lew*,
  795 F.3d 48 (D.C. Cir. 2015) ..............................................................................6

*Steinhorst Assocs. v. Preston*,
  572 F. Supp. 2d 112 (D.D.C. 2008) ...................................................................12

*Stewart v. Azar*,
  366 F. Supp. 3d 125 (D.D.C. 2019) ...................................................................19

*Tel. & Data Sys., Inc. v. F.C.C.*,
  19 F.3d 42 (D.C. Cir. 1994) ...............................................................................5

*U.S. Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973) .........................................................................................21

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
  858 F.3d 1034 (7th Cir. 2017) ...........................................................................7

*Wyoming Outdoor Council v. U.S. Forest Serv.*,
  165 F.3d 43 (D.C. Cir. 1999) ......................................................................12, 21

## Statutes and Legislative History

5 U.S.C. § 705 ............................................................................................................. 1

20 U.S.C. § 1681(a)(3) ............................................................................................... 17

*42 U.S.C. § 18114 ............................................................................................. *passim*

*42 U.S.C. § 18116 ............................................................................................. *passim*

155 Cong. Rec. S13193-01 (2009) ........................................................................... 21

## Federal Regulations

45 C.F.R. § 92 ............................................................................................................. 3

45 C.F.R. § 92.4 .......................................................................................................... 3

*81 Fed. Reg. 31,376 (May 18, 2016) ................................................................ *passim*

84 Fed. Reg. 27,846 (June 14, 2019) ................................................................. *passim*

84 Fed. Reg. 63,809 (Nov. 19, 2019) ....................................................................... 12

85 Fed. Reg. 37,160 (June 19, 2020) ................................................................ *passim*

## Federal Rules

Fed. R. Civ. P. 65(d)(2) ............................................................................................... 2

## Other Authorities

Ctrs. for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-
    19): Cases in the U.S.*, https://perma.cc/8DT9-BMKQ (last visited July 29,
    2020) .................................................................................................................. 24

Dep't of Defense, *Report and Recommendations on Military Service by
    Transgender Persons* (Feb. 22, 2018), https://perma.cc/7369-K2VC ................... 14

U.S. Census Bureau, *Characteristics of People by Language Spoken at Home*,
    American Community Survey 2018 1-Year Estimates Subject Tables, tbl.
    S1603, https://perma.cc/R59J-HG4K .................................................................. 15

U.S. Census Bureau, *Language Spoken at Home*, American Community Survey
    2018 1-Year Estimates Subject Tables, tbl. S1601 (2018),
    https://perma.cc/Z452-RSWR ............................................................................. 15

## INTRODUCTION

Defendants' opposition to plaintiffs' motion for a preliminary injunction demonstrates why the Revised Rule should be enjoined or its effective date stayed pursuant to 5 U.S.C. § 705. Plaintiffs submitted numerous declarations that articulated in detail how the Revised Rule will continue to cause irreparable harm to plaintiffs, their members, and their patients, particularly in light of an ongoing global pandemic.  Plaintiffs explained how the Revised Rule, which HHS promulgated in disregard of Section 1554 of the ACA, 42 U.S.C. § 18114, and the Supreme Court's decision in *Bostock v. Clayton County, Georgia*, 590 U.S. ___, 2020 WL 3146686 (June 15, 2020), invites discrimination against LGBTQ people and people with limited English proficiency ("LEP"), burdens LGBTQ-affirming health care providers, endangers public health, and harms the health and well-being of LGBTQ people, individuals with LEP, and countless others.  Defendants' opposition, like the Revised Rule, ignores entirely the concrete and real harms that the Revised Rule has caused and will continue to cause, including denial of access to health care and information to LGBTQ people and people with LEP.  This failure permeated the entire rulemaking process, rendering the entire rule arbitrary and capricious.

Defendants' opposition, like the Revised Rule, also continues to rely on a single district court case to justify HHS's policy reversals from the 2016 Final Rule – *Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016) – without acknowledging that *Bostock* abrogates *Franciscan Alliance*.  Defendants also fail to acknowledge their own role in predetermining *Franciscan Alliance*'s outcome, which eviscerates their attempt to use the decision as a justification for HHS's policy changes, as well as the limited nature of the preliminary injunction.

Defendants claim the Revised Rule hews closely to the text of Section 1557, 42 U.S.C. § 18116, but at the same time, they have announced, contrary to *Bostock*, that Section 1557 does not encompass discrimination on the basis of gender identity or sexual orientation and also assert the authority to incorporate broad religious exemptions not grounded in the text.  Defendants repeatedly claim the Revised Rule provided reasoned explanations for its policy changes and repeal of numerous provisions in the 2016 Final Rule, but they fail to point to where and how the

Revised Rule adequately explained why HHS disregarded prior factual findings.  Defendants claim the Revised Rule is consistent with Sections 1554 and 1557 of the ACA, but fail to explain how elimination of the prohibitions against discrimination in health care protects access to health care.  Defendants' failures are not surprising because the Revised Rule erects barriers to health care; it does not facilitate access.  The Revised Rule should be enjoined or its effective date stayed.

## ARGUMENT

## I.    DEFENDANTS' RELIANCE ON *FRANCISCAN ALLIANCE* IS MISPLACED.

Throughout their opposition, defendants cite *Franciscan Alliance* as a purported justification for the Revised Rule, just as HHS did in the Revised Rule.  Indeed, defendants go so far as to claim that *Franciscan Alliance* "compelled HHS" to follow the course it did in the Revised Rule.  Opp. at 16.  Not only do defendants obscure their role in orchestrating the outcome of *Franciscan Alliance*, they overstate its effect and ignore that *Bostock* repudiated its reasoning.

In October 2016, a group of private health care providers and states moved to preliminarily enjoin HHS from enforcing the 2016 Final Rule's prohibitions on discrimination on the basis of gender identity and termination of pregnancy.  On December 31, 2016, the court granted the motion, holding plaintiffs had demonstrated a likelihood of success on their claim because "Title IX unambiguously refers to the biological and anatomical difference between male and female students as determined at birth," and the ordinary meaning of "sex" as used in Title IX (and Section 1557 by incorporation) does not encompass gender identity.  227 F. Supp. 3d at 687, 689 (cleaned up).  The court's injunction, however, was limited to enjoining HHS from *enforcing* the 2016 Final Rule's "prohibition of discrimination on the basis of 'gender identity' and 'termination of pregnancy.'"  *Id.* at 695.  It did not apply to non-parties who were subject to the 2016 Final Rule, *see* Fed. R. Civ. P. 65(d)(2), and the 2016 Final Rule remained on the books.

After the change in administrations, HHS did *not* appeal the preliminary injunction.  *See* Ex. 1 at 1.[1]  And when plaintiffs renewed their motions for summary judgment in 2019, instead of

---

[1] All exhibits cited are exhibits to the Declaration of Omar Gonzalez-Pagan.

defending the 2016 Final Rule, HHS attacked it, arguing that plaintiffs were entitled to summary judgment because the "ordinary meaning of 'sex' within Title IX does not encompass gender identity," and the 2016 Final Rule's definition of sex discrimination was contrary to law.  Ex. 2 at 4-9.  After the court granted the plaintiffs' motion, *see* 414 F. Supp. 3d 928 (N.D. Tex. 2019), HHS requested that the court modify its final judgment to "make clear that the Court intended to vacate the phrases 'gender identity' and 'termination of pregnancy' in the definition of 'On the basis of sex' in 45 C.F.R. § 92.4 and that the rest of 45 C.F.R. § 92 should remain in effect."  Ex. 3 at 4. On November 21, 2019, the court issued an order modifying its judgment, as HHS requested, and clarified it was vacating *only* the portion of the 2016 Final Rule that "defines 'On the basis of sex' to include gender identity and termination of pregnancy."  Ex. 4 at 2.  The court did not vacate other provisions protecting the rights of LGBTQ people, such as the prohibition on categorical exclusions, language access protections for people with LEP, the scope of covered entities, or the unitary standard.  *Id.*  HHS did not appeal the court's order.

What is more, four days *before* HHS published the Revised Rule, the Supreme Court decided *Bostock*, abrogating *Franciscan Alliance* and nullifying its vacatur of "gender identity" from the 2016 Final Rule's definition of "on the basis of sex."  *Franciscan Alliance* was predicated on the district court's conclusion that "the text of Title IX indicates Congress's binary definition of 'sex.'"  227 F. Supp. 3d at 687.  *Bostock*, however, assumed, "for argument's sake," that "'sex' signified what the employers suggest, referring only to biological distinctions between male and female."  *Bostock*, 140 S. Ct. at 1739.  And the Court nonetheless held that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual *based on sex*."  *Id.* at 1741 (emphasis added).  In other words, *Bostock* eviscerated *Franciscan Alliance*'s reasoning.  Defendants' continued reliance on *Franciscan Alliance*'s flawed reasoning in the wake of *Bostock* is the very definition of arbitrary and capricious agency action and the resulting rule is contrary to the law announced in *Bostock*.

Given the abrogation of *Franciscan Alliance*, its vacatur of the definition of "on the basis of sex" is a legal nullity.  Under similar circumstances, courts have held that "a party who relies

upon the wrong interpretation of the law should not be rewarded over a party who relies upon the correct interpretation." *Dillow v. Home Care Network, Inc.*, No. 16 Civ. 612, 2017 WL 749196, at *4 (S.D. Ohio Feb. 27, 2017); *see also Lewis-Ramsey v. Evangelical Lutheran Good Samaritan Soc'y*, 215 F. Supp. 3d 805, 810 (S.D. Iowa 2016); *Kinkead v. Humana, Inc.*, 206 F. Supp. 3d 751, 755 (D. Conn. 2016). The same principle applies here. Defendants are not entitled to rely on an incorrect interpretation of the law to justify the Revised Rule.

## II.   PLAINTIFFS HAVE STANDING TO CHALLENGE THE REVISED RULE.

The Revised Rule eliminates regulatory nondiscrimination protections for LGBTQ people, people with LEP, and countless others. It causes immediate, irreparable harm to plaintiffs, their patients, and their members that can be redressed by an injunction or stay.

### A.   Enjoinment of the Revised Rule Will Redress Plaintiffs' Injuries.

Defendants rely on *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976), to argue that the discrimination by covered entities, such as health care providers and insurance companies, and any resulting harm would not be caused by the Revised Rule. Defendants are mistaken for multiple reasons, including that it "is impossible to maintain, of course, that there is no standing to sue regarding action of a defendant which harms the plaintiff only through the reaction of third persons." *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986).

First, defendants ignore that plaintiffs' challenge encompasses provisions of the Revised Rule that result in harms that do not depend on the actions of third parties. The elimination of remedies for victims of discrimination is a direct injury from the Revised Rule. The narrowing of the scope of covered entities, the unlawful incorporation of religious exemptions, and the elimination of notice and tagline requirements also do not depend on acts of third parties.

Second, in *Simon* "the organizational plaintiffs lacked standing on their own behalf because they alleged no injury to themselves or their organizational activities, only to their ideological goals." *Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 938 n.7 (D.C. Cir. 1986). Here, the organizational plaintiffs allege injury and irreparable harm to themselves and their organizational activities. *See* Part II.C, *infra*. In addition, the relief sought in *Simon* –

4

the denial of favorable tax treatment to hospitals that did not serve indigents – only encouraged "third parties to provide the hospital treatment desired by the appellants" and "whether third parties would provide this treatment was 'speculative at best.'" *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 811 (D.C. Cir. 1983). The relief plaintiffs seek here would prohibit discrimination on the basis of gender identity and sex stereotypes and compliance would not be voluntary. In other words, the relief sought "would make the injurious conduct of third parties complained of in this case illegal." *Id.* This case, thus, does not require "any broad explication of the justiciability of indirect injury." *Tel. & Data Sys., Inc. v. F.C.C.*, 19 F.3d 42, 47 (D.C. Cir. 1994). Rather, because the administrative action "authorized the conduct or established its legality," the "injurious private conduct is fairly traceable to the administrative action." *Id.*

Third, the discrimination the Revised Rule invites against LGBTQ people and those with LEP is not speculative; it is a near certainty. Defendants acknowledged the 2016 Final Rule "likely induced many covered entities to conform their policies and operations to reflect gender identity as protected classes [*sic*] under Title IX." 84 Fed. Reg. 27,846, 27,876 (June 14, 2019). They also acknowledged some covered entities may revert to policies and practices in place before the 2016 Final Rule. *See* 85 Fed. Reg. 37,160, 37,225 (June 19, 2020). To establish injury, plaintiffs need only "show that the agency action is at least a substantial factor motivating the third parties' actions." *Ciox Health, LLC v. Azar*, 435 F. Supp. 3d 30, 48-49 (D.D.C. 2020) (cleaned up).

Finally, grasping at straws, defendants argue plaintiffs' claims are not redressable because "it is possible that some providers could choose to avoid Section 1557 altogether by refusing to accept federal funds." Opp. at 10. It "would carry the [*Simon v.*] *Eastern Kentucky* line beyond rational limits to argue that, were beneficiaries of HHS largesse required to [comply with the rule], a significant number would so resist . . . that they would choose to give up the federal assistance needed to discharge their functions." *Heckler*, 789 F.2d at 938-39.

B.   **Plaintiffs Have Standing to Challenge Each Provision at Issue.**

Defendants are mistaken in claiming that "plaintiffs offer no basis to show they are harmed by any other provision of the Rule so as to justify an injunction—such as by the removal of the

mandate for notices and taglines from significant healthcare communications." Opp. at 11. At least one plaintiff has standing to challenge each provision at issue. Every plaintiff has standing to challenge the elimination of gender identity protections. Plaintiffs also have standing to challenge: the elimination of the prohibition on categorical coverage exclusions for gender-affirming care, Shafi ¶¶ 27, 35; the removal of language access protections, such as the notice and tagline requirements, Salcedo ¶¶ 49-52; Lint ¶¶ 53-55; Shafi ¶¶ 30-33; Bolan ¶ 19; Carpenter ¶ 19; Vargas ¶ 23; the elimination of the unitary standard, Salcedo ¶ 37; Lint ¶ 52; the narrowing of the scope of covered entities, Shafi ¶ 28; Cummings ¶ 31; Fabian ¶ 21; Vargas ¶ 18; Harker ¶ 17; the elimination of nondiscrimination protections in the unrelated regulations, Salcedo ¶¶ 38-39; Lint ¶¶ 56, 58; and the incorporation of religious exemptions. Vargas ¶ 17; Harker ¶ 17; Shafi ¶ 20.

### C.      Plaintiffs Have Alleged Sufficient Injuries-in-Fact.

Defendants fundamentally fail to understand the irreparable nature of the harms the Revised Rule causes to each of the plaintiffs.

#### 1.      Health Care Provider Plaintiffs

Plaintiffs include two organizational private health care providers – Whitman-Walker Health and the Los Angeles LGBT Center – and four individual health care providers. Each is subject to the Revised Rule and thus has standing as a regulated entity to challenge an agency's promulgation of regulations in violation of the APA. *State Nat. Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015). In addition, the Revised Rule will negatively affect the organizational activities of the health care provider plaintiffs, impose financial burdens, and diminish their ability to care for their patients, increasing their costs and costs to the overall health care system. The health care provider plaintiffs will see an increased demand for their services. Carpenter ¶ 16; Cummings ¶ 20. LGBTQ patients, including those with LEP, will turn to them because of the fear of discrimination that the Revised Rule invites and fosters from *other* providers. Shafi ¶ 34; Henn ¶ 29; Pumphrey ¶ 9; Cummings ¶¶ 9, 14, 20, 25-26, 28; Carpenter ¶¶ 16, 21; Bolan ¶¶ 18, 22-23. This increased demand will require additional expenditures and the diversion of already limited resources. Shafi ¶ 36; Henn ¶ 29; Pumphrey ¶ 15; Cummings ¶ 8; Bolan ¶ 22.

The Revised Rule also will make it more difficult for the health care provider plaintiffs to care for their patients because fear of discrimination will cause their patients to delay obtaining necessary care from *other* health care providers or decline to disclose their LGBTQ status to these *other* providers.  As a result, patients will come to them with more acute medical conditions that will be more difficult to treat and costlier to the providers and the system at large.  Shafi ¶¶ 20-22, 40; Henn ¶¶ 15-18, 20-21; Pumphrey ¶ 12; Cummings ¶¶ 16, 18, 20, 22(m), 33; Carpenter ¶¶ 9, 11-15, 18; Bolan ¶¶ 13-17, 19-21; Vargas ¶ 22; Harker ¶ 19.

Finally, the health care provider plaintiffs satisfy the criteria to assert claims on behalf of their patients.  First, they "have suffered an injury in fact," giving them "a sufficiently concrete interest in the outcome of the issue in dispute." *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (quotations omitted). *See also June Med. Servs. L. L. C. v. Russo*, 140 S. Ct. 2103, 2118-19 (2020). Second, "[d]octors and their patients have a confidential relationship, especially when it comes to asserting rights related to invasive procedures and treatments." *City & Cnty. of San Francisco v. Azar*, 411 F. Supp. 3d 1001, 1011 (N.D. Cal. 2019).  Indeed, because "most of the medical procedures at issue here such as . . . gender-affirming surgery . . . cannot be safely secured without the aid of a physician," the "rights of the individual physician plaintiffs and their patients here are thus closely intertwined." *Id.*  Third, LGBTQ patients, particularly those who are transgender, are hindered from asserting their own rights in light of the undeniable stigma, harassment, and discrimination they encounter as a result of their LGBTQ status.  Transgender patients may be chilled from bringing their own claims given that disclosure of a transgender person's status "exposes transgender individuals to a substantial risk of stigma, discrimination, intimidation, violence, and danger." *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018); *see also Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017); *Foster v. Andersen*, No. 18 Civ. 2552, 2019 WL 329548, at *2 (D. Kan. Jan. 25, 2019).  This situation is similar to the obstacles women affected by abortion restrictions face who "may be chilled from such assertion by a desire to protect the very privacy of [their] decision from the publicity of a court suit." *Singleton v. Wulff*, 428 U.S. 106, 117 (1976).

The health care provider plaintiffs have standing to assert the right of their LGBTQ patients, including those who have LEP. *San Francisco*, 411 F. Supp. 3d at 1011.

### 2. The TransLatin@ Coalition

The TransLatin@ Coalition has standing to challenge the Revised Rule based on its own injuries and those inflicted upon its members. To counteract the Revised Rule's harmful effects and the confusion it engenders, the Coalition will be required to spend and divert already limited resources to help LGBTQ people navigate the discriminatory barriers to care they will encounter. Salcedo ¶ 42; Lint ¶ 66. The Coalition also will have to divert resources from other critical programmatic work, like emergency housing, ESL classes, and case management. Salcedo ¶¶ 44, 46-49; Lint ¶¶ 62, 64. This Court has recognized that the expenditure of resources for such services is a form of irreparable harm. *See District of Columbia v. U.S. Dep't of Agric.*, No. 20 Civ. 119 (BAH), 2020 WL 1236657, at *28 (D.D.C. Mar. 13, 2020).

The Coalition also asserts claims on behalf of its members, who are LGBTQ and primarily people with LEP. Contrary to defendants' claim that plaintiffs did not identify an individual member "who might be negatively impacted by the 2020 Rule" (Opp. at 14), both Ms. Salcedo and Ms. Lint are members of the Coalition. And they documented their fear of being denied health care because of their transgender status and LEP. Salcedo ¶¶ 3, 21-23, 26; Lint ¶¶ 4, 34-35.

### 3. Bradbury-Sullivan Center

The Bradbury-Sullivan Center asserts claims based on the Revised Rule's negative impact on its organizational activities and the frustration of its mission. The Center no longer will be able to rely on the 2016 Final Rule's provisions and clear guidance to advocate for its patrons when they encounter discriminatory health care providers and insurance coverage exclusions. Shanker ¶¶ 8-9. It also will be required to spend and divert already limited resources to help LGBTQ patients navigate the discriminatory barriers to care as a result of the Revised Rule. Shanker ¶¶ 24-29. And the Revised Rule will negatively affect the Center's ability to provide referrals. Shanker ¶¶ 13, 18, 20, 25. Finally, the Center will need to engage in increased education efforts for its patrons, health care providers, and insurance companies. Shanker ¶¶ 8-9, 11. Such expenditure

of resources for "additional education of and outreach" "beyond those normally expended" constitutes irreparable harm. *District of Columbia*, 2020 WL 1236657, at *28.

### 4.    The Health Professional Association Plaintiffs

The health professional association plaintiffs – GLMA and AGLP – assert claims on their own behalf and those of their members and their members' patients.  GLMA and AGLP are national organizations that represent the interests of hundreds of thousands of LGBTQ health professionals across the country.  Their members include hundreds of health care professionals. Vargas ¶ 5; Harker ¶¶ 4-5, 17.  At least some members are employed by entities with fewer than fifteen employees and will be irreparably harmed if the Revised Rule is allowed to go into effect. Vargas ¶¶ 16-21, 26; Harker ¶¶ 11-22.  In addition, Dr. Deborah Fabian is an individual member of GLMA.  She submitted a declaration asserting her fears about the loss of protections due to the Revised Rule because she works for the Indian Health Service, which no longer would be a covered entity.  Fabian ¶¶ 5, 19-21.  The Revised Rule also will negatively impair GLMA's and ALGP's programmatic activities and missions.  Vargas ¶¶ 12-17; Harker ¶¶ 15-16.

## III.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

### A.    The Revised Rule Is Arbitrary and Capricious.

Defendants assert throughout their opposition that the Revised Rule is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). Where, as here, the reasonableness of HHS's decision-making process is at issue, arbitrary and capricious review applies, not *Chevron* deference, particularly where reliance interests are implicated.  *See Encino Motorcars LLC v. Navarro*, 136 S. Ct. 2117, 2126-27 (2016).[2]

### 1.    HHS Did Not Provide Reasoned Explanations for its Policy Reversals.

#### a.    HHS's Elimination of the Definition of "On the Basis of Sex" Is Arbitrary and Capricious and Not in Accordance with *Bostock*.

Defendants conflate plaintiffs' arguments concerning the Revised Rule's elimination of the

---

[2] Defendants fail to address entirely HHS's elimination of gender identity and sexual orientation protections in unrelated regulations.  *See* Mot. at 8-9, 14, 28.

definition of "on the basis of sex."  First, plaintiffs contend the elimination was arbitrary and capricious because HHS failed to provide a reasoned explanation for its policy reversal, particularly in light of *Bostock*.  Mot. at 14-16.  Second, plaintiffs argue the Revised Rule is not in accordance with law because HHS's elimination of the definition of "on the basis of sex," combined with its statements that Section 1557 "does not encompass discrimination on the basis of gender identity," 85 Fed. Reg. at 37,191, shows HHS did not merely conform the regulation to the statutory text.  HHS's enforcement position is that Section 1557 does not prohibit discrimination based on gender identity or sexual orientation, which contravenes *Bostock*.

Defendants offer several purported justifications for HHS's policy reversal and elimination of the definition of "on the basis of sex."  Opp. at 16-18.  None is sufficient to satisfy the APA's requirements that an agency show "good reasons" for reversal and demonstrate the new policy is "permissible under the statute," *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), while also taking into account the "serious reliance interests" present.  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

Defendants first claim HHS was entitled to rely on *Franciscan Alliance* without waiting for *Bostock*.  But *Bostock* abrogated *Franciscan Alliance before* the Revised Rule was published.  The Revised Rule failed to even acknowledge *Bostock*'s holding or its reasoning.  It also did not explain how a losing litigation position the Supreme Court rejected can support HHS's "best understanding of the law."  85 Fed. Reg. at 37,168.  HHS failed to provide a reasoned basis for the Revised Rule's elimination of the definition of "on the basis of sex."

Defendants fare no better in arguing that HHS was entitled to finalize the Revised Rule without waiting for *Bostock* because HHS included language in the preamble suggesting the Revised Rule "may be interpreted in conformity with *Bostock*."  Opp. at 17.  Defendants are not entitled to rely on their post-hoc justification that elimination of the definition of "on the basis of sex" was an effort to hew more closely to the statutory text.  Opp. at 6-7.  "An agency must defend its actions based on the reasons it gave when it acted."  *Regents of the Univ. of Cal.*, 140 S. Ct. at 1909.  The proper inquiry thus is not whether HHS could do what it did, but whether it did so

10

properly and for the right reasons.  HHS's statements that eliminating gender identity from the definition of discrimination "on the basis of sex" "reverts" to or "relies" on the statute's "plain meaning" (*e.g.*, 85 Fed. Reg. at 37,168, 37,178), must be read in the context of HHS's repeated declarations that discrimination "on the basis of sex" does not encompass discrimination on the basis of gender identity or sexual orientation.  *See, e.g.*, 85 Fed. Reg. at 37,175, 37,180, 37,183.

In addition, the Revised Rule has created, and will continue to create, widespread confusion about the scope of protections against discrimination under Section 1557.  *See, e.g.*, Vera Decl. ¶¶ 6-8; Davis Decl. ¶¶ 9-11.  The 2016 Final Rule included express references to gender identity and sex stereotyping in the definition of "on the basis of sex" specifically because HHS had determined such clarification was necessary to mitigate ongoing discrimination.  *See* 81 Fed. Reg. 31,376, 31,460 (May 18, 2016).  The Revised Rule not only eliminates this clarification, but creates confusion by affirmatively stating discrimination on the basis of gender identity and sexual orientation is not covered, despite *Bostock*'s ruling to the contrary.  Although *Bostock* controls, the general public cannot be expected to know how to resolve conflicting messages from different branches of government.  HHS failed to consider the confusion its actions would engender.

Even apart from *Bostock*, defendants failed to provide a reasoned explanation for HHS's policy reversal and rejection of its prior position that discrimination "on the basis of sex" includes discrimination on the basis of gender identity.  Defendants continue to point only to *Franciscan Alliance*.  *See* Opp. at 18.  But a single district court opinion whose outcome HHS helped predetermine does not provide a sufficient justification for such a dramatic shift in policy.  As another court recently held, "an agency cannot flip-flop regulations on the whims of each new administration," particularly without considering the harms to parties and their reliance interests. *California v. Bernhardt*, No. 18 Civ. 5712, 2020 WL 4001480, at *16 (N.D. Cal. July 15, 2020).  "The APA requires reasoning, deliberation, and process.  These requirements exist, in part, because [the public relies] on stable regulations."  *Id.*  HHS was not writing on a blank slate. It was required to provide a "reasoned explanation" in light of HHS's change in position and the significant reliance interests involved.  *Encino Motorcars*, 136 S. Ct. at 2126. HHS failed to do so.

Finally, seeking to rationalize their argument that the Revised Rule may be squared with *Bostock* because HHS's elimination of the definition of "on the basis of sex" was simply an effort to hew more closely to the statutory text, defendants contend the Court may not look to the preamble in determining whether the Revised Rule is in accordance with law.  *See* Opp. at 16.  But courts routinely look to a regulation's preamble as strong evidence of the agency's interpretation of its regulation.  *See, e.g.*, *Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999); *Steinhorst Assocs. v. Preston*, 572 F. Supp. 2d 112, 124 (D.D.C. 2008).  And a rule's "preamble may under some circumstances be reviewable," including when the preamble evinces "the agency's intention to bind either itself or regulated parties."  *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1222, 1223 (D.C. Cir. 1996).  HHS has articulated an unambiguous enforcement policy that it does not consider discrimination on the basis of gender identity or sexual orientation to be discrimination it can or will enforce.  *See, e.g.*, 85 Fed. Reg. at 37,175, 37,180, 37,191, 37,194, 37,198.[3]  These affirmative statements in the Rule's preamble, coupled with the elimination of the definition of "on the basis of sex," show HHS was conforming the regulation to an enforcement policy that excludes LGBTQ people.  As this Court has recognized, "an agency's statement of a general enforcement policy may be reviewable for legal sufficiency where the agency has expressed the policy as a formal regulation . . . or has otherwise articulated it in some form of universal policy statement, which might conceivably include more informal documents."  *People for Ethical Treatment of Animals, Inc. v. U. S. Dep't of Agric.*, 60 F. Supp. 3d 14, 19 (D.D.C. 2014) (cleaned up).  The Court can and should consider the preamble, which demonstrates the Revised Rule is not in accordance with law.

          **b.**    **HHS's Elimination of the Prohibition on Categorical Coverage Exclusions Was an Arbitrary Policy Reversal.**

Defendants seek to justify their elimination of the 2016 Final Rule's prohibition on

---

[3] This policy is consistent with defendants' general and definitive policy not to enforce protections for LGBTQ people.  *See, e.g.*, Notification of Nonenforcement of Health and Human Services Grants Regulation, 84 Fed. Reg. 63,809 (Nov. 19, 2019).

categorical coverage exclusions by claiming Section 1557 did not require such a mandate. The crux of plaintiffs' challenge, however, is that because HHS repudiated a prior policy based on significant factual findings, HHS was required to offer "a more detailed justification" for its policy change consistent with scientific and medical evidence. *See Fox*, 556 U.S. at 515. An agency "cannot simply disregard contrary or inconvenient factual determinations that it made in the past," *id.* at 537 (Kennedy, J. concurring), even when reversing a policy after an election.

HHS did not offer a reasonable explanation. As the opposition acknowledges, HHS merely asserted the 2016 Final Rule "attempted to shut down debate over the efficacy of treatments for gender dysphoria" in concluding coverage exclusions were "outdated and not based on current standards of care," while the Revised Rule "recognizes the lack of a scientific consensus on these important questions." Opp. at 20. But the administrative record shows there is no real scientific or medical debate over these issues. The national medical consensus recognizes the value, medical necessity, and importance of gender-affirming treatments for gender dysphoria. *See* Exs. 5 to 13 (discussing the medical consensus); Ettner ¶ 31. HHS's only response is to point to a news article in an effort to manufacture a disagreement (Opp. at 21) – not to any scientific evidence – and to fault plaintiffs' reference to the WPATH study, which it dismisses as "an advocacy group." Opp. at 21. Yet, HHS relied on WPATH as an authoritative source in responding to comments in the 2016 Final Rule. *See* 81 Fed. Reg. at 31,435 n.263; *see also Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019). HHS's decision to eliminate the categorical coverage exclusions on gender-affirming treatment runs counter to the evidence before HHS and was not the product of reasoned decision-making. *See, e.g.*, *Roe v. U.S. Dep't of Defense*, 947 F.3d 207, 225-28 (4th Cir. 2020).

Defendants also misconstrue the evidence on which HHS relied. Opp. at 20-21. First, in deciding not to issue a "National Coverage Determination (NCD) on sex-reassignment surgery for Medicare beneficiaries with gender dysphoria," CMS did not conclude "the jury is still out." *Id.* at 20. CMS concluded decisions would be on a case-by-case basis. Mot. at 17. Second, although the military panel that issued the 2018 Department of Defense Report may have considered input from medical professionals, its conclusions ultimately were based on "military judgment," not

scientific or medical evidence.  Dep't of Defense, *Report and Recommendations on Military Service by Transgender Persons* (Feb. 22, 2018), at 4, 18, https://perma.cc/7369-K2VC.  Third, defendants repeat the same misleading characterization of the Steensma study as in the Revised Rule – "that social transitioning is tied to the persistence of gender dysphoria."  Opp. at 21.  What the study found is that the intensity of early gender dysphoria, which is correlated with a desire to socially transition, is predictive of persistence.  Mot. at 18.

Finally, defendants' response to plaintiffs' argument that HHS did not consider reliance interests confirms HHS's failure.  Opp. at 22.  First, defendants claim it would have been unreasonable to rely on the 2016 Final Rule because of *Franciscan Alliance*.  But the *Franciscan Alliance* injunction did not address the 2016 Final Rule's prohibition on categorical coverage exclusions.  Second, defendants assert it was necessary to revise the 2016 Final Rule because it "exceeded the Department's authority under Section 1557, adopted erroneous and inconsistent interpretations of civil rights law, caused confusion, imposed unjustified and unnecessary costs, and conflicted with applicable court decisions."  Opp. at 22 (quoting 85 Fed. Reg. at 37,166).  But the Revised Rule does not explain how these purported justifications relate in any way to the categorical coverage exclusions.  HHS failed to consider the serious reliance interests at issue, as it was required to do.  *See Dep't of Homeland Sec*., 140 S. Ct. at 1915.

### c.   HHS Failed to Engage in Reasoned Decision-Making in Eliminating the Notice and Language Access Requirements.

The record shows that HHS failed to engage in "reasoned decisionmaking" in its elimination of the language access protections.  *Judulang v. Holder*, 565 U.S. 42, 53 (2011).

First, contrary to defendants' contention, HHS did not account for how eliminating notices and taglines will decrease access to health care information and keep many LGBTQ people, including people with LEP, uninformed of Section 1557's nondiscrimination protections.  Defendants claim HHS outlined in the Proposed Rule the evidence showing notice and tagline provisions were providing little to no marginal benefit.  Opp. at 24.  But HHS cited only "anecdotal[]" reports that "utilization of translation services did not appreciably rise after the

[2016] Final Rule's imposition of the notice and taglines requirements." 84 Fed. Reg. at 27,882. And the anecdotal evidence appears to be one comment by an insurance company. *See id.* at 27,882 n.230; 85 Fed. Reg. at 37,233 n.370. Further, even after admitting commenters reported "an increase in translation services after the 2016 Rule," HHS simply stated that it agreed with those who "reported a different experience" and concluded it did not have "data enabling it to fulfill the request of commenters who urged the Department to calculate the value of such benefits lost as the result of this final rule." 85 Fed. Reg. at 37,233. HHS's undervaluing, if not completely ignoring, the harms from the Revised Rule violates the APA. *See Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (irrational to ignore "harms that regulation might do to human health").

Second, HHS failed to adequately consider regulatory alternatives. For instance, HHS did not consider issuing guidance to covered entities clarifying or amending the communications HHS considered "significant," the definition of which HHS claimed caused confusion. *See, e.g.*, 84 Fed. Reg. at 27,858; Opp. Br. at 22. The only alternative HHS considered was "keeping the requirement but limiting the frequency of required mailings to one per year to each person served by the covered entity." 85 Fed. Reg. at 37,223. That option would have cost only $63 million a year by the agency's own estimate, but HHS refused to adopt it based simply on its belief that "the costs under this alternative still outweigh the benefits because such mass multi-language taglines mailings would still be received overwhelmingly by English speakers and because the requirement to issue non-discrimination notices would be largely duplicative of non-discrimination notice requirements that already exist under Section 1557's underlying civil rights regulations." *Id.* HHS's reasoning completely overlooks the human cost of eliminating the notices and taglines – approximately 25 million people in the United States have LEP.[4] In addition, HHS failed to explain how individuals will know about their rights under Section 1557 without these notices

---

[4] U.S. Census Bureau, *Language Spoken at Home*, American Community Survey 2018 1-Year Estimates Subject Tables, tbl. S1601 (2018), https://perma.cc/Z452-RSWR; U.S. Census Bureau, *Characteristics of People by Language Spoken at Home*, American Community Survey 2018 1-Year Estimates Subject Tables, tbl. S1603, https://perma.cc/R59J-HG4K.

when not all of the underlying statutes apply to every health care provider.  HHS's explanation is wholly inadequate to justify a policy reversal.  *See Encino Motorcars*, 136 S. Ct. at 2127; *New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 549 (S.D.N.Y. 2019).

### d.     HHS's Narrowing of the Entities Covered Under Section 1557 Was Arbitrary and Capricious.

HHS seeks to justify its narrowing of the entities covered under Section 1557 by claiming that its interpretations are the most reasonable, if not the only permissible, constructions of the statute.  Not only are HHS's interpretations inconsistent with the language of Section 1557 and the purpose of the ACA, but HHS has failed to provide a reasoned explanation for its policy change.

First, Section 1557 applies to "any program or activity that is administered by an Executive Agency *or* an entity established under this title."  42 U.S.C. § 18116(a) (emphasis added).  The Revised Rule, however, limits Section 1557 to "any program or activity administered by the Department under Title I of the ACA."  85 Fed. Reg. at 37,226.  HHS claimed Congress and the text of the statute compelled this interpretation because Congress had included a limitation in the text – "under this title" – meaning Title I programs and activities.  *Id.* at 37,170; *see also* Opp. at 27.  HHS's interpretation, however, is inconsistent with the plain language of the statute and makes little sense.  It reads the word "or" out of the statute, and reads "under this title" into the phrase "any program or activity that is administered by an Executive Agency."  Also, if "under this title" applied to "Executive Agency," there would have been no need for the statute to reference programs administered by Executive agencies.  The result of HHS's unreasonable interpretation is that numerous HHS health programs and activities are excluded from Section 1557's scope, which is inconsistent with the statute's purpose.  The purpose of the ACA is to increase health access and coverage, not narrow it.  *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538-39 (2012); Amicus Br. of U.S. House of Representatives (Dkt. 34-1) at 1-2, 8-12.

Second, HHS misconstrues plaintiffs' argument regarding the unreasonableness of HHS's declaration that health insurers are not a "program or activity" under Section 1557.  Plaintiffs do not argue "that providing 'health insurance' coverage is the same thing as the provision of

'healthcare.'"  Opp. at 28.  Rather, plaintiffs explained that Section 1557, by its terms, applies to "any health *program* or *activity*."  42 U.S.C. § 18116(a) (emphasis added).  It is not limited to direct health care.  The distinction HHS draws between "health insurance" and "healthcare" is beside the point.  Mot. at 20.  Health insurance clearly is a "health program or activity."  By excluding health insurers from the scope of Section 1557, HHS again is acting counter to the purpose of the ACA, which was designed to expand access to health insurance.  *See Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 538-39; Amicus Br. of U.S. House of Representatives at 1-2, 8-12.

### e.  HHS's Incorporation of Sweeping Religious Exemptions Is Not the Product of Reasoned Decision-Making.

Defendants claim that HHS satisfied the APA because the Revised Rule provided "good reasons" for its new policy and explained why its previous exclusion of Title IX's religious exemption was not based on the best reading of the statute.  Opp. at 28-32.  The Revised Rule did no such thing.  First, defendants obscure that although Title IX applies to "any education program or activity receiving Federal financial assistance," Title IX's religious exemption by its terms applies only to "*an educational institution which is controlled by a religious organization*."  20 U.S.C. § 1681(a)(3) (emphasis added).  Contrary to defendants' contention (Opp. at 29), the Revised Rule did not explain why Title IX's religious exemption, which applies only to certain "educational institutions," is appropriate in the health care context.  *See* 85 Fed. Reg. at 37, 207.

Second, defendants claim HHS "determined in its sound judgment that Section 1557 had to be applied consonant with RFRA" and the exclusion of religious exemptions "had caused the 2016 Rule to be vacated in part in *Franciscan Alliance*."  Opp. at 29-30.  But the 2016 Final Rule took RFRA into account and acknowledged it would not displace the protections RFRA affords. *See* 81 Fed. Reg. at 31,379-80, 31,466.  And by the time the Revised Rule was published, *Bostock* had abrogated *Franciscan Alliance* and nullified its vacatur of limited parts of the 2016 Final Rule.

Third, defendants assert "[a]nother good reason" for incorporating Title IX's blanket exemption was "the desire to 'protect . . . providers' medical judgment and their consciences.'" Opp. at 30 (quoting 85 Fed. Reg. at 37,206).  Religious exemptions, however, do not protect

providers' *medical* judgment, and the 2016 Final Rule already protected providers' "religious freedom and conscience." 81 Fed. Reg. at 31,466; *see also* Ex. 14. The "good reason" HHS has failed to provide is why it incorporated Title IX's much broader religious exemption when it previously considered and specifically declined to incorporate it and when Section 1557 does not refer to any exemption in Title IX or contain any religious exemption.

Finally, HHS failed to address the serious risks the 2016 Final Rule identified of importing sweeping religious exemptions into the health care context, *see* 81 Fed. Reg. at 31,380, regardless of whether they are considered factual findings or a policy statement. HHS also failed to respond to concerns that the Revised Rule "decreases protections for patients while increasing exemptions for providers." Opp. at 31. Tellingly, defendants do not even acknowledge plaintiffs' observation that HHS provided "no basis for its assertion that the religious conscience provisions will help 'ensure that patients receive the high quality and conscientious care that they deserve.'" Mot. at 22 (quoting 85 Fed. Reg. at 37,206). These failures render the Revised Rule arbitrary and capricious. *See New York*, 414 F. Supp. 3d at 550-51.

### 2.  HHS Failed to Consider the Harm the Revised Rule Will Cause.

Defendants' opposition repeats one of the central deficiencies of the Revised Rule in failing to consider or even acknowledge the harm the Revised Rule will cause to LGBTQ people, including those with LEP. The protections for LGBTQ people and people with LEP in the 2016 Final Rule were grounded in concrete evidence that "[d]iscrimination in the health care context can often lead to poor and inadequate health care or health insurance or other coverage for individuals and exacerbate existing health disparities in underserved communities." 81 Fed. Reg. at 31,444. HHS disregarded this evidence in reversing its policy and repealing the protections against discrimination in health care, rendering the Revised Rule arbitrary and capricious. *See Stewart v. Azar*, 366 F. Supp. 3d 125, 145 (D.D.C. 2019). And defendants continue to disregard the harm the Revised Rule will create. They simply assert the Revised Rule cannot give rise to any harm because the "prior rule was legally unenforceable" (Opp. at 18), and "it would have been unreasonable for anyone to rely on a rule that had been gutted by a preliminary injunction (and

ultimately a vacatur) shortly after its issuance."  Opp. at 22.

Again, defendants overstate the scope and effect of the *Franciscan Alliance* injunction and ignore the reliance interests the 2016 Final Rule created.  *See, e.g.*, Shafi ¶¶ 25-26; Shanker ¶¶ 8-9, 11.  It was reasonable for LGBTQ people to continue to rely on the 2016 Final Rule.  *Franciscan Alliance* was an outlier in an otherwise relatively uniform, nationwide body of law interpreting discrimination on the basis of transgender status as a form of sex discrimination.  *See* Ex. 5 (Lambda Legal), at 9-11.  And now, in light of *Bostock*, *Franciscan Alliance*'s vacatur of the 2016 Final Rule's prohibition on discrimination on the basis of gender identity is a nullity.

Without question, it will be the Revised Rule, with its elimination of the definition of discrimination "on the basis of sex" and its pronouncement that Section 1557 does not prohibit gender identity and sexual orientation discrimination, that will invite discrimination in health care against plaintiffs, their members, their patients, and LGBTQ people nationwide.

### B.       The Revised Rule Is Not in Accordance with Law.

**Section 1554.**  Defendants' assertion that plaintiffs failed to demonstrate how the Revised Rule violates Section 1554 of the ACA and interferes with access to health care (Opp. at 32) is disingenuous at best.  Plaintiffs' brief and declarations detail with specificity how the Revised Rule creates unreasonable barriers to health care, impedes timely access to health care services, and interferes with communications between providers and patients in violation of Section 1554:

- The elimination of the definition of "on the basis of sex" invites discrimination against LGBTQ people and discourages them from seeking care in the first instance and fully disclosing personal information.  Mot. at 9-11; Shafi ¶ 21; Henn ¶ 16; Pumphrey ¶ 12; Cummings ¶¶ 24, 28; Bolan ¶¶ 13-15, 17, 19; Carpenter ¶¶ 11, 15; Shanker ¶¶ 22-23; Vargas ¶¶ 21-22; Harker ¶¶ 8, 19; Salcedo ¶¶ 32-33; Lint ¶ 48.

- The elimination of prohibitions on categorical coverage exclusions for gender-affirming care, combined with the narrowed scope of covered entities, will result in a reduction of coverage and access to medically necessary health care for transgender and gender nonconforming patients.  Mot. at 10; Shanker ¶ 28; Shafi ¶¶ 24-29; Cummings ¶ 30; Salcedo ¶ 39; Lint ¶¶ 48, 57-58.

- The repeal of the notice and language access provisions creates unreasonable barriers for LGTBQ people with LEP to obtaining health care information.  Mot. at 11; Shafi ¶ 32; Cummings ¶¶ 13, 27, 33; Salcedo ¶¶ 40-41; Lint ¶ 55; Vargas ¶ 23.

- The sweeping religious exemptions burden LGBTQ people's access to health care by allowing health care institutions and providers to deny care to LGBTQ people based on religious, conscience, or moral grounds.  Mot. at 33; Shafi ¶ 20, 39; Henn ¶¶ 14, 27; Pumphrey ¶ 16; Cummings ¶¶ 25-27; Bolan ¶¶ 8, 17, 22-23; Carpenter ¶¶ 8, 15; Harker ¶ 20; Vargas ¶¶ 16, 20, 25.

**Section 1557.**  The Revised Rule conflicts with Section 1557 by limiting the entities covered under Section 1557 and excluding health insurance and by importing broad religious exemptions from other statutes in contravention of the plain language of Section 1557 and Congress's rejection of such exemptions.  *See* 155 Cong. Rec. S13193-01 (2009).

The Revised Rule also conflicts with the language and purpose of Section 1557 by eliminating the statute's unitary legal standard and enforcement mechanisms.  *See* Mot. at 26-27. Defendants contend HHS's interpretation of Section 1557 is the "most straightforward construction" of Section 1557.  Opp. at 33.  But HHS's interpretation disregards Section 1557's context, structure, and text.  In enacting Section 1557 and the ACA, "Congress intended to create a new, health specific, anti-discrimination cause of action that is subject to a *singular* standard, regardless of a plaintiff's protected class status."  *Rumble v. Fairview Health Servs.*, No. 14 Civ. 2037, 2015 WL 1197415, at *11 (D. Minn. Mar. 16, 2015) (emphasis added).  Congress's use of the disjunctive "or" further indicates the enforcement mechanisms applicable under any of the incorporated statutes are available to every claim of discrimination under Section 1557, regardless of type.  42 U.S.C. § 18116(a).  Congress did not intend to import multiple, piecemeal legal standards and burdens of proof derived from different statutory contexts, as HHS proposes. Disparate enforcement mechanisms cannot adequately redress intersectional discrimination claims.  Where an agency's interpretation does not accord with a statute's structure and purpose, it is not entitled to deference.  *See, e.g.*, *Kennecott Utah Copper Corp.*, 88 F.3d at 1213.[5]

---

[5] To the extent the Court finds Section 1557's language to be ambiguous on this point, HHS's elimination of the unitary standard is arbitrary and capricious because it leads to a patchwork of standards and HHS did not provide a reasoned explanation as to why a change in approach was necessary other than saying its new interpretation was "better."  85 Fed. Reg. at 37,202.  HHS's say-so is not enough.

**C.      Plaintiffs Are Likely to Succeed on Their Constitutional Claims.**

**1.      The Revised Rule Violates Plaintiffs' Right to Equal Protection.**

Defendants contend plaintiffs have not alleged any government action that violates the Equal Protection clause, and the Revised Rule could not possibly violate the Constitution "because the 2020 Rule does nothing more than repeat the text of the statute." Opp. at 34. This argument pretends HHS has not taken a clear position that Section 1557 permits discrimination on the basis of gender identity and sex stereotyping – a position repeatedly stated in the preamble. *See, e.g.*, 85 Fed. Reg. 37,175, 37,180, 37,183, 37,191, 37,194, 37,198. These unambiguous statements represent HHS's interpretation of the statutory text, and combined with the elimination of the definition of "on the basis of sex," the Revised Rule constitutes government action that purports to permit discrimination on the basis of gender identity under Section 1557. *See Wyoming Outdoor Council*, 165 F.3d at 53. The Revised Rule does not simply repeat the text of the statute – it excludes gender identity and sex stereotyping from Section 1557's protections.

Defendants also incorrectly assert plaintiffs have not shown any discriminatory animus behind the Revised Rule's exclusion of LGBTQ people from Section 1557. They focus exclusively on defendant Severino's statements and ignore that the Revised Rule is part of the Trump administration's broader pattern of systematically removing protections for LGBTQ people. Mot. at 41-42. Defendants also mischaracterize defendant Severino's statements as "policy or legal disagreements" about whether "on the basis of sex" includes gender identity and sex stereotyping. His comments reflect a broad and explicit bias against LGBTQ people. *See* Mot. at 30.[6] The Revised Rule's elimination of protections for LGBTQ individuals violates the Equal Protection Clause because such elimination is not remotely related to HHS's stated purposes behind the Revised Rule. Mot. at 40. Instead, it reflects a "desire to harm a politically unpopular group." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

---

[6] Defendants' argument that these statements are not part of the administrative record is incorrect. *See* Exs. 5, 15.

### 2.     The Revised Rule Violates Plaintiffs' Right to Due Process.

The Revised Rule's elimination of the definition of "on the basis of sex," in conjunction with HHS's explicit statements that Section 1557 does not protect LGBTQ people, also violates plaintiffs' due process rights.  Defendants completely ignore the Supreme Court's decisions in *Obergefell v. Hodges*, 135 S. Ct. 2584, 2593 (2015), and *Lawrence v. Texas*, 539 U.S. 558, 562 (2003), where the Court recognized a liberty interest in living openly and expressing oneself consistent with one's sexual orientation or gender identity.  Defendants' attempt to distinguish *Arroyo Gonzalez*, 305 F. Supp. 3d at 333, also fails.  The challenged law in *Arroyo* and the Revised Rule both interfere with LGBTQ people's ability to express their identity – in *Arroyo*, by prohibiting changes to sex markers on birth certificates, and in the Revised Rule, by inviting discrimination against LGBTQ people who live openly and interfering with transgender people's ability to live as their true self.

### 3.     The Revised Rule Violates Plaintiffs' Right to Free Speech.

Defendants ignore the thrust of plaintiffs' Free Speech claim – namely, that by inviting health care discrimination against LGBTQ people, the Revised Rule discourages and constrains LGBTQ patients from disclosing and expressing their gender identity and sexual orientation.  Mot. at 31.  Defendants also fail to address plaintiffs' argument that the Revised Rule's burden on speech is based on the content and viewpoint of the speech because the Revised Rule attaches different consequences to the same speech depending on the identity of the speaker – *i.e.* a cisgender woman may disclose her gender identity without being subjected to discrimination but a transgender woman may not.  Defendants' failure to counter any of plaintiffs' arguments demonstrates that plaintiffs are likely to succeed on their Free Speech claims.

### 4.     The Revised Rule Violates the Establishment Clause.

Plaintiffs do not contest that the Establishment Clause allows for religious exemptions and calls for "benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference."  *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 334-35 (1987).  Indeed, the 2016 Final Rule struck this balance by

ensuring that no application of the rule "would violate applicable Federal statutory protections for religious freedom and conscience."  81 Fed. Reg. at 31,466.  But at "some point, accommodation may devolve into an unlawful fostering of religion."  *Amos*, 483 U.S. at 334-35 (cleaned up).  This is precisely what the Revised Rule does.  It expands the number and types of religious and moral exemptions without taking into account the harms to LGBTQ patients and health care providers that will flow from them.  Such blind favoring of religion at others' expense violates the Establishment Clause.  *See Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710 (1985).

## IV.    THE REVISED RULE WILL CAUSE IRREPARABLE HARM.

Plaintiffs have demonstrated amply how the Revised Rule will cause irreparable harm to them, their patients, their members, and their patrons, including:  (1) the loss of access to health care, Mot. at 38; (2) the invitation of well-documented discrimination, Mot. at 36-37; (3) the immediate impairment of plaintiffs' programmatic activities and diversion of limited resources, Mot. at 39-41; and (4) the unconstitutional deprivation of equal protection and the infringement of other constitutional rights.  Mot. at 28-33, 42.  *See also* Part II.C *supra*.

The Revised Rule also imposes upon LGBTQ people stigma, causes distress, and negatively impacts their health directly.  The Revised Rule removes regulatory protections based on gender identity and sex stereotyping and actively calls into question LGBTQ people's identities. The Revised Rule repeatedly, purposefully, and disrespectfully fails to refer to transgender people by their correct gender and pronouns.  *See*, *e.g.*, 85 Fed. Reg. at 37,180 & n.90-91 (remarking that Aimee Stephens "quite obviously" is not "a woman" because "Stephens's sex" is male); *id.* at 37,191 (referring to transgender boy who died of suicide following severe mistreatment and harassment on account of his transgender status as "her" – despite quoting in a footnote the court's opinion correctly referring to him as a boy).  The Revised Rule also suggests LGBTQ people are a threat to children – an offensive, dangerous statement that has been used historically to justify violence and discrimination against LGBTQ people.  *See* 85 Fed. Reg. at 37,222.  In short, the governmental message the Revised Rule sends has a detrimental effect on the dignity and health of LGBTQ people, resulting in significant distress, hopelessness, hypervigilance, depression,

generalized anxiety disorder, and trauma, particularly for transgender people.  Ettner ¶¶ 56, 62.
LGBTQ youth and transgender people already are distressed and fearful of the Revised Rule's
effects.  *See* Vera Decl. ¶¶ 6-8; Davis Decl. ¶¶ 9-11.

What is more, neither the Revised Rule nor defendants' opposition consider the effects the
Revised Rule will have in the midst of a global pandemic, when trust between patients and their
health care providers is more important than ever.  COVID-19 has resulted in nearly 150,000
deaths and over 4 million cases in the U.S. alone.  *See* Ctrs. for Disease Control and Prevention,
*Coronavirus Disease 2019 (COVID-19): Cases in the U.S.*, https://perma.cc/8DT9-BMKQ (last
visited July 29, 2020).  Defendants make no mention of it, even though LGBTQ people are
disproportionately vulnerable to COVID-19, Henn ¶ 12, and the health care provider plaintiffs
already are overwhelmed by the pandemic.  Shafi ¶ 36; Cummings ¶¶ 8-9; *cf.* Fabian ¶ 24.

## V.      THE BALANCE OF EQUITIES FAVORS PLAINTIFFS, AND AN INJUNCTION OR STAY IS IN THE PUBLIC INTEREST.

Defendants turn the balancing of the equities and public interest on its head.  Opp. at 42-
43.  Defendants now claim the Revised Rule mitigates the harms from the 2016 Final Rule, which
"imposed substantial costs on covered entities without yielding sufficient benefits, failed to protect
religious interests, interfered with the medical and ethical judgment of health professionals, and
unjustifiably expanded its own jurisdiction."  Opp. at 43.  The administrative record, however,
neither supports nor details any of these purported harms.

The only provisions the Revised Rule identified as imposing "unnecessary regulatory
burdens" were the notice and language provisions, *see* 85 Fed. Reg. at 37,162, and even those cost
figures are speculative because HHS relied exclusively on self-reported estimates.  *Id.* at 37,229.
HHS also failed to examine the burdens and harms to LGBTQ people and people with LEP that
would result from the elimination of these provisions.  *See* Mot. at 24-25.

The record likewise does not support HHS's assertion that the 2016 Final Rule "failed to
protect religious interests" and interfered with the medical and ethical judgment of health
professionals.  The 2016 Final Rule enabled doctors, rather than insurance companies, to use their

medical expertise to make individualized treatment decisions.  *See* Mot. at 16.  And between 2008 and January 2018, HHS received fewer than 50 complaints regarding violations of religious or conscience statutes.  *See* 85 Fed. Reg. at 37,206.  It is the Revised Rule's prioritization of the religious and conscience objections of individual providers over the rights of LGBTQ people to receive health care that will cause irreparable harm.  Granting the requested preliminary relief will serve the public interest and public health, particularly given the current COVID-19 pandemic.

**VI.    A NATIONWIDE INJUNCTION IS THE ONLY ADEQUATE REMEDY.**

Plaintiffs have met the standard for a nationwide injunction by showing a likelihood of success on the merits and that the Revised Rule has nationwide applicability.  *See Nat'l Mining Ass'n v. U.S. Army Corps*, 145 F.3d 1399, 1408-10 (D.C. Cir. 1998).  Indeed, defendants do not contest that the Revised Rule's harms will be experienced nationwide.  Rather, they argue a nationwide injunction is inappropriate because the Revised Rule is being challenged in other courts.  But only nationwide relief can remedy nationwide harm.  *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  Moreover, nationwide relief would not prevent "legal questions from percolating through the federal courts."  Opp. at 44.  Defendants' assertion that certain unnamed non-plaintiffs may want the Revised Rule to take effect to "afford[] them certainty regarding the obligations of covered entities in protecting important nondiscrimination rights" (Opp. at 44), further reinforces why a nationwide injunction is necessary.  The Revised Rule's failure to conform to *Bostock* has created confusion about covered entities' nondiscrimination obligations that only a nationwide injunction can remedy.  Ironically, despite objecting to nationwide relief here, defendants have no issue relying on the nationwide injunction in *Franciscan Alliance*.

Because HHS's lack of reasoned decision-making permeates the entire Revised Rule, the Court cannot save any part of the Revised Rule, as defendants suggest.  Opp. at 44-45.  The entire rule must be enjoined or its effective date stayed.

Dated:  July 29, 2020                              Respectfully submitted,


LAMBDA LEGAL DEFENSE                              STEPTOE & JOHNSON LLP
AND EDUCATION FUND, INC.

By:  _/s/ Omar Gonzalez-Pagan_____                By:  ___/s/ Laurie Edelstein_____

OMAR GONZALEZ-PAGAN*                              LAURA (LAURIE) J. EDELSTEIN*
*ogonzalez-pagan@lambdalegal.org*                *ledelstein@steptoe.com*
KAREN LOEWY*                                      STEPTOE & JOHNSON LLP
*kloewy@lambdalegal.org*                          One Market Plaza
CARL S. CHARLES*                                  Spear Tower, Suite 3900
*ccharles@lambdalegal.org*                        San Francisco, CA  94105
LAMBDA LEGAL DEFENSE                              Phone: (415) 365-6700
AND EDUCATION FUND, INC.                          Fax:    (415) 365 6699
120 Wall Street, 19th Floor
New York, NY  10005                               MICHAEL VATIS
Phone: (212) 809-8585                             (D.C. Bar No. 422141)
Fax:    (212) 809-0055                            *mvatis@steptoe.com*
                                                  KHRISTOPH A. BECKER*
JAMIE A. GLIKSBERG*                               *kbecker@steptoe.com*
*jgliksberg@lambdalegal.org*                      STEPTOE & JOHNSON LLP
LAMBDA LEGAL DEFENSE                              1114 Avenue of the Americas
AND EDUCATION FUND, INC.                          New York, NY  10036
105 West Adams, 26th Floor                        Phone: (212) 506-3900
Chicago, IL  60603                                Fax:    (212) 506-3950
Phone: (312) 663-4413
Fax:    (312) 663-4307                            JOHANNA DENNEHY
                                                  (D.C. Bar No. 1008090)
                                                  *jdennehy@steptoe.com*
* Admitted *pro hac vice.*                        LAURA LANE-STEELE**
                                                  *llanesteele@steptoe.com*
** *Application for admission to U.S. District*   STEPTOE & JOHNSON LLP
*Court for the District of Columbia forthcoming.* 1330 Connecticut Avenue NW
                                                  Washington, DC  20036
                                                  Phone: (202) 429-3000
                                                  Fax:    (202) 429-3902


*Counsel for Plaintiffs*