**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **WHITMAN-WALKER CLINIC, INC.,** *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,** *et al.*, <br><br> **Defendants.** | **Civil Action No. 20-1630 (JEB)** |

## MEMORANDUM OPINION

In an effort to improve access to health care for LGBTQ individuals, the Department of Health and Human Services in 2016 promulgated a Rule that offered a bevy of protections for such patients. Those included explicit prohibitions on discrimination on the basis of gender identity or sex stereotyping, limits on exemptions from providing treatment that certain religious entities could invoke, proscriptions of categorical coverage exclusions, and a number of others. Believing that many of these protections were either unnecessary or misguided, the current administration has recently issued a Rule that revises or repeals the 2016 Rule in significant respects.

Concerned by this change in policy, private health-care facilities that provide services to LGBTQ people, LGBTQ-services organizations, national associations of health professionals, and individual physicians and behavioral-health providers have joined forces to bring suit challenging the new Rule under both the Administrative Procedure Act and various constitutional provisions. They now ask this Court to preliminarily enjoin the measure while this litigation proceeds.

1

As the daunting length of this Opinion suggests, the multiple issues they raise and their ability to do so pose myriad thorny questions that require extensive analysis. The Court ultimately concludes that Plaintiffs have standing to level challenges to certain provisions of the 2020 Rule, but not others, and that they are likely to succeed (and will suffer irreparable harm) on two central claims: first, that the 2020 Rule arbitrarily and capriciously eliminated "sex stereotyping" from the prior Rule's definition of "discrimination on the basis of sex"; and second, that it improperly incorporated Title IX's exemption of certain religious organizations from the statute's nondiscrimination mandate. The Court, consequently, will grant Plaintiffs' Motion in part and enjoin HHS from implementing these two provisions during the pendency of this case.

**Table of Contents**

I.   Background ........................................................................................................... 5

   A.  Statutory Background ...................................................................................... 5

   B.  Regulatory Background .................................................................................. 6

      1.  2016 Rule .................................................................................................. 6

      2.  2020 Rule .................................................................................................. 9

      3.  Bostock ................................................................................................... 12

   C.  The Instant Litigation .................................................................................. 13

II.  Legal Standard ................................................................................................... 14

III.  Standing ............................................................................................................ 15

   A.  Organizational Standing .............................................................................. 18

      1.  Legal Standard ....................................................................................... 18

      2.  Application to Claims ............................................................................. 20

         a.  Common-Injury Claims ..................................................................... 21

            i.  Injury-in-Fact ............................................................................. 21

            ii.  Causation and Redressability ..................................................... 27

               (a)  Elimination of 2016 Rule's Definition of Sex Discrimination ........ 27

               (b)  Incorporation of Title IX's Religious Exemption ............................ 34

               (c)  Section 1554 and Establishment Clause ......................................... 35

         b.  Additional Organizational-Injury Claims ......................................... 36

            i.  Elimination of Prohibition on Categorical Coverage Exclusions .......... 36

            ii.  Elimination of Notice Requirements ........................................... 38

            iii.  Narrowing Scope of Covered Entities ...................................... 41

            iv.  Section 1557 Legal Standard ..................................................... 43

   B.  Third-Party Standing .................................................................................... 45

IV.  Analysis ............................................................................................................ 50

   A.  Likelihood of Success on the Merits ........................................................... 51

      1.  Elimination of 2016 Rule's Definition of Sex Discrimination ...................... 51

      2.  Incorporation of Title IX's Religious Exemption ...................................... 62

      3.  Elimination of Prohibition on Categorical Coverage Exclusions ................. 67

      4.  Elimination of Notice Requirements .......................................................... 73

     5.    Section 1554 ................................................................................................. 79

     6.    Constitutional Claims .................................................................................. 81

         a.   Equal Protection ................................................................................ 81

         b.   Substantive Due Process .................................................................... 83

         c.   Free Speech........................................................................................ 83

         d.   Establishment Clause ........................................................................ 84

  B.   Irreparable Harm ................................................................................................ 85

  C.   Balance of Equities and Public Interest ............................................................ 93

V.   Remedy..................................................................................................................... 95

VI.  Conclusion................................................................................................................ 101

## I.      Background

The Court begins with a brief overview of the relevant statutory background, then turns to the various regulatory actions at issue, and concludes with a history of the current litigation.

### A.  Statutory Background

Passed in 2010, the Patient Protection and Affordable Care Act (ACA) is "a comprehensive national plan to provide universal health insurance coverage" across the nation.  Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 583 (2012).  It adopted a series of reforms to "expand coverage in the individual health insurance market," many of which were designed to protect consumers and make quality health care more broadly accessible.  King v. Burwell, 135 S. Ct. 2480, 2485 (2015).  An important component of the ACA's effort to ensure the prompt and effective provision of health care to all individuals — and of particular relevance for the present case — is the statute's express anti-discrimination mandate, which draws from protections embodied in four longstanding civil-rights laws.  Section 1557 provides, as pertinent here:

> Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section [504 of the Rehabilitation Act of 1973 (29 U.S.C. 794)], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under [Title I of the ACA] (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section [504], or such Age Discrimination Act shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116(a).

By outlawing discrimination "on the ground prohibited" by Title IX, Section 1557 bars discrimination "on the basis of sex."  See 20 U.S.C. § 1681(a) (Title IX).  It also forbids discrimination based on race, color, national origin, age, and disability.  See 42 U.S.C. § 2000d (Title VI); id. § 6102 (Age Discrimination Act); 29 U.S.C. § 794 (Rehabilitation Act).  These prohibitions sweep broadly, applying to "any health program or activity" receiving federal funding, as well as to "any program or activity that is administered by an Executive Agency or any entity established under [Title I of the ACA]."  42 U.S.C. § 18116(a).  Section 1557 likewise adopts the "enforcement mechanisms" available under the four incorporated statutes, instructing that they "shall apply for purposes of violations."  Id.  Finally, it provides that the Secretary of HHS "may" promulgate implementing regulations.  Id. § 18116(c).

     B.  Regulatory Background

          1.  *2016 Rule*

Exercising that delegation of authority, HHS published a rule on May 18, 2016, to "clarif[y] and codif[y] existing nondiscrimination requirements and set[] forth new standards to implement Section 1557."  Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375, 31,376 (May 18, 2016).  In doing so, the agency devoted particular attention to the statute's prohibition on discrimination based on sex and well-documented challenges experienced by LGBTQ individuals seeking access to health care.  The agency reported that for "transgender individuals, a major barrier to receiving care is a concern over being refused medical treatment based on bias against them."  Id. at 31,460.  In one study, approximately 27% of transgender respondents reported that they had been refused needed health care.  Id.  A 2011 survey likewise revealed that 25% of transgender individuals had experienced harassment in medical settings.  Id.  These findings supported the belief that transgender individuals who have

suffered such discriminatory treatment "often postpone or do not seek needed health care, which may lead to negative health consequences." Id.  HHS also noted that many insurance or other health-care providers maintained explicit exclusions of coverage for all care related to gender dysphoria — a condition characterized by distress arising from a conflict between one's birth-assigned gender and gender identity — or associated with gender transition.  Id. at 31,429.

The 2016 Rule thus introduced a host of measures in response to these and other perceived barriers to accessing quality and necessary health care.  Several are of particular relevance to the present litigation.

First, the 2016 Rule defined its prohibition on sex discrimination — as incorporated by way of Title IX — to include "discrimination on the basis of . . . sex stereotyping, and gender identity."  81 Fed. Reg. at 31,467 (formerly codified at 45 C.F.R. § 92.4).  The Rule explained that "gender identity" is "an individual's internal sense of gender, . . . which may be different from an individual's sex assigned at birth."  Id.  It defined "sex stereotypes," in turn, to include "stereotypical notions of masculinity or femininity," as well as "the expectation that individuals will consistently identify with only one gender and that they will act in conformity with the gender-related expressions stereotypically associated with that gender."  Id. at 31,468 (formerly codified at 45 C.F.R. § 92.4).  HHS explained that such "clarification" regarding the scope of Section 1557's sex-discrimination prohibition was consistent with prior agency and judicial interpretation, and was necessary to combat continued discrimination experienced by transgender individuals seeking access to health care.  Id. at 31,388, 31,460.

In addition, the 2016 Rule declined to expressly incorporate Title IX's exemption of certain religious entities from its prohibition on sex discrimination in the event of a conflict between such prohibition and the entity's religious tenets.  As HHS explained, "Section 1557

itself contains no religious exemption." Id. at 31,380.  The agency also cited concerns

surrounding wholesale importation of Title IX's exemption into the broader health-care context,

worrying that an exemption could "result in a denial or delay in the provision of health care to

individuals" and "discourag[e] [them] from seeking necessary care." Id.  While the Rule made

clear that it did not incorporate Title IX's religious exemption, it nonetheless instructed that

Section 1557's nondiscrimination mandate would not apply in the event of a conflict with federal

statutory protections for religious freedom and conscience.  Id. at 31,466 (formerly codified at 45

C.F.R. § 92.2(b)(2)).

        Several other provisions warrant brief mention, as they also appear in this litigation.  The

2016 Rule prohibited insurers from having or implementing "categorical coverage exclusion[s]

or limitation[s] for all health services related to gender transition." Id. at 31,471–72 (formerly

codified at 45 C.F.R. § 92.207(b)(4)).  It also required health-care providers and other covered

entities to post notices and short, written "taglines" — in fifteen different languages in certain

significant publications and in conspicuous physical locations — informing patients of their

nondiscrimination rights and the availability of language-assistance services.  Id. at 31,469

(formerly codified at 45 C.F.R. § 92.8).  Finally, the Rule clarified the scope of entities to which

Section 1557 applied — namely, every health program or activity that receives federal funding,

is administered by HHS, or is administered by an entity established under Title I of the ACA. Id.

at 31,466 (formerly codified at 45 C.F.R. 92.2(a)).

        One additional piece of background regarding the 2016 Rule merits mention.  In

December 2016, several months after the Rule's promulgation, a federal court in the Northern

District of Texas issued a nationwide preliminary injunction barring HHS from enforcing its

definition of sex discrimination insofar as it included "gender identity" (but not sex

8

stereotyping).  Franciscan Alliance, Inc. v. Burwell, 227 F. Supp. 3d 660, 695–96 (N.D. Tex.

2016).  The court reasoned that the statutory term "sex," as deployed in Title IX and incorporated

into Section 1557, "refer[red] to the biological differences between males and females" and thus

did not encompass gender identity.  Id. at 688–89.  It went a step further in October 2019 when it

vacated that portion of the 2016 Rule and remanded it for "further consideration."  Franciscan

Alliance, Inc. v. Azar, 414 F. Supp. 3d 928, 945 (N.D. Tex. 2019).  Critically, as the court

subsequently clarified, such vacatur applied only "insofar as the Rule defines 'On the basis of

sex' to include gender identity . . . ."  ECF No. 43 (Pl. Reply), Exh. 4 (Franciscan Alliance

Order) at ECF p. 3.  "The remainder of 45 C.F.R. § 92," it made clear, "remains in effect."  Id.

#### 2. *2020 Rule*

The Obama administration having departed, in June 2019, HHS issued a notice of

proposed rulemaking that suggested "substantial revisions" to the 2016 Rule.  See

Nondiscrimination in Health and Health Education Programs or Activities, 84 Fed. Reg. 27,846,

27,848 (June 14, 2019).  Many of the agency's proposed changes became reality when it

promulgated the final 2020 Rule just over a year later.  See Nondiscrimination in Health and

Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160 (June 19,

2020).  Because the Court explains each challenged provision in additional detail when

considering the merits of Plaintiffs' various claims, the briefest of discussions of the relevant

specific changes will suffice for present purposes.

First, the 2020 Rule "repeal[ed] the 2016 Rule's definition of 'on the basis of sex,'"

which — as a reminder — explicitly prohibited discrimination based on sex stereotyping and

gender identity.  Id. at 37,178.  HHS did so on the belief that the prior definition "exceeded the

scope of the authority delegated by Congress in Section 1557," imposing legal requirements

"that cannot be justified by the text of Title IX." Id. at 37,161–62; see also, e.g., id. at 37,191

(explaining that "the term 'on the basis of . . . sex' in Section 1557 does not encompass

discrimination on the basis of gender identity").  As a result of this wholesale reversal in the

agency's legal interpretation, no provision of the 2020 Rule contains any reference to "sex

stereotyping" or "gender identity."  Indeed, the regulation carries no definitional provision at all,

and instead simply explains that Section 1557 prohibits discrimination on the grounds barred in

the four civil-rights statutes it incorporates.  Id. at 37,244 (to be codified at 45 C.F.R. § 92.2).

       In another policy reversal, the 2020 Rule expressly incorporated Title IX's religious

exemption into Section 1557.  See 45 C.F.R. § 92.6(b) (incorporating "exemptions" contained in

various statutes, including Title IX).  As HHS explained, "Any educational operation of an entity

may be exempt from Title IX due to control by a religious organization."  85 Fed. Reg. at

37,207–08.  The agency made clear that such exemption applied in whole to Section 1557,

thereby excepting applicable operations from the statute's prohibition on sex discrimination if

inconsistent with the organization's religious tenets.  Id. at 37,207–08 & n.267.  According to

HHS, these and other safeguards "will protect both providers' medical judgment and their

consciences, thus helping to ensure that patients receive the high-quality and conscientious care

that they deserve."  Id. at 37,206.

       HHS similarly eliminated the 2016 Rule's prohibition on insurers' having or

implementing categorical coverage exclusions for gender-affirming care.  In doing so, the agency

contended that no statutory authority existed for such a prohibition in the first place, and it

pointed to evidence indicating division among the medical community "on many issues related

to gender identity, including the value of various 'gender-affirming' treatments for gender

dysphoria."  Id. at 37,187, 37,198.

Next, HHS repealed the 2016 Rule's requirements that covered entities provide various notices and taglines informing individuals of Section 1557's prohibited grounds of discrimination and the availability of language-assistance services.  The agency justified that action by emphasizing the significant costs of providing such notices in covered communications and physical locations, as well as limited evidence of their leading to increased access to care. Id. at 37,224, 37,232–33.

The 2020 Rule also narrowed the scope of entities covered under Section 1557 in two distinct ways.  First, HHS interpreted the statute's nondiscrimination protections to apply only to health programs or activities receiving federal funding, programs or activities administered by HHS under Title I of the ACA, or programs or activities administered by entities established under Title I.  See 45 C.F.R. § 92.3(a).  As relevant here, this regulatory action restricted the statute's coverage to HHS programs administered under Title I of the ACA, as opposed to all of the agency's health programs and activities (as provided by the 2016 Rule).  See 85 Fed. Reg. at 37,170–71.  The effect of this change would likely be to exclude certain programs administered by the Centers for Medicare & Medicaid Services and the Centers for Disease Control and Prevention, among other HHS components, from Section 1557's reach.  Id.  In addition, the 2020 Rule interpreted Section 1557's reference to "any health program or activity" receiving federal funding, see 42 U.S.C. § 18116(a), as excluding entities "principally or otherwise engaged in the business of providing health insurance."  45 C.F.R. § 92.3(b), (c).

Finally, the 2020 Rule requires would-be plaintiffs to employ the particular enforcement mechanism and accompanying legal standard available under each of Section 1557's incorporated statutes, depending on the precise ground of discrimination asserted.  See 45 C.F.R. § 92.5; 85 Fed. Reg. at 37,202.  In other words, a litigant bringing a discrimination claim on a

11

ground prohibited by Title VI — *e.g.*, race — cannot invoke the enforcement mechanisms available under Title IX.  See 85 Fed. Reg. at 37,202.

          3.   Bostock

      Just four days before HHS published the 2020 Rule, the Supreme Court issued its decision in Bostock v. Clayton County, 140 S. Ct. 1731 (2020), a case involving Title VII's prohibition on discrimination "because of . . . sex."  42 U.S.C. § 2000e–2(a)(1).  The Court held that discrimination based on transgender status or sexual orientation "necessarily entails discrimination based on sex," and accordingly falls within Title VII's sweep.  Bostock, 140 S. Ct. at 1747.  In reaching that conclusion, the Court expressly assumed that "sex" "refer[red] only to biological distinctions between male and female."  Id. at 1739.  Nothing turned on the original meaning of that statutory term, the Court explained, because a "straightforward" application of Title VII's text confirmed that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."  Id. at 1741, 1743.

      In the 2020 Rule, HHS acknowledged that the Court's forthcoming decision in Bostock "will likely have ramifications" for Title IX's similarly worded prohibition on sex discrimination.  See 85 Fed. Reg. at 37,168.  That was especially so, the agency admitted, because "Title VII case law has often informed Title IX case law with respect to the meaning of discrimination 'on the basis of sex.'"  Id.  HHS nevertheless pushed ahead, publishing the 2020 Rule shortly after Bostock was decided.  Nowhere did the agency mention the case's holding, let alone analyze the implications of its reasoning for HHS's determination that "the term 'on the basis of . . . sex' in Section 1557 does not encompass discrimination on the basis of gender identity."  Id. at 37,191.  Indeed, the final Rule suggests that HHS simply thought Bostock would

come out differently than it ultimately did.  See id. at 37,168 (stating that "the reasons why 'on

the basis of sex' . . . does not encompass sexual orientation or gender identity under Title VII

have similar force for the interpretation of Title IX").

     C.  The Instant Litigation

     Three days after HHS finalized the 2020 Rule — but before its provisions went into

effect — Plaintiffs filed this suit against the agency under the Administrative Procedure Act, 5

U.S.C. § 701 et seq.  Among the current Plaintiffs are two private health-care facilities that

provide services to LGBTQ people (Whitman-Walker Clinic, Inc. and Los Angeles LGBT

Center) (the "health-provider Plaintiffs"); two LGBTQ-services organizations (TransLatin@

Coalition and Bradbury-Sullivan LGBT Community Center); two national associations of health

professionals (American Association of Physicians for Human Rights, Inc. (GLMA) and AGLP:

The Association of LGBTQ+ Psychiatrists); and four individual physicians and behavioral-health

providers who work for the health-provider Plaintiffs.  See ECF No. 1 (Complaint), ¶¶ 31–46.

Their Complaint asserts various claims against HHS, all pertaining to the 2020 Rule.  Id.,

¶¶ 225–307.

     Soon thereafter, Plaintiffs filed this Motion for Preliminary Injunction or, in the

Alternative, a Stay Pending Judicial Review.  See ECF No. 29, Exh. 1 (Pl. Mot.).  Much like

their Complaint, the Motion asserts a congeries of claims against HHS, which run together at

certain points.  Stated broadly, Plaintiffs seek an order from this Court enjoining the agency from

carrying out each of the aforementioned regulatory repeals and barring it from enforcing several

of the newly promulgated provisions.  They chiefly contend that these actions were arbitrary and

capricious or otherwise foreclosed by Section 1557.  In addition, Plaintiffs argue that select

provisions of the 2020 Rule conflict with Section 1554, which prohibits regulations that create

13

unreasonable barriers and impede access to health-care services.  See 42 U.S.C. § 18114.

Finally, Plaintiffs maintain that the 2020 Rule runs afoul of the Fifth Amendment's guarantees of

equal protection and substantive due process, infringes their right to free speech under the First

Amendment, and violates the Establishment Clause.

      Following a hearing on the Motion, the Court provided Defendants an opportunity to

submit a surreply on questions relating to standing and irreparable harm, as Plaintiffs had

declined to discuss the former in their opening brief.  On August 17, 2020 — one week after

Defendants' supplemental filing, and one day before the 2020 Rule was scheduled to go into

effect — a federal court in the Eastern District of New York "preliminarily enjoin[ed] [HHS]

from enforcing the repeal" of the 2016 Rule's definition of discrimination on the basis of sex.

Walker v. Azar, No. 20-2834, 2020 WL 4749859, at *10 (E.D.N.Y. Aug. 17, 2020).  Walker

endorsed essentially the very argument that Plaintiffs make here — namely, that HHS's repeal of

the 2016 Rule's definition was arbitrary and capricious in light of the agency's failure to

consider the implications of the Supreme Court's decision in Bostock.  Id. at *9–10.  Because the

court's injunction remains in effect, HHS's repeal of that definitional provision has not yet

occurred.  Walker, however, considered only that sole provision of the 2020 Rule; it did not

decide any of the additional issues Plaintiffs raise before this Court.  As a result, with the one

exception, each of the 2020 Rule's new provisions are now in effect.

## II.    Legal Standard

      "A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter

v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary

injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to

suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in

his favor, and [4] that an injunction is in the public interest."  Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (alterations in original) (quoting Winter, 555 U.S. at 20).  "The moving party bears the burden of persuasion and must demonstrate, 'by a clear showing,' that the requested relief is warranted."  Hospitality Staffing Solutions, LLC v. Reyes, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (quoting Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Historically, these factors have "been evaluated on a 'sliding scale.'"  Davis v. Pension Ben. Guar. Corp., 571 F.3d 1288, 1291 (D.C. Cir. 2009) (quoting Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 361 (D.C. Cir. 1999)).  In other words, if the movant makes an "unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor."  Id. at 1291–92.  This Circuit has hinted, though not held, that Winter — which overturned the Ninth Circuit's "possibility of irreparable harm" standard — establishes that "likelihood of irreparable harm" and "likelihood of success" are "'independent, free-standing requirement[s].'"  Sherley, 644 F.3d at 392–93 (quoting Davis, 571 F.3d at 1296 (Kavanaugh, J., concurring)); see League of Women Voters v. Newby, 838 F.3d 1, 7 (D.C. Cir. 2016) (declining to address whether "sliding scale" approach is valid after Winter).  Unresolved, too, is the related question of "whether, in cases where the other three factors strongly favor issuing an injunction, a plaintiff need only raise a serious legal question on the merits."  Aamer v. Obama, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (internal quotation and citation omitted).

## III.   Standing

Perhaps overconfident of their standing to bring this suit, Plaintiffs, as mentioned before, never even discussed this question in their original Motion.  This threshold issue, however, is

quite involved, given all of the discrete challenges Plaintiffs assert here.  The Court, as it must, thus begins by addressing its own jurisdiction.

Article III of the Constitution limits the power of the federal judiciary to the resolution of "cases and controversies," a phrase given meaning by the doctrine of "standing."  Whitmore v. Arkansas, 495 U.S. 149, 154–55 (1990); see U.S. Const. art. III, § 2, cl. 1.  "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III."  Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992).  For that reason, finding that a plaintiff has standing is a necessary "predicate to any exercise of [the Court's] jurisdiction."  Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc).

"Every plaintiff in federal court bears the burden of establishing the three elements that make up the 'irreducible constitutional minimum' of Article III standing: injury-in-fact, causation, and redressability."  Dominguez v. UAL Corp., 666 F.3d 1359, 1362 (D.C. Cir. 2012) (quoting Lujan, 504 U.S. at 560–61).  First, the plaintiff "must have suffered an 'injury in fact' — an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical."  Lujan, 504 U.S. at 560 (internal quotation marks and citations omitted).  Second, "there must be a causal connection between the injury and the conduct complained of — the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'"  Id. (alterations in original) (citation omitted).  Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  Id. at 561 (citation omitted).  A "deficiency on any one of the three prongs suffices to defeat standing."  U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).

While the plaintiff "bears the burden of establishing" all three elements of standing, the "manner and degree of evidence required" to do so varies according to the "stage[] of the litigation." Lujan, 504 U.S. at 561. "In the context of a preliminary injunction motion," the plaintiff must "'show a substantial likelihood of standing' 'under the heightened standard for evaluating a motion for summary judgment.'" Electronic Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity, 878 F.3d 371, 377 (D.C. Cir. 2017) (quoting Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 912–13 (D.C. Cir. 2015)). "Thus, the plaintiff cannot 'rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts' that, if 'taken to be true,' demonstrate a substantial likelihood of standing." Id. (alteration in original) (quoting Lujan, 504 U.S. at 561); see also Electronic Privacy Info. Ctr. v. U.S. Dep't of Commerce, 928 F.3d 95, 104 (D.C. Cir. 2019). "[I]n assessing plaintiffs' standing, [the Court] must assume they will prevail on the merits of their . . . claims." LaRoque v. Holder, 650 F.3d 777, 785 (D.C. Cir. 2011).

Because "standing is not dispensed in gross," but instead may differ claim by claim, Davis v. FEC, 554 U.S. 724, 734 (2008) (internal quotation and alteration omitted), a plaintiff "must demonstrate standing for each claim he seeks to press." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006). Only one plaintiff, however, needs standing in order for a particular claim to go forward. Comcast Corp. v. FCC, 579 F.3d 1, 6 (D.C. Cir. 2009). That is, if constitutional standing "can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise that claim." Carpenters Indus. Council v. Zinke, 854 F.3d 1, 9 (D.C. Cir. 2017) (quoting Mountain States Legal Found. v. Glickman, 92 F.3d 1228, 1232 (D.C. Cir. 1996)); see also In re Navy Chaplaincy, 697 F.3d 1171, 1176–1178 (D.C. Cir. 2012) (concluding that plaintiffs had standing because "at least some plaintiffs" would suffer injury).

While an "inability to establish a substantial likelihood of standing" on a particular claim

"requires denial of the motion for preliminary injunction," it does not warrant outright dismissal.

Food & Water Watch, 808 F.3d at 913.

The Court will first assess nine of Plaintiffs' claims under the rubric of organizational

standing.  It will then consider whether they can assert the rights of third-party LGBTQ patients

to bring the three remaining constitutional counts.

    A.  Organizational Standing

        1.  *Legal Standard*

Organizations can sue either on their own behalf ("organizational standing") or on behalf

of their members ("representational" or "associational standing").  See Ctr. for Responsible

Sci. v. Gottlieb, 311 F. Supp. 3d 5, 9 (D.D.C. 2018).  For reasons that will become evident, the

Court largely focuses on the former theory with respect to the health-provider Plaintiffs

(Whitman-Walker and LA LGBT).  To establish organizational standing, Plaintiffs must show

that the organization itself, like any individual plaintiff, satisfies the three familiar elements of

standing — (1) injury, (2) causation, and (3) redressability.  See Equal Rights Ctr. v. Post Props.,

633 F.3d 1136, 1138 (D.C. Cir. 2011).

To satisfy the injury-in-fact requirement, an organization must allege a "concrete and

demonstrable injury to [its] activities."  Food & Water Watch, 808 F.3d at 919 (alteration in

original) (quoting PETA v. USDA (PETA II), 797 F.3d 1087, 1093 (D.C. Cir. 2015)).

Conversely, "a mere 'setback'" to the organization's "'abstract social interests' is not sufficient."

Equal Rights Ctr., 633 F.3d at 1138 (quoting Spann v. Colonial Vill., Inc., 899 F.2d 24, 27 (D.C.

Cir. 1990)).  Our Circuit memorializes this distinction in a two-part test: the Court must ask first

"whether the agency's action or omission to act 'injured the [organization's] interest'"; then, if

satisfied, it inquires whether "the organization 'used its resources to counteract that harm.'"

PETA II, 797 F.3d at 1094 (alteration in original) (quoting Equal Rights Ctr., 633 F.3d at 1140);

accord Food & Water Watch, 808 F.3d at 919 (employing same test); see also Havens Realty

Corp. v. Coleman, 455 U.S. 363, 379 (1982) (finding organizational injury based on an "injury to

the organization's activities" followed by "the consequent drain on the organization's

resources").

Regarding the first prong: to qualify as an injury to the organization's interest, the

challenged activity must "perceptibly impair[] the organization's ability to provide services."

Food & Water Watch, 808 F.3d at 919 (quoting Turlock Irrigation Dist. v. FERC, 786 F.3d 18,

24 (D.C. Cir. 2015)).  Put otherwise, it must "inhibit[]" the organization's "daily operations" in a

concrete way,  PETA II, 797 F.3d at 1094 (citation omitted), such as by "undermin[ing] the

organization's ability to perform its fundamental programmatic services."  Nat'l Veterans Legal

Servs. Program v. U.S. Dep't of Def., No. 14-1915, 2016 WL 4435175, at *6 (D.D.C. Aug. 19,

2016).  A necessary aspect of this requirement is that there be a "direct conflict between the

defendant's conduct and the organization's mission."  Abigail All. v. Eschenbach, 469 F.3d 129,

133 (D.C. Cir. 2006).

Once this first prong is met, the Court moves on to the second and asks whether the

organization will "use[] its resources to counteract that harm."  Food & Water Watch, 808 F.3d

at 919 (quoting PETA II, 797 F.3d at 1094).  While "self-inflicted" injuries do not count, Abigail

All., 469 F.3d at 133, an injury is not a "self-inflicted . . . budgetary choice[]" merely by having

been made willfully or voluntarily.  Equal Rights Ctr., 633 F.3d at 1139 (quoting Fair Emp't

Council of Greater Washington, Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1276 (D.C. Cir. 1994)).

Rather, as long as the organization will expend resources "to counteract[] the effects of the

defendant['s]" challenged conduct, that diversion can suffice for Article III purposes.  Id. at 1140.

In a suit for preliminary injunctive relief, "past harm is not sufficient to establish an injury in fact."  Nat'l Whistleblower Ctr. v. HHS, 839 F. Supp. 2d 40, 45–46 (D.D.C. 2012). The plaintiff, rather, must show "a real and immediate — as opposed to merely conjectural or hypothetical — threat of future injury."  Nat. Res. Def. Council v. Pena, 147 F.3d 1012, 1022 (D.C. Cir. 1998) (quoting Church v. City of Huntsville, 30 F.3d 1332, 1337 (11th Cir. 1994)); see also City of Los Angeles v. Lyons, 461 U.S. 95, 105 (1983); Attias v. Carefirst, Inc., 865 F.3d 620, 627 (D.C. Cir. 2017) ("[W]e have frequently upheld claims of standing based on allegations of a 'substantial risk' of future injury.").

The tests for causation and redressability "mirror, with little added gloss, the requirements for a non-organizational plaintiff who attempts to invoke the jurisdiction of the federal courts."  Citizens for Responsibility and Ethics in Washington v. U.S. Office of Special Counsel, No. 19-3757, 2020 WL 4530647, at *6 (D.D.C. Aug. 6, 2020).  In other words, an organizational plaintiff must show that its injury is "fairly traceable to the defendant's allegedly unlawful conduct."  Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent. Inc., 659 F.3d 13, 24 (D.C. Cir. 2011).  It must also be "likely" that the injury would be "redressed by a favorable court decision."  Id.

### 2.  *Application to Claims*

Mindful of its obligation to ensure that standing exists for every count asserted, the Court will "address seriatim" Plaintiffs' allegations with respect to each claim.  West v. Lynch, 845 F.3d 1228, 1235 (D.C. Cir. 2017).  For ease of explanation, however, it will begin by describing several organizational injuries alleged by the health-provider Plaintiffs, as these asserted harms

have consequences for several of their counts.  Specifically, such harms satisfy the injury-in-fact requirement for Plaintiffs' claims that HHS: 1) improperly eliminated the 2016 Rule's definition of sex discrimination; 2) erred by incorporating Title IX's religious exemption into Section 1557; 3) violated Section 1554; and 4) ran afoul of the Establishment Clause.  After surveying these "common injuries," the Court will separately address causation and redressability for all four claims.  It will then separately consider standing for the five additional claims that rely on alleged organizational injury but do not share common injuries with the first four claims. Finally, as previously mentioned, the Court will analyze Plaintiffs' remaining three constitutional counts in a separate sub-section, as they do not raise issues of organizational standing.

a.   Common-Injury Claims

i.   Injury-in-Fact

The Court begins by laying out several organizational injuries that underlie four of Plaintiffs' claims.

First, both Whitman-Walker and LA LGBT — *i.e.*, the health-provider Plaintiffs — profess financial and operational injuries as a result of increased patient demand spurred by the new Rule.  Specifically, they contend that growing numbers of LGBTQ patients are likely to turn to their organizations for health-care services given the patients' augmented <u>fear</u> of discrimination at the hands of external providers.  <u>See</u> Pl. Mot., Exh. 9 (Declaration of Robert Bolan), ¶¶ 11, 13, 18 (explaining that 2020 Rule is "likely to cause an increase in demand for my health care services" because "patients will come to us seeking affirming health care out of fear of discrimination elsewhere"); Exh. 3 (Declaration of Naseema Shafi), ¶ 34 (explaining that "fear of discrimination, resulting from the [2020] Rule, is likely to result in increased demand for Whitman-Walker's health care services"); Exh. 4 (Declaration of Sarah Henn), ¶¶ 19, 29; Exh. 5

21

(Declaration of Randy Pumphrey), ¶¶ 9, 14–15; Exh. 8 (Declaration of Darrel Cummings), ¶¶ 12, 18, 20; Exh. 9 (Declaration of Ward Carpenter), ¶¶ 12, 16.  That increased demand, in turn, will necessarily generate "considerable operational and financial challenges."  Shafi Decl., ¶ 34; Carpenter Decl., ¶ 12.  On the financial side, a larger pool of patients demanding the organizations' services will force them to provide care on a broader scale, and the resulting expenditures will exacerbate pressure on already constrained budgets.  See Shafi Decl., ¶ 34; Henn Decl., ¶ 29; Cummings Decl., ¶ 20.  Operations will also suffer, as fear of discrimination will likely cause an "increase in demand for [LA LGBT's] services," which will "increase wait times" and "limit [LA LGBT's] ability to provide adequate care and time to [its] patients." Carpenter Decl., ¶¶ 12, 16.  LA LGBT has likewise indicated the need to hire additional mental-health staff to contend with "increase[d] patient trauma" that the 2020 Rule has and will allegedly continue to cause.  Id., ¶ 12.

In addition, the health-provider Plaintiffs assert a related but distinct injury: having to provide costlier and more involved treatment.  According to the organizations, heightened fears of discrimination on account of the 2020 Rule will cause patients to refrain from being fully transparent with external providers regarding their LGBTQ identities and unique medical histories.  See Bolan Decl., ¶ 17 ("The [2020] Rule will cause LGBTQ patients to attempt to hide their LGBTQ identities to an even greater degree when seeking health care services, especially from religiously-affiliated health care organizations, in order to avoid discrimination."); Shafi Decl., ¶ 21 (contending that 2020 Rule will "encourage LGBTQ patients to remain closeted to the extent possible when seeking medical care"); Henn Decl., ¶¶ 19–20; Pumphrey Decl., ¶ 12; Cummings Decl., ¶¶ 18–19; Carpenter Decl., ¶ 15.  Other patients will delay seeking necessary care entirely — even, at times, in cases of emergency.  See Pl. Mot., Exh. 6 (Declaration of

Bamby Salcedo), ¶ 33 (stating that "[t]ransgender and gender nonconforming people will likely delay necessary health care and preventative screenings due to fear of discrimination"); Carpenter Decl., ¶ 20; Cummings Decl., ¶ 18.

In either case, patients expose themselves to "significant adverse health consequences" and undercut the effectiveness of their eventual treatment.  See Shafi Decl., ¶ 21; see also Pumphrey Decl., ¶ 12; Cummings Decl., ¶ 24.  For instance, patients who conceal a same-sex sexual history may not be screened for HIV or other relevant diseases, and they may not be prescribed necessary preventive medications on account of misdiagnoses.  See Shafi Decl., ¶ 21; Henn Decl., ¶ 16; Bolan Decl., ¶¶ 13–15.  The consequences for the health-provider Plaintiffs are evident: a patient pool with conditions that are increasingly advanced at diagnosis and less responsive to treatment, thus requiring the organizations to expend resources on costlier and more challenging care, especially when administered in cases of emergency.  See Cummings Decl., ¶¶ 9, 16 (explaining that 2020 Rule "increases patients' reluctance to seek care for both minor and serious conditions" and "exacerbate[s]" number of patients who arrive at LA LGBT "with acute medical conditions that could have been avoided but-for the[ir] reluctance to seek routine and necessary medical care for fear of discrimination"); Henn Decl., ¶¶ 18–21 (describing how deferral of care "strain[s] Whitman-Walker's resources," "increase[s] costs," and "make[s] it harder for our health care providers to treat the patients"); Bolan Decl., ¶ 11; Carpenter Decl., ¶¶ 11–12, 15.

Each of these qualifies as an injury to the health-provider Plaintiffs' interests.  Increased demand and fear of discrimination "perceptibly impair [their] ability to provide services," Food & Water Watch, 808 F.3d at 919 (citation omitted), thus "inhibit[ing]" their "daily operations" by forcing them to deliver costlier and more difficult treatment to a growing number of patients.

PETA II, 797 F.3d at 1094.  "These are real, concrete obstacles to [Plaintiffs'] work, rather than the kind of 'abstract concern that does not impart standing.'"  PETA v. USDA, 7 F. Supp. 3d 1, 8 (D.D.C. 2013) (quoting Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1433 (D.C. Cir. 1995)), aff'd, 797 F.3d at 1089; see also Dist. of Columbia v. USDA, 444 F. Supp. 3d 1, 40–42 (D.D.C. 2020) (determining that plaintiff organization suffered injury-in-fact by showing that agency action would cause individuals to turn to organization's programs, thereby "increasing demand and forcing [the organization] to divert resources" away from other programs in order to service such demand); Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1276 (D.C. Cir. 1994) (finding organizational standing satisfied where protested action "might increase the number of people in need of counseling . . . [and] reduce[ ] the effectiveness of any given level of [the organization's] outreach efforts").

These harms, moreover, directly frustrate Plaintiffs' missions "to offer affirming community-based health and wellness services to all."  Shafi Decl., ¶¶ 3, 40; see also Cummings Decl., ¶¶ 3–4, 33 (similar).  And it is evident that the organizations will "use[] [their] resources to counteract" such injury, spending more money and exerting more manpower at a time when resources are already stretched thin.  Food & Water Watch, 808 F.3d at 919 (quoting PETA II, 797 F.3d at 1093).

Resisting such a conclusion, Defendants first assert that Plaintiffs "cannot explain how the 2020 Rule might injure them as opposed to others not before the Court."  ECF No. 42 (Def. Opp.) at 11–12.  On the contrary, far from asserting a mere "generalized grievance," Plaintiffs have alleged concrete and particularized financial and programmatic injuries affecting them uniquely as health-care providers.  See Duke Power Co. v. Carolina Envt'l Study Grp., Inc., 438 U.S. 59, 80 (1978).

Next, Defendants characterize Plaintiffs' alleged "financial harm" as "fatally unspecific."
ECF No. 48 (Def. Surreply) at 10.  To the extent the Government suggests that Plaintiffs need
provide a greater accounting of their alleged financial injury than they already have, see ECF No.
46 (Aug. 3, 2020, Hearing Transcript) at 32, they are mistaken.  The precise amount of economic
harm a plaintiff suffers is "irrelevant," as even "[a] dollar . . . is still an injury-in-fact for standing
purposes."  Carpenters Indus. Council, 854 F.3d at 5–6; see also Czyzewski v. Jevic Holding
Corp., 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of
money is ordinarily an 'injury.'").  And although Defendants attack Plaintiffs' allegations as
"amorphous," they never engage with them specifically, instead opting to rely on non-binding
authority that is far afield.  See Def. Surreply at 10.  In International Academy of Oral Medicine
& Toxicology v. U.S. Food & Drug Administration, 195 F. Supp. 3d 243 (D.D.C. 2016), for
instance, the court rejected the plaintiff organization's standing argument on the unremarkable
ground that it had not specifically identified a member who claimed she would suffer future
injury, as required to assert representational — as opposed to organizational — standing.  Id. at
264–65.  And in Freedom Watch, Inc. v. McAleenan, 442 F. Supp. 3d 180 (D.D.C. 2020), the
plaintiff organization offered only "bare assertions" devoid of any "factual allegations to
establish, with any level of clarity," how the Government's refusal to conduct a criminal
investigation of a third party would generate a "downturn in financial support" for the
organization.  Id. at 187, 191–92.

Defendants finally argue that Plaintiffs' alleged harm is "conjectural."  Def. Opp. at 12
(citing Clapper v. Amnesty Int'l USA, 568 U.S. 398, 401 (2013)).  Specifically, they contend
that Plaintiffs' claim is premised on a "risk of discrimination in health care" — namely, the
belief that third-party medical providers "may choose to deny individuals certain procedures or

coverage" or otherwise engage in discrimination against LGBTQ patients.  Id.  That outcome,

Defendants insist, is "far from inevitable."  Id.  Another court just last week endorsed this

reasoning, holding that the State of Washington lacked standing to challenge the 2020 Rule

because it had not demonstrated that the Rule would "yield an increase in discrimination against

LGBTQ individuals or a decrease in available healthcare or health coverage."  Washington v.

HHS, No. 20-1105, slip op. at 19 (W.D. Wash. Aug. 28, 2020).

      The health-provider Plaintiffs, however, do not stake their primary injury-in-fact claim on

this potentiality.  Instead, they assert that LGBTQ patients' fear of discrimination at the hands of

third parties — regardless of whether such discrimination ultimately occurs — will cause

individuals to turn to Plaintiff organizations for care, thereby necessarily generating financial and

operational burdens that "impair[] [Plaintiffs'] ability to provide services."  Food & Water

Watch, 808 F.3d at 919 (citation omitted).  That result is far from "conjectural"; as demonstrated

above, anxiety surrounding the possibility of discrimination and denial of treatment is

substantially likely to provoke such behavior.  See supra at 21–23.  The result, similarly, is easily

distinguished from the highly attenuated chain of possibilities deemed insufficient in Clapper,

where the harm "would not have arisen unless a series of independent actors, including

intelligence officials and Article III judges, exercised their independent judgment in a specific

way."  Attias, 865 F.3d at 628 (citing Clapper, 568 U.S. at 410–14).  Plaintiffs, accordingly, have

demonstrated a "substantial risk" that the alleged harm "will occur," Susan B. Anthony List v.

Driehaus, 573 U.S. 149, 158 (2014) (quoting Clapper, 568 U.S. at 414 n.5), thus rendering it

"sufficiently 'imminent' for standing purposes."  Attias, 865 F.3d at 627 (quoting Food & Water

Watch, 808 F.3d at 915).

ii.    Causation and Redressability

Having addressed the common injuries-in-fact for four of Plaintiffs' claims, the Court now considers independently the other standing requirements — *viz.*, causation and redressability — for each of those counts.

(a) Elimination of 2016 Rule's Definition of Sex
Discrimination

Plaintiffs first challenge HHS's repeal of the 2016 Rule's definition of discrimination "on the basis of sex," which explicitly prohibited discrimination based on sex stereotyping and gender identity.  They must show that the injuries described above are "fairly . . . trace[able] to" such repeal.  Lujan, 504 U.S. at 560–61 (alterations in original) (citation omitted).  Where causation depends on the conduct of a third party not before the court, "standing is not precluded, but it is ordinarily substantially more difficult to establish."  Id. at 562 (citation and internal quotation marks omitted).  Plaintiffs must show that the third party will act "in such manner as to produce causation."  Id.  A permissible theory of standing "does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties."  Dep't of Commerce v. New York, 139 S. Ct. 2551, 2566 (2019).

The health-provider Plaintiffs successfully clear the bar.  Their proposed causal chain is relatively simple: the 2020 Rule's elimination of the prior explicit prohibitions on discrimination based on sex stereotyping and gender identity instilled in LGBTQ patients a fear of discrimination at the hands of external providers, thereby causing Plaintiff organizations to suffer the financial and operational consequences of higher demand.  Of course, as this theory makes clear, it is the patients' decisions to seek services from the health-provider Plaintiffs that most immediately causes their harm.  The law is clear, however, that Plaintiffs may establish standing

27

based on the actions of third parties, so long as there is "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation." Americans for Safe Access v. Drug Enforcement Admin., 706 F.3d 438, 446 (D.C. Cir. 2013) (citation omitted). Indeed, the D.C. Circuit has routinely found causation established in cases where the relevant "third-party conduct . . . is voluntary but reasonably predictable." Competitive Enter. Inst. v. FCC, No. 18-1281, 2020 WL 4745272, at *8 (D.C. Cir. Aug. 14, 2020); see also, e.g., Energy Future Coal. v. EPA, 793 F.3d 141, 144 (D.C. Cir. 2015); Tozzi v. HHS, 271 F.3d 301, 308–10 (D.C. Cir. 2001); Competitive Enter. Inst. v. NHTSA, 901 F.2d 107, 116–17 (D.C. Cir. 1990).

Plaintiffs have provided "substantial evidence," Americans for Safe Access, 706 F.3d at 446 (citation omitted), that the 2020 Rule's elimination of the explicit prohibition on discrimination based on sex stereotyping and gender identity has caused — and will continue to cause — patients to fear discrimination at the hands of third parties. See, e.g., Cummings Decl., ¶¶ 11–12 (explaining that elimination of these prohibitions "caused immediate panic" among LA LGBT patients and leads them to "fear discrimination"); Salcedo Decl., ¶ 23 (transgender woman stating that "[t]he [2020] Rule's elimination of the clear regulatory protections in the 2016 Final Rule . . . heightens my fears, as it communicates to health care providers that such discrimination is acceptable"); Pumphrey Decl., ¶ 9 (stating that repeal of prohibitions "will on its own invoke increased fear and trauma among LGBTQ patients"); Henn Decl., ¶ 7; Pl. Mot., Exh. 7 (Declaration of Ariana Inurritegui-Lint), ¶ 48; Exh. 13 (Declaration of Roy Harker), ¶ 14. It is that rational fear that will drive LGBTQ patients to rely increasingly on the services of the health-provider Plaintiffs. See supra at 21–23. The resulting harm that these organizations will likely suffer — principally, having to expend more resources to care for patients — is therefore

"attributable to" the 2020 Rule.  Block v. Meese, 793 F.2d 1303, 1308 (D.C. Cir. 1986); see also

Scenic Am., Inc. v. DOT, 983 F. Supp. 2d 170, 179–80 (D.D.C. 2013).

Defendants nonetheless argue that Simon v. Eastern Kentucky Welfare Rights

Organization, 426 U.S. 26 (1976), precludes a finding of causation here.  See Def. Opp. at 9–10;

Def. Surreply at 4.  But Simon does not stand for the proposition that Plaintiffs cannot establish

causation when their injury stems most immediately from third-party conduct.  See Block, 793

F.2d at 1309 ("It is impossible to maintain, of course, that there is no standing to sue regarding

action of a defendant which harms the plaintiff only through the reaction of third persons.").  The

case, instead, turned on its particular facts.  The plaintiffs there claimed that the Internal Revenue

Service's favorable tax treatment of certain hospitals caused those hospitals to refrain from

providing indigent patients free care.  See 426 U.S. at 42–44.  The Court only dismissed for lack

of standing because the plaintiffs' allegations failed to show that the hospitals would have chosen

to provide free care but for the challenged benefit.  Id.  This case, by contrast, involves "very

different" evidence.  Competitive Enter. Inst., 2020 WL 4745272, at *8.  Plaintiffs have provided

ample support for their allegation that they will likely suffer financial and operational injury as a

result of the 2020 Rule.  Id. (finding Simon inapplicable where plaintiff established a reasonable

likelihood of harm from Government action, even when such harm turned on third-party

conduct).

Although Defendants do not invoke it in the context of causation, Clapper likewise does

not preclude a finding that Plaintiffs' injuries are fairly traceable to the 2020 Rule.  There, the

Supreme Court explained that plaintiffs do not have standing simply because they incur certain

costs as a "reasonable reaction" to a risk of harm when that harm "is not certainly impending."

Clapper, 568 U.S. at 416.  The Court was concerned about the potential for plaintiffs to

"manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." Id. No such hazard exists here. As the health-provider Plaintiffs explain, they will be forced to incur financial and operational costs because LGBTQ patients — independent third parties — will fear discrimination as a result of the 2020 Rule and respond accordingly. It is the substantial likelihood of increased demand caused by the patients' own independent decisions in response to the 2020 Rule that will generate Plaintiffs' injury, not the reactions of the organizations themselves to a risk of future discrimination as a result of the Rule. Because Plaintiffs' harm derives from the uncoordinated actions of non-plaintiffs, the organizations are not "inflicting harm on themselves," and Clapper thus does not control.

With causation satisfied, the Court now turns to redressability. As a reminder, "it must be 'likely,' as opposed to merely 'speculative,' that [Plaintiffs'] injury will be 'redressed by a favorable decision.'" Lujan, 504 U.S. at 561 (citation omitted); Int'l Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795, 811 (D.C. Cir. 1983) (explaining that plaintiffs do not have "to prove that granting the requested relief is certain to alleviate' their injury"). "Causation and redressability typically 'overlap as two sides of a causation coin.'" Carpenters Indus. Council, 854 F.3d at 6 n.1 (quoting Dynalantic Corp. v. Dep't of Defense, 115 F.3d 1012, 1017 (D.C. Cir. 1997)). For "if a government action causes an injury, enjoining the action usually will redress that injury." Id.

Redressability here, however, involves an unexpected wrinkle, one involving previously discussed decision from the Northern District of Texas. As a reminder, the 2016 Rule specifically defined Section 1557's prohibition on sex discrimination to include "discrimination on the basis of . . . sex stereotyping, and gender identity." 81 Fed. Reg. at 31,467 (formerly

codified at 45 C.F.R. § 92.4).  Before the 2020 Rule was finalized, however, that Texas court

vacated the "gender identity" portion of this definition.  See Franciscan Alliance Order at ECF p.

3 ("[T]he Court VACATES the Rule insofar as the Rule defines 'On the basis of sex' to include

gender identity . . . ."); see also Franciscan Alliance, 414 F. Supp. 3d at 945.  That meant that the

2016 Rule's original prohibition on discrimination based on gender identity was no longer part of

the regulation.  As a result, even if this Court were to grant Plaintiffs their desired relief and

enjoin HHS from enforcing its repeal of the 2016 definition, the resulting regulation would not

contain any language barring gender-identity discrimination.  Put differently, enjoining or

vacating the 2020 Rule would not suddenly make gender-identity discrimination illegal under

Section 1557 — or change how the regulatory text addresses gender-identity discrimination —

because the relevant provision of the 2016 Rule was no longer in effect following Franciscan

Alliance.

        All Plaintiffs say in response is that the Supreme Court's recent decision in Bostock

"abrogat[ed]" Franciscan Alliance, rendering its vacatur "a legal nullity."  Pl. Reply at 3.  Yet

they identify no authority that would permit either this Court or HHS to disregard the final order

of a district court vacating part of a regulation.  Indeed, that vacatur remains final today, as the

Government did not appeal the court's decision.  When pressed at the hearing on this Motion,

moreover, Plaintiffs insisted that they had also challenged other provisions that were not vacated.

See Hrg. Tr. at 7.  But Defendants' redressability argument is confined to this regulatory

provision, see Def. Surreply at 3–4, vacatur of which renders the Court powerless to revive it.

Cf. Charles H. Koch, Jr. & Richard Murphy, Admin. L. & Prac. § 10:29 (3d ed.) ("A court

cannot, generally speaking, rewrite or 'fix' an agency's rule insofar as doing so would require

the court to infringe on the agency's policymaking authority.").  The Eastern District of New

York recently reached the same conclusion in a parallel case there.  Walker, 2020 WL 4749859, at *7 (explaining that court "has no power to revive a rule vacated by another district court").

This result, however, does not completely doom Plaintiffs' challenge to this provision. That is because their claim is not confined to the "gender identity" language; they also contest HHS's elimination of the 2016 Rule's definition of sex discrimination as including discrimination based on sex stereotyping.  See Pl. Reply at 5 (explaining that desired relief "would prohibit discrimination on the basis of gender identity and sex stereotypes") (emphasis added); Compl., ¶ 13.  Franciscan Alliance, notably, did not vacate this latter definitional provision; the court's opinion never even mentioned it.  See 414 F. Supp. 3d 928.  Indeed, the court's final order explicitly stated that aside from the provision specifically vacated (and one other not relevant here), "[t]he remainder of 45 C.F.R. § 92 remains in effect."  Franciscan Alliance Order at ECF p. 3.

Were this Court to enjoin the relevant provision of the 2020 Rule, therefore, Plaintiffs would be left with the 2016 Rule's prohibition on discrimination based on sex stereotyping.  See Def. Opp. at 9 ("Enjoining the challenged 2020 Rule would leave plaintiffs with the non-vacated portions of the 2016 Rule.").  That relief would clearly redress at least some of their injury.  See Walker, 2020 WL 4749859, at *7 (finding redressability satisfied because "Franciscan Alliance did not address the concept of 'sex stereotyping' embodied in the 2016 Rule"); Defs. of Wildlife v. Gutierrez, 532 F.3d 913, 925 (D.C. Cir. 2008) (finding standing established when "order from the district court could redress appellants' injury, at least in part").  Just as eliminating the 2016 Rule's definition of "on the basis of sex" has and will increase fear of discrimination among LGBTQ patients, with the consequent harms for the health-provider Plaintiffs, reviving part of that prior provision will likely lessen those fears.  It is far from "speculative," Lujan, 504 U.S. at

561 (citation omitted), to conclude that reinstating an explicit prohibition against discrimination based on sex stereotyping will affect the behavior of LGBTQ patients — especially when their alleged fear is directly attributable to the 2020 Rule, the arguable centerpiece of which eliminated language containing that prohibition.  See, e.g., Shafi Decl., ¶ 34; Bolan Decl., ¶ 18; Henn Decl., ¶¶ 7, 19.  Indeed, even HHS admits that the 2016 Rule "likely induced many covered entities to conform their policies and operations" to the regulation's definition of sex discrimination, and that elimination of that definition may cause some covered entities to "revert to the policies and practices they had in place before" the 2016 Rule.  See 84 Fed. Reg. at 27,876.

In a brief attempt to escape this result, Defendants suggest that some providers could opt to avoid the strictures of Section 1557 by refusing to accept federal funds altogether.  See Def. Opp. at 10; 42 U.S.C. § 18116(a) (applying restrictions to "any health program or activity, any part of which is receiving Federal financial assistance").  Defendants, however, fail to provide even a single instance in which an entity covered by Section 1557 has declined federal funding for the purpose of avoiding the provision's requirements.  It defies belief that a "significant number" of covered entities would so surrender federal assistance, especially when there is no evidence of such behavior in the aftermath of the 2016 Rule.  Action All. of Senior Citizens v. Heckler, 789 F.2d 931, 938–39 (D.C. Cir. 1986) (rejecting similar argument that redressability is not established because recipients of federal funding might surrender funding rather than comply with regulation).

Because a favorable ruling will likely redress at least some of Plaintiffs' injury, the Court finds that they have standing to attack the 2020 Rule's elimination of the 2016 Rule's prohibition on discrimination based on sex stereotyping.

33

(b) Incorporation of Title IX's Religious Exemption

Plaintiffs' challenge to the 2020 Rule's incorporation of Title IX's religious exemption

similarly clears the causation and redressability bars.  That exemption, to review, excuses certain

religious organizations from Title IX's nondiscrimination mandate if application of such

mandate would be inconsistent with the organization's "religious tenets."  20 U.S.C.

§ 1681(a)(3).

The analysis proceeds in similar fashion to that regarding Plaintiffs' challenge to the

Rule's elimination of the sex-discrimination definition.  Specifically, there is "substantial

evidence" that HHS's newly and explicitly incorporated religious exemption will cause patients

to fear discrimination at the hands of religiously affiliated providers, once again "leaving little

doubt as to causation."  Americans for Safe Access, 706 F.3d at 446 (citation omitted).  As one

declarant puts it, the 2020 Rule "will cause LGBTQ patients to attempt to hide their LGBTQ

identities when seeking health care services, especially from religiously-affiliated health care

organizations, in order to avoid discrimination."  Harker Decl., ¶ 19; see also Bolan Decl., ¶ 17

(similar); Pl. Mot., Exh. 11 (Declaration of Adrian Shanker), ¶¶ 22–23 (stating that 2020 Rule's

religious exemption will "exacerbate" number of LGBTQ patients who "remain closeted" while

seeking health care out of fear of discrimination); Cummings Decl., ¶ 19 (explaining that

"[t]ransgender and gender nonconforming clients are particularly likely to delay care as a result

of the" 2020 Rule's religious exemption).  Such apprehension, in turn, further contributes to

increased demand for the services of the health-provider Plaintiffs and their accompanying

financial and operational injuries.

Defendants yet again assail Plaintiffs' causation argument as unduly speculative,

contending that it "assumes that a provider who would otherwise refuse to offer services as a

result of the dictates of his or her religion, would be willing to violate those same beliefs in order to comply with a hypothetical HHS regulation." Def. Surreply at 8. As already explained, however, Plaintiffs' argument for standing rests not on the possibility of third-party, religiously affiliated providers <u>actually</u> discriminating against LGBTQ patients, but rather on patients' genuine <u>fear</u> of encountering discrimination when seeking care from such institutions. It is that apprehension, immediately stimulated by the 2020 Rule's incorporation of Title IX's religious exemption, that contributes to the particular organizational injuries the health-provider Plaintiffs have asserted. Far from resting on "mere speculation about the decisions of third parties" — *viz.*, LGBTQ patients — therefore, Plaintiffs' theory "relies instead on the predictable effect of Government action" on such decisions. <u>Dep't of Commerce</u>, 139 S. Ct. at 2566.

"Having found that [Plaintiffs] satisf[y] the element of causation, the issue of redressability is straightforward." <u>Ciox Health, LLC v. Azar</u>, 435 F. Supp. 3d 30, 52 (D.D.C. 2020). Just as explicitly incorporating Title IX's religious exemption into Section 1557 spurred LGBTQ patients' fear of discrimination, enjoining such incorporation would likely palliate such fear and "redress [Plaintiffs'] injury, at least in part." <u>Defs. of Wildlife</u>, 532 F.3d at 925.

(c) Section 1554 and Establishment Clause

Plaintiffs claim that the 2020 Rule violates Section 1554's prohibition on, *inter alia*, regulations that "create[] any unreasonable barriers to the ability of individuals to obtain appropriate medical care" or "impede[] timely access to health care services." 42 U.S.C § 18114(1)–(2); Pl. Mot. at 26. They also contend that the 2020 Rule "facilitate[s] the religious beliefs of objecting providers, without exception," thereby running afoul of the Establishment Clause. <u>See</u> Pl. Mot. at 33. With the above discussion in mind, standing for each challenge is readily established.

While Plaintiffs' opening brief does not state the contours of their Section 1554 claim with much particularity, see Pl. Mot. at 26, their reply makes clear that the challenge is premised in part on the 2020 Rule's elimination of the explicit prohibition on discrimination based on sex stereotyping and gender identity, as well as its incorporation of religious exemptions. See Pl. Reply at 19–20. Their Establishment Clause claim, in turn, rests squarely on HHS's incorporation of Title IX's religious exemption. See Pl. Mot. at 33. Their standing to assert each claim thus follows directly from their standing to challenge the individual regulatory provisions as arbitrary and capricious. Defendants offer no reason why the analysis might differ.

b. Additional Organizational-Injury Claims

With standing thus established for the four "common-injury" claims, the Court now separately considers five additional counts that also rely on alleged organizational injury. It ultimately renders a split decision: Plaintiffs have successfully established standing for their challenges to HHS's elimination of: 1) the 2016 Rule's prohibition on categorical coverage exclusions for gender-affirming care; and 2) its notice requirements. They have not, however, demonstrated a substantial likelihood of standing for their claims that the 2020 Rule: 3) improperly restricted Section 1557's scope to Title I programs or activities; 4) improperly excluded health insurers from Section 1557's coverage; and 5) erroneously interpreted Section 1557's legal standard.

i. Elimination of Prohibition on Categorical Coverage Exclusions

In support of its challenge to HHS's elimination of the 2016 Rule's prohibition on categorical coverage exclusions for gender-affirming care, Plaintiff Whitman-Walker asserts a monetary injury — namely, that it will obtain reduced reimbursements from insurers that scale back their coverage of such treatment. See Shafi Decl., ¶ 35. Whitman-Walker hosts many

36

patients who require hormone therapy and affirming mental-health services.  Id.  As a result of

the 2020 Rule's elimination of the 2016 Rule's prohibition on coverage exclusions for such care,

Whitman-Walker asserts it will experience a monetary loss in the form of lower reimbursements.

Id.  That loss will further "undermin[e] the organization's ability to perform its fundamental

programmatic services," Nat'l Veterans Legal Servs. Program, 2016 WL 4435175, at *6, and

force it to rely more heavily on resources from other sources, including increasing charges to

patients and drawing from its already depleted fundraising and grant revenue.  See Shafi Decl.,

¶ 35.

      Defendants characterize this asserted injury as unduly speculative, pointing out that the

2016 Rule "prohibited only categorical exclusions — it did not speak to individual

determinations."  Def. Surreply at 5.  They thus maintain that "a covered entity may choose to

deny a claim" under either the 2016 or 2020 Rule.  Id.  The mere fact that insurers under the

2016 Rule could deny coverage based on individual determinations, however, does not vitiate the

reality of a substantially increased risk of injury posed by a categorical exclusion.  It is by no

means speculative to conclude that, under the 2020 Rule, certain insurers will deny

reimbursement for treatment they previously covered.  See Shanker Decl., ¶ 28 (asserting that

removing coverage requirements for insurance providers will cause patients to "most certainly

experience increased denials of coverage for their medically necessary health care"); Carpenter

Decl., ¶ 13 (mentioning patients' fear that "they will no longer have access to hormone therapy

to treat gender dysphoria" as result of regulatory changes).  Indeed, HHS itself admits that some

insurers will not maintain coverage consistent with the 2016 Rule's requirements.  See 85 Fed.

Reg. at 37,181.  Plaintiffs need only show a "substantial risk" of the alleged harm, not an

outright certainty; they have carried that burden.  Susan B. Anthony, 573 U.S. at 158; Attias, 865 F.3d at 627.

They likewise successfully establish causation and redressability.  The D.C. Circuit has repeatedly held that "injurious private conduct is fairly traceable to the administrative action contested in the suit if that action authorized the conduct or established its legality."  Tel. & Data Sys., Inc. v. FCC, 19 F.3d 42, 47 (D.C. Cir. 1994); see also Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 940 (D.C. Cir. 2004), abrogation on other grounds recognized in Perry Capital LLC v. Mnuchin, 864 F.3d 591 (D.C. Cir. 2017) (collecting cases).  Here, the injurious private conduct — insurers' eliminating prohibitions on categorical coverage exclusions of gender-affirming care — was illegal under the 2016 Rule but made permissible by the 2020 Rule.  See Tel. & Data Sys., 19 F.3d at 47.  The requisite causation, therefore, exists. See Cares Cmty. Health v. HHS, 346 F. Supp. 3d 121, 127 (D.D.C. 2018) (finding injury fairly traceable to government action even though monetary injury caused by insurance company's modifying contract because such modification "would be unlawful" in absence of government action).  An order restoring the 2016 Rule's prohibition on categorical coverage exclusions, moreover, would redress Plaintiffs' injury.  See Nat'l Wrestling Coaches, 366 F.3d at 940–41 ("Causation and redressability thus are satisfied in this category of cases, because the intervening choices of third parties are not truly independent of government policy.").

ii.   Elimination of Notice Requirements

Plaintiffs next challenge HHS's repeal of the 2016 Rule's requirement that covered entities provide various notices and taglines informing the public of their nondiscrimination and accessibility rights under Section 1557.  Their alleged injury stemming from that repeal once

again centers on harm to the organizations themselves, most urgently in the form of increased costs.

According to Plaintiff Whitman-Walker, the 2016 Rule's notice and tagline provisions "are critical to ensure meaningful access to care." Shafi Decl., ¶ 32. Those provisions required that covered entities issue notice to the public that they provide, among other things, language-assistance services, including translated documents and oral interpretation. See 81 Fed. Reg. at 31,469 (formerly codified at 45 C.F.R. § 92.8); see also id. at 31,470 (formerly codified at 45 C.F.R. § 92.201) (detailing covered entities' language-access obligations). Plaintiffs argue that notice of the availability of such services is "crucial to promoting positive patient health outcomes" by way of ensuring full communication between patient and provider. See Henn Decl., ¶¶ 16, 25. Indeed, even HHS acknowledged that at least some covered entities likely "experienced an increase in translation services after the 2016 Rule." 85 Fed. Reg. at 37,233. Removal of such notices, in turn, renders it increasingly difficult for patients with limited English proficiency (LEP) to understand their rights to language services and how they can utilize them, thereby hindering access to meaningful health care. See Shafi Decl., ¶ 32 (explaining that LEP patients "will not be aware of their rights or the programs or services available to them when they go to other health care facilities"); Pumphrey Decl., ¶ 13; Henn Decl., ¶ 25; see also 85 Fed. Reg. at 37,233 (acknowledging record evidence that "removing the notice and taglines requirements may cause [LEP] individuals to delay care or not receive care until their medical issues are more severe and costlier to treat").

The implication for Whitman-Walker is clear: provision of costlier and more difficult treatment. As previously described, see supra at 21–23, inadequate care elsewhere leads to increased patient demand, as well as a patient pool with conditions that are increasingly

advanced at diagnosis and less responsive to treatment.  The elimination of notice and tagline

provisions once again perpetuates these concrete harms.  See Shafi Decl., ¶ 33 (explaining that

Whitman-Walker will experience "increased costs because its patients will come to us sicker as a

result of inadequate care elsewhere"); Henn Decl., ¶ 25 (asserting that elimination of notice

requirements will "diminish[] . . . meaningful access to health care" and will, in turn, "cause

more patients to seek out care at Whitman-Walker"); see also Shanker Decl., ¶ 27 (stating that

elimination of notice and tagline requirements will "make it much more difficult for transgender

and gender nonconforming patrons . . . to understand their rights and how to advocate for such

rights"); Salcedo Decl., ¶ 41 (explaining that without the notices, patients "will avoid seeking

care until they feel they are sufficiently proficient in speaking and reading English, which will

worsen their underlying and untreated medical conditions").

       In response, Defendants insist that Plaintiff organizations "remain free to voluntarily

provide the notices required by the 2016 Rule."  Def. Opp. at 12.  True, but irrelevant.  As

explained, the harm Plaintiffs experience occurs when other providers do not post notices.

Defendants also misunderstand the scope of the present Motion.  Their surreply contends

exclusively that Plaintiffs lack standing to challenge HHS's changes to language-access

provisions, in part because they have not demonstrated imminent harm.  See Def. Surreply at 6–

7; see also Def. Opp. at 25–26.  While Plaintiffs' opening brief is admittedly ambiguous as to

whether they challenge regulatory action in addition to HHS's repeal of the notice and tagline

requirements, their reply concentrates nearly exclusively on the repeal of those latter provisions.

See Pl. Reply at 14–16; see also Hrg. Tr. at 22–23 (Plaintiffs stating that present Motion focuses

on this repeal).  In any event, Plaintiffs' asserted injury does not require the Court to assume "a

highly attenuated chain of possibilities."  Clapper, 568 U.S. at 410.  Rather, "a substantial risk of

harm exists already," simply by virtue of the elimination of the notice and tagline requirements, which Plaintiffs have demonstrated will likely bear tangible implications for Whitman-Walker's provision of services.  See Attias, 865 F.3d at 629.

Causation and redressability, once again, are easily established.  The injurious private conduct — namely, providers' declining to deliver notices of patients' health-care rights under Section 1557 — was illegal under the 2016 Rule, but made permissible by the 2020 Rule.  That reality renders such conduct "fairly traceable to the administrative action contested."  Tel. & Data Sys., 19 F.3d at 47.  And an order restoring the 2016 Rule's notice and tagline requirement would redress Plaintiffs' injury because covered entities would once again be required to provide them.  See Nat'l Wrestling Coaches, 366 F.3d at 940–41.

### iii.   Narrowing Scope of Covered Entities

As previewed above, Plaintiffs' standing arguments are not all successful; indeed, they encounter significantly rockier terrain with respect to the claims that follow.  The Court begins with their dual contentions that the 2020 Rule 1) improperly restricted Section 1557's coverage to programs or activities administered by HHS under Title I of the ACA, as opposed to all of the agency's health programs and activities; and 2) improperly excluded entities principally engaged in providing health insurance from Section 1557's coverage.  Their fleeting attempt to invoke standing to challenge these regulatory actions is muddled at best and does not enable the Court, at this juncture, to conclude that they have stated a constitutionally cognizable injury.

Plaintiffs cite several declaration excerpts in support of their standing to challenge HHS's narrowing of entities covered under Section 1557.  See Pl. Reply at 6; Hrg. Tr. at 15.  All, however, share common defects.  Two declarations simply allege that such narrowing "will result in discrimination against LGBTQ patients."  Shafi Decl., ¶ 28; see also Cummings Decl.,

41

¶ 31 (similar).  The health-professional-association Plaintiffs similarly assert that the 2020 Rule "invites harassment and discriminatory treatment of GLMA members with regard[] to terms and conditions of employment based on their LGBTQ status."  Pl. Mot., Exh. 12 (Declaration of Hector Vargas), ¶ 18; see also Harker Decl., ¶¶ 16–17 (contending that members "could lose regulatory protections from discrimination regarding . . . employment benefits" and "may be subjected to discrimination").  In addition, a GLMA member who works for the Indian Health Service — which, as a non-Title I program, would no longer be covered by Section 1557 — states that she "will no longer . . . be protected from discrimination in health care pursuant to Section 1557."  Pl. Mot., Exh. 14 (Declaration of Deborah Fabian), ¶¶ 2, 5, 21.  Finally, TransLatin@ Coalition members who rely on public-health-insurance coverage through Medicaid — which also would no longer enjoy Section 1557's protections — allege that they will suffer discrimination.  See Inurritegui-Lint Decl., ¶¶ 56–58; Salcedo Decl., ¶¶ 38–39.

The Court cannot credit these bids for standing.  To satisfy Article III's strictures, the reader will well recall, Plaintiffs must demonstrate that the alleged future injury is "imminent." Bennett v. Spear, 520 U.S. 154, 167 (1997); see also Whitmore, 495 U.S. at 158 ("Allegations of possible future injury do not satisfy the requirements of [Article] III.").  To "shift[] injury from 'conjectural' to 'imminent,'" Plaintiffs must show that there is a "substantial . . . probability" of injury.  Sherley, 610 F.3d at 74.  Simply asserting, without any elaboration, that individuals will experience discrimination at the hands of Title I programs and health insurers does not "suffice[] to demonstrate the 'substantial probability'" that discrimination will actually occur as required to establish standing.  Chamber of Commerce v. EPA, 642 F.3d 192, 201 (D.C. Cir. 2011).  Equally glaring is the absence of any explanation as to how Plaintiffs' alleged injury is caused by these regulatory actions.  That is, they never attempt to demonstrate how narrowing the scope of

42

covered entities will give rise to injury, let alone provide "substantial evidence" in support of such a "causal relationship."  Americans for Safe Access, 706 F.3d at 446 (citation omitted).

Separately, Plaintiff Bradbury-Sullivan Center suggests that it "no longer will be able to rely" on the 2016 Rule's "clear guidance" when advocating for patrons "when they encounter . . . insurance coverage exclusions."  Pl. Reply at 8 (citing Shanker Decl., ¶¶ 8-9).  Even assuming that the elimination of such guidance sufficiently "impair[s] [its] ability to provide services," nowhere does Bradbury-Sullivan explain how it has or will "use[] its resources to counteract that harm" — specifically, its alleged diminished ability to advocate on behalf of patients to insurers. See Food & Water Watch, 808 F.3d at 919 (citation omitted).

While Plaintiffs' inability to establish "a substantial likelihood of standing" requires denial of their present Motion with respect to these two claims regarding the scope of Section 1557's coverage, this is not necessarily the end of the line.  The Court does not rule out the potential for Plaintiffs to better support their standing argument in the future with revamped allegations.  See Food & Water Watch, 808 F.3d at 913.  For instance, their briefs contain no mention of representational standing, which would provide them a chance to assert standing premised on future harm to their members and patients.  See Chamber of Commerce, 642 F.3d at 199 (representational-standing criteria); Summers v. Earth Island Inst., 555 U.S. 488, 498 (2009) (requiring Plaintiffs to "make specific allegations establishing that at least one identified member had suffered or would suffer harm").  To be successful, of course, any such effort would need to address the various shortcomings identified in this Opinion.

### iv.    Section 1557 Legal Standard

The Court need not expend much effort in concluding that Plaintiffs similarly lack standing to assert their final Section 1557 claim.  To spell out the precise dispute: Section 1557

states that "[t]he enforcement mechanisms provided for and available under such title VI, title IX, section [504 of the Rehabilitation Act], or such Age Discrimination Act shall apply for purposes of violations of this subsection."  42 U.S.C. § 18116(a).  The 2020 Rule requires would-be plaintiffs to employ the particular enforcement mechanism and accompanying legal standard available under each statute, depending on the precise ground of discrimination asserted.  See 85 Fed. Reg. at 37,202.  In other words, a litigant bringing a claim based on race discrimination in violation of Title VI cannot employ the enforcement mechanism available for sex discrimination under Title IX.  Plaintiffs, on the other hand, contend that Section 1557 created a new, health-specific, anti-discrimination cause of action subject to a singular standard.  By their lights, Section 1557 allows a plaintiff to invoke the enforcement mechanism of any of the incorporated statutes for a health-discrimination claim, regardless of the particular type of discrimination alleged.  See Pl. Mot. at 27.

Plaintiffs' theory of standing for this challenge is murky, to say the least.  Nowhere do they suggest that HHS's interpretation of the standard for Section 1557 claims causes LGBTQ individuals to fear discrimination, or even that it exposes them to a heightened risk of discrimination.  Nor do Plaintiffs contend that the regulatory action causes them organizational injury.  Instead, they briefly reference excerpts from declarations emphasizing the challenges posed by the possibility of intersectional discrimination — that is, discrimination based on multiple protected grounds.  According to one declarant, "Rather than being able to assert claims under a single legal standard, intersectional discrimination claims will be subject to different standards, enforcement mechanisms, and remedies based on which characteristics are at issue."  Salcedo Decl., ¶ 37.  That result, in turn, will "have a particularly harmful effect" on claimants "because discrimination based on sexual orientation, gender identity, transgender status, national

origin, disability, and LEP status does not occur in an identity vacuum."  Inurritegui-Lint Decl., ¶ 52; see also ECF No. 37, Exh. 1 (AARP Amicus Brief) at 10–12 (describing intersectional discrimination experienced by LGBTQ older adults).

Much like before, however, Plaintiffs have not established that any future discrimination — especially discrimination causing an individual to actually sue under Section 1557 — would be sufficiently "imminent" to qualify as a valid injury-in-fact.  Summers, 555 U.S. at 493.  Even if it were, Plaintiffs could not plausibly allege that such discrimination would be "fairly traceable" to HHS's interpretation of Section 1557's legal standard in the 2020 Rule.  Id.

The proper context for quarrels surrounding the legal standard for Section 1557 claims would be an actual lawsuit bringing such a claim.  There, a plaintiff could argue that Section 1557 permits her to assert various discrimination counts under a single legal standard, and that HHS's interpretation to the contrary is inconsistent with the statutory text.  Indeed, numerous courts entertaining claims of discrimination under Section 1557 have grappled with these precise arguments.  See, e.g., Briscoe v. Health Care Serv. Corp., 281 F. Supp. 3d 725, 737–38 (N.D. Ill. 2017); York v. Wellmark, Inc., No. 16-627, 2017 WL 11261026, at *16–18 (S.D. Iowa 2017); Galuten ex rel. Galuten v. Williamson Med. Ctr., No. 18-519, 2019 WL 1546940, at *5 (M.D. Tenn. 2019).  The posture of this case does not permit this Court to join them.

For these reasons, Plaintiffs cannot establish a "substantial likelihood of standing" to challenge HHS's interpretation of Section 1557's legal standard.  Electronic Privacy Info. Ctr., 878 F.3d at 377.

B.  Third-Party Standing

While it now emerges from the depths of its organizational-standing dive, having found standing on six of the nine claims analyzed, the Court's jurisdictional work is not complete.  It

must now consider whether Plaintiffs can assert the rights of third-party LGBTQ patients to

bring three remaining constitutional counts.

Plaintiffs contend that the 2020 Rule runs afoul of the Fifth Amendment's guarantees of

equal protection and substantive due process, as well as the First Amendment's promise of free

speech. Specifically, they claim that the regulation 1) "discriminates on the basis of sex,

transgender status, and sexual orientation," in violation of equal protection; 2) impedes "the right

to live openly and express oneself consistent with one's sexual orientation or gender identity," in

violation of substantive due process; and 3) "impermissibly chills LGBTQ patients . . . from

being open about their gender identity, transgender status, or sexual orientation," in violation of

the First Amendment. See Pl. Mot. at 28, 31. These claims do not invoke organizational

injuries, but rather are clearly premised on the rights of individuals — that is, LGBTQ people.

While the organizational Plaintiffs never specify the precise basis for their standing to

assert these constitutional counts, several purport to bring claims on behalf of their patients or

members. See, e.g., Compl., ¶ 32 (health-provider Plaintiffs assert claims "on behalf of their

patients and recipients of services"); Pl. Reply at 7–8 (arguing that health-provider Plaintiffs

satisfy criteria to bring claims on behalf of their patients). The Court, accordingly, will examine

whether they may do so.

A litigant "generally must assert his own legal rights and interests, and cannot rest his

claim to relief on the legal rights or interests of third parties." Warth v. Seldin, 422 U.S. 490,

499 (1975). That principle, however, is far from "absolute," as courts have recognized that there

are circumstances in which it is "necessary to grant a third party standing to assert the rights of

another." Kowalski v. Tesmer, 543 U.S. 125, 129–30 (2004). A plaintiff may bring suit on

behalf of a third party upon satisfying three criteria: 1) the plaintiff "must have suffered an

'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute"; 2) the plaintiff "must have a close relation to the third party"; and 3) "there must exist some hindrance to the third party's ability to protect his or her own interests." Powers v. Ohio, 499 U.S. 400, 411 (1991) (quoting Singleton v. Wulff, 428 U.S. 106, 112–16 (1976)). Because Plaintiffs satisfy these criteria with respect to the third parties in question — *i.e.*, their LGBTQ patients — they may assert equal-protection, substantive-due-process, and free-speech claims on their behalf.

The first prong is "easily satisfied." Lepelletier v. FDIC, 164 F.3d 37, 43 (D.C. Cir. 1999). As discussed above, the health-provider Plaintiffs have suffered an injury in fact — financial and operational harm — thus giving them a "'sufficiently concrete interest' in the outcome of the issue in dispute." Powers, 499 U.S. at 411 (quoting Singleton, 428 U.S. at 112).

The second criterion also goes Plaintiffs' way. The requirement that a plaintiff have a "close relation" to the relevant third party, Powers, 499 U.S. at 411, is "to ensure that the plaintiff will act as an effective advocate for the third party." Lepelletier, 164 F.3d at 43 (citation omitted). For the requirement to be fulfilled, "the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter." Singleton, 428 U.S. at 115; see also Lepelletier, 164 F.3d at 45 (remarking that third-party standing "does not require a perfect match" between interests).

Here, "there can be no doubt" that the health-provider Plaintiffs will be "motivated, effective advocate[s]" for their LGBTQ patients. Powers, 499 U.S. at 414. Whitman-Walker, for instance, "has a special mission to serve the LGBTQ community" and provides a range of community-based health and wellness services. See Compl., ¶ 37; Shafi Decl., ¶ 3. Nearly 45% of its patients identified as lesbian, gay, bisexual, or otherwise non-heterosexual, and more than

10% identified as transgender or gender nonconforming.  See Compl., ¶ 37.  Whitman-Walker

even has an in-house legal-services department that exists to help LGBTQ patients combat

discriminatory barriers to accessing quality health care.  See Shafi Decl., ¶ 16.  Just as the

elimination of the 2016 Rule's explicit prohibition on discrimination based on sex stereotyping

and gender identity and incorporation of Title IX's religious exemption will likely cause

Whitman-Walker financial and operational injury, those same provisions instill in many LGBTQ

patients a heightened fear of discrimination that will lead to worsened health outcomes.  It seems

clear that Whitman-Walker shares a "common interest" with LGBTQ patients, Powers, 499 U.S.

at 413, such that the organization will serve as "an effective advocate" for them.  Lepelletier, 164

F.3d at 43 (citation omitted).

Defendants do not contest any of the above.  Instead, they briefly contend that Plaintiffs

do not have a "close relation" with their potential future patients "who may experience alleged

discrimination as a result of visiting other healthcare providers."  Def. Surreply at 10.  There are

multiple problems with this argument.  First, some of the individuals on whose behalf the health-

provider Plaintiffs assert claims appear to be current patients.  See Compl., ¶ 32; Pl. Reply at 7.

For instance, those Plaintiffs maintain that the 2020 Rule undermines their ability to treat current

patients by contributing to considerable financial and operational challenges.  See Shafi Decl.,

¶¶ 34–36; Carpenter Decl., ¶¶ 12, 16; Cummings Decl., ¶ 33.  Defendants do not suggest the

absence of a "close relation" in these circumstances.

In any event, Defendants are wrong to suggest that the health-provider Plaintiffs cannot

assert the rights of LGBTQ patients they might treat in the future.  The Supreme Court recently

observed that "[w]e have long permitted abortion providers to invoke the rights of their actual or

potential patients in challenges to abortion-related regulations."  June Med. Servs. LLC v. Russo,

140 S. Ct. 2103, 2118 (2020) (plurality opinion) (emphasis added) (citing cases); see also id. at

2139 n.4 (Roberts, C.J., concurring in the judgment) (agreeing with plurality's third-party-

standing analysis).  There is no reason to think it should be any different in the case of LGBTQ

health-care providers.  To be sure, and as Defendants point out, Kowalski v. Tesmer declined to

allow attorneys to assert the rights of future, "as yet unascertained" criminal defendants.  See 543

U.S. at 130–31; Def. Surreply at 10.  In that situation, however, the class of potential third parties

could have been literally any person.  By contrast, the health-provider Plaintiffs' present bid

involves a far more limited universe of third parties — LGBTQ individuals seeking health care.

And that universe bears notable resemblance to the similarly confined pool of women seeking

abortions, where physicians can invoke the rights of unknown potential patients.  Plaintiffs,

accordingly, satisfy the second prong of the Powers test.

Finally, Plaintiffs make it a trifecta by successfully showing that there exists "some

hindrance" to third-party patients' "ability to protect [their] own interests."  Powers, 499 U.S. at

411.  "There is no denying that transgender individuals face discrimination, harassment, and

violence because of their gender identity."  Whitaker v. Kenosha Unified Sch. Dist., 858 F.3d

1034, 1051 (7th Cir. 2017).  Numerous courts have recognized that disclosure of transgender

status may expose individuals to "a substantial risk of stigma, discrimination, intimidation,

violence, and danger."  Arroyo Gonzalez v. Rossello Nevares, 305 F. Supp. 3d 327, 333 (D.P.R.

2018); see also, e.g., F.V. v. Barron, 286 F. Supp. 3d 1131, 1137–38 (D. Id. 2018); Ray v.

Director, No. 18-272, 2018 WL 8804858, at *1 (S.D. Ohio Apr. 5, 2018).  Plaintiffs have alleged

the same here.  See Bolan Decl., ¶ 7 ("Many if not most of the individuals in our very diverse

patient population face considerable stigma and discrimination."); Inurritegui-Lint Decl., ¶ 28;

Salcedo Decl., ¶ 31; Shanker Decl., ¶ 21.  Indeed, this situation closely resembles Singleton,

where the Supreme Court allowed physicians to assert the rights of women seeking abortions after noting that they "may be chilled from such assertion by a desire to protect the very privacy of [their] decision[s] from the publicity of a court suit."  428 U.S. at 117–18.

All Defendants say in response is that the fact that LGBTQ patients themselves sued as plaintiffs to challenge the 2020 Rule in another jurisdiction "undercuts plaintiffs' claim that their own patients are prevented from mounting challenges of their own."  Def. Surreply at 10 (citing Walker v. Azar, No. 20-2834 (E.D.N.Y. 2020)).  Yet the final Powers prong "does not require an absolute bar from suit."  Pa. Psychiatric Soc. v. Green Spring Health Servs., Inc., 280 F.3d 278, 290 (3d Cir. 2002).  It is enough that "patients' fear of stigmatization . . . operates as a powerful deterrent to bringing suit."  Id.; see also id. at 290 n.14 (explaining that "cases do not demand an absolute impossibility of suit in order to fall within the [impediment] exception") (alteration in original) (quoting 15 James Wm. Moore et al., Moore's Federal Practice § 101.51 [3][c]); Singleton, 428 U.S. at 117–18 (acknowledging that suit could have been brought under pseudonym, but nevertheless finding third-party standing when woman's desire to protect privacy could discourage her from suing).  Plaintiffs have made that showing here.

The health-provider Plaintiffs, accordingly, have standing to assert the equal-protection, substantive-due-process, and free-speech rights of third-party LGBTQ patients.

## IV.    Analysis

With its protracted jurisdictional prelude finally concluded, the Court may now finally turn to the four preliminary-injunction factors.  It separately looks at likelihood of success on the merits and irreparable harm before jointly considering the balance of the equities and the public interest.

A.  <u>Likelihood of Success on the Merits</u>

As to the first prong, the Court finds that Plaintiffs have shown their likelihood of success with respect to their claims that HHS: 1) improperly eliminated explicit prohibitions within the 2016 Rule's definition of sex discrimination; and 2) improperly incorporated Title IX's religious exemption into Section 1557.  They do not fare as well on the remaining counts for which they have demonstrated standing — namely, their claims that HHS: 3) erroneously eliminated the 2016 Rule's prohibition on categorical coverage exclusions for gender-affirming care; 4) improperly repealed the 2016 Rule's notice requirements; and 5) violated Section 1554.  In addition, as a result of the Court's disposition of these claims, Plaintiffs' four constitutional counts entitle them to no further relief.  The Court separately analyzes all of these questions.

1.  *Elimination of 2016 Rule's Definition of Sex Discrimination*

As previously recounted, the 2016 Rule defined discrimination "[o]n the basis of . . . sex" to include "discrimination on the basis of . . . sex stereotyping, and gender identity."  81 Fed. Reg. at 31,467 (formerly codified at 45 C.F.R. § 92.4).  The 2020 Rule, however, repealed this definition entirely, and none of its provisions contains any reference whatsoever to "sex stereotyping" or "gender identity."  Plaintiffs attack this policy change as arbitrary and capricious, largely in light of the Supreme Court's intervening decision in <u>Bostock</u>.  The Court concurs.

When an agency changes or reverses a prior policy, it must first "display awareness that it is changing position."  <u>FCC v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 515 (2009).  It may not, for example, "depart from a prior policy *sub silentio*."  <u>Id.</u>  The agency also "must show that there are good reasons for the new policy," <u>id.</u>, and must "supply a reasoned analysis for the change."  <u>Ark Initiative v. Tidwell</u>, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting <u>Motor Vehicle</u>

Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 42 (1983)); see also State Farm, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'") (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).  Agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem."  Id.

This framework plainly applies to the present case.  While the 2016 Rule made clear that sex discrimination includes discrimination based on sex stereotyping and gender identity, the 2020 Rule contains no such provision.  As Defendants seem to concede, this regulatory reversal represents a change in prior policy under Fox.  See Def. Opp. at 18 (acknowledging that HHS's "position had changed") (citing Fox, 556 U.S. at 514).

Turning, then, to the analysis under Fox, it is undisputed that HHS has discharged its initial obligation to "display awareness that it is changing position" when it issued the final rule. Fox, 556 U.S. at 515.  The agency acknowledged that the 2016 Rule included sex stereotyping and gender identity within its prohibition on sex discrimination, see 85 Fed. Reg. 37,236, but nevertheless explained that the 2020 Rule "eliminates" that provision and omits any such definitional language.  Id. at 37,161–62; see also id. at 37,178 (acknowledging that the 2020 Rule "repeals the 2016 Rule's definition of 'on the basis of sex'").

The agency, however, has not fulfilled its obligation to provide either "good reasons," Fox, 556 U.S. at 515, or a "reasoned analysis" supporting its policy change.  State Farm, 463 U.S. at 42.  Before the Court explains why, however, it must refer back to its earlier standing holding.  Attentive readers will recall that the Court previously determined that Plaintiffs lack standing to challenge HHS's repeal of the 2016 Rule's prohibition on gender-identity

discrimination, given the Texas decision vacating that language.  That conclusion, however, does not mean that the prohibition on gender-identity discrimination is entirely irrelevant to the present merits discussion.  On the contrary, the Court's assessment of HHS's reasoning for its repeal of the 2016 Rule's sex-stereotyping provision necessarily includes some consideration of the gender-identity provision.  That is so for a simple and intuitive reason: the two concepts share substantial overlap.

Discrimination based on transgender status — *i.e.*, gender identity — often cannot be meaningfully separated from discrimination based on sex stereotyping because the belief that an individual should identify with only their birth-assigned sex is such a sex-based stereotype.  See, e.g., Adams *ex rel.* Kasper v. School Bd. of St. John's Cty., No. 18-13592, 2020 WL 4561817, at *9 (11th Cir. Aug. 7, 2020) ("Because [plaintiff] was assigned a female sex at birth but identifies consistently and persistently as a boy and presents as masculine, he defies the stereotype that one's gender identity and expression should align with one's birth sex."); Whitaker, 858 F.3d at 1048 ("By definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth."); Glenn v. Brumby, 663 F.3d 1312, 1316 (11th Cir. 2011) ("A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes.").  Indeed, HHS itself admits the possibility that the 2016 Rule deployed the term "sex stereotyping . . . to encompass gender identity."  85 Fed. Reg. at 37,236.  Nor do Defendants ever dispute Plaintiffs' contention that "the flaws that permeated the rulemaking process with respect to the elimination of 'gender identity' apply equally to the elimination of 'sex stereotyping.'"  ECF No. 47 (Plaintiffs' Clarification Regarding Response) at 1; see also Hrg. Tr. at 21–22 (similar).  For these reasons, even though the Court may only grant Plaintiffs relief with respect to HHS's elimination of the prohibition on discrimination based on

sex stereotyping, the agency's reasoning regarding the gender-identity provision necessarily

informs its treatment of the sex-stereotyping provision.

HHS's shortcomings begin in the preamble to the 2020 Rule.  "[T]he preamble to a

regulation is evidence of an agency's contemporaneous understanding of its proposed rules."  It

may serve, accordingly, "as a source of evidence concerning contemporaneous agency intent."

Wyo. Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 53 (D.C. Cir. 1999); see also Harman

Min. Co. v. Director, 678 F.3d 305, 315–16 (4th Cir. 2012) (explaining that regulatory preamble

may serve "as a source of explanation as to [agency's] rationale in amending . . . regulations");

CHW West Bay v. Thompson, 246 F.3d 1218, 1226–27, 1230 (9th Cir. 2001) (looking to

regulation's preamble as evidence that agency action was arbitrary and capricious).  It follows

that the Court may consider HHS's statements in the preamble to the 2020 Rule as part of the

agency's explanation underlying its action, which "will enable the court to evaluate the agency's

rationale at the time of decision."  Pension Ben. Guar. Corp. v. LTV Corp., 496 U.S. 633, 654

(1990).  Indeed, Defendants themselves admit that "a Rule's preamble may help determine

whether an Agency's decision to adopt a particular approach was supported by adequate

reasoning."  Def. Opp. at 16.  Even if the preamble "lacks the force and effect of law," Saint

Francis Med. Ctr. v. Azar, 894 F.3d 290, 297 (D.C. Cir. 2018), Defendants thus do not appear to

dispute that the Court may consider HHS's statements therein when assessing whether the

explanation for its action is satisfactory.

Here, the 2020 Rule's preamble brings into stark relief HHS's position that

discrimination based on transgender status does not qualify as sex discrimination under Section

1557.  The agency repeatedly explained that "the term 'on the basis of . . . sex' in Section 1557

does not encompass discrimination on the basis of gender identity."  85 Fed. Reg. at 37,191; see

also, e.g., id. at 37,183 (disagreeing with commenters "who contend that Section 1557 or Title IX encompass gender identity discrimination within their prohibition on sex discrimination"); id. at 37,168, 37,179–80, 37,194 (similar).  It is evident that these legal conclusions drove the agency's decision to eliminate the 2016 Rule's inclusion of gender identity and sex stereotyping in its definition of sex discrimination.  As HHS insisted in issuing the 2020 Rule, that prior definition "exceeded the scope of the authority delegated by Congress in Section 1557," id. at 37,161, imposing legal requirements "that cannot be justified by the text of Title IX, and in fact are in conflict with express exemptions in Title IX."  Id. at 37,162; see also Walker, 2020 WL 4749859, at *9 ("It is clear from the preamble . . . that a central reason for HHS's action was a fundamental disagreement as to whether Title IX — and, by implication, § 1557 — prohibited discrimination based on gender identity and sex stereotyping.").  By eliminating the explicit prohibitions, HHS explained, the 2020 Rule "bring[s] the provisions of the Code of Federal Regulations into compliance with the underlying statutes."  85 Fed. Reg. at 37,162.

Four days before HHS published the final rule, however, the Supreme Court issued a decision that — at the very least — called the validity of HHS's legal determinations into serious question.  In Bostock, it held that under Title VII, discrimination based on transgender status or sexual orientation "necessarily entails discrimination based on sex."  140 S. Ct. at 1747.  The Court reached that conclusion through a "straightforward application" of the statutory text, which prohibits employers from discriminating against any individual "because of . . . sex."  Id. at 1743; 42 U.S.C. § 2000e–2(a)(1).  As the Court ultimately found, "[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."  Bostock, 140 S. Ct. at 1741.

These principles plainly have implications for Title IX's prohibition on sex discrimination and, by extension, Section 1557.  As previously recounted, Title IX bars discrimination "on the basis of sex."  20 U.S.C. § 1681(a).  The reasoning of Bostock, at a minimum, suggests the possibility that this provision encompasses discrimination based on transgender status.  There is no apparent reason why the Court's conclusion — that it is "impossible" to discriminate based on transgender status without discriminating based on sex, see 140 S. Ct. at 1741 — would remain cabined to Title VII and not extend to other statutes prohibiting sex discrimination.  Put another way, just as "sex plays an unmistakable and impermissible role" in any decision to treat otherwise identical individuals differently simply because they possess different gender identities under Title VII, the same would appear to be true under Title IX.  See id. at 1741–42.  Indeed, two courts of appeals have already so held.  See Adams, 2020 WL 4561817, at *11–12 (applying Bostock and concluding that "Title IX, like Title VII, prohibits discrimination against a person because he is transgender, because this constitutes discrimination based on sex"); Grimm v. Gloucester Cty. Sch. Bd., No. 19-1952, 2020 WL 5034430, at *21, 24 n.18 (4th Cir. Aug. 26, 2020) (similar).  There exists a fairly strong case, therefore, that application of Bostock's textual analysis to Title IX (by way of Section 1557's incorporation of that statute) would yield the conclusion that the statute forbids discrimination based on gender identity and sex stereotyping, insofar as such stereotypes are based on the belief that an individual should identify with only their birth-assigned sex.  Cf. Bostock, 140 S. Ct. at 1778–81 & n.57 (Alito, J., dissenting) (discussing potential "consequences" of Court's Title VII holding for statutes such as Title IX and Section 1557).

Notwithstanding Bostock's clear import for the meaning of discrimination based on sex under Title IX, HHS plowed ahead with the 2020 Rule implementing that precise statutory

phrase without even pausing to consider the Court's decision.  The Department's 89-page final rule contains no discussion whatsoever of Bostock's reasoning or how the case might apply to Title IX.  Indeed, HHS did not even acknowledge Bostock's holding.  The agency instead clung to its position that "Title IX does not encompass discrimination on the basis of sexual orientation or gender identity," 85 Fed. Reg. at 37,168, and it repeatedly invoked that conclusion as justification for its elimination of the 2016 Rule's provision to the contrary.  Id. at 37,161–62. HHS so acted despite itself admitting that "a holding by the U.S. Supreme Court on the meaning of 'on the basis of sex' under Title VII will likely have ramifications for the definition of 'on the basis of sex' under Title IX."  Id. at 37,168 (emphasis added).

"The APA requires reasoning, deliberation, and process."  California v. Bernhardt, No. 18-5712, 2020 WL 4001480, at *16 (N.D. Cal. July 15, 2020).  HHS should have at least considered the import of Bostock for the reasons underlying its regulatory action — namely, the agency's belief that Title IX does not prohibit discrimination based on transgender status — before it eliminated regulatory language providing for precisely what Bostock seemed to guarantee.  The agency's failure to take that obvious deliberative step prevents the Court from finding that its policy change was supported by "reasoned analysis" and compels the conclusion that its action was arbitrary and capricious.  State Farm, 463 U.S. at 42.  In so holding, the Court aligns itself with the Eastern District of New York's recent resolution of a similar challenge to the 2020 Rule.  See Walker, 2020 WL 4749859, at *9–10 (finding repeal of 2016 Rule's definition of sex discrimination arbitrary and capricious in light of agency's failure to consider implications of Bostock).

Defendants offer several arguments in response, but none is persuasive.  They begin by positing that the district court's decision in Franciscan Alliance "compelled" HHS to "not

includ[e] an expanded definition of 'on the basis of sex'" in the 2020 Rule because that case "vacated the language contained in the previous rule that plaintiffs now advocate for."  Def. Opp. at 16.  There are multiple problems with this argument.  First, Defendants' premise is mistaken. As previously explained, Franciscan Alliance only vacated the 2016 Rule "insofar as the Rule defines 'On the basis of sex' to include gender identity" and one other provision not relevant here.  Franciscan Alliance Order at ECF p. 3.  The court made clear that the "remainder of 45 C.F.R. § 92 remains in effect."  Id.  Franciscan Alliance, accordingly, did not vacate the 2016 Rule's definitional provision relating to sex stereotyping; indeed, the decision never even mentioned it.  See 414 F. Supp. 3d 928.  Defendants thus cannot contend the decision was "reason enough for HHS to release the 2020 Rule in its current form."  Def. Opp. at 17.

In addition, contrary to Defendants' assertion, nothing in Franciscan Alliance "compelled" HHS in any sense of the word with respect to the present rulemaking.  See Def. Opp. at 16.  Franciscan Alliance simply vacated a portion of the 2016 Rule's definition of discrimination on the basis of sex.  It did not order the agency to do anything in particular when promulgating a future rule implementing Section 1557, or even to conduct another rulemaking at all.  In fact, nothing in Franciscan Alliance prevented HHS from re-promulgating the very provisions that the court vacated.  To be sure, any such regulation may have suffered the same fate as the 2016 Rule in subsequent litigation, but the point is that the order in Franciscan Alliance did not itself preclude HHS from following such a course.  Defendants therefore cannot suggest that the decision effectively bound the agency's hands and "compelled" it to proceed as it did.  See Def. Opp. at 16.

Even worse, HHS failed entirely to consider the implications of Bostock for the agency's reliance on Franciscan Alliance — to wit, the possibility that the Supreme Court thoroughly

undermined that earlier decision's reasoning.  <u>Franciscan Alliance</u>'s holding that Title IX's prohibition on sex discrimination did not include gender-identity discrimination was premised entirely on the court's belief that the statutory term "sex" "refer[red] to the biological differences between males and females."  227 F. Supp. 3d at 688.  HHS, notably, drew from the Government's losing litigating position in <u>Bostock</u> to make this same argument.  <u>See</u> 85 Fed. Reg. at 37,178–79.  <u>Bostock</u>, however, expressly <u>assumed</u> that "sex" "refer[red] only to biological distinctions between male and female."  140 S. Ct. at 1739.  Whether or not the term included some norms relating to gender identity was immaterial, the Court explained, because it is nevertheless "impossible" to discriminate based on transgender status without discriminating based on sex.  <u>Id.</u> at 1741.  To be sure, contrary to Plaintiffs' assertion, <u>Bostock</u> did not render <u>Franciscan Alliance</u>'s vacatur "a legal nullity."  Pl. Reply at 3.  That disposition remains on the books.  But HHS could not continue to invoke it as justification for an independent regulatory action without at least considering whether <u>Bostock</u> undermined the former decision's very basis.

Relatedly, Defendants contend that "HHS acted reasonably in finalizing its rule without waiting for [<u>Bostock</u>]" because that decision "concerned a separate statute" — <u>i.e.</u>, Title VII. <u>See</u> Def. Opp. at 17.  As HHS itself admitted, however, "Title VII case law has often informed Title IX case law with respect to the meaning of discrimination 'on the basis of sex,'" and a decision in <u>Bostock</u> "will likely have ramifications" for Title IX.  <u>See</u> 85 Fed. Reg. at 37,168. That much has already become clear, as evidenced by two courts of appeals' recent applications of <u>Bostock</u> to conclude that Title IX likewise prohibits discrimination based on transgender status.  <u>Adams</u>, 2020 WL 4561817, at *11–12; <u>Grimm</u>, 2020 WL 5034430, at *21, 24 n.18. Indeed, even apart from <u>Bostock</u>, several courts have independently concluded that Title IX

prohibits discrimination based on sex stereotyping or gender identity.  See, e.g., Whitaker, 858 F.3d at 1049; Dodds v. United States Dep't of Educ., 845 F.3d 217, 221 (6th Cir. 2016).  HHS asserted vaguely that "the binary biological character of sex" may "take[] on special importance in the health context," leading to "implications" that a Title VII ruling "might not . . . fully address[]."  85 Fed. Reg. at 37,168; see also id. at 37,185.  Even if one grants HHS's premise, the mere possibility that Bostock may apply slightly differently in the health-care context does not give the agency license to refuse to consider the decision entirely.

To be clear, the Court does not adopt Plaintiffs' contention that Bostock "conclusively rejects" HHS's position that Title IX (and Section 1557) do not prohibit discrimination based on transgender status.  See Pl. Mot. at 14.  It need not go so far, and it does not so hold today.  It is sufficient for the Court to determine that Bostock, at the very least, has significant implications for the meaning of Title IX's prohibition on sex discrimination, and that it was arbitrary and capricious for HHS to eliminate the 2016 Rule's explication of that prohibition without even acknowledging — let alone considering — the Supreme Court's reasoning or holding.  See Walker, 2020 WL 4749859, at *9 ("Whether or not it is dispositive of [the scope of sex discrimination] with respect to Title IX and § 1557, Bostock is at least 'an important aspect of the problem.'") (quoting State Farm, 463 U.S. at 43).

Finally, Defendants insist that the 2020 Rule cannot be arbitrary and capricious because it simply regurgitates the plain, unobjectionable text of Section 1557.  Specifically, they argue that HHS "declin[ed] to include a definition of 'on the basis of sex' in the 2020 Rule," and "Plaintiffs cite no authority that would require a regulation to expand upon statutory text."  Def. Opp. at 15; see also 85 Fed. Reg. at 37,244 (to be codified at 45 C.F.R. § 92.2).  This misconstrues Plaintiffs' argument.  HHS did not adopt the 2020 Rule in a vacuum devoid of context or history.  As

60

previously explained, because the agency changed its position and opted to repeal a prior regulatory provision, it needed to provide a "reasoned analysis for the change" and a "satisfactory explanation for its action."  State Farm, 463 U.S. at 42–43; see also Fox, 556 U.S. at 515; Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2126 (2016).  Regardless of the ultimate regulation the agency adopts, the Court must assess the reasonableness of the agency's explanation for why it made the change.  And here, HHS's explanation is plainly insufficient, not least because it neglected to consider in any fashion an intervening Supreme Court decision that bore direct and undisputed consequences not only for the regulatory provision at issue, but also for the validity and coherence of the reasons HHS provided for its action.  The agency cannot escape that conclusion by simply asserting that "the elimination of a regulatory definition of [a statutory] term would not preclude application of the [Supreme] Court's construction" of that term's meaning.  See 85 Fed. Reg. at 37,168.  When assessing the procedural validity of HHS's action, this Court remains obligated to "examin[e] the reasons" underlying HHS's action. Judulang v. Holder, 565 U.S. 42, 53 (2011).

The Court "do[es] not hold that the agency decision here was substantively invalid." Dep't of Commerce, 139 S. Ct. at 2576.  It "address[es] only whether the agency complied with the procedural requirement that it provide a reasoned explanation for its action."  Dep't of Homeland Security v. Regents of the Univ. of Cal., 140 S. Ct. 1891, 1916 (2020).  Nothing prevents HHS from returning to the drawing board and attempting again to issue a regulation that parrots Section 1557's prohibition on sex discrimination.  To be successful, however, any such effort must exhibit what was sorely lacking here — namely, compliance with the APA's procedural mandates.

2. *Incorporation of Title IX's Religious Exemption*

Next up is the 2020 Rule's incorporation of Title IX's religious exemption.  Plaintiffs

challenge that regulatory action as arbitrary and capricious, largely contending that HHS failed to

sufficiently consider the implications of such incorporation for access to health care.  They are

correct.

As the reader well knows by this point, Section 1557 incorporates the particular grounds

of discrimination contained in four other civil-rights statutes.  Once again relevant here is Title

IX.  By referencing the "ground" of discrimination prohibited by Title IX, Section 1557 plainly

barred discrimination on the basis of sex.  See 20 U.S.C. § 1681(a); 42 U.S.C. § 18116(a).  It did

not, however, explicitly incorporate Title IX's exemption of certain educational operations of

entities controlled by religious organizations from its nondiscrimination mandate.  See 20 U.S.C.

§§ 1681(a), 1687.  The 2016 Rule, accordingly, "decline[d] to . . . import Title IX's blanket

religious exemption into Section 1557."  81 Fed. Reg. at 31,380.  HHS reached that conclusion

both because "Section 1557 itself contains no religious exemption" and because it found that a

categorical exemption would be inappropriate in the broader health-care context.  Id.

The 2020 Rule, however, reversed course and explicitly incorporated Title IX's religious

exemption into Section 1557's nondiscrimination scheme.  See 45 C.F.R. § 92.6(b)

(incorporating "exemptions" contained in various statutes, including Title IX).  As imported into

the current regulation, such exemption could be read so as to enable any educational operation of

an entity controlled by a religious organization engaged in the provision of health care to evade

the statute's prohibition on sex discrimination, if application of such prohibition would be

inconsistent with the organization's religious tenets.  See 20 U.S.C. §§ 1681(a), 1687; 85 Fed.

Reg. at 37,207–08.  It is this incorporation that Plaintiffs challenge as arbitrary and capricious.

The APA demands that an agency considering regulatory action "examine all relevant factors and record evidence." Am. Wild Horse Pres. Campaign v. Perdue, 873 F.3d 914, 923 (D.C. Cir. 2017). At a minimum, the agency "cannot entirely fail[] to consider an important aspect of the problem." State Farm, 463 U.S. at 43. Rather, it must "adequately analyze . . . the consequences" of its actions. Am. Wild Horse, 873 F.3d at 932. In doing so, "[s]tating that a factor was considered . . . is not a substitute for considering it." Getty v. Fed. Savs. & Loan Ins. Corp., 805 F.2d 1050, 1055 (D.C. Cir. 1986). The agency must instead provide more than "conclusory statements" to prove that it "consider[ed] the [relevant] priorities." Id. at 1057. For instance, the D.C. Circuit has held that concerns raised in public comments are sufficient to alert an agency to "an important aspect of the problem," which the agency must consider lest its action be deemed arbitrary and capricious. Gresham v. Azar, 950 F.3d 93, 103 (D.C. Cir. 2020).

Several of the 2016 Rule's primary justifications for declining to incorporate Title IX's religious exemption into Section 1557 focused on the potential negative implications of such an exemption for access to care and ultimate health outcomes. For instance, HHS referenced statements from the "overwhelming majority of individual commenters" and "[m]ost" commenting organizations that a religious exemption "would potentially allow for discrimination on the bases prohibited by Section 1557 or for the denial of health services to women." 81 Fed. Reg. at 31,379. Such concerns, HHS concluded, counseled against a "blanket religious exemption," which "could result in a denial or delay in the provision of health care" and could "discourag[e] individuals from seeking necessary care," thereby generating "life threatening results." Id. at 31,380. The agency also found that there were "significant differences between the educational and health care contexts that warrant different approaches." Id. While families selecting religious educational institutions "typically do so as a matter of choice," individuals in

the health-care context "may have limited or no choice of providers, particularly in rural areas or where hospitals have merged with or are run by religious institutions," or in "emergency circumstances." Id.

The 2020 Rule, however, "said almost nothing" about these important issues. Encino Motorcars, 136 S. Ct. at 2127. Nowhere did HHS grapple with the policy grounds against importing a religious exemption into Section 1557. More fundamentally, nowhere did it consider the "consequences" of such an exemption for access to care, Am. Wild Horse, 873 F.3d at 932, despite the fact that the "ACA's intended purpose [is] to broaden access to health care." Morris v. Cal. Physicians' Serv., 918 F.3d 1011, 1014 (9th Cir. 2019). To the extent the agency even gestured at these issues, its discussion was patently insufficient to discharge its duty to provide a "reasoned explanation" for its change in policy. Encino Motorcars, 136 S. Ct. at 2126.

For instance, at one point HHS asserted that the incorporation of Title IX's religious exemption will ensure patients receive "high-quality and conscientious care." 85 Fed. Reg. at 37,206. Yet that "conclusory statement[]" was delivered entirely without elaboration or support. Getty, 805 F.2d at 1057; see Gresham, 950 F.3d at 103 ("Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking."). Indeed, one would think that the more likely outcome would be patients' being denied care — a possibility HHS never acknowledged. Similarly, it did not even resist comments stating that, more generally, "religious exemptions would make it harder to find healthcare in low provider areas." 85 Fed. Reg. at 37,218.

Defendants briefly insist that HHS "concluded" that a "religious exemption[] is unlikely to lead to widespread diminishing of healthcare options for individuals." Def. Op. at 31. But the agency did no such thing. Indeed, it took no position whatsoever on the actual effects that a

religious exemption would have, a reality confirmed by the very preamble excerpt Defendants

cite.  There, HHS offered a vague summary of comments from select providers purportedly

seeking exemptions from "providing certain treatments," not necessarily "from treating certain

patients"; comments from "[s]ome" hospitals that prohibit discrimination on the basis of gender

identity and sexual orientation; and comments from "[s]ome" religious providers that claim to

"have never refused to care for a patient on the grounds of their identity as an LGBT individual."

85 Fed. Reg. at 37,206.  The Court has no reason to dispute the truth of any of these comments.

HHS, however, cited them not as evidence that a religious exemption will preserve health-care

opportunities for individuals, but instead simply for the entirely unproductive proposition that

"members of the public hold different opinions concerning conscience and religious freedom

laws."  Id.  At no point did the agency even assert that a religious exemption would preserve

meaningful access to health care for vulnerable populations — let alone provide evidence

supporting any such conclusion.

Attempting to skirt this deficiency, Defendants contend that HHS was neither required to

supply a more "detailed" justification for its policy reversal nor to "respond specifically" to the

2016 Rule's discussion of the serious risks posed by a categorical religious exemption for the

prompt and nondiscriminatory provision of health care.  See Def Opp. at 31 (quoting Nat'l Ass'n

of Home Builders v. EPA, 682 F.3d 1032, 1038 (D.C. Cir. 2011)); Fox, 556 U.S. at 502

(requiring "a more detailed justification" for policy reversal when "new policy rests upon factual

findings that contradict those which underlay [agency's] prior policy").  Even assuming

Defendants are correct that the 2016 Rule's rejection of a religious exemption did not rest upon

"factual findings" — a questionable premise, given HHS's reliance on the documented potential

for denials and delays in health-care provision as a result of the exemption — their objection

misses the point.  The Court does not here require HHS to provide a more "detailed justification than what would suffice for a new policy created on a blank slate." Fox, 556 U.S. at 515.  It merely requires HHS to "consider an important aspect of the problem" — namely, the potential negative consequences that importing a blanket religious exemption into Section 1557 might have for access to health care.  State Farm, 463 U.S. at 43.  The agency's dereliction of that fundamental procedural obligation flunks the APA's standards for reasoned decisionmaking. See Gresham, 950 F.3d at 103 (holding agency action arbitrary and capricious for failing to adequately consider potential for loss in health-care coverage as result of action); Am. Wild Horse, 873 F.3d at 932 (faulting agency for "brush[ing] aside critical facts" and not "adequately analyz[ing]" consequences of decision).

To be sure, Defendants identify other factors that HHS considered in deciding to import Title IX's religious exemption into Section 1557.  In particular, they point to the agency's consideration of 1) the fact that Title IX has been interpreted to apply outside of core educational institutions; 2) the Religious Freedom Restoration Act; 3) Franciscan Alliance's invalidation of the 2016 Rule's definition of sex discrimination in part because of HHS's not incorporating Title IX's religious exemption; and 4) the need to "protect . . . providers' medical judgment and their consciences."  Def. Opp. at 29–31; 85 Fed. Reg. at 37,206–08.  The Court need not address the legitimacy of these considerations today.  For even if HHS could properly consider such factors, its "wholesale failure" to adequately address a "salient factor" — namely, access to care — renders its decision arbitrary and capricious.  Humane Soc'y v. Zinke, 865 F.3d 585, 607 (D.C. Cir. 2017).  That is not to say, of course, that HHS could never promulgate a rule under Section 1557 incorporating Title IX's religious exemption.  "Rather, [the Court] holds today only that [HHS] must adequately consider the effect of" a blanket religious exemption on the ability for

66

individuals to access care on a prompt and nondiscriminatory basis.  See Stewart v. Azar, 313 F.

Supp. 3d 237, 272 (D.D.C. 2018).  It never did so here.

In closing this particular area of discussion, the Court notes that nothing in this decision

renders religiously affiliated providers devoid of protection.  Far from it.  To name a few

safeguards: the ACA instructs that no provision "shall be construed to have any effect on Federal

laws regarding (i) conscience protection; (ii) willingness or refusal to provide abortion; and (iii)

discrimination on the basis of the willingness or refusal to provide, pay for, cover, or refer for

abortion or to provide or participate in training to provide abortion."  42 U.S.C. § 18023(c)(2).

The 2020 Rule, moreover, explicitly acknowledges that Section 1557 is subject to RFRA's

protections of religious conscience from government-imposed burdens, see 45 C.F.R. § 92.6(b)

— protections the Supreme Court has confirmed are "very broad."  Burwell v. Hobby Lobby

Stores, Inc., 573 U.S. 682, 693 (2014).  Nothing in the Court's decision today implicates in any

fashion the applicability of these independent statutory safeguards.

### 3.  *Elimination of Prohibition on Categorical Coverage Exclusions*

Plaintiffs encounter less success in their challenge to HHS's elimination of the 2016

Rule's prohibition on "categorical coverage exclusion[s] or limitation[s] for all health services

related to gender transition."  81 Fed. Reg. at 31,471–72 (formerly codified at 45 C.F.R. §

92.207(b)(4)).  Although they no doubt have ardent policy objections to the agency's removal of

such prohibitions on insurers' having or implementing categorical coverage exclusions, the sole

question before the Court is whether HHS "examine[d] the relevant data and articulate[d] a

satisfactory explanation for its action including a 'rational connection between the facts found

and the choice made.'"  State Farm, 463 U.S. at 43 (quoting Burlington Truck Lines, 371 U.S. at

168).  At least at the present juncture, Plaintiffs have not shown otherwise.  Mindful of the

"narrow" scope of arbitrary-and-capricious review — a standard that bars courts from "substitut[ing] [their] judgment for that of the agency" — the Court finds that Plaintiffs have not demonstrated a likelihood of success on this aspect of their case.  Id.

As an initial matter, Defendants contend that HHS exceeded its authority under the 2016 Rule when it prohibited categorical coverage exclusions of gender-affirming care, including sex-reassignment procedures.  See Def. Opp. at 19.  As the agency asserted in the 2020 Rule, "There is no statutory authority to require the provision or coverage of such procedures under Title IX protections from discrimination on the basis of sex."  85 Fed. Reg. at 37,198; see also id. at 37,199.  Plaintiffs, somewhat puzzlingly, never argue to the contrary; nor do they maintain that Section 1557 compels the inclusion of a prohibition on coverage exclusions.  Instead, Plaintiffs simply contend that HHS "did not offer a reasonable explanation" for its policy change, which ran "counter to the evidence" and "was not the product of reasoned decision-making."  Pl. Reply at 13.  In light of this more limited argument, the Court need not resolve the precise limits of HHS's authority to implement Section 1557's prohibition on sex discrimination.  Even assuming that the 2016 Rule's prohibition on categorical coverage exclusions of gender-affirming care was lawful, the Court cannot presently conclude that the agency's decision to remove that prohibition was arbitrary and capricious.

When an agency changes a policy position, "it need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one."  Fox, 556 U.S. at 515.  Instead, "it suffices that the new policy is permissible under the statute," and "that there are good reasons for it."  Id.  Here, HHS expressly confronted its prior policy regarding prohibitions on categorical coverage exclusions and delivered a sufficiently reasoned explanation for its new position.  In promulgating the 2020 Rule, the agency consulted scientific

studies, government reviews, and comments from a host of medical professionals regarding treatment for gender dysphoria. See 85 Fed. Reg. 37,187, 37,196–98. The upshot, according to HHS, was that "the medical community is divided on many issues related to gender identity, including the value of various 'gender-affirming' treatments for gender dysphoria (especially for minors)." Id. at 37,187. That division counseled against a blanket prohibition on categorical coverage exclusions of gender-affirming care. According to the agency, eliminating the prohibition would enable providers and insurers "to use their best medical judgment" when delivering and covering care, as informed by "ongoing medical debate and study" regarding gender-affirming treatment. Id. at 37,187.

In the 2020 Rule, HHS acknowledged the 2016 Rule's assumption that entities offering categorical coverage exclusions for gender-affirming care were relying on medical judgments that were "outdated and not based on current standards of care." Id. at 37,187 (quoting 81 Fed. Reg. at 31,429). The agency, however, concluded that this earlier assertion was "erroneous" and that there was "a lack of scientific and medical consensus to support" it. Id. Plaintiffs take issue with three pieces of evidence HHS cited in support of that conclusion. Without entering the merits of the debate, the Court is satisfied that each was valid for HHS to consider, and that each reinforced the agency's ultimate determination.

First, HHS pointed to a 2016 CMS decision declining to issue a National Coverage Determination that would have mandated coverage for sex-reassignment surgery for Medicare beneficiaries with gender dysphoria. See 85 Fed. Reg. at 37,187. There, CMS determined, "[b]ased on an extensive assessment of the clinical evidence," that "there is not enough high quality evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria and whether patients most likely to benefit

from these types of surgical intervention can be identified prospectively."  CMS, <u>Decision Memo</u>
<u>for Gender Dysphoria and Gender Reassignment Surgery (CAG-00446N)</u> (Aug. 30, 2016),
https://perma.cc/9S73-4WQB.  Plaintiffs emphasize that CMS's decision did not mean there
would be national non-coverage for gender-affirming care, but only that coverage determinations
would occur on a case-by-case basis.  <u>See</u> Pl. Mot. at 17.  That point, however, is non-
responsive, as HHS invokes the CMS decision only as evidence for the "lack of scientific and
medical consensus" regarding such treatment.  <u>See</u> 85 Fed. Reg. at 37,187.

Second, HHS referenced a 2018 Department of Defense report, which found that there is
"considerable scientific uncertainty and overall lack of high quality scientific evidence
demonstrating the extent to which transition-related treatments . . . remedy the multifaceted
mental health problems associated with gender dysphoria."  <u>Id.</u> (quoting Department of Defense,
<u>Report and Recommendations on Military Service by Transgender Persons</u> at 5 (Feb. 22, 2018),
https://perma.cc/7369-K2VC).  Plaintiffs attempt to blunt the force of this report by pointing out
that it summarized recommendations "based on each Panel member's independent <u>military</u>
judgment."  DOD Report at 4 (emphasis added).  As HHS noted, however, the report also
included input from civilian medical professionals with experience treating gender dysphoria.
<u>See</u> 85 Fed. Reg. at 37,187; DOD Report at 18.  In any event, even assuming that the military
context in which the report was issued counsels against unguarded acceptance of all of its
conclusions in the context of civilian health care, the report's factual finding regarding the
"scientific uncertainty and overall lack of high quality scientific evidence" surrounding gender-
affirming treatment ultimately echoes CMS's similar finding two years earlier — which
Plaintiffs do not and cannot dispute was tailored to civilians.

Finally, HHS characterized a scientific study as concluding "that children who socially transition in childhood faced dramatically increased likelihood of persistence of gender dysphoria into adolescence and adulthood." 85 Fed. Reg. at 37,187 (citing Thomas D. Steensma et al., "Factors Associated with Desistance and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study," 52(6) J. Am. Acad. of Child & Adolescent Psych. 582–90 (2013)). Plaintiffs dispute that representation, emphasizing that the study concluded only that the intensity of early gender dysphoria appears to be an important predictor of the persistence of gender dysphoria in later years of life. See Pl. Mot. at 18 (citing Steensma et al. at 582). Defendants, however, correctly point out that the study found that boys who transitioned during childhood experienced "significantly" greater gender dysphoria in later years, a finding consistent with HHS's characterization. See Steensma at 586–87; see also id. at 588 (explaining that "[c]hildhood social transitions were important predictors of persistence" and that "[s]ocial transitions were associated with more intense [gender dysphoria] in childhood").

Beyond criticizing HHS's reliance on these sources, Plaintiffs point to standards issued by the World Professional Association for Transgender Health — and adopted by additional organizations — that endorse various forms of treatment for gender dysphoria. See Pl. Mot. at 16–17. But HHS explicitly considered these standards in promulgating the 2020 Rule, referencing submissions from various commenters who agreed with the group's approach. See 85 Fed. Reg. at 37,196 & nn.220–25. After summarizing such evidence, the agency turned to comments from clinicians who criticized the WPATH standards for reaching "policy conclusions without adequate clinical evidence." Id. at 37,197 & n.232 (citing studies). HHS also indicated its agreement with certain commenters "that the 2016 Rule relied excessively on the conclusions of an advocacy group (WPATH) rather than on independent scientific fact-finding" such as the

aforementioned CMS decision that conducted an "extensive assessment of the clinical evidence" only to find an absence of evidence sufficient "to determine whether gender reassignment surgery improves health outcomes" for individuals with gender dysphoria.  Id. at 37,187, 37,198.

Once again, it is not this Court's place to resolve this scientific debate.  Nor may it pass judgment on the wisdom of the agency's decision.  The Court is limited, rather, to considering whether "the agency has examined relevant data and has articulated a rational explanation for its action."  Eagle-Picher Indus., Inc. v. EPA, 759 F.2d 905, 921 (D.C. Cir. 1985).  The above discussion makes clear that HHS thoroughly considered the evidence Plaintiffs raise, but nevertheless concluded that "there is no medical consensus to support one or another form of treatment for gender dysphoria."  85 Fed. Reg. at 37,198.  Plaintiffs cannot show that determination to be arbitrary and capricious simply by pointing to evidence that the agency plainly took into account.  See Pl. Mot. at 16–17.

Plaintiffs also briefly contend that HHS failed to consider the "reliance" interests of various stakeholders, including transgender patients, on the 2016 Rule's prohibition on categorical coverage exclusions.  Id. at 18.  Even assuming Plaintiffs have identified "serious reliance interests" with the requisite particularity, Encino Motorcars, 136 S. Ct. at 2126 (quoting Fox, 556 U.S. at 515), nowhere do they acknowledge HHS's express statement that nothing in the 2020 Rule "prohibits a healthcare provider from offering or performing sex-reassignment treatments and surgeries, or an insurer from covering such treatments and procedures, either as a general matter or on a case-by-case basis."  85 Fed. Reg. at 37,188.  Indeed, HHS went on, "The large number of comments received from healthcare providers who perform such treatments and procedures suggests that there is no shortage of providers willing to do so."  Id.; see also id. at 37,196 (acknowledging comments claiming that 2020 Rule's insurance coverage provisions

jeopardize access to gender transition services).  If Plaintiffs deem that discussion insufficient to discharge HHS's duty to consider "legitimate reliance on prior interpretation," they will need to address it head on.  Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 742 (1996).

Plaintiffs, consequently, have not demonstrated a likelihood of success on the merits of their challenge to HHS's repeal of the 2016 Rule's prohibition on categorical coverage exclusions for gender-transition-related health services.

### 4.  *Elimination of Notice Requirements*

Plaintiffs next take aim at HHS's elimination of the 2016 Rule's notice and tagline requirements.  Here, too, the Court finds that they have not demonstrated a likelihood of success on their claim that such repeal was procedurally invalid.

As previously discussed, although their briefing at times references unspecified revisions to the 2016 Rule's language-access requirements, Plaintiffs confine their present challenge to HHS's repeal of the prior Rule's notice and tagline provisions.  See Hrg. Tr. at 22–23; Pl. Mot. at 24.  Those provisions required covered entities to post certain notices and taglines in their "significant publications and significant communications" with members of the public, as well as in "conspicuous physical locations."  81 Fed. Reg. at 31,469 (formerly codified at 45 C.F.R. § 92.8(f)–(g)).  The notices were intended to inform the public that, *inter alia*, the covered entity does not discriminate on the grounds incorporated into Section 1557, and that it provides various language-assistance services and auxiliary aids.  See id. (formerly codified at 45 C.F.R. § 92.8(a)).  Covered entities also had to include short "taglines" in certain significant communications and locations, in either fifteen languages (for larger-sized communications and physical locations) or in two languages (for smaller communications), indicating the availability of these language-assistance services.  Id. (formerly codified at 45 C.F.R. §§ 92.4, 92.8).

The 2020 Rule eliminated these notice and tagline requirements entirely.  In reviewing

that action, the Court is once more tasked with determining whether the repeal was arbitrary and

capricious — in other words, whether HHS neglected to provide a sufficiently "reasoned

analysis" for its change in policy.  State Farm, 463 U.S. at 42.  Finding that the agency's

explanation was more than adequate, the Court declines Plaintiffs' invitation to set aside the

repeal.

By this point in the journey, the reader knows all too well that in order to justify a change

in policy, an agency must "display awareness that it is changing position" and "must show that

there are good reasons for the new policy."  Fox, 556 U.S. at 515.  Here, HHS did both.  It

plainly acknowledged its shift in course from the 2016 Rule, stating explicitly that it sought to

"repeal in toto the Section 1557 provisions on taglines . . . and notices of non-discrimination."

84 Fed. Reg. at 27,868; see also 85 Fed. Reg. at 37,204.  The agency likewise provided an array

of reasons for its change in position.  For instance, HHS determined that the costs and burdens

imposed by the notice and tagline requirements were "substantially larger than originally

anticipated."  84 Fed. Reg. at 27,857.  The 2016 Rule had estimated that the total cost of

complying with these provisions would be $7.2 million, with expenditures declining to zero after

the first year of implementation notwithstanding covered entities' continuing obligation to

provide the notices on all "significant publications and significant communications."  81 Fed.

Reg. at 31,453, 31,458 (Table 5); 84 Fed. Reg. at 27,875.  HHS ultimately concluded that these

projections were a "gross underestimation" of costs, and that eliminating the requirements would

save approximately $2.9 billion over a five-year period.  See 85 Fed. Reg. at 37,163, 37,224.

In addition, the agency cited reports from covered entities of implementation difficulties,

largely resulting from the many different and overlapping notice and language-access

requirements imposed by federal and state governments.  See id. at 37,211 & n.281 (citing

statutes).  Even when implemented correctly, stakeholders feared that the "repetitive nature" of

the notices "dilute[d] the messages contained in significant communications to the point that

some recipients may be disregarding the information entirely."  Id. at 37,211.  HHS also noted

that high costs often yielded minimal benefit, both because the "vast majority of recipients of

taglines do not require translation services" and because providers were often required to print

taglines in languages that very few individuals spoke.  Id. at 37,233.  In Wyoming, for instance,

health-insurance issuers needed to provide translation notices in Gujarati and Navajo in every

significant communication sent to beneficiaries to account for a combined 79 speakers of those

languages.  Id.  HHS could validly consider these concerns in determining that a new approach

was warranted.  The agency, after all, need not establish that its stated justifications are "better

than the reasons for the old" policy; it suffices that the agency "believes [the new policy] to be

better."  Fox, 556 U.S. at 515.

　　　　Plaintiffs do not address any of these justifications for HHS's change in position, much

less contest their legitimacy.  Instead, they contend that the agency neglected to explain or

sufficiently consider how individuals will become apprised of their health-care rights under

Section 1557, along with the availability of various language-assistance services, without the

notices or taglines.  See Pl. Mot. at 19, 24–25.  As will presently become clear, however, HHS

grappled with the precise considerations that Plaintiffs insist it ignored.  Indeed, it found that

limited evidence of notice and taglines' leading to increased access was a principal reason that

their significant costs and burdens outweighed their far more limited benefits.

　　　　An agency discharges its obligation to "consider an important aspect of the problem"

when it "g[ives] the specific reasons for which it disagree[s]" with the basis for the alleged

problem.  Am. Petroleum Inst. v. EPA, 684 F.3d 1342, 1350 (D.C. Cir. 2012) (citation omitted).

Here, in the 2020 Rule, HHS squarely considered the possibility that "[r]epealing the notice and

taglines requirement may impose costs, such as decreasing access to, and utilization of,

healthcare for non-English speakers."  85 Fed. Reg. at 37,232.  The agency acknowledged a

report from one commenting hospital that had experienced an uptick in requests for translation

services after the 2016 Rule, and it remarked that other entities had documented a similar trend.

Id. at 37,233.  But the agency also cited ample evidence that pointed in the other direction.

Several commenters, including at least one health plan, reported no increase in the number of

callers requesting translation services since the 2016 Rule's promulgation.  Id. at 37,232–33; 84

Fed. Reg. at 27,859.  Another health plan reported lower numbers of requests for translation

services over the same three-month period in 2017 compared to 2016.  See 84 Fed. Reg. at

27,859.

Ultimately, even as it acknowledged the "difference in reports" among commenters, HHS

determined that the evidence, viewed in its entirety, was consistent with the conclusion that the

2016 Rule's notice and tagline requirements "did not appreciably increase the use of translation

services."  85 Fed. Reg. at 37,233.  The agency likewise found that the significant burdens

imposed by the requirements — including their dramatically underestimated cost — were

"disproportionate" to such limited evidence of their potential benefit.  Id.  Notably, the 2020

Rule specifically required covered entities to take "reasonable steps to ensure meaningful access

to [language-access] programs or activities by limited English proficient individuals."  45 C.F.R.

§ 92.101; see also 85 Fed. Reg. at 37,209–10.  HHS simply eliminated the requirement that "all

significant communications contain taglines," which the agency determined, in light of the

evidence, was "unduly broad, sometimes confusing, and inefficient."  85 Fed. Reg. at 37,176

(emphasis added).  "Such cost-benefit analyses epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency."  Office of Communication of United Church of Christ v. FCC, 707 F.2d 1413, 1440 (D.C. Cir. 1983).

In sum, therefore, HHS plainly "acknowledge[d]" the possibility of a reduction in access to health care, Am. Petroleum Inst., 684 F.3d at 1350, and "articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  State Farm, 463 U.S. at 43 (quoting Burlington Truck Lines, 371 U.S. at 168).  The APA requires nothing more.

Plaintiffs also briefly dispute HHS's reasoning on a narrower ground.  Specifically, they home in on the agency's apparent determination that the notice requirements under Section 1557's incorporated statutes would adequately inform individuals of their nondiscrimination rights in the event the additional notices and taglines under Section 1557 were eliminated.  See Pl. Mot. at 19.  As the agency explained, each of the four statutes incorporated into Section 1557 independently requires covered entities to distribute various forms of notice regarding individuals' right to be free from discrimination on the relevant protected ground.  See 85 Fed. Reg. at 37,175–76 & n.61 (citing 45 C.F.R. § 80.6(d) (Title VI); 45 C.F.R. § 84.8 (Section 504); 45 C.F.R. § 86.9 (Title IX); 45 C.F.R. § 91.32 (Age Discrimination Act)).  Those provisions would be unaffected by the repeal of Section 1557's supplementary notice requirements, and, according to HHS, would continue to provide broad notification of patients' nondiscrimination rights.  See id. at 37,204 ("[HHS] is unaware of data suggesting that those regulations have been or are inadequate to their purpose of making individuals aware of their civil rights.").

In response, Plaintiffs claim that HHS never explained how some individuals would learn of such rights in the absence of Section 1557's notices and taglines because "the underlying

[incorporated] statutes . . . may not apply to every health care entity."  Pl. Mot. at 25; see also id. at 19 (asserting vaguely that "not all the underlying statutes apply to every health care provider").  But Plaintiffs make no effort whatsoever to elaborate on that posited coverage cap, either as to its extent or the type of health-care entity that would fall within it.  They simply make tentative declarations that unidentified patients at an unspecified number of facilities "may" not receive affirmative notice of particular protected grounds of nondiscrimination.  On this record, and especially in light of HHS's analysis of the limited benefits of the notice and tagline requirements in relation to their significant burdens, the Court cannot conclude that Plaintiffs have established that HHS "failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency."  State Farm, 463 U.S. at 43.

Finally, in their reply brief, Plaintiffs argue for the first time that HHS "failed to adequately consider regulatory alternatives" to a repeal of the notice and tagline provisions, such as the possibility of issuing guidance clarifying the communications the agency considered to be "significant."  Pl. Reply at 15.  As an initial matter, "district courts . . . generally deem arguments made only in reply briefs to be forfeited."  Pardo-Kronemann v. Donovan, 601 F.3d 599, 610 (D.C. Cir. 2010).  In any event, Plaintiffs appear to be squarely mistaken that HHS "did not consider" such an alternative, see Pl. Reply at 15, as the agency specifically "decline[d] to retain [the notice and tagline] requirements while merely issuing more guidance on what constitute significant communications."  85 Fed. Reg. at 37,176.  Plaintiffs never acknowledge that discussion.

As Plaintiffs have not demonstrated any procedural deficiency in HHS's elimination of the 2016 Rule's notice and tagline requirements, the Court rejects their proposal to enjoin such repeal.

       5.  *Section 1554*

Across their two briefs, the sum total of Plaintiffs' argument that the 2020 Rule violates Section 1554 of the ACA amounts to approximately a single page.  <u>See</u> Pl. Mot. at 26; Pl. Reply at 19–20.  The Court likewise need not spend much time here.

Section 1554 prohibits HHS from promulgating any regulation that, *inter alia*, "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care," "impedes timely access to health care services," or "interferes with communications regarding a full range of treatment options between the patient and the provider."  42 U.S.C. § 18114(1)–(3).  Plaintiffs contend that the 2020 Rule runs afoul of these prohibitions.

Although caselaw construing Section 1554 is extremely sparse, the Court draws guidance from the sole court of appeals decision interpreting the provision.  There, the *en banc* Ninth Circuit explained that "[t]he most natural reading of § 1554 is that Congress intended to ensure that HHS, in implementing the broad authority provided by the ACA, does not improperly impose regulatory burdens on doctors and patients."  <u>California *ex rel.* Becerra v. Azar</u>, 950 F.3d 1067, 1094 (9th Cir. 2020) (*en banc*).  The court rejected the plaintiffs' argument that an HHS regulation implementing various measures designed to ensure that certain funds would not be used to promote abortion services violated Section 1554.  <u>Id.</u> at 1092.  According to the court, because the rule at issue "places no substantive barrier on individuals' ability to obtain appropriate medical care or on doctors' ability to communicate with clients," it "does not

79

implicate § 1554," which prevents only "direct government interference with health care."  Id. at

1094–95.

Plaintiffs provide no reason to depart from this interpretation.  Indeed, they do not

address California at all, despite the fact that Defendants highlighted the case in their brief.  See

Def. Opp. at 32.  Nor do Plaintiffs cite a single case construing Section 1554 or otherwise offer

anything resembling an interpretation of the provision.  Instead, they reference broad assertions

in their declarations that various provisions of the 2020 Rule "invite[] discrimination against

LGBTQ people," "discourage[] them from seeking care in the first instance," and "burden [their]

access to health care."  Pl. Reply at 19–20; see also id. (alleging that 2020 Rule will cause a

"reduction of coverage" and hinder receipt of "health care information").  Plaintiffs, however,

cannot show that the Rule places a "substantive barrier on individuals' ability to obtain

appropriate medical care."  California, 950 F.3d at 1095.  A regulation that does so would itself

affirmatively "impede[]" access to health care and itself "interfere[]" with communications

regarding treatment options; by contrast, the challenged provisions principally reduce regulatory

burdens affecting patients and covered entities.  See 42 U.S.C. § 18114(2)–(3); see also Planned

Parenthood of Md., Inc. v. Azar, No. 20-361, 2020 WL 3893241, at *9–10 (D. Md. July 10,

2020) (holding that regulation violated Section 1554 by requiring insurers to provide two

separate bills for particular services, as opposed to one combined bill, thereby "mak[ing] it

harder for consumers to pay for insurance," and distinguishing California given that direct

imposition of regulatory burden).

To be clear, the Court today need not, and does not, fully embrace California's

interpretation of Section 1554.  It preserves the possibility that a regulation generating

sufficiently severe and demonstrated negative consequences for the "ability of individuals to

80

obtain appropriate medical care" or "timely access to health care services" might violate Section 1554, see 42 U.S.C. § 18114(1)–(2), even if the rule itself does not amount to "direct government interference with health care" by requiring providers or patients to perform or abstain from certain conduct. California, 950 F.3d at 1094. Plaintiffs however, must offer a greater showing of those negative implications than simply broad statements in declarations attesting to alleged future harm at the hands of unnamed providers and insurers, and they must sufficiently tie such harm to the challenged regulation itself. Their inability to do so here prevents their success on the merits.

### 6.  *Constitutional Claims*

The Court's last merits destination is Plaintiffs' four constitutional claims. As a reminder, they contend that the 2020 Rule runs afoul of the Fifth Amendment's guarantees of equal protection and substantive due process, infringes their right to free speech, and violates the Establishment Clause. The reader need not gather her wits again, for very little discussion is warranted. In light of its prior disposition of Plaintiffs' various arbitrary-and-capricious challenges, the Court finds that it need not presently rule on any of these tag-along constitutional claims. This is so, essentially, because resolution of Plaintiffs' APA claims provides them all the relief they seek with respect to the relevant challenged provisions.

### a.  Equal Protection

Start with the equal-protection claim. As Plaintiffs' briefing makes clear, this challenge is premised in whole on HHS's elimination of the 2016 Rule's definition of sex discrimination. According to Plaintiffs, the "[2020] Rule constitutes government action that purports to permit discrimination on the basis of gender identity under Section 1557." Pl. Reply at 21. They focus exclusively on how the Rule "does not simply repeat the text of the statute — it excludes gender

identity and sex stereotyping from Section 1557's protections." Id.; see also Pl. Mot. at 28 (arguing 2020 Rule "carv[es] . . . out" LGBTQ people "from regulatory nondiscrimination protections under Section 1557").  Separately, they contend that HHS violated the Equal Protection Clause because it harbored impermissible discriminatory animus against LGBTQ people.  See Pl. Mot. at 29–31.  But that assertion, once more, rests entirely on the elimination of the 2016 Rule's explicit prohibitions.  See Pl. Reply at 21 (claiming there is "discriminatory animus behind the [2020] Rule's exclusion of LGBTQ people from Section 1557"); Pl. Mot. at 29 ("[T]he exclusion of LGBTQ people from the nondiscrimination protections under Section 1557 is motivated by the Trump administration's and HHS officials' clear animus against LGBTQ people.").

The Court, however, has already found that HHS's repeal of the 2016 Rule's prohibition on discrimination based on sex stereotyping was arbitrary and capricious, and that Plaintiffs lack standing to challenge the elimination of the gender-identity provision.  See supra at 31, 57.  The former disposition will, for the reasons given below, yield an injunction barring enforcement of that repeal.  As a result, the Court need not presently consider an independent constitutional challenge to the same provision that would generate for Plaintiffs no additional relief.  See Damus v. Nielson, 313 F. Supp. 3d 317, 335 (D.D.C. 2018) (declining to address plaintiffs' additional constitutional argument when resolution of APA claim yielded desired injunctive relief); Aracely, R. v. Nielsen, 319 F. Supp. 3d 110, 154 n.29 (D.D.C. 2018) (same).  Indeed, forbearance is all the more warranted in light of the Supreme Court's longstanding instruction that courts "ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable."  Spector Motor Serv. v. McLaughlin, 323 U.S. 101, 105 (1944).

### b.   Substantive Due Process

Plaintiffs' substantive-due-process claim yields the same outcome, as it is once again premised on the "[2020] Rule's elimination of the definition of 'on the basis of sex.'"  Pl. Reply at 22; see also id. (arguing that 2020 Rule "interfere[s] with LGBTQ people's ability to express their identity . . . by inviting discrimination against LGBTQ people," thereby violating substantive due process).  By finding for Plaintiffs on their arbitrary-and-capricious challenge to that repeal, the Court rendered unnecessary any consideration of an alternative ground for enjoining the same agency action.

It bears noting that, although their reply brief appears to limit any substantive-due-process argument to the elimination of the 2016 Rule's sex-discrimination definition, Plaintiffs at times cast their due-process claim as challenging the 2020 Rule as a whole.  See Pl. Mot. at 31 ("The [2020] Rule must be set aside.").  Their exceedingly brief discussion, however, identifies no specifically challenged regulatory action other than the repeal of the 2016 Rule's definition. In any event, the Court's standing and merits dispositions leave only two provisions for potential discussion: the elimination of the 2016 Rule's prohibition on categorical coverage exclusions and notice requirements.  At no point do Plaintiffs suggest that these repeals amount to a substantive-due-process violation.

### c.   Free Speech

Plaintiffs next posit that the 2020 Rule "impermissibly chills LGBTQ patients . . . from being open about their gender identity, transgender status, or sexual orientation and from expressing themselves in a manner consistent with each's gender identity or sexual orientation," in violation of the First Amendment.  See Pl. Mot. at 31.  Although Plaintiffs never point to the specific regulatory provision that causes this alleged "chill[ing]" of expression, their discussion

appears to attribute it to the 2020 Rule's repeal of the prior definition of sex discrimination and incorporation of Title IX's religious exemption. See Pl. Reply at 22 (contending that 2020 Rule "discourages and constrains" expression by "inviting health care discrimination against LGBTQ people"); Pl. Mot. at 32 (similar). Nowhere do Plaintiffs identify any other components of the 2020 Rule that might underlie their free-speech claim. Once again, therefore, because this constitutional challenge is apparently confined to regulatory actions already deemed arbitrary and capricious, the Court need not presently resolve it.

d.   Establishment Clause

Finally, Plaintiffs insist that the 2020 Rule violates the Establishment Clause "because it imposes costs, burdens, and harms on plaintiffs, their members, and patients to facilitate the religious beliefs of objecting providers." Pl. Mot. at 33. Perhaps predictably, this challenge is based entirely on the Rule's incorporation of religious exemptions from Section 1557's nondiscrimination mandate. See id.; Pl. Reply at 22–23. The Court has already found HHS's adoption of Title IX's religious exemption to be arbitrary and capricious, so it need not presently resolve any Establishment Clause challenge regarding that particular regulatory action, for the same reasons previously discussed.

Plaintiffs also appear to take issue with the 2020 Rule's incorporation of "'definitions, exemptions, affirmative rights, or protections' from unrelated statutes." Pl. Mot. at 33 (quoting 45 C.F.R. § 92.6(b)). This vague invocation, however, does not come anywhere close to informing the Court of the precise basis for their constitutional challenge. The cited regulatory provision incorporates protections from more than ten distinct statutes, as well as "any related, successor, or similar Federal laws or regulations." 45 C.F.R. § 92.6(b). Aside from Title IX, Plaintiffs mention none of these laws, let alone explain why incorporation of their various rights

or protections violates the Establishment Clause.  The Court declines to analyze the merits of a

claim Plaintiffs have not coherently pressed.

    B.  Irreparable Harm

    Although the first prong of the preliminary-injunction test consumed no small amount of

ink, the next one is not nearly as prolix.  It asks whether Plaintiffs are "likely to suffer irreparable

harm in the absence of preliminary relief."  Winter, 555 U.S. at 20.  Since the Court has

determined that they are likely to succeed on their challenges to HHS's repeal of the 2016 Rule's

definition of sex discrimination and incorporation of Title IX's religious exemption, it need only

consider irreparable harm with respect to those two claims.  The Court finds that the health-

provider Plaintiffs have made the requisite showing as to each.

    "To demonstrate irreparable injury, a plaintiff must show that it will suffer harm that is

'more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff.'"

Hi-Tech Pharmacal Co. v. FDA, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (quoting Gulf Oil Corp. v.

Dep't of Energy, 514 F. Supp. 1019, 1026 (D.D.C. 1981)).  In other words, the harm must be

"both certain and great; it must be actual and not theoretical," and of a nature "of such

imminence that there is a clear and present need for equitable relief to prevent irreparable

harm."  Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985) (quotation marks and

emphasis omitted).  In addition, the harm "must be beyond remediation."  Chaplaincy of Full

Gospel Churches, 454 F.3d at 297.

    Here, there is little question that the health-provider Plaintiffs have shown they will suffer

some harm.  As the D.C. Circuit has confirmed, "[O]bstacles" that "unquestionably make it more

difficult for [an organization] to accomplish [its] primary mission . . . provide injury for purposes

both of standing and irreparable harm."  League of Women Voters, 838 F.3d at 9 (emphasis

added); see also Open Communities All. v. Carson, 286 F. Supp. 3d 148, 177 (D.D.C. 2017)
(same).  As the Court has already determined, see supra at 28–29, 34, elimination of the 2016
Rule's sex-discrimination definition and incorporation of Title IX's religious exemption will
likely "perceptibly impair[]" the health-provider Plaintiffs' "ability to provide services." Food &
Water Watch, 808 F.3d at 919.

With harm having been established, the Court may move to the principal issues in
assessing the irreparability of Plaintiffs' injuries — namely, the harm's extent and remediability.
The health-provider Plaintiffs have demonstrated that they will likely experience an array of
financial and operational burdens as a result of the two regulatory actions at issue.  As a
reminder, they have shown that the 2020 Rule will lead to a significant increase in demand for
their health-care services from LGBTQ patients who fear discrimination at the hands of external
providers.  See Bolan Decl., ¶¶ 11, 13, 18; Shafi Decl., ¶ 34; Henn Decl., ¶¶ 19, 29.  It "will
demand organizational resources" to service this increased patient population, as care does not
pay for itself.  Dist. of Columbia, 444 F. Supp. 3d at 41.  In addition, the health-provider
Plaintiffs will be forced to provide increasingly difficult treatment for LGBTQ patients who
arrive with more acute conditions, either because they refrain from being fully transparent with
their external providers given their heightened fears of discrimination, or because such
apprehension causes them to delay seeking necessary care entirely.  See Bolan Decl., ¶¶ 11, 17;
Shafi Decl., ¶ 21; Salcedo Decl., ¶ 33; Cummings Decl., ¶ 16; Carpenter Decl., ¶ 20.

Whitman-Walker, for instance, explains that many of its health-care services currently
lose money, and the "pressure" on those services will be "exacerbate[d]" by an influx of new
clients.  See Shafi Decl., ¶¶ 34–35; see also id., ¶ 34 (questioning Whitman-Walker's ability to
"sustain the additional financial burdens resulting from an increased load of patients").  The

delayed provision of care — from either increased demand or patients' deferring such care and arriving with worsened conditions — will "strain Whitman-Walker's resources," "increase costs," and "make it harder for [its] health care providers to treat the patients."  Henn Decl., ¶¶ 21, 29.  For its own part, LA LGBT asserts that the 2020 Rule "makes it difficult, if not impossible, for the Center to continue providing the same level of social, mental, and physical health care to its patients."  Cummings Decl., ¶ 33; see also Carpenter Decl., ¶ 16 (describing how "increase in demand . . . will limit my ability to provide adequate care and time to my patients" and may worsen outcomes); Cummings Decl., ¶ 20 (explaining how "increased demand" will cause "financial strains on the Center").  As the Court has already shown, see supra at 26, these harms are far from "speculative."  Def. Opp. at 42.  And they will "be serious in terms of [their] effect[s] on [Plaintiffs],'" jeopardizing their ability to treat all patients who turn to their organizations for urgent health-care needs.  See Hi-Tech Pharmacal Co., 587 F. Supp. 2d at 11 (quoting Gulf Oil Corp., 514 F. Supp. at 1026).

Beyond these injuries, the health-provider Plaintiffs have also pointed to other ways in which they will "expend[] resources 'in response to, and to counteract, the effects of the [2020 Rule].'"  PETA II, 797 F.3d at 1097 (quoting Equal Rights Ctr., 633 F.3d at 1140).  It is well established that even resources "expend[ed] . . . to educate [an organization's] members and others" qualifies as injury where "doing so subjects the organization to 'operational costs beyond those normally expended.'"  Food & Water Watch, 808 F.3d at 920 (quoting Nat'l Taxpayers Union, 68 F.3d at 1434); see also Nat'l Ass'n of Home Builders v. EPA, 667 F.3d 6, 12 (D.C. Cir. 2011).

That is exactly what will occur here, as the health-provider Plaintiffs will "need to devote more resources to working with outside providers and organizations to remind them of the

importance of providing health care to all patients on nondiscriminatory terms." Shafi Decl.,

¶ 37 (emphasis added); see also id. (citing plans to "increase [Whitman-Walker's] education

programs and community outreach" to deal with effects of 2020 Rule). LA LGBT has cited

"confusion and panic created by the [2020] Rule" as leading it to "already . . . expend additional

resources educating its clients and staff about their rights," and it intends to continue doing so.

See Cummings Decl., ¶¶ 9, 14 (emphasis added); Dist. of Columbia, 444 F. Supp. 3d at 41

(crediting similar allegations of need to expend resources on "outreach" and "education"

regarding agency action). It likewise intends to host informational sessions about how the Rule

will affect patients and LA LGBT's services, which will force the organization "to divert

resources away from other programming." Cummings Decl., ¶ 26. These expenditures will

further burden budgets that are already severely strained, subjecting the health-provider Plaintiffs

to additional operational expenses. See Shafi Decl., ¶ 36–37; Cummings Decl., ¶ 8.

Courts routinely find irreparable harm based on similar allegations of future injury. See

Open Communities All., 286 F. Supp. 3d at 178 (irreparable harm where agency action

threatened to "frustrate[]" organization's mission, and where organization stated intention to

counteract action by spending resources on outreach, public education, and advocacy); Dist. of

Columbia, 444 F. Supp. 3d at 40–42 (irreparable harm where organization alleged that agency

action would cause individuals to "turn to [its] food assistance program, increasing demand and

forcing [organization] to divert resources"); E. Bay Sanctuary Covenant v. Trump, 354 F. Supp.

3d 1094, 1109, 1116 (N.D. Cal. 2018) (irreparable harm when organization "experienced

difficulty implementing its programs" and expended resources to counteract agency action); see

also League of Women Voters, 838 F.3d at 9 (irreparable harm when challenged action "ma[de]

it more difficult for [organizations] to accomplish their primary mission of registering voters").

The plentiful evidence indicating that Plaintiffs will suffer their alleged harms renders this case far afield from John Doe Company v. CFPB, 849 F.3d 1129 (D.C. Cir. 2017), cited by Defendants, where the plaintiff simply asserted it would suffer economic harm in conclusory fashion "unaccompanied by any relevant declarations." Id. at 1134 (emphasis added); see Def. Opp. at 42. Because of the significant financial and operational harms the health-provider Plaintiffs will suffer on account of the 2020 Rule — and the consequent, well-established threat to their ability to deliver timely and effective care to their patients — the Court finds that their asserted injuries clear the irreparable-harm threshold.

In response, Defendants primarily insist that the health-provider Plaintiffs cannot demonstrate irreparable injury through economic harm unless such harm "threaten[s]" the "'very existence' of [their] business." Def. Surreply at 13 (quoting Soundboard Assn. v. U.S. Fed. Trade Comm'n, 254 F. Supp. 3d 7, 13 (D.D.C. 2017)); Def. Opp. at 42. Defendants are correct that while "economic loss does not, in and of itself, constitute irreparable harm," such loss may be sufficient where it "threatens the very existence of the movant's business." Wis. Gas. Co., 758 F.2d at 674. But that is not the entire story. As particularly relevant here, courts in this district have suggested that a lesser showing is permissible when the economic injury at issue is unrecoverable. Specifically, "where economic loss will be unrecoverable, such as in a case against a Government defendant where sovereign immunity will bar recovery, economic loss can be irreparable" even if it would not wipe the business out. Everglades Harvesting & Hauling, Inc. v. Scalia, 427 F. Supp. 3d 101, 115 (D.D.C. 2019); see also Dist. of Columbia, 444 F. Supp. 3d at 37 n.25 (deeming "existential harm requirement" inapplicable to unrecoverable economic harm) (citing Open Communities All., 286 F. Supp. 3d at 178); Texas Children's Hospital v. Burwell, 76 F. Supp. 3d 224, 242–44 (D.D.C. 2014). Other jurisdictions have adopted similar

approaches.  See Chamber of Commerce v. Edmondson, 594 F.3d 742, 770–71 (10th Cir. 2010)

("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign

immunity constitutes irreparable injury."); Iowa Utilities Bd. v. FCC, 109 F.3d 418, 426 (8th Cir.

1996) ("The threat of unrecoverable economic loss, however, does qualify as irreparable harm.").

      Overlooking this line of authority, Defendants rely on but a single case — National

Mining Association v. Jackson, 768 F. Supp. 2d 34 (D.D.C. 2011) — for the proposition that

unrecoverable monetary damages are irreparable only if they threaten a business's existence.

See Def. Opp. at 42.  Yet they never quote from the decision, and it is clear why: nothing

contained within it stands for their asserted principle.  On the contrary, National Mining

Association states that "if a movant seeking a preliminary injunction 'will be unable to sue to

recover any monetary damages against' a government agency in the future because of, among

other things, sovereign immunity, financial loss can constitute irreparable injury."  768 F. Supp.

2d at 52 (quoting Brendsel v. Office of Fed. Hous. Enter. Oversight, 339 F. Supp. 2d 52, 66–67

(D.D.C. 2004)); see also Texas Children's Hospital, 76 F. Supp. 3d at 242–44 (citing National

Mining Association before concluding that unrecoverable economic harm was irreparable even

though it "would not drive plaintiffs out of business") (emphasis added); Everglades Harvesting

& Hauling, 427 F. Supp. 3d at 116 (finding irreparable harm from "unrecoverable" projected

losses, even if they "do not sink these small businesses").  The court went on to suggest that

other factors may prevent non-existential economic losses from rising to the level of irreparable

harm, but nonetheless concluded that "[i]f a plaintiff has shown that financial losses are certain,

imminent, and unrecoverable, then the imposition of a preliminary injunction is appropriate and

necessary."  Nat'l Mining Ass'n, 768 F. Supp. 2d at 52–53; see also Texas Children's Hospital,

76 F. Supp. 3d at 242 (similar).  Here, the health-provider Plaintiffs check all three boxes.

As an initial matter, their injuries are unrecoverable because the present suit arises under the APA, which does not allow for recovery of monetary damages.  See 5 U.S.C. § 702 (providing for relief "other than money damages"); E. Bay Sanctuary Covenant v. Barr, 964 F.3d 832, 854 (9th Cir. 2020) ("In the APA context, economic harms may be irreparable because plaintiffs are otherwise unable to recover monetary damages."); Open Communities All., 286 F. Supp. 3d at 178 (concluding that plaintiff need not show existential threat to business because its "monetary losses . . . are not recoverable, as the APA provides no damages remedy"). Defendants, moreover, have at no point suggested any waiver of sovereign immunity that might enable recovery of monetary damages from HHS.  See Dist. of Columbia, 444 F. Supp. 3d at 34 (explaining that "economic injury caused by federal agency action is unrecoverable because the APA's waiver of sovereign immunity does not extend to damages claims"); Everglades Harvesting & Hauling, 427 F. Supp. 3d at 115 (similar).  In addition, as previously discussed, Plaintiffs' financial losses are "certain" and "imminent."  Nat'l Mining Ass'n, 768 F. Supp. 2d at 53.  The Court also does not turn a blind eye to the reality that here, "economic loss" is not simply "loss of profit"; rather, it means "reducing [health-care] services" to patients, many of whom are indigent.  See Texas Children's Hospital, 76 F. Supp. 3d at 243–44.

Concluding that Plaintiffs need not show a threat to their very existence in order to establish irreparable harm, of course, does not excuse them from their obligation to show that future economic injury will be "certain," "great," and "actual."  Wis. Gas Co., 758 F.2d at 674. The Court readily acknowledges that "[a] prospective injury that is sufficient to establish standing . . . does not necessarily satisfy the more demanding burden of demonstrating irreparable injury."  Cal. Ass'n of Private Postsecondary Schs. v. DeVos, 344 F. Supp. 3d 158, 170 (D.D.C. 2018).  Here, however, for the reasons explained above, the health-provider

Plaintiffs' unrecoverable future harm is of such a degree, severity, and "imminence that there is a clear and present need for equitable relief to prevent" it.  Wis. Gas Co., 758 F.2d at 674.

As a final coda, the Court briefly notes that the preliminary injunction recently issued by the Eastern District of New York does not alter this result.  See Walker, 2020 WL 4749859, at *10.  That injunction barred HHS from carrying out its repeal of the relevant provisions of the 2016 Rule's sex-discrimination definition.  Id.  This state of affairs thus raises potential questions as to whether Plaintiffs can still demonstrate irreparable harm regarding sex stereotyping in the absence of a similar order here.  In other words, if that provision of the Rule is already enjoined, where is the pressing injury?  While it is true that HHS cannot eliminate the Rule's explicit prohibition on sex stereotyping today, circumstances may well be different tomorrow.  This Court, after all, has no "power over or knowledge of whether and, if so, when" Walker's preliminary injunction "will be lifted or modified."  Cook Cty. v. McAleenan, 417 F. Supp. 3d 1008, 1030 (N.D. Ill. 2019).  Indeed, "[e]ven a temporary lag between the lifting" of that injunction (or restriction of its geographic scope) and entry of an injunction by this Court would likely "entail some irreparable harm" to Plaintiffs.  Id.

For these reasons, courts routinely grant follow-on injunctions against the Government, even in instances when an earlier nationwide injunction has already provided plaintiffs in the later action with their desired relief.  See, e.g., California v. HHS, 390 F. Supp. 3d 1061, 1065–66 (N.D. Cal. 2019) (issuing nationwide injunction, even though another court had already ordered same relief, because "the existence of another injunction — particularly one in a different circuit that could be overturned or limited at any time — does not negate [plaintiff's] claimed irreparable harm"); Mayor & City Council of Baltimore v. Azar, 392 F. Supp. 3d 602, 618–19 (D. Md. 2019) (ordering "overlapping" injunction even though nationwide injunction

had been issued in earlier case, and rejecting argument that there was no irreparable harm);
Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 435 (E.D.N.Y. 2018), vacated in part and rev'd in
part on other grounds, Regents of the Univ. of California, 140 S. Ct. 1891 (granting injunction
notwithstanding prior nationwide injunction because prior injunction could be lifted, and noting
that Government "cite[s] no authority for the proposition that Plaintiffs cannot establish
irreparable harm simply because another court has already enjoined the same challenged
action").

The Court acknowledges that other courts have taken different approaches. Some, for
instance, have entered discretionary stays or otherwise denied preliminary-injunction motions
upon the issuance of a nationwide injunction granting relief similar to what plaintiffs in the later
suit sought. See Pars Equality Ctr. v. Trump, No. 17-255, slip op. at 6–7 (D.D.C. Mar. 2, 2018);
Washington v. Trump, No. 17-0141, 2017 WL 4857088, at *6 (W.D. Wash. Oct. 27, 2017).
Recognizing that "overlapping injunctions appear to be a common outcome of parallel
litigation," however, the Court finds that Plaintiffs have established irreparable harm on their
sex-discrimination-definition claim notwithstanding the injunction in Walker. See California,
390 F. Supp. 3d at 1065. The Court declines to forbear when neither party has asked it to do so,
and when the relevant out-of-circuit injunction could be stayed, modified, or otherwise vacated
at any time.

### C. Balance of Equities and Public Interest

Having established a likelihood of success on the merits and irreparable harm, Plaintiffs
must finally demonstrate "that the balance of equities tips in [their] favor," and that "an
injunction is in the public interest." Sherley, 644 F.3d at 392 (quoting Winter, 555 U.S. at 20).
These last two prongs — which "merge when the Government is the opposing party," FBME

Bank Ltd. v. Lew, 125 F. Supp. 3d 109, 127 (D.D.C. 2015) (quoting Nken v. Holder, 556 U.S.

418, 435 (2009)) — pose no serious obstacle to Plaintiffs' request for a preliminary injunction.

The health-provider Plaintiffs have shown that they will suffer significant financial and

programmatic harm as a result of HHS's repeal of the 2016 Rule's sex-discrimination definition

and its incorporation of Title IX's religious exemption.  These irreparable injuries, which the

Court need not belabor again here, will impair Plaintiffs' public-health programs and cause them

to divert already scarce resources to counteract the 2020 Rule's effects.  In addition, denying an

injunction would impede the public interest by threatening the health of LGBTQ individuals at

large, some of whom will likely develop increasingly acute conditions on account of their

delaying necessary care or refraining from transparent communication with providers out of fear

of discrimination.  There is clearly a robust public interest in safeguarding prompt access to

health care.  See New York v. DHS, Nos. 19-3591, 19-3595, 2020 WL 4457951, at *31 (2d Cir.

Aug. 4, 2020) (finding that public interest favored preliminary injunction where agency action

would likely result in worse health outcomes); California v. Azar, 911 F.3d 558, 582 (9th Cir.

2018) (similar).  The COVID-19 pandemic only reinforces the importance of that public interest

and the concomitant need to ensure the availability and provision of care on a nondiscriminatory

basis.

On the other side of the ledger, Defendants emphasize the harm to an agency if a court

enjoins it "from effectuating statutes enacted" by Congress.  See Def. Opp. at 43 (quoting

Maryland v. King, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers)).  But "[t]here is generally

no public interest in the perpetuation of unlawful agency action."  League of Women Voters, 838

F.3d at 12.  "To the contrary, there is a substantial public interest 'in having governmental

agencies abide by the federal laws that govern their existence and operations.'"  Id. (quoting

94

Washington v. Reno, 35 F.3d 1093, 1103 (6th Cir. 1994)); see also N. Mariana Islands v. United States, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA."). HHS cannot invoke the public interest as being in favor of its actions when it promulgated the two relevant provisions in disregard of the APA's procedural mandates.

In addition, although Defendants cite the 2016 Rule's "substantial costs," Def. Opp. at 43, they fail to trace any to the two regulatory actions at issue here, as opposed to more likely subjects such as the prior Rule's notice and tagline provisions. Defendants separately claim that the 2016 Rule "failed to protect religious interests" and "interfered with . . . medical and ethical judgment." Id. Yet nothing in this Court's Order affects the application of RFRA — which the 2020 Rule made clear applies in full to Section 1557, see 45 C.F.R. § 92.6(b) — or any of the additional religious protections previously discussed. As these asserted harms do not outweigh those of Plaintiffs, the Court finds that the balance of equities tips in Plaintiffs' favor, and that an injunction is in the public interest.

## V.   Remedy

Having found that Plaintiffs are entitled to an injunction — at least as to the sex-stereotyping and religious-exemption issues — the Court now turns to its scope. Both Circuit precedent and the need to provide Plaintiffs complete relief confirm that a nationwide injunction is the appropriate remedy here.

"Once invoked, the scope of a district court's equitable powers . . . is broad, for breadth and flexibility are inherent in equitable remedies." Brown v. Plata, 563 U.S. 493, 538 (2011) (citation and internal quotation marks omitted). The D.C. Circuit has confirmed that the "broad discretion" district courts enjoy when awarding equitable relief includes the authority to issue

nationwide injunctions.  Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs, 145 F.3d 1399,

1408–09 (D.C. Cir. 1998).  In National Mining Association, the court of appeals explained that

"[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is

that the rules are vacated — not that their application to the individual petitioners is proscribed."

Id. at 1409 (alteration in original) (quoting Harmon v. Thornburgh, 878 F.2d 484, 495 n.21 (D.C.

Cir. 1989)).  That is, upon demonstrating the illegality of an agency action of general

applicability, "a single plaintiff, so long as he is injured by the rule, may obtain 'programmatic'

relief that affects the rights of parties not before the court."  Id. (quoting Lujan v. Nat'l Wildlife

Fed'n, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting)).  With these principles in mind, the

D.C. Circuit affirmed the district court's nationwide injunction and rejected the agencies'

argument that the injunctive relief should have extended only to the named plaintiffs.  Id. at

1408–09.

The APA itself points in the same direction, providing clear instruction for what courts

must do if they find that agency action is "arbitrary" or "capricious" — namely, "hold unlawful

and set aside" the defective action.  See 5 U.S.C. § 706(2); see also United Steel v. Mine Safety

& Health Admin., 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate

unlawful agency action.") (citing 5 U.S.C. § 706(2)); Innovation Law Lab v. Wolf, 951 F.3d

1073, 1094 (9th Cir. 2020) (describing "presumption . . . in APA cases that the offending agency

action should be set aside in its entirety rather than only in limited geographical areas").

This binding authority confirms the propriety of nationwide injunctions in APA cases

where the challenged policy is found to be arbitrary and capricious or otherwise facially

unlawful.  Other courts in this district have recognized the same, leveraging the above reasoning

and enjoining improper agency action on a nationwide basis.  See, e.g., Dist. of Columbia, 444 F.

Supp. 3d at 47–49; <u>Make the Road New York v. McAleenan</u>, 405 F. Supp. 3d 1, 67–72 (D.D.C.

2019), <u>rev'd on other grounds sub nom.</u> <u>Make the Road New York v. Wolf</u>, 962 F.3d 612 (D.C.

Cir. 2020); <u>Doe v. Rumsfeld</u>, 341 F. Supp. 2d 1, 17–19 (D.D.C. 2004); <u>Am. Lands All. v.</u>

<u>Norton</u>, No. 00-2339, 2004 WL 3246687, at *3 (D.D.C. June 2, 2004); <u>see also</u> <u>Planned</u>

<u>Parenthood Fed'n of Am., Inc. v. Heckler</u>, 712 F.2d 650, 651 (D.C. Cir. 1983) (affirming

injunction prohibiting enforcement of federal regulations).

 Ignoring this line of precedent entirely, Defendants briefly suggest that nationwide

injunctions are historically dubious and are at odds with "traditional equitable practice."  Def.

Opp. at 43 (quoting <u>DHS v. New York</u>, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring in

the grant of stay)).  Whether or not this history is right, <u>see</u> Mila Sohoni, <u>The Lost History of the</u>

<u>"Universal" Injunction</u>, 133 Harv. L. Rev. 920 (2020), Defendants do not cite a single binding

precedent applying any such "established principles" to overturn or otherwise "narrow injunctive

relief under the APA."  <u>Dist. of Columbia</u>, 444 F. Supp. 3d at 48.  On the contrary, as just

explained, the D.C. Circuit has expressly endorsed nationwide injunctions in this context.

 Defendants also contend that any relief ordered by this Court "should extend only to the

named plaintiffs," Def. Opp. at 43, and that "injunctive relief should be no more burdensome to

the defendant than necessary to provide complete relief to the plaintiffs."  <u>Id.</u> at 43 (quoting

<u>Madsen v. Women's Health Ctr., Inc.</u>, 512 U.S. 753, 765 (1994)).  But the "scope of injunctive

relief is dictated by the extent of the violation established."  <u>Califano v. Yamasaki</u>, 442 U.S. 682,

702 (1979).  In fact, Defendants completely overlook the reality that their proposed remedy —

an injunction that "extend[s] only to the named plaintiffs," Def. Opp. at 43 — would not provide

Plaintiffs with <u>any</u> meaningful relief, let alone "complete relief."  <u>Califano</u>, 442 U.S. at 702.

That is because their asserted harms, as discussed at length above, derive largely from the effects

of the 2020 Rule on third-party LGBTQ patients.  The reader well knows by now the relevant

chain of events: the 2020 Rule's elimination of explicit sex-discrimination prohibitions and

incorporation of Title IX's religious exemption instill in LGBTQ patients a fear of discrimination

at the hands of external providers, thereby causing the health-provider Plaintiffs to suffer the

significant financial and operational consequences of heightened demand and patients' arriving

with increasingly acute conditions.  Because these Plaintiffs' harms stem most immediately from

the foreseeable responses of third parties to the 2020 Rule — rather than from any direct

imposition of regulatory burden — an order barring enforcement of the Rule solely as to

themselves would not remedy their injuries.  Complete relief will only obtain upon an injunction

with a broader sweep — one that reinstates the relevant provisions of the 2016 Rule as applied to

all covered entities, a remedy that will mitigate the fears of LGBTQ patients and in turn alleviate

the health-provider Plaintiffs' consequent harms.

In addition, although Defendants never specifically request an injunction limited in

geographic scope, the Court notes that any such restriction on the applicability of its order would

impair the provision of complete relief to Plaintiffs.  Although Whitman-Walker is based in

Washington, D.C., it delivers health-care services not only to locals, but also to people from

Maryland, Virginia, Pennsylvania, West Virginia, and Delaware.  See Shafi Decl., ¶ 4.  LA

LGBT, meanwhile, reports that many of its patients come from various parts of California, other

states, and even other countries.  See Cummings Decl., ¶ 4; Bolan Decl., ¶ 5.  Many of the out-

of-state individuals who seek the Center's services do so specifically out of fear of

discrimination from local providers, and the organization reasonably expects these numbers only

to increase.  See Cummings Decl., ¶ 5.  Just as an injunction limited to the health-provider

Plaintiffs would be futile to remediate their injuries, neither will one restricted in scope to their immediate locales provide them full relief.

Indeed, to the extent similarly situated LGBTQ-affirming health-care providers across the country experience comparable harms as a result of the 2020 Rule, nationwide relief becomes all the more appropriate.  See Dist. of Columbia, 444 F. Supp. 3d at 51 (ordering nationwide injunction in part "because the burdens that would fall on the plaintiffs upon the Final Rule's implementation would also fall on those similarly situated").  There is no reason to believe — and nowhere do Defendants suggest — that the financial, programmatic, and operational injuries claimed by the health-provider Plaintiffs will be unique to them.  Rather, the consequences of increased demand and patients' arriving with more acute conditions threaten the activities of all organizations that subscribe to a similar LGBTQ-affirming mission.

In rendering such a decision, the Court does not discount Defendants' general concern that nationwide relief may truncate the process by which legal challenges percolate through various jurisdictions in the federal court system.  See Def. Opp. at 44.  These concerns are significantly tempered here, though, by the fact that two district courts in other jurisdictions have already issued opinions on preliminary-injunction motions raising similar challenges to the 2020 Rule.  See Walker, No. 20-2834 (E.D.N.Y. 2020); Washington, No. 20-1105 (W.D. Wash. 2020).  Nothing in this Court's Order, moreover, prevents other courts from tackling these same issues — much like the injunction in Walker did not bar this Court from considering Plaintiffs' challenge to the repeal of the 2016 Rule's sex-discrimination definition.  See also supra at 92–93 (citing instances of courts' issuing follow-on injunctions when other courts had previously ordered nationwide relief).  In addition, Defendants' reservations ignore the D.C. Circuit's explicit instruction that unlawful agency regulations are ordinarily vacated universally, not

simply enjoined in application solely to the individual plaintiffs.  Nat'l Mining Ass'n, 145 F.3d at 1409.

While the Court rejects Defendants' arguments against nationwide relief, so, too, does it decline Plaintiffs' sweeping invitation to enjoin the 2020 Rule "in its entirety."  Pl. Mot. at 44 (capitalization altered).  Plaintiffs believe that the rule is "so infected" that "there is no point in enjoining it on a piecemeal basis," and that HHS's failure to consider the Supreme Court's decision in Bostock "is indicative of the lack of reasoned decision-making that permeates the entire Revised Rule."  Id.  Such a holding would, of course, undo much of the analysis the Court has performed in this doorstop of an Opinion.  As explained at length above, aside from the two provisions the Court enjoins, Plaintiffs have not demonstrated that any other component of the 2020 Rule was insufficiently reasoned (or that they have standing to assail it).  Nowhere, moreover, do they explain how the agency's non-consideration of Bostock infects any of the Rule's numerous provisions — the majority of which Plaintiffs do not even mention, let alone challenge — other than the repeal of the 2016 Rule's sex-discrimination definition.  See 85 Fed. Reg. at 37,243–48 (reproducing 2020 Rule's amendments in full).  In addition, and unacknowledged by Plaintiffs, the 2020 Rule retains a severability clause.  See 45 C.F.R. § 92.3(d).  They never suggest that the extensive remainder of the 2020 Rule cannot "function sensibly" without the two discrete provisions the Court enjoins.  MD/DC/DE Broads. Ass'n v. FCC, 236 F.3d 13, 23 (D.C. Cir. 2001).

At the end of the day, the Court finds an injunction of nationwide scope to be the appropriate remedy here.  Such injunction will be limited to the two challenges for which Plaintiffs have demonstrated a likelihood of success on the merits — the 2020 Rule's repeal of the prior Rule's explicit prohibition on discrimination based on sex stereotyping, and the 2020

Rule's incorporation of Title IX's religious exemption.  This ruling as to the former tracks in part

the order of the Eastern District of New York in <u>Walker</u>, which enjoined HHS from enforcing

the repeal "of the 2016 definition of discrimination on the basis of sex."  <u>Walker</u>, 2020 WL

4749859, at *10.  The injunction here, as discussed above, applies only to the repeal of the 2016

Rule's definition insofar as it included "sex stereotyping," as Plaintiffs lack standing to challenge

the repeal of the previously vacated prohibition on "gender identity" discrimination.  As to Title

IX's religious exemption, however, this injunction is the first to issue.

**VI.     Conclusion**

The Court, accordingly, will grant in part and deny in part Plaintiffs' Motion for a

Preliminary Injunction or, in the Alternative, a Stay Pending Judicial Review.  HHS will be

preliminarily enjoined from enforcing the repeal of the 2016 Rule's definition of discrimination

"[o]n the basis of sex" insofar as it includes "discrimination on the basis of . . . sex stereotyping."

81 Fed. Reg. at 31,467.  In addition, the agency will be preliminarily enjoined from enforcing its

incorporation of the religious exemption contained in Title IX.  <u>See</u> 45 C.F.R. § 92.6(b).

Plaintiffs' Motion will be denied in all other respects.  A separate Order so stating will issue this

day.


*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  <u>September 2, 2020</u>