**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| WHITMAN-WALKER CLINIC, INC., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:20-cv-01630-JEB |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS
PLAINTIFFS' COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 1

I.    Plaintiffs Have Failed to Establish Standing to Press Ripe Claims and Those
Claims Should be Dismissed Under Rule 12(b)(1) ................................................................ 1

    A.    Plaintiffs Lack Standing to Press Ripe Claims ........................................... 1

        1.    Legal Standards for enforcement of Section 1557 violations .................... 1

        2.    Scope of entities subject to Section 1557 .................................................... 3

        3.    Discrimination on the basis of association and HHS's decision to
make conforming modifications to other HHS regulations ........................ 9

    B.    Plaintiffs' Challenges to HHS's Decision not to Define "On the Basis of
Sex" and Several of HHS's Other Decisions are Not Ripe for Review ............... 10

II.    Many of Plaintiffs' Claims Should be Dismissed Under Rule 12(b)(6) .......................... 14

    A.    Plaintiffs' Claims that HHS's Policies in the 2020 Rule are Contrary to
Law Fail as a Matter of Law ................................................................. 14

        1.    Plaintiffs' claims that HHS acted contrary to law by not including
an explicit prohibition on categorical coverage exclusions and
eliminating certain notice requirements ..................................................... 14

        2.    Plaintiffs' claims that anything in the 2020 Rule violates Section
1554 ............................................................................................................. 14

        3.    The 2020 Rule reasonably construes the scope of Section 1557 ............. 15

        4.    The 2020 Rule's return to enforcement mechanisms separately
available under the civil rights statutes incorporated into Section
1557 does not violate the APA ................................................................. 19

        5.    HHS's decision to take no position by rule on whether Section
1557 encompasses discrimination on the basis of association does
not violate the APA .................................................................................... 21

        6.    HHS's decision to make conforming modifications to other
regulations is not substantively contrary to law ....................................... 22

B.    Plaintiffs' Constitutional Claims Fail as a Matter of Law ................................... 22

    1.    Equal Protection ..................................................................... 22

    2.    Substantive Due Process ....................................................... 24

    3.    Free Speech ........................................................................... 22

    4.    Establishment Clause ............................................................ 25

CONCLUSION ................................................................................................ 25

## INTRODUCTION

In its prior opinion granting in part and denying in part Plaintiffs' Motion for Preliminary Injunction, this Court found that Plaintiffs likely lack standing to raise or are not likely to succeed on the merits of several of their claims. *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, --- F. Supp. 3d ---, No. CV 20-1630 (JEB), 2020 WL 5232076 (D.D.C. Sept. 2, 2020). For reasons similar to those addressed by the Court in that opinion, Defendants moved to dismiss these claims under Rule 12(b)(1) and 12(b)(6). ECF No. 57.

As many of Plaintiffs' alleged injuries are "riddled with contingencies and speculation that impede judicial review," *see Trump v. New York*, 141 S. Ct. 530, 535 (2020), Plaintiffs try to support their standing by invoking interests like educating the public about the implications of the challenged rule, or asserting that the rule might some day make it more difficult for them to help individuals remedy discrimination. But "to find standing based upon [these] kind[s] of interest[s] 'would significantly alter the allocation of power at the national level, with a shift away from a democratic form of government.'" *Carney v. Adams*, 141 S. Ct. 493, 499 (2020) (quoting *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring)). Accordingly, many of Plaintiffs' claims should be dismissed for lack of jurisdiction.

On the merits, Defendants agree that some of Plaintiffs' arbitrary and capricious claims, as reframed or further clarified in their opposition, should await summary judgment briefing on the administrative record. But Plaintiffs have failed to overcome Defendants' arguments that other claims should be dismissed under Rule 12(b)(6).

## ARGUMENT

### I. PLAINTIFFS HAVE FAILED TO ESTABLISH STANDING TO PRESS RIPE CLAIMS AND THOSE CLAIMS SHOULD BE DISMISSED UNDER RULE 12(b)(1)

#### A. Plaintiffs Lack Standing to Press Ripe Claims

#### 1. Legal standards for enforcement of Section 1557 violations

Plaintiffs lack standing to challenge the 2020 Rule's provisions related to what Plaintiffs collectively refer to as "enforcement mechanisms." *See* ECF No. 57-1 at 5-9, ECF No. 66 at 14.

Lumping various policies together, Plaintiffs assert that they have standing because they intend to expend resources for "community education" and "educating [their] clients and staff about their rights and available remedies." ECF No. 66 at 14-16. But there is a vital difference between an obstacle to the provision of services to individuals, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982), and a mere interest in an issue, *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). Courts have resisted the notion that organizations suffer an injury when they allege that government action has affected advocacy or education. *See Keep Chi. Livable v. City of Chi.*, 913 F.3d 618, 625 (7th Cir. 2019); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015); *Ctr. For Law and Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005).

In *Food and Water Watch*, an organization declared that permitting a regulation "to go into effect" would mean that it "would have to increase the resources that it spends on educating the general public and its members" about its implication. 808 F.3d at 920 (citation omitted). But this kind of intent-to-educate-in-light-of-the-policy-change based harm is "no more than an abstract injury to [an organization's] interests." *See Food & Water Watch, Inc.*, 808 F.3d at 920, 921; *see also Keep Chi. Livable v. Chicago*, 913 F.3d 618 (7th Cir. 2019) (same).

Plaintiffs' reliance on *Action Alliance of Senior Citizens of Greater Philadelphia v. Hecker*, 789 F.2d 931, 937–38 (D.C. Cir. 1986) is misplaced. *See* ECF No. 66 at 15. That case, like its more recent variant, *PETA v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015), involved an organization's challenge to an agency policy that affected the organization's access to information it needed to fulfill its educational mission—it notably did not involve only an intent to educate or advocate more in light of that policy. 789 F.2d at 935. More specifically, the plaintiff claimed that certain regulations HHS had promulgated were invalid because they omitted a requirement that programs receiving federal funding "provide HHS with a self-evaluation listing all the agency distinctions they utilize and the justification for each." *Id*. The court agreed with the plaintiff that HHS's regulations "significantly restricted th[e] flow" of "information regarding services available to the elderly" and that those restrictions would perceptibly impair the organization's ability to provide its services. *Id*. at 937–38; *see also PETA*, 797 F.3d at 1095-96 ("denial of access to bird-related

2

. . . information including, in particular, investigatory information" perceptibly impaired organization's ability to educate the public); *Food & Water Watch*, 808 F.3d at 920 (explaining *PETA*). *Action Alliance*, in other words, involved more than simply an intent-to-educate-in-light-of-the-new-policy based harm alleged here. *See Food & Water Watch* 808 F.3d at 921.

Plaintiffs' purported harms to any mission "provid[ing] legal advice and representation," *see* ECF No. 66 at 15, cannot form the basis of standing to challenge these provisions of the 2020 Rule for the reasons explained by the Ninth Circuit in *Habeas Corpus Resource Ctr. v. DOJ*, 816 F.3d 1241, 1249-51 (9th Cir. 2016).

Moreover, another claim at issue in *Action Alliance* is instructive as to how Plaintiffs' enforcement mechanisms claims here are unripe. The *Action Alliance* plaintiff challenged a "shield clause" provision to advance its interest in helping others seek relief from discrimination, but the Court explained that if "all of the agency's regulatory age distinctions would qualify for the statutory exemption, then the 'shield clause'" would effectively have no impact. 789 F.2d 941–42. The same is true of the challenged enforcement mechanism actions here. If a private right of action or compensatory damages are available under Section 1557, then HHS's silence on these matters by rule is irrelevant. *See id*. Plaintiffs also assert that HHS's move away from the unitary standard will "make[] it more difficult to bring discrimination claims under Section 1557, especially claims of intersection discrimination." ECF No. 66 at 17. But that is particularly difficult to discern without the "application of" Section 1557 "in particular instances." *See Action Alliance*, 789 F.2d at 942. Plaintiffs' hardships from delay are also indistinguishable from those rejected in *Action Alliance* as Plaintiffs here "have not pinpointed any" actual or imminent concrete policies or practices of covered entities "that appear vulnerable to attack under" Section 1557. *See id*.

   2.   **Scope of entities subject to Section 1557**

Plaintiffs' argument that they have standing to challenge HHS's construction of the term "health program or activity" rests entirely on the speculation that their patients' insurers will make policy changes due to changes in the challenged regulations. *See* ECF No. 66 at 4.  In "cases involving claims of threatened injury emanating directly from governmental conduct, the

[Supreme] Court has assessed the likelihood that the clash between the government and the plaintiff will in fact occur." *Wilderness Soc. v. Griles*, 824 F.2d 4, 11 (D.C. Cir. 1987). A plaintiff may establish a sufficiently imminent injury in this setting "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). If the plaintiff merely establishes "an objectively reasonable likelihood" of the future injury or a "not 'fanciful, paranoid, or otherwise unreasonable'" fear of the future injury, that "likelihood" is insufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 407, 414 n.5, 416 (2013). In this case, Plaintiffs do not claim a threat of injury emanating directly from governmental conduct. See ECF No. 66 at 3-6.

"The other setting comprises cases in which the government acts directly against a third party, whose expected response in turn will injure the plaintiff." *Griles*, 824 F.2d at 11. "The standing question in these three-party[] cases frequently turns not on the existence of personal injury but rather on so-called causation issues, *i.e.*, whether the third party's decision is sufficiently dependent upon the governmental action that plaintiff's injury is 'fairly traceable' to that action and is 'likely to be redressed' by an order binding the government." *Id*. If a plaintiff establishes a concrete injury, but that injury stems from a third party's "not 'fanciful, paranoid, or otherwise unreasonable'" fears of the implications of government conduct, the plaintiff does "not establish injury that is fairly traceable" to the government. *Clapper*, 568 U.S. at 416, 417 n.7. "When personal injury *is* at issue in a three-party case, it usually depends on how likely it is that the third party's response to the challenged governmental action will injure the plaintiff *at all*." *Griles*, 824 F.2d at 12. In this particular case, Plaintiffs' theory of standing is even further removed because Plaintiffs' purported injuries stem not only from their speculation that insurers will change policies due to the 2020 Rule, but also from their speculation that it will be their patients who are affected by these hypothetical changes. *See* ECF No. 66 at 3-6.

As in *Defenders of Wildlife*, Plaintiffs' declarations are "simply not enough" to demonstrate imminence because "'some day'" allegations—"without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual

or imminent' injury" required. 504 U.S. at 564.[1] Plaintiffs must "present . . . concrete evidence to substantiate their fears" of future imminent injury at the hands of insurers fairly traceable to the challenged government action, *Clapper*, 568 U.S. at 420; *see*, *e.g.*, *Massachusetts v. U.S. Dep't of Health and Human Servs.*, 923 F.3d 209, 223 (1st Cir. 2019); *California v. Azar*, 911 F.3d 558, 572–74 (9th Cir. 2018)). For example, in *Massachusetts v. HHS*, the First Circuit held that the plaintiff established standing only by "demonstrat[ing] that it [was] highly likely that at least three [specific] employers in the Commonwealth" would take advantage of an expanded regulatory exemption from a contraceptive coverage mandate, and by "refer[ing] to data, which the [Defendants did] not contest," showing that two of these entities employed a substantial number of people in the Commonwealth. *Id*. at 224; *see also California*, 911 F.3d at 567–68, 572 (concrete evidence supporting standing to challenge same rule where record "include[d] names of specific employers identified by the [regulatory impact analysis] as likely to use the expanded exemptions, including those operating in the plaintiff states like Hobby Lobby Stores, Inc." and where one such employer intervened in the case). The First Circuit made clear that the inquiry needed to focus on women who would lose coverage based on the expanded exemptions, not women whose employers were denying contraceptive coverage "even before" the challenged exemption was implemented. *Id*. at 224 n.9.

---

[1] The dissenting Justices make clear that the *Defenders of Wildlife* requirements do not evaporate because a third-party's actions are involved, as opposed to a plaintiff's own failure to be clearer about future intentions. Their disagreement with the majority—premised on the belief that "a reasonable finder of fact could [have] conclude[d] from the information in the affidavits and deposition testimony that either [plaintiff] will soon return to the project sites, thereby satisfying the 'actual or imminent' injury standard," *id*. at 591—illustrates that the *Defenders of Wildlife* specificity standard applies here. They explained that *Defenders of Wildlife* "differs from other cases," like the present one, "in which the imminence of harm turned largely on the affirmative actions of third parties beyond the plaintiff's control." *Id*. at 592-93 (citing *Whitmore v. Arkansas*, 495 U.S. 149, 155–56 (1990); *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *Rizzo v. Goode*, 423 U.S. 362, 372 (1976); *O'Shea v. Littleton*, 414 U.S. 488, 495–98 (1974); *Golden v. Zwickler*, 394 U.S. 103, 109 (1969)).

Here, Plaintiffs claim to have such concrete evidence by pointing to a study purportedly showing "'a significant increase relative to prior years' of plans containing categorical exclusions for coverage of gender affirming health care." ECF No. 66 at 5-6 (quoting Out2Enroll, *Summary of Findings: 2021 Marketplace Plan Compliance with Section 1557* (Nov. 2020), at 1 (hereinafter "2021 Out2Enroll Report")). The Out2Enroll Report, which analyzed 1,386 silver marketplace insurance plans from 176 insurers in the 36 states that use Healthcare.gov, found that only four insurers included transgender-specific exclusions in 2021. 2021 Out2Enroll Report at 1, 3-5. That actually represents *fewer* insurers than Out2Enroll found to have transgender-specific exclusions in 2020 plans. *See* Out2Enroll, *Summary of Findings: 2020 Marketplace Plan Compliance with Section 1557*, at 1, 4-5, https://out2enroll.org/out2enroll/wp-content/uploads/2019/11/Report-on-Trans-Exclusions-in-2020-Marketplace-Plans-2.pdf.

In any event, Plaintiffs cannot plausibly establish standing to challenge HHS's construction of "heath program or activity" by relying on any purported policy change reported in the 2021 Out2Enroll Report as a basis to try to establish an "imminent" injury. The report analyzes only "silver marketplace plan options" from the ACA Exchanges, 2021 Out2Enroll Report, at 1, and "[t]hese plans remain subject to [the 2020 Rule] because they are sold on the Exchanges established under Title I of the ACA (see § 92.3(a)(3) of this final rule)." 85 Fed. Reg. at 37,170. Thus, any purported changes reported in this report cannot plausibly be fairly traceable to HHS's new construction of the scope of covered entities in the 2020 Rule. *See id.*

In fact, the 2021 Report indicates that Plaintiffs' purported harms from other provisions of the 2020 Rule are far from predictable. The 2021 Out2Enroll Report suggests that consumers shopping for insurance have incredible choice, with few plans including transgender-related coverage exclusions. So if one plan declines to offer a certain type of coverage to a patient of any one Plaintiff, it is far more predicable that the consumer will simply opt for a policy from the vast majority of other insurers that do offer the coverage that they want, instead of imposing uncompensated costs on Plaintiff providers. Indeed, the Helathcare.gov website itself notifies

transgender consumers of these plans so they can pick a plan that suits their needs. *See* Healthcare.gov, Transgender health care, https://www.healthcare.gov/transgender-health-care/.

The Out2Enroll Report also highlights the importance of the holding in *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976). Despite the fact that this Court has preliminarily enjoined HHS from repealing the 2016 Rule's definition of "on the basis of sex," as partially vacated, insurers that are subject to Section 1557 in the 2020 Rule continue to make independent policy decisions that, in Plaintiffs' view, are noncompliant. Also, the fact that Plaintiffs—who care for a great number of patients covered by many different insurers—still cannot provide concrete evidence that any of their patients' insurers have made any relevant policy change due to HHS's construction of the scope of covered entities—which has been in effect since August 2020 and has not been enjoined by any court—casts substantial doubt on the reality of any of Plaintiffs' purported harms.

Plaintiffs cite briefing from pending cases. But the insurers in these briefs are "in no way particular to [Plaintiffs] or the particular [patients] on which [Plaintiffs] base[] their standing arguments." *See Washington v. U.*S. *Dep't of Health and Human Servs.*, 2020 WL 5095467, at *9 (Aug. 28, 2020). Indeed, one case involves alleged disability discrimination, not LGBTQ discrimination. *See* Br. in Supp. of Defs.' Mot. for J. on the Pleadings on Count III, *T.S. v. Heart of Cardon, LLC*, No. 1:20-cv-01699-TWPTAB (S.D. Ind. filed Oct. 20, 2020) (ECF No. 37). And both cases appear to involve a policy that has been in place since before the 2020 Rule. *See* Br. of Appellant, *Kadel v. North Carolina. State Health Plan*, No. 20-1409 (4th Cir. filed July 30, 2020) (Doc. No. 27). To the extent Plaintiffs are alleging injury stemming from these insurers, these pending cases serve only to highlight the ripeness problems that Plaintiffs have in this case; this Court must abstain from adjudicating this case based on a causal chain of injury that requires it to adjudicate the outcome of other pending concrete cases.

Even if any Plaintiff meets one of the exceptions to the prohibition on third-party standing, *see* ECF No. 66 at 6-8, that cannot substitute for Article III standing. The prohibition on third-party standing is an *additional* prudential limitation that exists "even when the plaintiff has alleged

injury sufficient to meet the 'case or controversy' requirement." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Thus, no Plaintiff can rely on their arguable satisfaction of the exceptions to third-party standing doctrine as a substitute for their independent establishment of Article III standing.

Plaintiffs "present no concrete evidence to substantiate [any] fears" of any Translatin@ Coalition member of imminent injury due to anything in the 2020 Rule, *see Clapper*, 568 U.S. at 420. *See* ECF No. 66 at 8-10. Plaintiffs rely on a witness declaration from a member—a Puerto Rico Medicaid beneficiary—as evidence that "Puerto Rico's Medicaid program excludes" certain procedures "from coverage." *See* ECF No. 66 at 9. But because Plaintiffs' evidence indicates that Puerto Rico's policy pre-dates the 2020 Rule, Plaintiffs have not identified an imminent injury "due to the challenged federal regulations." *See Massachusetts*, 923 F.3d at 222; *see also id*. at 224 n.9. Moreover, State Medicaid programs remain subject to Section 1557 under the 2020 Rule. *See* 85 Fed. Reg. at 37,174 ("Entities that receive Federal funding through . . . Medicaid programs would be subject to Section 1557 as recipients of Federal financial assistance."). These barriers also make the cited Arizona and Georgia Medicaid policies immaterial. *See* ECF No. 66 at 9.

Plaintiffs also purport to rely on the member's "ability to rely on HHS OCR . . . [to] enforce Section 1557," *id*. at 9-10, but the member's "interests in enforcement" of Section 1557 by HHS cannot support standing to defend a particular regulatory code because "'a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another,'" *see Diamond v. Charles*, 467 U.S. 54, 64 (1986).

Plaintiffs' only standing argument related to HHS's construction of the scope of federal entities covered by Section 1557—a separate claim from the scope of the term "health program or activity"—is that a GLMA member, Dr. Deborah Fabian, works for the Indian Health Service ("IHS"). *See* ECF No. 66 at 10. But Plaintiffs "present no concrete evidence to substantiate [Dr. Fabian's] fears" of imminent injury at the hands of IHS. *See Clapper*, 568 U.S. at 420. Moreover, Plaintiffs' speculation that IHS will imminently discriminate in light of the 2020 Rule is especially unlikely because the equal protection principles in the Fifth Amendment prohibit IHS and all federal entities from engaging in discrimination.

Plaintiffs claim that Plaintiff Bradbury-Sullivan LGBT "may" hire an additional case manager and "may be required to redirect additional staff and resources" in light of the 2020 Rule's construction of the scope of covered entities. *See* ECF No. 66 at 11. But these expenditures appear contingent on fear that there will be an "inevitable increase in denials of care and discrimination," *see id*., unsupported by concrete evidence that these events are imminent, *see Clapper*, 568 U.S. at 420. Plaintiffs cannot choose "to make expenditures based on hypothetical future harm that is not" demonstrably imminent. *See id*. at 402. Plaintiffs failure to provide evidence that this Plaintiff has made any actual expenditure because of HHS's construction of the scope of covered entities— effective since August 2020—casts further doubt on the likelihood of their predictions.

### 3. Discrimination on the basis of association and HHS's decision to make conforming modifications to other HHS regulations

Plaintiffs "present no concrete evidence to substantiate their fear" of imminent injury stemming from HHS's conforming amendments to related regulations, *see Clapper*, 568 U.S. 420, and instead try to merge these claims with their "challenge to the Revised Rule's unlawful removal of protections for LGBTQ patients," ECF No. 66 at 12. Plaintiffs claim that they have endured or will endure "financial and operational injuries . . . from increased access of their services resulting from patients' and members' fear of discrimination." ECF No. 66 at 13. Plaintiffs' argument, however, is foreclosed by *Clapper*. 568 U.S. at 417 n.7. There, in footnote seven, the Court addressed Amnesty International's "alternative theory of standing," which is similar to Plaintiffs' theory here. *See id*. The Court held that *actual* injury derived from the fears of third-parties about the implications of government action does "not establish injury that is fairly traceable to [the challenged statute], because [Amnesty International's assertions] are based on third parties' subjective fear of surveillance." *Id*.

Plaintiffs' reliance on their old declarations on which this Court discerned that "rational fear *will* drive LGBTQ patients to rely increasingly on services of the health-provider Plaintiffs," *see Whitman-Walker*, 2020 WL 5232076, at *12 (emphasis added), has ripened into weak evidence of imminent harm alone.  These challenged provisions have been in effect since August 2020;

despite Plaintiffs' onslaught of declarations, the absence of concrete evidence that they have actually experienced an ongoing increase in demand for uncompensated care as a result of these changes indicates that any harm from these provisions was never imminent.

Moreover, it is implausible that Plaintiffs have endured a discernable increase in uncompensated care demand due to fears connected in some way to HHS's conforming amendments to related regulations in light of the Supreme Court's decision in *Bostock*. The conforming amendments continue to proscribe sex discrimination, so if Plaintiffs are "correct that *Bostock* means that" sex discrimination "must [always] incorporate protection for gender identity and sexual orientation discrimination, then it means that [these changes do], in fact, extend protection against discrimination to LGBTQ individuals." *See Washington*, 2020 WL 5095467, at *8. The point is that it seems more predictable that *Bostock* has substantially alleviated fears of future discrimination in the LGBTQ community, and that most lay people who are surely not familiar with the minutia of the actual changes HHS made in the 2020 Rule could not have fears that are fairly traceable to them. At a minimum these claims are not ripe for review until the adjudication of concrete allegations of discrimination.

## B. Plaintiffs' Challenges to HHS's Decision not to Define "On the Basis of Sex" and Several of HHS's Other Decisions are Not Ripe for Review

Plaintiffs say that they "are challenging defendants' actual excision of LGBTQ people from the [2020] Rule's protections." ECF No. 66 at 1. But HHS's decision not to define "on the basis of sex" by rule did no such thing; HHS merely "decline[d], at th[e] time, to propose its own[] definition of 'sex' for purposes of discrimination on the basis of sex in the regulation." 84 Fed. Reg. at 27,857. HHS's decision on this matter is not ripe for review absent a crystalized agency policy that the definition excludes the very type of discrimination Plaintiffs' purport that it excludes. Absent such a decision, Plaintiffs never explain why this Court should override a regulation that merely hews to the language of the statute, when a regulation is "not ordinarily considered the type of agency action 'ripe' for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components

10

fleshed out, by some concrete action applying the regulation to [a patient's] situation in a fashion that harms or threatens to harm" Plaintiffs. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 981 (1990); *see also Action Alliance*, 789 F.2d at 942.

Because they cannot establish the elements of ripeness, Plaintiffs discuss the merits of their claim that HHS's decision was arbitrary or capricious. *See* ECF No. 66 at 17. But the ripeness doctrine prevents courts from adjudicating these merits questions if, like here, Plaintiffs' framing of their claim indicates that their concerns rest primarily upon "future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted). Ripeness doctrine dictates that this court dismiss Plaintiffs' claims related to HHS's decision to hew to the language of the statute because HHS may ultimately determine that sex discrimination under Section 1557 encompasses the very type of discrimination Plaintiffs fear HHS will decide it does not encompass.

The fact that Plaintiffs "challenge an already promulgated regulation and final agency action" is not determinative. *See* ECF No. 66 at 18. Even when "there can be no question that [a] regulation—promulgated in a formal manner after notice and evaluation of submitted comments"—is the subject of judicial review and the issue a plaintiff raises "presents a purely legal question," the "legal issue as presently framed [may] not [be] appropriate for judicial resolution." *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 162–63 (1967).

Plaintiffs are wrong to say that Defendants' arguments "would mean that any decision to eliminate regulatory protections would be insulated from judicial review." ECF No. 66 at 18. Ripeness doctrine insulates from judicial review generalized regulatory standards unless and until the regulation directly and actually affects the "primary conduct" of a regulated entity. *See Toilet Goods*, 387 U.S. at 164; *see also Nat'l Wildlife Fed.*, 497 U.S. at 891; *Sprint Corp. v. FCC*, 331 F.3d 952, 956 (D.C. Cir. 2003). Plaintiffs' cases involve clear direct and immediate effects that are more concrete than the fear and uncertainty-based injury on which this Court preliminarily found Plaintiffs had standing. For example, in *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 38 (1983), the agency permitted cars to be manufactured without

passive restraint seat belts as soon as the rule became effective. The agency did not replace the rule with a generalized standard that might someday be interpreted to require passive restraints. *See id.*; *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1910 (2020) (revoking "work authorization and . . . benefits" from "[s]ome 700,000 aliens").

Unable to meaningfully explain how their challenge to HHS's decision not to define sex by rule is ripe, Plaintiffs yet again latch onto the language in the preamble. *See* ECF No. 66 at 19. But language in the preamble "lacks the force and effect of law." *See St. Francis Med. Ctr. v. Azar*, 894 F.3d 290, 297 (D.C. Cir. 2018). So it does not govern HHS's decision on this matter. *Cf. New England Power Generators Ass'n v, Inc. v. FERC*, 707 F.3d 364, 369 (D.C. Cir. 2013) ("[N]either a[n agency] decision's legal reasoning nor the precedential effect of such reasoning confers standing unless the substance of the decision itself gives rise to injury in fact."). More importantly, HHS explicitly qualified the cited language (which was issued *before* the Supreme Court's decision in *Bostock*). *See* 85 Fed. Reg. at 37,168 ("[T]o the extent that a Supreme Court decision is applicable in interpreting the meaning of a statutory term, the elimination of the regulatory definition of such term would not preclude the application of the Court's construction."). That qualification is entirely consistent with HHS's reason for "declin[ing] . . . to propose its own[] definition of 'sex' for purposes of discrimination on the basis of sex in the regulation;" namely, "[b]ecause of the likelihood that the Supreme Court will be addressing the issue in the near future." *See* 84 Fed. Reg. at 27,857.

Plaintiffs claim that unlike *Aulenback, Inc. v. Fed. Highway Admin.*, 103 F.3d 156 (D.C. Cir. 1997), the "preamble clearly explains Defendants' interpretation of Section 1557." *See* ECF No. 66 at 19. Of course, the *Aulenback* plaintiffs claimed that the challenged policy manual provided an interpretation of a statute the agency implemented. *See* 103 F.3d at 159, 164. To the extent Plaintiffs suggest that the preamble here is "authoritative" while the *Aulenback* policy was not, the *Aulenback* court "assum[ed] the [agency] ha[d the] policy" in the Manual, but did not find it to be "authoritative" because "petitioners fail[ed] to show on the record before the court that [the agency] ha[d] purported to take an enforcement action based on the Manual's definition" of the

statutory term. *Id.* at 167. In other words, an interpretation is not ripe for review unless it appears in a binding rule or has been established by case-by-case adjudication. *See id.*; *see also Habeas Corpus Resource Ctr.*, 816 F.3d at 1252-54.  Plaintiffs say that here "there is an administrative record on which to assess" the rule's legality. ECF No. 66 at 19. But there is no reason that there would not have likewise been an administrative record supporting the agency's creation of the Manual at issue in *Aulenback*.

Although this Court did find that Plaintiffs endure some harm in light of HHS's decision not to define on the basis of sex, *see* ECF No. 66 at 20, the ripeness analysis requires this Court to balance and consider "the degree and nature of the regulation's present effect on those seeking relief," *Toilet Goods*, 387 U.S. at 164. Like in *Reno v. Catholic Social Servs, Inc.*, 509 U.S. 43, 58–59 (1993), HHS's decision not to define "on the basis of sex" by rule "imposes no penalties for violating any newly imposed restriction" on any Plaintiff. *See id.* at 58. And the hardships imposed on the plaintiffs and the social service organization from awaiting further administrative action in *Catholic Social Services*, which were insufficient to establish ripeness, were quite similar to those Plaintiffs describe here. *See id.* at 79 (Stevens, J., dissenting) (explaining that regulations unripe for review required plaintiffs to live in "fear . . . afraid to seek help when their rights are violated, when they are victimized by criminals . . . or when they become ill"); *see also Action Alliance*, 789 F.2d 941–42.

Plaintiffs' request that the Court defer ruling on ripeness until after the administrative record is produced so that they can "test HHS's denial that it has promulgated a regulation that permits discrimination on the basis of sex stereotyping and gender identity" and other positions makes little sense. *See* ECF No. 66 at 20. The regulation that HHS promulgated is published in the Federal Register and in the Code of Federal Regulations. And because "[t]he prudential ripeness doctrine asks whether a federal court '*should* decide a case,'" *Conference of State Bank Superisors v. OCC*, 313 F. Supp. 3d 285, 300 (D.D.C. 2018) (citation omitted), it is properly decided at the motion to dismiss stage, *see id.* at 294 n.2.

II.     **MANY OF PLAINTIFFS' CLAIMS SHOULD BE DISMISSED UNDER RULE 12(b)(6).**

    **A. Plaintiffs' Claims that HHS's Policies in the 2020 Rule are Contrary to Law Fail as a Matter of Law**

        **1. Plaintiffs' claims that HHS acted contrary to law by not including an explicit prohibition on categorical coverage exclusions and eliminating certain notice requirements**

Defendants explained that HHS did not exceed its statutory authority in (1) declining to include an explicit prohibition on categorical coverage exclusions in the 2020 Rule, *see* ECF No. 57-1 at 16, and (2) modifying certain notice requirements and the meaningful access standard for limited English proficient individuals, *see* ECF No. 57-1 at 17. Plaintiffs entirely fail to respond to these arguments, only identifying and articulating arbitrary or capricious claims. *See* ECF No. 66 at 22-27.[2] Thus, the Court should dismiss Plaintiffs' claims that these decisions were substantively contrary to law.

        **2. Plaintiffs' claims that anything in the 2020 Rule violates Section 1554 of the ACA**

Plaintiffs' criticisms of *California v. Azar*, 950 F.3d 1067 (9th Cir. 2020), *see* ECF No. 66 at 28, fall flat. The *California* court's conclusions about the meaning of § 1554 had nothing to do with *Rust v. Sullivan*, 500 U.S. 173 (1991). *See* 950 F.3d at 1092–94. Moreover, *Mayor & City Council of Baltimore v. Azar*, 973 F.3d 258 (4th Cir. 2020)—which does not undermine the *California* court's construction of § 1554 as requiring a direct interference with health care and in which the court primarily disagreed with the *California* court's determination that *Rust* was relevant in analyzing the particular claim presented in that case, *see id.* at 289—has little relevance

---

    [2] Defendants moved to dismiss several of Plaintiffs' arbitrary and capricious claims because, as framed in their Complaint, they were premised on HHS's failure to provide a reasoned explanation for its decision, which is available in the preamble to the Rule. *See* ECF No. 57-1. Having reviewed Plaintiffs' arbitrary and capricious claims as reframed or further clarified in their opposition papers, Defendants agree that, if the Court determines they are ripe for review and Plaintiffs have standing to raise them, some of those claims should await summary judgment briefing on the administrative record. Specifically, Defendants agree that the Court should defer ruling on the merits of Plaintiffs' claims that the following decisions are arbitrary or capricious: HHS's decision not to include an explicit prohibition on categorical coverage exclusions; HHS's elimination of certain notice requirements; HHS's construction of the scope of covered entities; and HHS's decision to make conforming modifications to related HHS regulations.

here.

Even assuming Plaintiffs' overbroad reading of § 1554, which is wrong for the reasons explained in Defendants' opening brief and this Court's preliminary injunction opinion, Plaintiffs still fail to state a claim for relief. They give short shrift to asserting that several of HHS's decisions in the 2020 Rule create "barriers to care." ECF No. 66 at 29. But the statute prohibits regulations that create *unreasonable* barriers to care.

Plaintiffs make no serious effort particularized to the challenged provisions to state a claim for relief. *See* ECF No. 66 at 29. It is neither Defendants' nor this "[C]ourt's duty to identify, articulate, and substantiate a claim for the petitioner." *See Nat'l Exchange Carrier Ass'n, Inc. v. FCC*, 253 F.3d 1, 4 (D.C. Cir. 2001). As Plaintiffs fail "to make intelligible to the court any coherent argument" that each challenged provision of the Rule violates Section 1554 of the ACA, *see Nat'l Exchange Carrier Ass'n*, 253 F.3d at 4, and rely on the same type of "broad statements" that the Court properly found insufficient before, *see Whitman-Walker*, 2020 WL 5232076, at *36, the Court should dismiss this claim.

### 3. The 2020 Rule reasonably construes the scope of Section 1557

#### a. *Scope of Federal Entities*

Plaintiffs say that "the scope of the 2016 Rule made sense," ECF No. 66 at 33; however, the question before the Court is not whether a different interpretation makes sense or is preferable, but whether HHS's construction is "within the bounds of reasonable interpretation." *See City of Arlington, Tex. v. FCC*, 569 U.S. 290, 296 (2013).

Plaintiffs correctly point out that applying the "rule of last antecedent" to the statute means that the term "under this title" would apply only to "any entity established." ECF No. 66 at 30. But Defendants already explained that applying that rule would result in a construction whereby Section 1557 would apply to "any program or activity that is administered by an Executive Agency"—*i.e.*, *all federal action*, regardless of its connection to healthcare, HHS, or the ACA—an outcome that Congress could not have plausibly intended. ECF No. 57-1 at 19. So Plaintiffs' effort to employ "traditional tools of statutory construction" fails to ascertain Congress' intent as

to which Executive Agencies and federal action Section 1557 is supposed to apply. *See Chevron, U.S.A. v. NRDC*, 467 U.S. 837, 843 n.9 (1984). Plaintiffs argue that HHS's construction "is inconsistent with the ACA's goal," ECF No. 66 at 31, but the D.C. Circuit has rejected that style of *Chevron* step two reasoning. *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 494–95 (D.C. Cir. 2016). "Such policy arguments are more properly addressed to legislators or administrators, not to judges." *Chevron*, 467 U.S. at 864. The Court should dismiss Plaintiffs' claims that HHS's construction of the scope of federal entities subject to Section 1557 is not in accordance with law or in excess of HHS's statutory authority.

### b. HHS Permissibly Construed "Health Program or Activity" Consistently with the Civil Rights Restoration Act of 1987

Plaintiffs argue that Defendants' interpretation is impermissible because it "exclude[s] most health insurance providers." ECF No. 66 at 32. To address this issue, "[f]irst, applying the ordinary tools of statutory construction, the court must determine 'whether Congress has directly spoken to the precise question at issue.'" *City of Arlington*, 569 U.S. at 296 (citation omitted). Here, the relevant portion of Section 1557 provides that it applies to "any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). The term "health program or activity," however, is not defined by the ACA. The ACA is silent as to its precise reach, including whether its reach extends to health insurers.

Plaintiffs point out that in Section 1553, Congress defined "health care entity" to include "a health insurance plan," among other entities. ECF No. 66 at 33. But Section 1557 does not use the term "health care entity" and Congress was explicit that its definition of "health care entity" in Section 1553 was for use only "[i]n th[at] section." 42 U.S.C § 18113(b). Plaintiffs cherry-pick language from other provisions of the ACA where they claim Congress used somewhat similar, but not identical terminology, *see* ECF No. 66 at 33, but it is well established that there is no requirement that even the same term used in different provisions of the same statute be interpreted identically, especially given the long history of the pertinent term "program or activity" from the civil rights law context here. *See Envt'l. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574–76 (2007);

*see also Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 532 n.39 (2d Cir. 2017) (same); *Abbott Labs. v. Young*, 920 F.2d 984, 987 (D.C. Cir. 1990) ("[I]t is not impermissible under *Chevron* for an agency to interpret an imprecise term differently in two separate sections of a statute which have different purposes."). The point, for *Chevron* step one purposes, is that, especially in light of Congress's explicit regulation of health insurers throughout the ACA, the absence of health insurers among entities receiving federal financial assistance upon which Section 1557 clearly and explicitly imposes its antidiscrimination mandate is conspicuous. If Congress unambiguously intended to subject all health insurers receiving federal financial assistance to Section 1557's antidiscrimination requirements, Congress could have said so clearly in the text of Section 1557, like it did in Section 1553. Plaintiffs cannot simply assert that "Section 1557 plainly covers 'health programs and activities,' not just direct health care" when they identify other provisions of the ACA where Congress used terms to regulate health insurance explicitly. *See* ECF No. 66 at 33.

In light of the statute's ambiguity as to the scope of the term "health program or activity," the agency, at step two, reasonably "presume[d] that Congress was well aware that the pivotal word[s]"—program or activity—"had been construed in similar contexts as a term of art." *See Blitz v. Donovan*, 740 F.2d 1241, 1245 (D.C. Cir. 1984); *see also Mozilla Corp. v. FCC*, 940 F.3d 1, 25 (D.C. Cir. 2019). As the Civil Rights Restoration Act of 1987 ("CRRA") provides an "interpretation of 'program or activity'" for each of the statutes incorporated into Section 1557, *see* Pub. L. No. 100-259, HHS reasonably looked to it to construe the same term in Section 1557. *See* 85 Fed. Reg. at 37,171. Specifically, the CRRA defines "program or activity" to encompass all operations of regulated entities only when they are "principally engaged in the business of providing education, health care, housing, social services, or parks and recreation." *See, e.g.*, 20 U.S.C. § 1687(3)(A)(ii) (Title IX). So "with respect to the health sector," the CRRA applies "'program or activity' to cover all of the operations of an entity only when that entity is 'principally engaged in the business of providing . . . health care . . . .'" *Id.* (quoting CRRA §3(a) (adding § 908(3)(A)(ii) to Title IX). Plaintiffs say that the CRRA does not suggest that providing health

care excludes health insurance, *see* ECF No. 66 at 33, but HHS reasonably determined that, just as one would not say one's homeowner's insurance provides lodging, health insurance does not "provide" health care. *See* 85 Fed. Reg. at 37,244-45. Plaintiffs' failure to present any caselaw construing the CRRA to say otherwise is telling. HHS's construction is permissible.

Plaintiffs also argue that the construction "undermines the ACA's purpose," ECF No. 66 at 33, but as just explained, the D.C. Circuit has rejected that style of *Chevron* step two reasoning. *Van Hollen, Jr.*, 811 F.3d at 494–95. If Congress' unambiguous purpose was to subject all health insurers receiving federal financial assistance to Section 1557's antidiscrimination requirements, it could have said so in the text. *See supra* at 16. In light of Congress' decision not to do so, this Court should defer to HHS's interpretation. *See Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2397 (2020) (Kagan, J., concurring).

Plaintiffs also argue that HHS's construction of the CRRA is incorrect because the CRRA is intended to ensure "that if any part of a program or activity receives federal financial assistance, the entire program must comply with the applicable civil rights laws, not simply those aspects of covered entities receiving funding." ECF No. 66 at 32. But Plaintiffs' reading misconstrues the 2020 Rule and the CRRA. The 2020 Rule's construction *does* "encompass[] *all* of the operations of entities 'principally engaged in the business of providing healthcare' that receive financial assistance." 85 Fed. Reg. at 37,172 (emphasis added). HHS merely clarified "that for any entity *not principally engaged* in the business of providing healthcare, such entity's operations are subject to the Section 1557 Rule only to the extent any such operation receives Federal financial assistance provided by [HHS]." *Id*. Contrary to Plaintiffs' suggestion, that reading is entirely consistent with (and derived from) the CRRA, which defines a program or activity as "all the operations of . . . an entire corporation, partnership, or other private organization . . . (i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship, *as a whole*; or (ii) *which is principally engaged in* the business of providing education, *health care*, housing, social services, or parks and recreation . . . any part of which is extended Federal financial assistance." *Id*. (emphasis added). *See, e.g.*, 20 U.S.C. § 1687(3)(A). Nothing in *Doe v. Salvation Army in U.S.*, 685

F.3d 564, 571–72  (6th Cir. 2012), which discerned whether religious organizations were per se exempt from being principally engaged in the business of social services, is to the contrary.

For the foregoing reasons, the Court should dismiss Plaintiffs' claims that HHS's construction of "health program or activity" is not in accordance with law or in excess of HHS's statutory authority. *See Little Sisters of the Poor*, 140 S. Ct. at 2397–98 (Kagan, J., concurring).

### 4. The 2020 Rule's return to enforcement mechanisms separately available under the civil rights statutes incorporated into Section 1557 does not violate the APA

Defendants explained that HHS's construction of Section 1557, in the 2020 Rule, that individuals may employ the enforcement mechanisms available under each incorporated statute, depending on which cause of action the individual intends to bring, is a permissible construction of Section 1557. ECF No. 57-1 at 22-24. Defendants also explained that HHS's decision not to take a position by rule on whether Section 1557 affords compensatory damages or a private right of action was not contrary to law. *Id.* at 24-25. Plaintiffs say that these decisions "conflict[] with the statutory language and purpose of Section 1557," without clearly explaining how. *See* ECF No. 66 at 34-37. Section 1557 says only that "[t]he enforcement mechanisms provided for and available under" each incorporated statute "shall apply for purposes of violations of this subsection." Section 1557(c). The Ninth Circuit has found that "[t]he text is ambiguous" on this precise question. *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 953 (9th Cir. 2020).[3]

Instead of providing any analysis about how Section 1557 purportedly forecloses HHS's approach, Plaintiffs note that "where, as here, the reasonableness of HHS's decision-making process is at issue, arbitrary and capricious review applies, not *Chevron* deference." ECF No. 66 at 35. To the extent Plaintiffs are arguing that a failure to provide a reasoned explanation makes

---

[3] Plaintiffs suggest that the agency concluded that these changes were unambiguously required by the statute, *see* ECF No. 66 at 35, but HHS said no such thing. The fact that HHS said that it "believes [its] approach is what the statutory text contemplates"—and provided that explanation among other reasons for its change—does not reflect a conclusion that the text unambiguously requires its approach. 85 Fed. Reg. at 37,202.

the agency decision contrary to Section 1557, they are wrong. Although "the analysis of an agency's statutory interpretation at *Chevron* step two has some overlap with arbitrary and capricious review[,] . . . 'the Venn diagram of the two inquiries is not a circle.'" *Mozilla*, 940 F.3d at 49 (quoting *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 605 (D.C. Cir. 2017)). In cases like this one, an agency's reasoned justifications for a rule may satisfy both the arbitrary and capricious standard and *Chevron* step two's reasonableness requirement. *See Pharm. Res. & Mfrs. of Am. v. FTC*, 790 F.3d 198, 208–12 (D.C Cir. 2015). By contrast, an agency's procedural error in failing to take a hard look at an issue in promulgating the regulation would not dictate the substantive "bounds of reasonable interpretation" that "Congress . . . desired the agency (rather than the courts) to possess." *City of Arlington*, 569 U.S. at 296 (citation omitted); *see also Little Sisters of the Poor*, 140 S. Ct. at 2397–99 (Kagan, J., concurring); *Mozilla*, 940 F.3d at 49.

Plaintiffs' reliance on *Encino Motorcars LLC v. Navarro*, 136 S. Ct. 2117 (2016), is misplaced. That case did not involve judicial review under § 706 of the APA, but a private suit by employees of an automobile dealership against their employer alleging Fair Labor Standards Act ("FLSA") claims, which was initiated not in an agency but in a federal district court. *Id*. at 2124. In light of the Court's determination that the Department of Labor arbitrarily or capriciously adopted a regulation, the Court determined that the lower courts must construe the FLSA "without placing controlling weight" on the regulation. *See id*. at 2127.[4] Although Plaintiffs cite a case where a court declined to provide its view on whether an agency's decision was within the scope of the substantive bounds of reasonable interpretation in light of its conclusion that the agency acted arbitrarily in a manner that required remand, nothing in that opinion forecloses this Court from dismissing Plaintiffs' contrary to law claims at this point in this litigation to narrow the issues for review at summary judgment.[5] *Cf. Altera Corp . & Subsidiares v. Comm'r of Internal Revenue*,

---

[4] Some of the Court's reasoning in the opinion is confusing, and the leading administrative law treatise has criticized the opinion for "seem[ing] to conflate procedural failures, including a failure to provide adequate explanation, with ineligibility for *Chevron* deference." Richard J. Pierce, Jr. & Kristin E. Hickman, *Administrative Law Treatise* § 3.5.1 (6th ed.).

[5] Even if this Court agreed with Plaintiffs' approach, it should dismiss Plaintiffs' claims to the extent they are construed as *Chevron* step one claims.

926 F.3d 1061, 1075 (9th Cir. 2019); *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 521 (2d Cir. 2017); *see also Arent v. Shalala*, 70 F.3d 610, 619–20 (D.C. Cir. 1995) (Wald, J., concurring).

Plaintiffs provide no argument that HHS's decision not to decide by rule whether compensatory damages are available for Section 1557 violations or whether Section 1557 confers a private right of action are contrary to law, focusing only on their arbitrary or capricious claims. ECF No. 66 at 35-37. That claim also fails. Plaintiffs effectively admit that HHS acknowledged that it was changing positions, but complain that HHS "said nothing about [certain] U.S. Supreme Court decisions," ECF No. 66 at 36, even though the Supreme Court has indicated that courts should not reverse "an executive agency, not for violating [their] cases, but for failure to discuss them adequately," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 526 (2009). Plaintiffs do not state a claim that HHS failed to provide a reasoned explanation for its change as required by *Fox. See id.* The Court should dismiss Plaintiffs' claims that any of these actions are not in accordance with law, in excess of HHS's statutory authority, arbitrary, or capricious.

### 5. HHS's decision to take no position by rule on whether Section 1557 encompasses discrimination on the basis of association does not violate the APA

Plaintiffs provide no argument that HHS's decision not to decide by rule whether discrimination on the basis of association violates Section 1557 is not in accordance with law or in excess of HHS's statutory authority, and the Court should dismiss those claims. *See* ECF No. 66 at 37-38. As for Plaintiffs' arbitrary or capricious claim, the APA permits courts to "insist that an agency . . . articulate a satisfactory explanation for its action." *Fox*, 556 U.S. at 513 (citation omitted). Defendants provided HHS's explanation—published in the Federal Register—in support of their motion to dismiss, *see* ECF No. 57-1 at 25, and that explanation meets the requirements of *Fox*, *see* 556 U.S. at 513. Plaintiffs identify some other purported explanation, but it was not the one Defendants identified in moving to dismiss. *See* ECF No. 66 at 37, 57-1 at 25. The statement Plaintiffs identify was actually HHS's response to the very comments Plaintiffs claim HHS "ignored." *See* ECF No. 66 at 38. HHS considered commenters' concerns that repealing the section would be confusing,

21

but determined that it would be more confusing to have potentially invalid regulations on the books that might ultimately be vacated by a court. *See* 85 Fed. Reg. at 37,199. Contrary to Plaintiffs' assertions, this was a policy judgment made in consideration of comments on the proposed rule, not a formal factual finding. *See Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1037–38 (D.C. Cir. 2012). Section 1557(c) does not require a formal factual finding that HHS's decision would result in less confusion, and Plaintiffs' effort to impose such an extra-statutory obligation on HHS contravenes *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978). The APA claims Plaintiffs have identified should be dismissed.

### 6. HHS's decision to make conforming modifications to other regulations is not substantively contrary to any law

Plaintiffs argue that HHS's conforming amendments to related regulations are "contrary to law" because of *Bostock*. *See* ECF No. 66 at 39. "No matter how it is framed, the question a court faces when faced with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority*." *City of Arlington*, 569 U.S. at 297. Plaintiffs make no real effort to explain how these changes are outside HHS's statutory authority or not in accordance with any particular law, but merely attack the agency's failure to consider the outcome of *Bostock* in its explanation for the change. *See* ECF No. 66 at 39. These arbitrary or capricious claims disguised as contrary-to-law claims should be dismissed. *See Whitman-Walker*, 2020 WL5232076, at *27 ("The Court does not hold that the agency decision here was substantively invalid.") (citation omitted).

### B. Plaintiffs' Constitutional Claims Fail as a Matter of Law

### 1. Equal Protection.

As Defendants have explained, to the extent Plaintiffs are alleging a claim of "discrimination against LGBTQ people," ECF No. 66 at 40, it is subject to rational basis review in this Circuit, *see* ECF No. 57-1 at 26-27 n.7, not heightened scrutiny. Plaintiffs' claim that the 2020 Rule fails rational basis review, *see* ECF No. 66 at 40, is wrong, because, in the proposed and final rules, HHS has provided good reasons for each change it made that satisfy the APA

standard of review. *See Cooper Hosp./Univ. Med. Ctr. v. Burwell*, 179 F. Supp. 3d 31, 47 (D.D.C. 2016) (Boasberg, J.) ("[I]f the challenge is to an *agency* action, the equal-protection challenge is subsumed within the APA challenge."). So at a minimum, the equal protection claim can be dismissed to the extent APA claims remain pending for summary judgment. *See id.*

Plaintiffs are wrong to suggest that Defendants' state action argument is premised on the fact that HHS did not take a position on the post-*Bostock* definition of sex discrimination in the 2020 Rule. *See* ECF No. 66 at 40-41. Even assuming the 2020 Rule does not prohibit LGBTQ discrimination (which Defendants do not claim), that does not mean HHS *authorized* discrimination. Plaintiffs' argument that government inaction that might result in harm at the hands of third parties constitutes discrimination, *id.*, has been rejected as contrary to the state action doctrine. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50–53 (1999); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 176–77 (1972).

Because rational basis review is applicable, Plaintiffs' animus claims fail; only actions "inexplicable by anything but animus toward the class it affects" are invalid. *See Romer v. Evans*, 517 U.S. 620, 632 (1996). Plaintiffs have failed to demonstrate how their animus claims meet the *Regents of the University Of California v. DHS* standard even assuming *strict* scrutiny were to apply (and it does not). *See* 140 S. Ct. 1891, 1916 (2020). Plaintiffs' brief highlights one article written by Defendant Severino, but does not address Defendants' arguments that the statements are mere policy and legal disagreements. Even assuming the statements somehow reflects animus, *Regents* requires a plaintiff to plead both "contemporary statements" made by "[t]he relevant actors," 140 S. Ct. at 1916, and the cited article not only predates the rulemaking proceeding at issue but Mr. Severino's appointment.

Plaintiffs' concession that their equal protection claim "needs to be tested based on the administrative record," ECF No. 66 at 41, does not permit the Court to bypass Defendants' motion to dismiss.  The claim should be dismissed because it fails the Rule 12(b)(6) standard.

### 2.  Substantive Due Process

Plaintiffs fail to define a fundamental right that has been abridged, *see* ECF No. 41-42, so any substantive due process claim is subject to rational basis review, *see Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 712 (D.C. Cir. 2007), which is easily satisfied or merged with Plaintiffs' § 706(2)(A) claims to the extent they survive, *see supra*. Plaintiffs erroneously invoke *Reitman v. Mulkey*, 387 U.S. 369, 373 (1967), in which the Court found a California constitutional amendment impermissibly motivated by discriminatory racial animus violated the Equal Protection Clause. As described *supra*, Plaintiffs have not plausibly pleaded such a claim under *Regents* even assuming strict scrutiny were to apply. *Reitman*—the race discrimination grandparent to *Romer*—indicates that constitutional provisions prohibiting legislative entities from even considering certain antidiscrimination laws are highly suspect as they suggest a constitutional right to discriminate. Plaintiffs identify nothing in the 2020 Rule prohibiting covered entities from having policies in place that protect patients from LGBTQ discrimination that could make it similarly suspect. This line of cases explicitly rejects the notion that there can be a "constitutional violation on the mere repeal of" an antidiscrimination statute (which is not akin to anything HHS did in the 2020 Rule). *See Reitman*, 387 U.S. at 376. *Reitman* also does not call into question "put[ting] in statutory [or regulatory] form an existing policy of neutrality with respect to private discriminations," *id.*, which is more than the agency has done here.  HHS "decline[d] . . . to propose its own[] definition of 'sex' for purposes of discrimination on the basis of sex in the regulation" to ensure its rules can be construed consistently with the statute and "[b]ecause of the likelihood that the Supreme Court will be addressing the issue in the near future," after parts of the earlier regulatory definition had been vacated by a court, 84 Fed. Reg. at 27,857.  That reasonable choice does not violate the Constitution.

### 3.  Free Speech

Because the First Amendment "is a restraint on government action, not that of private persons," *CBS, Inc v. DNC*, 412 U.S. 94, 114 (1973), Plaintiffs fail to identify a single case where a court found a First Amendment violation based on the government's failure to regulate third

parties' conduct (even assuming that is akin to the challenged agency action), ECF No. 66 at 43-44, nor have Plaintiffs plausibly alleged facts supporting a claim that HHS took any of its actions with the intent to abridge anyone's speech. Even though First Amendment values may justify government regulation, "[t]he First Amendment does not reach acts of private parties in every instance where the Congress or [an agency] has merely permitted or failed to prohibit [certain] acts." *CBS*, 412 U.S. at 144. This claim must be dismissed.

### 4. Establishment Clause

It is well-established "that the political branches [can] shield religious exercise through legislative accommodation" without violating the Constitution. *See Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005). Plaintiffs' arguments have effectively been rejected in *Corp. for Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327 (1987). And even assuming that the regulation might be invalid (even though it would not) as applied to "an LGBTQ patient seek[ing] care in a rural area with only one hospital for miles," ECF No. 66 at 44, Plaintiffs' hypotheticals have no relevance to the facial change to the regulation that Plaintiffs bring. *See Edwards v. D.C.*, 755 F.3d 996, 1001 (D.C. Cir. 2014) ("To succeed in a typical facial attack, Appellants must establish 'that no set of circumstances exist under which the challenged regulations would be valid or that the statute lacks any plainly legitimate sweep.") (citation omitted) (cleaned up). In any event, Plaintiffs do not respond to Defendants' point that Plaintiffs' statutory claims are determinative on this question, as Plaintiffs do not challenge Section 1557 itself, so there is no circumstance in which this Court should reach this claim. *See* ECF No. 57-1 at 31.

### CONCLUSION

For the foregoing reasons, this Court should grant Defendants' motion to dismiss, as explained above.

Dated: January 19, 2021                      Respectfully submitted,

                                             JOHN V. COGHLAN
                                             Deputy Assistant Attorney General

Federal Programs Branch

MICHELLE R. BENNETT
Assistant Director, Federal Programs Branch

*/s/ Liam C. Holland*
LIAM C. HOLLAND
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, N.W.
Washington, D.C. 20530
(202) 514-4964
Liam.C.Holland@usdoj.gov

*Attorneys for Defendants*